**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 ([●]) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING
AND DIRECTING THE BANKS AND PAYMENT PROCESSORS
TO CEASE ANY HOLDS ON, OR REDIRECTION OF, CASH OR
RECEIVABLES OF THE DEBTORS, (II) AUTHORIZING THE DEBTORS TO
(A) CONTINUE USE OF THEIR EXISTING CASH MANAGEMENT SYSTEM, BANK
ACCOUNTS, AND BUSINESS FORMS, (B) CONTINUE INTERCOMPANY
TRANSACTIONS, (C) PAY RELATED OBLIGATIONS, AND
(D) PAY AND HONOR PROCESSING OBLIGATIONS,
(III) WAIVING CERTAIN INVESTMENT AND
DEPOSIT GUIDELINES, AND
(IV) GRANTING RELATED
RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (the "Motion"):[2]

**RELIEF REQUESTED**

1.     The Debtors seek entry of an interim order and a final order (respectively,

the "Proposed Interim Order" and "Proposed Final Order"), substantially in the forms attached

hereto as **Exhibit A** and **Exhibit B**, respectively, granting, among other things, the following

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Gary Richards in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the First Day Declaration.

relief:

  i. authorizing and directing the Banks and Payment processors to cease any holds on, or redirection of, cash or receivables of the Debtors;

  ii. authorizing, but not directing, the Debtors to:

    a. continue use of their existing cash management system, bank accounts, and business forms;

    b. continue intercompany transactions;

    c. pay obligations related thereto; and

    d. pay or otherwise honor the Processing Obligations (as defined below);

  iii. waiving certain investment and deposit requirements under the U.S. Trustee Guidelines (as defined herein); and

  iv. granting related relief, including scheduling a hearing to consider approval of the Motion on a final basis.

2. In support of this Motion, the Debtors rely on and incorporate the First Day Declaration and the *Declaration of Jeffrey Gasbarra*, filed contemporaneously herewith.

## JURISDICTION AND VENUE

3. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States

33418080.4

Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal bases for the relief requested in this Motion are sections 105, 345, 363, 364, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), rule 2002, 6003, 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 2015-2, 4001-3, 9013-1.

## BACKGROUND OF THE DEBTORS

6.      The Debtors operate a multi-space entertainment venue complex, specializing in large-scale live entertainment—concerts, festivals, corporate functions, and multimedia events—and are known for state-of-the-art audiovisual production, including a 2022 upgrade featuring one of the world's highest-resolution video walls.  The Debtors focus on industry-leading production capabilities, immersive audiovisual experiences, and status as one of North America's largest standing-room-only entertainment venues.

7.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

8.      Additional information regarding the Debtors' businesses, capital structures and circumstances preceding the Petition Date may be found in the First Day Declaration.

## THE CASH MANAGEMENT SYSTEM

### I.      Overview

9.      The Debtors operate a streamlined cash management system (the "Cash Management System"), an illustrative schematic of which is attached as **Exhibit C** to this Motion.

33418080.4

The Debtors use the Cash Management System to collect, transfer, and disburse funds, pay their financial obligations, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, ensure cash availability and liquidity, and to facilitate cash monitoring, forecasting, and reporting.[3]  The Cash Management System is narrowly tailored to meet the Debtors' operating needs while reducing administrative expenses.

10.    The Debtors maintain daily oversight over the Cash Management System and implement controls for entering, processing, and releasing funds. The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

11.    The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.

12.    Because of the nature and operation scale of the Debtors' business, any disruption to the Cash Management System could have an immediate and significant adverse effect on the Debtors' business and operations to the detriment of their estates and stakeholders. Accordingly, the Debtors request authority, but not direction, to continue using their existing Cash Management System during the pendency of these chapter 11 cases, subject to the terms described herein.

## II.    The Bank Accounts and Flow of Funds

13.    As of the Petition Date, the Debtors' Cash Management System consists of 12 bank accounts (each, a "Bank Account," and, collectively, the "Bank Accounts"), each of which is

---

[3] In the ordinary course of business, the Debtors may close existing accounts or open new accounts to facilitate their cash management needs.

33418080.4

identified on **Exhibit D**, attached hereto. All of the prepetition Bank Accounts used in the Cash Management System are maintained at J.P. Morgan Chase Bank, N.A. ("JPM").  Immediately prior to the Petition Date, however, to preserve the status quo, the Debtors opened an account with Flagstar Bank, N.A. ("Flagstar," and together with JPM, the "Banks"), which the Debtors intend to use as their primary operating account during these chapter 11 cases.  The schematic attached hereto as **Exhibit C** reflects both (a) the prepetition operation of the Debtors' Cash Management System and (b) how the Debtors intend to operate their Cash Management System during these chapter 11 cases. In the near term, the Debtors intend to open additional accounts with Flagstar to hold certain cash reserves associated with relief granted pursuant to interim orders entered in these chapter 11 cases.

14.    The Bank Accounts are further described in the following table:

| Active Debtor Bank Accounts | Account Description |
|---|---|
| x2368 (JP Morgan) | Avant Gardner, LLC's main account |
| x2376 (JP Morgan) | Avant Gardner, LLC's payroll account |
| x9907 (JP Morgan) | Avant Gardner, LLC's collection account |
| x7163 (JP Morgan) | EZ Festivals, LLC's operating account for payment of vendors |
| x0212 (JP Morgan) | Reynard Productions LLC's payroll account |
| x3576 (Flagstar) | AGDP Holding Inc. DIP Account |
| **Dormant / Inactive Accounts** | **Account Description** |
| x2589 | Inactive Account |
| x2509 | Inactive Account |
| x9923 | Inactive Account |
| x7353 | Inactive Account |
| x7601 | Inactive Account |
| x7906 | Inactive Account |

33418080.4

### III.    Disputes with Financiers

15.    As described further in the First Day Declaration, prior to the Petition Date, the Debtors entered into loan agreements with three parties to finance the renovations of The Brooklyn Mirage: TVT, Insta Funding, and Pinnacle.  As discussed below, Insta Funding increased collection efforts in the months leading up to the Petition Date which efforts, ultimately, led to a prejudgment lien attaching to the Bank Account ending in x2368, thereby blocking the Debtors' use of such account.  Additionally, the Debtors' food and beverage payment processor—Billfold (defined and described below)— remits the funds to a TVT lockbox account, and TVT for the TVT, Pinnacle, and Insta Funding loan.  TVT then remits any remaining balance to the Debtors. On the Petition Date, the Debtors rescinded their receivables redirection letter to Billfold and instructed Billfold to remit all net sales directly to the Debtors.  The Debtors dispute Insta Funding's, TVT's, and Pinnacle's claims and purported liens.

16.    In the week prior to the Petition Date, Insta Funding, TVT, and Pinnacle attempted to utilize an auto-debit feature of their respective loan agreements to debit over $1 million from the Debtors' accounts to TVT's lockbox account.  The funds currently remain in the Debtors' bank account as restricted cash.

17.    Following Insta Funding's collection activity against the Debtors, and the attachment of the prejudgment lien, the Prepetition Term Loan Lenders, who hold a validly perfected senior lien on the Bank Accounts and monies on deposit, exercised their rights under a deposit account control agreement ("DACA") and instructed the Bank to release the hold on the Debtors' Bank Accounts.  The Debtors must use their Bank Accounts to operate, and allowing a rogue creditor to paralyze the Debtors' operations would cripple these chapter 11 cases.

18.    Acknowledging their dispute over TVT's, Insta Funding's, and Pinnacle's claims, the Debtors intend to segregate and reserve (i) the amount that was in their Bank Accounts when

33418080.4

the Insta Funding prejudgment lien attached pending resolution of the parties' disputes, and (ii) any amounts received due to food and beverage sales pending the outcome of potential litigation against TVT, Pinnacle, and Insta Funding.[4]  Those amounts are not accounted for as available cash or receipts under the Approved Budget.  Segregating and restricting the amounts received due to food and beverage sales, pending the outcome of litigation, adequately protects any security interest that TVT, Pinnacle, or Insta Funding has in the or any other assets of the Debtors.  The funds held will be subject to the senior liens held by the Prepetition Term Loan Lenders and any other person or entity holding or asserting a security interest in such funds with the same order of priority as such liens attached to the applicable Bank Accounts.

## IV.    Bank Fees

19.    The Debtors incur periodic service charges and other fees related to the Cash Management System (collectively, the "Bank Fees"). The Debtors pay the Banks an aggregate of approximately $6,500 per month in Bank Fees, which are generally due and payable monthly.

20.    As of the Petition Date, the Debtors estimate that they owe approximately $6,500 in prepetition, unpaid Bank Fees, all of which will become due and payable within thirty (30) days of the Petition Date.  The Debtors request authority, but not direction, to continue paying Bank Fees, including the prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practice.

## V.    Intercompany Transactions

21.    The Debtors maintain an intercompany Cash Management System to help maintain bank accounts for operating, ticketing, and payroll (the "Intercompany System").

---

[4] While the Debtors do not believe that the financiers' attempt to auto-debit the Debtors' Bank Account was successful, to the extent any cash leaves the account on account of such claim, the Debtors will credit such amount towards any amount that the Debtors would otherwise segregate and restrict pursuant to this motion. The Debtors reserve all rights to recover any amounts debited by such auto-debit feature.

33418080.4

22.     Through the Intercompany System, the Debtors maintain relationships with each other and occasionally engage in transactions (the "Intercompany Transactions") that result in intercompany receivables and payables among the Debtors (the "Intercompany Balances").  As such, there may periodically be Intercompany Balances owing by one Debtor to another Debtor.

23.     The Debtors seek authority, but not direction, to continue Intercompany Transactions in the ordinary course of business consistent with historical practice.

## VI.     Payment Processors

24.     The Debtors sell various goods and services in the ordinary course of business and accept payment from their customers through various payment methods via different processors.[5] The Debtors are party to certain agreements (the "Payment Processing Agreements") with the applicable payment processors (the "Payment Processors").   Under the Payment Processing Agreements, the Debtors generally receive gross proceeds of customer purchases, less any chargebacks, returns, reserves, and/or processing fees debited from the payment balance by the Payment Processors, and such proceeds are swept to the main bank account or held in an escrow account.   The Payment Processors charge processing fees between 2.7%-2.9%[6] of the total transaction value (the "Processing Fees").  While the Debtors believe that they are current on all Processing Fees, certain *de minimis* prepetition Processing Fees may become due and payable within thirty (30) days of the Petition Date.  The following table summarizes which Payment Processors handle certain good and services:

---

[5] The Debtors have also filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Maintain and Administer Certain Customer Programs and Practices, (II) Authorizing Debtors to Pay and Honor Related Prepetition and Postpetition Obligations, and (III) Granting Related Relief* seeking relief to continue providing customer refunds in the ordinary course of business.

[6] Certain Payment Processors also charge a flat fee of $0.28 per transaction in addition to the percentage fee.

33418080.4

| Good or Service | Payment Processor |
|---|---|
| Tickets sold in advance | DICE |
| Tickets sold on site | Square |
| Food and beverage | Billfold |
| Table sales deposits | Seven Rooms / Stripe |
| Table sales balance | Toast |
| Artist merchandise | Square |

25.    **DICE**. The Debtors utilize the services of DICE FM, Inc. ("DICE") to process advance ticket sales pursuant to a Payment Processing Agreement.  When a customer purchases a ticket through DICE, they pay the ticket price and fees.  After DICE takes its fee, the remainder of the funds are remitted to a Stripe[7] escrow account that is owned by the Debtors (the "DICE Escrow Account").  Sales and refunds are reported on a biweekly basis, and if the net balance of sales and refunds results in a payable to the Debtors, then 97% of the amount is released from the DICE Escrow Account to the Debtors.  The remaining 3% is held for a 90-day period to cover additional refunds, and subsequently remitted to the Debtors.

26.    **Square**. The Debtors utilize the services of a different Payment Processor, Square Capital, LLC, a/k/a Block, Inc. ("Square") to collect payments from customers for tickets sold at the door and for merchandise sales.  Prior to the Petition Date, the Debtors received a notice from Square that Insta Funding had sent Square a UCC-1 filing, and therefore Square would no longer remit amounts owed to the Debtors absent a lien release or court order.  The Debtors must use their Square to collect payments from customers and retain the estate's property.

27.    **Billfold**. The Debtors sell food and beverage exclusively through another payment processor, Billfold, LLC ("Billfold").  In conjunction with Billfold, the Debtors operate a unique wristband payment system for food and beverage at the venues, significantly reducing customers' waiting time.  Customers load credit on their Billfold wristband using cash or other payment

---

[7] Stripe, Inc. ("Stripe") is a financial infrastructure platform that provides payment processing software for businesses.

methods, and the Billfold wristband is linked to the customer.  Billfold's processing fees are approximately 2.75% of point-of-sale sales and $0.28 per transaction, and on average, the Debtors pay approximately $50,000 per month in Billfold processing fees.  Billfold also retains a refund account of 0.5% of total payments that is used to process customer refunds.

28.      As noted above, since the Debtors entry into agreements with TVT and Pinnacle, Billfold has remitted the funds to a TVT lockbox account.  Also as noted above, while prosecuting their dispute of TVT's and Pinnacles' claims during these chapter 11 cases, the Debtors have directed Billfold to remit funds from food and beverage sales directly to the Debtors, which the Debtors will then place into a segregated and restricted Bank Account pending the outcome of the dispute.

29.      **SevenRooms, Toast, & Square.**   The remaining Payment Processors are SevenRooms, Toast, Inc. ("Toast"), and Square.  SevenRooms is a reservation service that the Debtors utilize for planning and coordinating table reservations.  When a customer reserves a table through SevenRooms, their deposit is then processed through Stripe.  From there, 75% of the customer's deposit goes to the Debtors' accounts and 25% is held by Stripe as a reserve for refunds.  Any remaining balance that the customer incurs while on-site is paid and processed through Toast.[8] If tables are paid for by walk-up, such as when the customer does not have a reservation, then all payments are processed through Toast.

30.      **Chargebacks**.  When a customer returns a good or service purchased from the Debtors or disputes a charge with a Payment Processor, the Debtors may, in certain circumstances, be obligated to refund to the Payment Processor the value of the purchase (the "Chargebacks", and together with the Processing Fees, the "Processing Obligations").  The Debtors generally satisfy

---

[8] Toast is a point-of-sale restaurant hardware and software service.

Chargebacks by netting (i.e., setting off) the applicable amount charged against payments owed to the Debtors by a Payment Processor. However, it is possible that certain Processing Obligations that the Debtors incurred before the Petition Date may not have been netted, either in full or in part, against payments owed to the Debtors by the Payment Processors before the Petition Date.[9]

31.    To avoid disruption to the vital services provided by the Payment Processors, the Debtors seek authority, but not direction, to continue honoring the Payment Processing Agreements and Processing Obligations, and any obligations related thereto, whether arising pre- or post-petition, in the ordinary course and consistent with past practices.

32.    It is also essential to the continued operation of the Debtors' business that they be able to continue to accept all forms of payment. Any interruption in the Debtors' ability to continue accepting all forms of payment or paying or otherwise honoring the Processing Obligations would irreparably damage the value of their businesses. By this Motion, the Debtors are requesting authority to allow the Payment Processors to continue to administer the non-cash payments and set off any Chargebacks against amounts owed to the Debtors, whether the Debtors incurred such Chargebacks before, on, or after the Petition Date; provided that the Chargebacks are offset against amounts owed to the Debtors solely in accordance with the terms of the applicable Payment Processing Agreement. For example, certain Payment Processing Agreements do not provide for, or limit, such setoff, and the Debtors are not granting the Payment Processors any additional rights than they otherwise have under the applicable Payment Processing Agreement.

## VII.    Business Forms and Books & Records

33.    As part of the Cash Management System, the Debtors utilize a number of preprinted

---

[9] DICE may have a prepetition claim against the Debtors on account of unrelated transactions. The Debtors are not seeking authority to repay that prepetition claim, and any attempt by DICE to recover that claim through the payment processing transactions with the Debtors would be an impermissible setoff and violate the automatic stay.

33418080.4

business forms (the "Business Forms"), including, but not limited to, letterhead, purchase orders, invoices, and preprinted and future checks. The Debtors also maintain books and records to document their financial results and a wide array of operating information (the "Books & Records").

34.    To avoid significant disruption to their business operations and to minimize administrative expenses to their estates, the Debtors request authorization to continue using all of the Business Forms and Books & Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession, and to, upon exhaustion of the Debtors' existing supply of checks, to reorder (or with respect to checks the Debtors or their agents print themselves) checks that include the "Debtor in Possession" designation and corresponding bankruptcy case number(s).

## VIII.    Compliance With the Bankruptcy Code and U.S. Trustee Guidelines

35.    Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  To comply with section 345 of the Bankruptcy Code, the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") for the United States Trustee for the District of Delaware (the "U.S. Trustee") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with certain requirements set by the U.S. Trustee. For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking

33418080.4

of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the court "for cause" orders otherwise. 11 U.S.C. § 345(a)–(b).

36.     As of the Petition Date, the Debtors believe that all the Bank Accounts are maintained at a financial institution that has executed a uniform depository agreement with, and is designated as authorized depositories ("<u>Authorized Depositories</u>") by, the U.S. Trustee pursuant to the U.S. Trustee Guidelines. *See* USTP Region 3 Authorized Depository Institutions, June 30, 2025 (available at https://www.justice.gov/ust/ust-regions-r03/page/file/1582216/dl) at 6 (listing JPMorgan Chase Bank).  The Bank at which the Bank Accounts are held is highly rated, nationally chartered banks that are subject to supervision by national banking regulators.

37.     Although the Bank Accounts are maintained at an Authorized Depositories, and that the existing Cash Management System therefore complies with the requirements of section 345(b) of the Bankruptcy Code, the Debtors request, out of an abundance of caution, that the Court waive the requirements of section 345(b) of the Bankruptcy Code on an interim basis and permit them to maintain their deposits in the Bank Accounts in accordance with the Debtors' existing deposit practices.

## BASIS FOR RELIEF REQUESTED

**I.      The Court Should Authorize and Direct the Banks and Payment Processors to Cease any Holds on, or Redirection of, Cash or Receivables of the Debtors.**

38.     As described above, Billfold has been redirecting receivables from the Debtors to a TVT lockbox account to pay amounts owed by the Debtors on account of usurious loans to TVT, Pinnacle, and Insta Funding.  As of the Petition Date, the Debtors have rescinded that receivables redirection letter and instructed Billfold to remit funds directly to the Debtors.

39.     Accounts receivable and cash in the Debtors' deposit accounts are undoubtedly property of the estate. *See In re Alert Holdings, Inc.*, 148 B.R. 194, 203 (Bankr. S.D.N.Y. 1992)

("Just as executory contracts are property of the estate, so, too, are accounts receivable [and] rights of action to recover accounts receivable...."); *In re West Nottingham Academy in Cecil Cty.*, 662 B.R. 103, 111 & n.12 (Bankr. D. Md. 2024) (deposit accounts are property of the estate, and receivables remained are debtor's property even if lienholder sends notice redirecting payment). Any attempt to collect debts from property of the estate is prohibited by the automatic stay.  11 U.S.C. § 362(a)(6).  Allowing TVT to redirect future receivables (which are property of the estate) to pay its own prepetition debts would violate the automatic stay and result in unfair treatment of similarly-situated creditors.  Further, Square must be ordered to lift a hold on the account to ensure that payments from customers (property of the estate) are not garnished for a prepetition creditor.

40.     In the interest of preserving the status quo, the Debtors have agreed to segregate and restrict the amount that was in their Bank Accounts when the Insta Funding prejudgment lien attached. As explained above, Insta Funding's prejudgment lien would not extend to any amounts that enter the Bank Accounts after the Petition Date due to the automatic stay under 11 U.S.C. § 362.  The Debtors believe that segregating and restricting the amount that was present when the lien arose pre-petition adequately protects any security interest that Insta Funding has in the account.  Accordingly, the Court can authorize and direct the Banks to release holds on the Bank Accounts.

41.     The Debtors have also agreed to segregate and restrict any amounts received due to food and beverage sales pending the outcome of potential litigation against TVT, Pinnacle, and Insta Funding.  Those amounts are not accounted for as receipts under the Approved Budget.  Segregating and restricting the amounts received due to food and beverage sales, pending the outcome of litigation, adequately protects any security interest that TVT, Pinnacle, or Insta Funding has in the receivables or any other assets of the Debtors, so the Court can authorize and direct the Payment Processors (including Billfold) to cease any redirection of receivables to the extent such redirection continues after the

Petition Date.

42.    While not an issue the Court must resolve for purposes of this motion, there are numerous substantive reasons why Insta Funding's attempted attachment will ultimately fail.

43.    *First*, the prejudgment attachment is patently avoidable as a preferential transfer because the prejudgment lien was on account of an antecedent debt (the Insta Funding financing) and was transferred to Insta Funding within 90 days of the Petition Date. *See* 11 U.S.C. § 547.

44.    *Second*, the prejudgment attachment is likewise avoidable pursuant to the Debtors' strong-arm powers under section 544 of the Bankruptcy Code because it is unperfected. *See In re Savidge*, 57 B.R. 389, 390 (D. Del. 1986) (prejudgment lien must be perfected by subsequent judgment, and intervening bankruptcy serves to dissolve the prejudgment lien).

45.    *Third*, Insta Funding is a junior creditor whose lien attached to the Debtors' Bank Accounts well after perfection of the liens held by the Prepetition Agent on behalf of the Prepetition Term Loan Lenders via a DACA. Because the Prepetition Agent (on behalf of the Prepetition Term Loan Lenders) has priority by virtue of being perfected through control of the Debtors' Bank Accounts, the junior lienholder cannot exercise its attachment on the Bank Accounts. *See* N.Y. U.C.C. § 9-327(a) (secured party having control of a deposit account has priority over a conflicting security interest held by a secured party without control).

46.    The appellate court in *Wulco, Inc. v. O'Gara Group, Inc.* faced this exact issue and dissolved the junior creditor's attachment lien. 228 N.E.3d 167 (Ct. App. Ohio 2023). In *Wulco*, a court issued a default judgment against the defendant, which the plaintiff subsequently used to garnish the defendant's bank accounts at JPMorgan Chase Bank. *Id.* at 169. One of the defendant's lenders (Monroe) intervened and proved that it had a prior DACA with the defendant and JPMorgan Chase Bank. *Id.* at 170. The appellate court both held that because Monroe had a

perfected security interest in the deposit accounts with priority over the plaintiff's judgment lien, the plaintiff's judgment lien could not be used to garnish the defendant's accounts, and the money had to remain in the account. *Id.* at 180.

47. *Finally*, even if the attachment lien would be valid on pre-petition amounts in the Debtors' Bank Accounts, the Bank Accounts should not be frozen post-petition and the Debtors should be able to operate the Bank Accounts and use any funds that are deposited into the account post-petition. Otherwise, the Bank and Insta Funding would be violating the automatic stay by continuing to withhold funds from the Debtors after the Petition Date. See 11 U.S.C. § 362(a)(3) (automatic stay prohibits a creditor from exercising control over property of the estate). The Debtors' Bank Accounts are property of the estate, and any post-petition activities to hinder the Debtors from being able to access the funds that are deposited in their Bank Accounts after the Petition Date violates the automatic stay. *See, e.g., Franchise Tax Bd. v. Roberts* (*In re Roberts*), 175 B.R. 339, 343 (9th Cir. B.A.P. 1994) (creditor must stop garnishing funds upon bankruptcy); *In re Manuel*, No. 14-53487, 2014 WL 7405571, at *2 (Bankr. E.D. Mich. Dec. 24, 2014) (same); *In re Bailey*, 428 B.R. 694, 699 (Bankr. N.D.W. Va. 2010) (same).

48. Accordingly, the Debtors request that the Court authorize and direct Banks and Payment Processors (including Square) cease any holds on, or redirection of, cash or receivables of the Debtors. The Debtors further request that the Court authorize and direct JPMorgan Chase Bank to release any and all holds on the Debtors' Bank Accounts.

## II. The Court Should Authorize the Debtors to Continue to Use the Cash Management System.

49. The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor-in-possession accounts at an authorized depository; (b) establish one debtor-in-possession bank account for all estate monies requires for

the payment of taxes, including payroll taxes; (c) physically set aside monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the chapter 11 case; (e) use new business forms indicating the debtor in possession status of the chapter 11 debtor, including checks that bear the designation of "debtor in possession" and reference the bankruptcy case number and type of account on such check; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement. *See* U.S. Trustee Guidelines.

50.    These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims. Considering the complexity of the Debtors' business and financial affairs and the need to collect, disburse, and move funds through the Cash Management System, enforcing these provisions of the U.S. Trustee Guidelines during these chapter 11 cases would risk meaningfully disrupting the Debtors' operations and business.

51.    Accordingly, assuming that the Debtors gain access to their Bank Accounts and Cash Management System, the Debtors request that the Court allow them to continue to use, designate, maintain, and close any or all Bank Accounts that comprise the Cash Management System, as each was maintained in the ordinary course of business before the Petition Date.

52.    Maintaining the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of this section is to provide a debtor with the flexibility to engage in the ordinary course transactions required to operate its business without unnecessary oversight by its creditors or the court. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed

to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (citations omitted); *In re Vision Metals, Inc.*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions" necessitated by a debtor's cash management system. *See, e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a reluctance to interfere in a debtor's routine, day-to-day business decisions) (citations omitted); *Vision Metals*, 325 B.R. at 142 ("[W]hen a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business.").

53.     Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter[.]" *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993). The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Id.*

54.     Additionally, the Court may rely on its equitable powers to grant the relief requested herein. Specifically, section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgement that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code and the doctrine of necessity, the Court may exercise its broad grant of equitable powers to approve this Motion,

including the payment of prepetition obligations when such payment is essential to the continued operation of a debtor's business. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11"). Therefore, it is within the Court's equitable powers under section 105(a) of the Bankruptcy Code to approve the continued use of the Cash Management System.

55.     The Cash Management System constitutes an important business practice that provides flexibility to the Debtors. Accordingly, the continued use of the Cash Management System without interruption is useful to the Debtors' pursuit of the sale process, ongoing business operations, and the success of these chapter 11 cases.

56.     Requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be unnecessary. The Cash Management System provides the Debtors with the ability to, *inter alia*, track the location and amount of funds. By contrast, maintaining the current Cash Management System will minimize delays in paying postpetition debts and eliminating administrative inefficiencies.

57.     Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtor entities will not make unauthorized payments on account of prepetition obligations and will implement procedures to mark prepetition and postpetition payables, splitting invoices that cover both the prepetition and postpetition periods, and stopping automatic payments on prepetition obligations. The Debtors will continue to work closely with

their advisors and the Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval. In light of such protective measures, maintaining the Cash Management System is in the best interests of the Debtors' estates, creditors, and all parties in interest.

58.     In addition, the Debtors respectfully request that the Court authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees. In light of the material benefit of maintaining the Cash Management System in order to avoid unnecessary disruption and costly delay, especially as compared to the relatively modest amount of the Bank Fees, such relief is warranted under the circumstances.

59.     Accordingly, the Debtors request authority, but not direction, to continue using the Cash Management System, including maintaining, servicing, and administering the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Banks to have drawn, issued, or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court. If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts necessary to preserve the value of the Debtors' Non-Debtor Affiliates and subsidiaries, which would jeopardize the Debtors' restructuring and result in unnecessary disruption to their business operations and additional costs to their estates.

III.    **The Court Should Authorize the Debtors to Continue to Use Their Existing Business Forms and Books & Records.**

60.     To avoid disrupting the Cash Management System and incurring unnecessary expenses, the Debtors request authority, but not direction, to continue to use the Business Forms substantially in the form existing immediately before the Petition Date, without reference to their

status as debtors in possession. Parties in interest will not be prejudiced by this relief and undoubtedly will be aware of their status as debtors in possession. Thus, changing the Business Forms is unnecessary and would be unduly burdensome. In accordance with Local Rule 2015-2, once the Debtors have exhausted their existing stock of Business Forms, the Debtors will ensure that any new Business Forms are clearly labeled "Debtor in Possession" as soon as it is reasonably practicable to do so.

### IV. Authorizing the Debtors to Continue Using Debit, Wire, Credit Card, and ACH Payments Is Warranted.

61. The Debtors request relief from the U.S. Trustee Guidelines to the extent such guidelines require the Debtors to make all disbursements by check. Implementing the U.S. Trustee Guidelines would needlessly impair the Debtors' efforts to preserve the value of their estates. Thus, the Debtors request authority, but not direction, to continue using the Cash Management System, including receiving, processing, honoring, and paying any and all checks, ACH transfers and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto. Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

62. The Debtors also request that the Court authorize and direct the Banks to receive, process, honor, and pay any and all checks, electronic fund transfers, credit cards, ACH payments, and other instructions, and drafts payable through, or drawn directed on, such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, electronic fund transfers, credit card, or ACH payments are dated prior or subsequent to the Petition Date. The Debtors also request that, to the

33418080.4

extent a Bank honors a prepetition check or other item drawn on any account either (a) at the direction of the Debtors or (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Bank will not be deemed to be liable to the Debtors or their estates on account of such prepetition check or other item honored postpetition. This relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

63.     Moreover, the Debtors request authority, but not direction, to authorize the Banks to (a) continue to charge the Debtors the Bank Fees, as applicable, and (b) charge back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business and only to the extent consistent with historical practices.

## V.     The Court Should Authorize the Debtors to Continue Engaging in Postpetition Intercompany Transactions and Grant Administrative Expense Status to Postpetition Intercompany Transactions.

64.     Allowing the Debtors to engage in postpetition Intercompany Transactions is in the best interests of the Debtors' estates and their creditors, and the Debtors seek authority to enter into such Intercompany Transactions in the ordinary course of business. If the Intercompany Transactions were to be discontinued, the Cash Management System and related controls might be disrupted. The Debtors' continued performance of the Intercompany Transactions on a postpetition basis is in the best interests of the Debtors, their creditors, and other parties in interest.

65.     The Debtors, moreover, will continue to maintain records of such Intercompany Transactions. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls could be disrupted to the detriment of the Debtors and their estates. Accordingly, the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

33418080.4

66.    Because certain of the Intercompany Transactions might represent extensions of intercompany credit that are an important component of the Cash Management System, the Debtors request the authority, but not direction, to continue conducting Intercompany Transactions postpetition in the ordinary course of business without further Court order. The Debtors further request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition payments on account of postpetition Intercompany Transactions between or among the Debtors or their Non-Debtor Affiliates that give rise to an Intercompany Claim be accorded administrative expense status, which would result in an administrative expense claim in favor of the applicable Debtor payer. This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors. For the avoidance of doubt, the relief requested herein with respect to the postpetition Intercompany Transactions and the Intercompany Balances resulting therefrom shall not constitute an admission of the Debtors or any other party as to the validity, priority, or status of any prepetition Intercompany Balance or the Intercompany Transaction(s) from which such Intercompany Balance may have arisen.

## VI.    The Court Should Authorize the Debtors to Pay and Honor Processing Obligations.

67.    The Debtors request authority to continue to perform under the Payment Processing Agreements in the ordinary course of business, and to pay, honor, or deduct from the appropriate account, the Processing Obligations. Payment of the Processing Obligations will minimize disruption to the Debtors' operations and is therefore in the best interests of their estates. Absent payment of the Processing Obligations, the Payment Processors might assert setoff rights against the funds that are being processed, freeze the funds, and/or refuse to provide banking and payment processing services to the Debtors.

33418080.4

68.     Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority, in their sole discretion, to pay and/or reimburse the Payment Processors in the ordinary course of business for any Processing Obligations arising prior to or after the Petition Date.  Further, the Debtors seek authority to allow the Payment Processors to continue to administer the non-cash payments and set off any Chargebacks against amounts owed to the Debtors, whether the Debtors incurred such Chargebacks before, on, or after the Petition Date; provided that the Chargebacks are offset against amounts owed to the Debtors solely in accordance with the terms of the applicable Payment Processing Agreement.[10]

## VII.    Waiving of the Requirements of Section 345(b) of the Bankruptcy Code is Warranted.

69.     As explained above, the Debtors believe that the existing Cash Management System complies with the requirements of section 345 of the Bankruptcy Code.  However, out of an abundance of caution, to the extent the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code or the U.S. Trustee Guidelines, the Debtors seek a waiver of such requirements and as set forth herein.

70.     Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of estate money, such as cash, during a chapter 11 case and authorizes deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested

---

[10] DICE may have a prepetition claim against the Debtors on account of unrelated transactions.  The Debtors are not seeking authority to repay that prepetition claim, and any attempt by DICE to recover that claim through the payment processing transactions with the Debtors would be an impermissible setoff and violate the automatic stay.

33418080.4

a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise." 11 U.S.C. § 345(b). In addition, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at an authorized depository that agrees to comply with the U.S. Trustee's requirements. *See* U.S. Trustee Guidelines.

71.     Courts may waive compliance with section 345 of the Bankruptcy Code for "cause." 11 U.S.C. § 345(b). Local Rule 2015-2(b) provides that if a motion for a waiver of the restrictions imposed by section 345(b) of the Bankruptcy Code "is filed on the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant an interim waiver until a hearing on the debtor's motion can be held." Del. Bankr. L. R. 2015-2(b). As this Motion is being filed on the Petition Date and the Debtors have in excess of 200 creditors, the Debtors request that the Court enter an order waiving, on an interim basis, the requirements of section 345(b) of the Bankruptcy Code.

72.     Accordingly, the Court should authorize the Debtors to continue to deposit funds in the Bank Accounts and, to the extent that the requirements of section 345 of the Bankruptcy Code are inconsistent with these practices, the Debtors request a thirty-day (30-day) period following entry of an interim order to: (a) come into compliance with their obligations under section 345(b) of the Bankruptcy Code; (b) otherwise reach agreement with the U.S. Trustee, without prejudice to the Debtors' right to seek an extension of such period; or (c) return to the Court to argue that cause exists to waive the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines to the extent such requirements remain inconsistent with the Debtors' cash management practices.

## DEBTORS' BANKS SHOULD BE AUTHORIZED TO
## HONOR CHECKS AND ELECTRONIC FUNDS TRANSFERS

73.     The Debtors anticipate having sufficient funds to pay the amounts described in this

Motion, including by virtue of the DIP Financing.  In addition, under the Debtors' existing cash

management system, the Debtors can readily identify checks or wire transfer requests as relating

to an authorized payment pursuant to this Motion.  Therefore, the Debtors respectfully request that

the Court authorize all applicable financial institutions to receive, process, honor, and pay any and

all checks or wire transfer requests in respect of the relief requested in this Motion.  Any such

financial institution may rely on the representations of such Debtors as to which checks are issued

or wire transfers are made (or, as applicable, requested to be issued or made) and authorized to be

paid in accordance with this Motion without any duty of further inquiry and without liability for

following the Debtors' instructions.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

74.     The Debtors assert that immediate relief is necessary to avoid immediate and

irreparable harm. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days

after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid

immediate and irreparable harm." For the reasons discussed above, entry of the Proposed Interim

Order is integral to the Debtors' ability to successfully transition into chapter 11 and run an orderly

sale. Specifically, the relief requested is necessary to avoid a severe disruption of the Debtors' sale

process and operations at this critical juncture and, in turn, to preserve and maximize the value of

the Debtors' estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they

have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and,

therefore, respectfully requests that the Court approve the relief requested in this Motion.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

75.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximization process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

76.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or non-bankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## NOTICE

77.     Notice of this Motion has been provided to: (a) the Office of the United States

33418080.4

Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent under the Prepetition Financing Agreement and the DIP Facility; (d) counsel to the DIP Lenders and Prepetition Term Loan Lender; (e) counsel to LiveStyle; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) counsel to TVT, Insta Funding, and Pinnacle, and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of the Interim Order and the Final

Order, substantially in the form attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting

the relief requested herein and granting such other relief as is just and proper.

Dated:    August 4, 2025
          Wilmington, Delaware

                        **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

                        */s/ S. Alexander Faris*

                        Sean M. Beach (No. 4070)
                        Edmon L. Morton (No. 3856)
                        Kenneth J. Enos (No. 4544)
                        S. Alexander Faris (No. 6278)
                        Sarah Gawrysiak (No. 7403)
                        Evan S. Saruk (No. 7452)
                        1000 North King Street
                        Rodney Square
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253
                        Email:   sbeach@ycst.com
                                  emorton@ycst.com
                                  kenos@ycst.com
                                  afaris@ycst.com
                                  sgawrysiak@ycst.com
                                  esaruk@ycst.com

                        *Proposed Counsel to the Debtors and Debtors in Possession*

33418080.4

**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 ([•]) |
| Debtors. | (Jointly Administered) |
| | **Ref: Docket No. [•]** |

**INTERIM ORDER
(I) AUTHORIZING AND
DIRECTING THE BANKS AND
PAYMENT PROCESSORS TO CEASE
ANY HOLDS ON, OR REDIRECTION OF,
CASH OR RECEIVABLES OF THE DEBTORS,
(II) AUTHORIZING THE DEBTORS TO (A) CONTINUE
USE OF THEIR EXISTING CASH MANAGEMENT SYSTEM, BANK
ACCOUNTS, AND BUSINESS FORMS, (B) CONTINUE INTERCOMPANY
TRANSACTIONS, (C) PAY RELATED OBLIGATIONS, AND (D) PAY AND HONOR
PROCESSING OBLIGATIONS, (III) WAIVING CERTAIN INVESTMENT AND
DEPOSIT GUIDELINES, AND (IV) GRANTING RELATED RELIEF**

Upon the motion ("Motion")[2] of AGDP Holding Inc., and its debtor affiliates, as debtors

and debtors in possession (collectively, the "Debtors"), for entry of an interim order (this "Interim

Order") (i) authorizing and directing the Banks and Payment Processors to cease any holds on, or

redirection of, cash or receivables of the Debtors, (ii) authorizing, but not directing, the Debtors

to: (a) continue use of their existing cash management system, bank accounts, and business forms;

(b) continue intercompany transactions; (c) pay obligations related thereto; and (d) pay or

otherwise honor the Processing Obligations; (iii) waiving certain investment and deposit

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431).  The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Motion.

requirements under the U.S. Trustee Guidelines; and (iv) granting related relief, including scheduling a hearing to consider approval of the Motion on a final basis; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for a hearing on the Motion having been given; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.        The relief requested in the Motion is GRANTED on an interim basis as set forth herein.

2.        The final hearing on the Motion shall be held on [•], 2025 at [•] (prevailing Eastern Time) (the "Final Hearing").  Any objections or responses to entry of the proposed final order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on [•], 2025, and shall be served on (a) the Debtors, 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel; (b) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, DE, Attn: Sean M. Beach (sbeach@ycst.com), S. Alexander Faris (afaris@ycst.com) and Evan S. Saruk (esaruk@ycst.com); (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jonathan W. Lipshie

(Jon.Lipshie@usdoj.gov); and (d) counsel to any statutory committee appointed in these chapter 11 cases.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter a final order without need for the Final Hearing.

3.      The Debtors are authorized to segregate and restrict (a) the amount that was in their Bank Accounts when the Insta Funding prejudgment lien attached and (b) any amounts received due to food and beverage sales pending the outcome of potential litigation against TVT, Pinnacle, and Insta Funding; *provided, however*, that all such segregated and restricted funds shall be subject to the prepetition liens on the Bank Accounts held by third parties, including the senior liens held by the Prepetition Term Loan Lenders, in the same order of priority as existed prepetition.  All Banks and Payment Processors (including DICE, Billfold, Square, and Stripe) are authorized and directed to cease any holds on, or redirection of, cash or receivables of the Debtors.  JPMorgan Chase Bank, N.A. is authorized and directed to release any and all holds on the Debtors' Bank Accounts.

4.      The Debtors are authorized, but not directed, to: (a) designate, maintain, and continue to use their Cash Management System as described in the Motion and honor any obligations related to the use thereof; (b) designate, maintain, close, and continue to use any or all of their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on Exhibit D attached to the Motion, in the names and with the account numbers existing immediately before the Petition Date; (c) deposit funds in and withdraw funds from the Bank Accounts by all the usual means, including checks, electronic fund transfers, ACH transfers, and other debits or electronic means; (d) treat their prepetition Bank Accounts, for all purposes, as debtor in possession accounts; and (e) open new debtor in possession accounts in accordance with the terms set forth herein; *provided* that in the case of each of (a) through (e), such action is taken in the ordinary course of business and consistent with past practice.  The relief granted in this Interim

Order is extended to any new bank account opened by the Debtors in the ordinary course of business after the date hereof, which account shall be deemed a Bank Account, and to the bank at which such account is opened, which bank shall be deemed a Bank, in each case, pursuant to this Interim Order.

5.      The Debtors are authorized, but not directed, to: (a) enter into and engage in the Intercompany Transactions and to take any actions related thereto on the same terms as, and materially consistent with, the Debtors' operation of the business in the ordinary course during the prepetition period.  In connection therewith, the Debtors shall continue to maintain current records with respect to all transfers of cash so that all transactions, including the Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.

6.      The Debtors are authorized, but not directed, to set off mutual postpetition obligations relating to intercompany receivables and payables through the Cash Management System. In connection therewith, the Debtors shall continue to maintain current records with respect to all transfers of cash so that all transactions, including Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.  Each payment (or other transfer of cash, whether to or from the Debtors) from a Debtor to another Debtor under any Intercompany Transaction is hereby accorded administrative expense status under section 503(b) of the Bankruptcy Code.

7.      The Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of (or on behalf of) each Debtor, regardless of which entity actually makes such disbursements.

8.      The Debtors are authorized, but not directed, to continue using, in their present

33418080.4

4903-2948-2838v.21

form, the Business Forms, as well as checks and other documents relating to the Bank Accounts existing immediately before the Petition Date, and maintain and continue using, in their present forms, the Books & Records; *provided* that once the Debtors have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled with the "debtor in possession" designation and the lead chapter 11 case number as soon as reasonably practicable to do so. To the extent the Debtors print any new checks or use any electronic Business Forms, they shall include the "debtor in possession" designation and the lead chapter 11 case number on all such checks and soon as reasonably practicable.

9.     The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course of business consistent with past practice, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on the Debtor Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order; *provided* that the Debtors shall only instruct or request any Bank to pay or honor any check, draft, or other payment item issued on a Bank Account prior to the Petition Date but presented to such Bank for payment after the Petition Date as authorized by an order of the Court.

10.     The Banks are authorized, without further order of this Court, to charge or deduct, and the Debtors are authorized to pay, honor, or satisfy any reasonable Bank Fees or charges associated with the Bank Accounts in the ordinary course and consistent with past practice.

11.     The Banks are authorized, without further order of this Court, to charge back to the

appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services, or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

12.     The Payment Processors and the Debtors are authorized, but not directed, to continue to perform under the Payment Processing Agreements without interruption and in the usual and ordinary course, and are authorized to receive, process, and disburse all prepetition and postpetition Service Charges to the Debtors in the ordinary course in accordance with the Payment Processing Agreements in a manner consistent with past practices.

13.     The Debtors are authorized, but not directed, to pay any prepetition Processing Obligations and to continue paying the Processing Obligations in the ordinary course of business pursuant to the terms of the Payment Processing Agreements in a manner consistent with past practices.

14.     In connection with the Processing Obligations, the Payment Processors are authorized to setoff and recoup chargebacks, refunds, and other amounts payable to the Payment Processors by the Debtors, whether arising before or after the Petition Date, against amounts payable to the Debtors by the Payment Processors and amounts held in reserve by the Payment Processors, whether arising before or after the Petition Date; provided that the chargebacks, refunds, and other amounts payable to the Payment Processors by the Debtors are offset against amounts owed to the Debtors solely in accordance with the terms of the applicable Payment Processing Agreement.

15.     The Debtors shall serve a copy of this Interim Order on all Banks as soon as

practicable after entry of this Interim Order, and upon any bank at which the Debtors open a new bank account as soon as practicable upon the opening of the new account.

16.     All banks maintaining any of the Debtor Bank Accounts that are provided with notice of this Interim Order shall not honor or pay any bank payments drawn on the listed Debtor Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue timely stop payment orders in accordance with the documents governing such Debtor Bank Accounts.

17.     Subject to the terms set forth herein, any bank, including the Banks, may rely upon the representations of the Debtors with respect to whether any check, draft, wire, or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to any order of this Court, and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Interim Order (a) at the direction of the Debtors, (b) in a good-faith belief that this Court has authorized such prepetition check or item to be honored, or (c) as a result of a mistake made despite implementation of reasonable customary handling procedures, shall be deemed to be nor shall be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item being honored postpetition, or otherwise deemed to be in violation of this Interim Order.

18.     Any banks, including the Banks, are further authorized to honor the Debtors' directions with respect to the opening and closing of any Bank Account and accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; *provided* that the Banks shall not have any liability to any party for relying on such representations to the extent such reliance otherwise complies with applicable law.

19.     For the Banks at which the Debtors hold Bank Accounts that are party to a Uniform

Depository Agreement with the U.S. Trustee, as soon as practicable after entry of this Interim Order, the Debtors shall (a) contact such bank, (b) provide such bank with each of the Debtors' employer identification numbers, and (c) identify each of their Bank Accounts held at such bank as being held by a debtor in possession in the Debtors' chapter 11 cases.

20.     To the extent that any of the Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code and any provisions of the U.S. Trustee Guidelines, the Debtors time to comply with section 345(b) of the Bankruptcy Code is hereby extended for a period of thirty (30) days from the date of this Interim Order (the "Extension Period"), *provided*, *however*, that such extension is without prejudice to the Debtors' right to request a further extension of the Extension Period or a final waiver of the requirements of section 345(b) in these chapter 11 cases or the U.S. Trustee's right to oppose such a request.

21.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

22.     Nothing contained in the Motion or this Interim Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair the validity, priority, enforceability, or perfection of any security interest or lien or setoff right, in favor of any person or entity, that existed as of the Petition Date.

23.     Nothing in this Interim Order constitutes: (a) an admission as to the validity of any

claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or non-bankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Any payment made pursuant to this Interim Order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

24.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

25.    The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied.

26.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

27.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

28.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Interim Order.

**Exhibit B**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 ([•]) |
| Debtors. | (Jointly Administered) |
| | **Ref: Docket No. [•] & [•]** |

**FINAL ORDER
(I) AUTHORIZING AND DIRECTING THE BANKS AND PAYMENT PROCESSORS
TO CEASE ANY HOLDS ON, OR REDIRECTION OF, CASH OR RECEIVABLES OF
THE DEBTORS, (II) AUTHORIZING THE DEBTORS TO (A) CONTINUE USE OF
THEIR EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, AND
BUSINESS FORMS, (B) CONTINUE INTERCOMPANY TRANSACTIONS, (C) PAY
RELATED OBLIGATIONS, AND (D) PAY AND HONOR PROCESSING
OBLIGATIONS, (III) WAIVING CERTAIN
INVESTMENT AND DEPOSIT GUIDELINES,
AND (IV) GRANTING RELATED RELIEF**

Upon the motion ("Motion")[2] of AGDP Holding Inc., and its debtor affiliates, as debtors

and debtors in possession (collectively, the "Debtors"), for entry of a final order (this "Final

Order") (i) authorizing, but not directing, the Debtors to: (i) authorizing and directing the Banks

and Payment Processors to cease any holds on, or redirection of, cash or receivables of the Debtors,

(ii) authorizing, but not directing, the Debtors to: (a) continue use of their existing cash

management system, bank accounts, and business forms; (b) continue intercompany transactions;

(c) pay obligations related thereto; and (d) pay or otherwise honor the Processing Obligations; (iii)

waiving certain investment and deposit requirements under the U.S. Trustee Guidelines; and (iv)

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Motion.

granting related relief, each as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for a hearing on the Motion having been given; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The relief requested in the Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized to segregate and restrict (a) the amount that was in their Bank Accounts when the Insta Funding prejudgment lien attached and (b) any amounts received due to food and beverage sales pending the outcome of potential litigation against TVT, Pinnacle, and Insta Funding; *provided, however*, that all such segregated and restricted funds shall be subject to the prepetition liens on the Bank Accounts held by third parties, including the senior liens held by the Prepetition Term Loan Lenders, in the same order of priority as existed prepetition.  All Banks and Payment Processors (including DICE, Billfold, Square, and Stripe) are authorized and directed to cease any holds on, or redirection of, cash or receivables of the Debtors.  JPMorgan Chase Bank, N.A. is authorized and directed to release any and all holds on the Debtors' Bank Accounts.

3.      The Debtors are authorized, but not directed, to: (a) designate, maintain, and

continue to use their Cash Management System as described in the Motion and honor any obligations related to the use thereof; (b) designate, maintain, close, and continue to use any or all of their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on Exhibit D attached to the Motion, in the names and with the account numbers existing immediately before the Petition Date; (c) deposit funds in and withdraw funds from the Bank Accounts by all the usual means, including checks, electronic fund transfers, ACH transfers, and other debits or electronic means; (d) treat their prepetition Bank Accounts, for all purposes, as debtor in possession accounts; and (e) open new debtor in possession accounts in accordance with the terms set forth herein; *provided* that in the case of each of (a) through (e), such action is taken in the ordinary course of business and consistent with past practice.  The relief granted in this Interim Order is extended to any new bank account opened by the Debtors in the ordinary course of business after the date hereof, which account shall be deemed a Bank Account, and to the bank at which such account is opened, which bank shall be deemed a Bank, in each case, pursuant to this Interim Order.

4.     The Debtors are authorized, but not directed, to: (a) enter into and engage in the Intercompany Transactions and to take any actions related thereto on the same terms as, and materially consistent with, the Debtors' operation of the business in the ordinary course during the prepetition period.  In connection therewith, the Debtors shall continue to maintain current records with respect to the transfers of cash so that all transactions, including the Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.

5.     The Debtors are authorized, but not directed, to set off mutual postpetition obligations relating to intercompany receivables and payables through the Cash Management

System.  In connection therewith, the Debtors shall continue to maintain current records with respect to all transfers of cash so that all transactions, including Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.  Each payment (or other transfer of cash, whether to or from the Debtors) from a Debtor to another Debtor under any Intercompany Transaction is hereby accorded administrative expense status under section 503(b) of the Bankruptcy Code.

6.      The Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of (or on behalf of) each Debtor, regardless of which entity actually makes such disbursements.

7.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents relating to the Bank Accounts existing immediately before the Petition Date, and maintain and continue using, in their present forms, the Books & Records; *provided* that once the Debtors have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled with the "debtor in possession" designation and the lead chapter 11 case number as soon as reasonably practicable to do so. To the extent the Debtors print any new checks or use any electronic Business Forms, they shall include the "debtor in possession" designation and the lead chapter 11 case number on all such checks and soon as reasonably practicable.

8.      The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course of business consistent with past practice, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on the Debtor Bank Accounts after the Petition Date by the holders or

makers thereof, as the case may be, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order; *provided* that the Debtors shall only instruct or request any Bank to pay or honor any check, draft, or other payment item issued on a Bank Account prior to the Petition Date but presented to such Bank for payment after the Petition Date as authorized by an order of the Court.

9.      The Banks are authorized, without further order of this Court, to charge or deduct, and the Debtors are authorized to pay, honor, or satisfy any reasonable Bank Fees or charges associated with the Bank Accounts in the ordinary course and consistent with past practice.

10.      The Banks are authorized, without further order of this Court, to charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services, or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

11.      The Payment Processors and the Debtors are authorized, but not directed, to continue to perform under the Payment Processing Agreements without interruption and in the usual and ordinary course, and are authorized to receive, process, and disburse all prepetition and postpetition Service Charges to the Debtors in the ordinary course in accordance with the Payment Processing Agreements in a manner consistent with past practices.

12.      The Debtors are authorized, but not directed, to pay any prepetition Processing Obligations and to continue paying the Processing Obligations in the ordinary course of business pursuant to the terms of the Payment Processing Agreements in a manner consistent with past

practices.

13.    In connection with the Processing Obligations, the Payment Processors are authorized to setoff and recoup chargebacks, refunds, and other amounts payable to the Payment Processors by the Debtors, whether arising before or after the Petition Date, against amounts payable to the Debtors by the Payment Processors and amounts held in reserve by the Payment Processors, whether arising before or after the Petition Date; provided that the chargebacks, refunds, and other payable to the Payment Processors by the Debtors are offset against amounts owed to the Debtors solely in accordance with the terms of the applicable Payment Processing Agreement.

14.    The Debtors shall serve a copy of this Final Order on all Banks as soon as practicable after entry of this Final Order, and upon any bank at which the Debtors open a new bank account as soon as practicable upon the opening of the new account.

15.    All banks maintaining any of the Debtor Bank Accounts that are provided with notice of this Final Order shall not honor or pay any bank payments drawn on the listed Debtor Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue timely stop payment orders in accordance with the documents governing such Debtor Bank Accounts.

16.    Subject to the terms set forth herein, any bank, including the Banks, may rely upon the representations of the Debtors with respect to whether any check, draft, wire, or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to any order of this Court, and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Final Order (a) at the direction of the Debtors, (b) in a good-faith belief that this Court has authorized such prepetition check or item to be honored, or (c) as a result of a

mistake made despite implementation of reasonable customary handling procedures, shall be deemed to be nor shall be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item being honored postpetition, or otherwise deemed to be in violation of this Final Order.

17.      Any banks, including the Banks, are further authorized to honor the Debtors' directions with respect to the opening and closing of any Bank Account and accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; *provided* that the Banks shall not have any liability to any party for relying on such representations to the extent such reliance otherwise complies with applicable law.

18.      To the extent that any of the Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code and any provisions of the U.S. Trustee Guidelines, the Debtors time to comply with section 345(b) of the Bankruptcy Code is hereby extended for a period of thirty (30) days from the date of the Final Order (the "Extension Period"), *provided*, *however*, that such extension is without prejudice to the Debtors' right to request a further extension of the Extension Period or a final waiver of the requirements of section 345(b) in these chapter 11 cases or the U.S. Trustee's right to oppose such a request.

19.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

20.      Nothing contained in the Motion or this Final Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of

the Petition Date or (b) alter or impair the validity, priority, enforceability, or perfection of any security interest or lien or setoff right, in favor of any person or entity, that existed as of the Petition Date.

21.     Nothing in this Final Order constitutes (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or non-bankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Any payment made pursuant to this Final Order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

22.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

23.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

24.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Final Order.

**Exhibit C**

**Cash Management Schematic**

# Cash Management System Schematic (Pre petition)



# Cash Management System Schematic (Post petition)





**Exhibit D**

**Bank Accounts**

| Debtor | Bank | Last Four Digits of Account Number | Account Type | Status |
|--------|------|-----------------------------------|--------------|--------|
| AGDP Holding Inc. | J.P. Morgan Chase Bank, N.A. | x2589 | Inactive | Inactive |
| Avant Gardner, LLC | J.P. Morgan Chase, Bank N.A. | x2368 | Commercial Checking | Active |
| Avant Gardner, LLC | J.P. Morgan Chase, Bank N.A. | x2376 | Commercial Checking | Active |
| Avant Gardner, LLC | J.P. Morgan Chase, Bank N.A. | x9907 | Commercial Checking | Active |
| Avant Gardner, LLC | J.P. Morgan Chase, Bank N.A. | x2509 | Inactive | Inactive |
| Avant Gardner, LLC | J.P. Morgan Chase, Bank N.A. | x9923 | Inactive | Inactive |
| EZ Festivals, LLC | J.P. Morgan Chase, Bank N.A. | x7163 | Commercial Checking | Active |
| EZ Festivals, LLC | J.P. Morgan Chase, Bank N.A. | x7353 | Inactive | Inactive |
| Made Event, LLC | J.P. Morgan Chase, Bank N.A. | x7601 | Inactive | Inactive |
| Reynard Productions, LLC | J.P. Morgan Chase, Bank N.A. | x0212 | Commercial Checking | Active |
| Reynard Productions, LLC | J.P. Morgan Chase, Bank N.A. | x7906 | Inactive | Inactive |
| AGDP Holding Inc. | Flagstar Bank, N.A. | X3576 | DIP Account | Active |

33418080.4

4903-2948-2838v.21