**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 ([•]) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS,
PURSUANT TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF THE
BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR
SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING
(A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND
(B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS;
(III) AUTHORIZING USE OF CASH COLLATERAL; (IV) SCHEDULING A FINAL
HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (the "Motion"):[2]

## RELIEF REQUESTED

1.    The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Interim Order"), and a final order (the "Final Order,"[3] respectively, and together,

the "Orders") granting, among other things, the following relief:

a.   ***DIP Facility:*** authorizing Avant Gardner, LLC and AGDP Holding Inc. (the
"Borrowers") to obtain post-petition debtor in possession financing pursuant to a
senior secured super-priority term loan facility in an aggregate amount of
45,781,302.19 (the "DIP Facility"), and for each of the other Debtors to guarantee

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification
number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ
Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431).  The Debtors' service address
is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion
and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Gary Richards in Support of
Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.
Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day
Declaration, Interim Order, or the DIP Term Loan Note, as applicable.

[3] The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

unconditionally on a joint and several basis, and subject to the terms and limitations set forth in the DIP Loan Documents in all respects, the Borrowers' obligations under the DIP Facility, all on the terms and conditions set forth in the Orders and that certain Debtor in Possession Term Promissory Note attached as <u>Exhibit A</u> to the Interim Order (the "<u>DIP Term Loan Note</u>" and collectively with the Orders and the Budget (defined below), as the same may be amended, restated, supplemented from time to time, or amended by the Orders, and any DIP Loan Documents (defined below), by and among the Borrowers, Alter Domus (US) LLC, as administrative agent and collateral agent (in each such capacity, the "<u>DIP Agent</u>"), and the lenders party thereto from time to time (together with its assigns and successors, the "<u>DIP Lenders,</u>" and, together with the DIP Agent, the "<u>DIP Secured Parties</u>");

b. ***DIP Loan Documents:*** authorizing the Debtors to execute, deliver, and enter into the DIP Loan Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts required in connection with the DIP Loan Documents;

c. ***DIP Obligations:*** authorizing the Debtors to pay all obligations under the DIP Loan Documents (collectively, and including all "<u>Obligations</u>" as defined and described in the DIP Term Loan Note, the "<u>DIP Obligations</u>") to the DIP Secured Parties;

d. ***Proceeds of DIP Facility:*** authorizing the Debtors, immediately upon entry of the Interim Order, to use proceeds of the DIP Facility as expressly provided in the DIP Loan Documents in accordance with the Interim Order and the applicable Approved Budget;

e. ***Superpriority Claim Status:*** granting and approving of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve-Out (defined below);

f. ***DIP Liens***: granting the DIP Agent, for the benefit of itself and the other DIP Secured Parties, valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (defined below) in all DIP Collateral, including Prepetition Collateral (defined below), Cash Collateral (defined below) to secured the DIP Obligations, which DIP Liens shall be subject only to the Carve-Out and Permitted Prior Liens (defined below);

g. ***Protective Advance Refinancing***: authorizing the Debtors to borrow, fund, and apply, subject to entry of the Final Order, the Roll-Up DIP Term Loans for the Protective Advance Refinancing (as defined and described in the DIP Term Loan Note);

33418081.6

4926-5953-8774v.4

h. ***Cash Collateral***: authorizing the Debtors to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), in accordance with both the Approved Budget and the DIP Loan Documents, and providing, among other things, adequate protection to Prepetition Secured Parties for any Diminution in Value of their interests in the Prepetition Collateral;

i. ***Automatic Stay:*** authorizing a modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Loan Documents;

j. ***Section 506(c) and Equities of the Case Waivers:*** subject to entry of the Final Order, authorizing the Debtors to waive (a) their right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

k. ***Immediate Effectiveness***: granting a waiver of any applicable stay with respect to the effectiveness of the Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h));

l. ***Final Hearing:*** scheduling a final hearing (the "<u>Final Hearing</u>") to consider approval of the relief requested in this Motion on a final basis and entry of the Final Order, and approving the form of notice with respect to the Final Hearing; and

m. ***Further Relief***: granting the Debtors such other and further relief as is just and proper.

2.     In support of this Motion, the Debtors rely on and incorporate the First Day Declaration, the *Declaration of Stephen Golmont*, and the *Declaration of Jeffrey Gasbarra* (together, the "<u>DIP Declarations</u>"), filed contemporaneously herewith.

## <u>JURISDICTION AND VENUE</u>

3.     The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final

order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001-2.

## PRELIMINARY STATEMENT

6.      The DIP Facility provides the Debtors with the liquidity necessary to conduct an efficient sale process for the Debtors' assets and is necessary to preserve value for all the Debtors' stakeholders.  Importantly, the Prepetition Secured Parties have consented to the incurrence of the DIP Facility and the use of their Cash Collateral, subject to the terms of the Approved Budget and the Orders.

7.      The terms of the DIP Facility, including the budget, escrowing, interest rate, and fees, were negotiated in good faith and at arm's length and are, taken as a whole, fair and reasonable under the circumstances of these chapter 11 cases.  Despite canvassing the market, the Debtors were unable to secure alternative source of financing on both better and executable terms than those being provided in the DIP Facility.  Specifically, given the existing funded debt, the Debtors would be unable to secure postpetition financing on a purely junior or unsecured basis, and any senior financing offered would require a costly and value-destructive priming fight with the Prepetition Secured Parties, which the Debtors sought to avoid.  Accordingly, despite the Debtors' best efforts, the best source of financing for these chapter 11 cases is the DIP Facility

provided on reasonable terms, which has the consent of the Prepetition Secured Parties to prime their liens in the Prepetition Collateral.

8.       Absent entry into the DIP Facility, the Debtors will have insufficient capital to fund operations or the administration of these chapter 11 cases.  Such lack of capital will be to the detriment of all parties in interest as it will have a significant adverse impact on the completion of a value-maximizing sale and wind-down of the Debtors' businesses and assets.

9.       Accordingly, the DIP Facility is not just the best financing currently available to the Debtors, it is the only option available to facilitate a sale of the Debtors' assets and an orderly wind-down of the Debtors' business while providing the maximum recovery possible for the Debtors' stakeholders and other parties in interest.

## BACKGROUND OF THE DEBTORS

10.      The Debtors operate a multi-space entertainment venue complex, specializing in large-scale live entertainment—concerts, festivals, corporate functions, and multimedia events—and is known for state-of-the-art audiovisual production, including a 2022 upgrade featuring one of the world's highest-resolution video walls.  The Debtors focus on industry-leading production capabilities, immersive audiovisual experiences, and status as one of North America's largest standing-room-only entertainment venues.

11.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under sections 101–1532 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

12.      Additional information regarding the Debtors' businesses, capital structures and circumstances preceding the Petition Date may be found in the First Day Declaration.

## DEBTORS' PREPETITION CAPITAL STRUCTURE

13.     As of the Petition Date, the Debtors had approximately $150,000,000 in funded secured debt obligations.  A summary of the obligations is set forth below:

| Debt Facility | Estimated Principal Amount Outstanding as of the Petition Date | Security, Priority, and Dispute |
|---|---|---|
| Prepetition Financing Agreement | $121,104,482.11 | Secured – first lien Undisputed |
| Protective Advances | $20,803,621.66 | Secured – first lien Undisputed |
| Prepetition LiveStyle Note | $11,849,828 (inclusive of interest) | Secured – subordinated Undisputed |
| Prepetition Packin Note | $1,500,000 | Unsecured Undisputed |
| **Total** | $155,257,931.77 | |

### A.      Secured Debt

(i)     *Prepetition Financing Agreement*

14.     Avant Gardner and AGDP Holdings, as borrowers, Reynard Productions, EZ Festivals, and Made Events, as guarantors, and the various lenders from time to time party thereto (the "Prepetition Term Loan Lenders") and Alter Domus (US), LLC, as administrative and collateral agent (in such capacity, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Term Loan Secured Parties") are parties to that certain Amended and Restated Financing Agreement, dated as of July 1, 2024 (as amended by Amendment No. 1 to A&R Financing Agreement, dated as of August 27, 2024, Amendment No. 2 to A&R Financing Agreement, dated as of October 25, 2024, Amendment No. 3 to A&R Financing Agreement, dated as of January 30, 2025 Amendment No. 4 to A&R Financing Agreement, dated as of February 7, 2025, and as further amended, restated, supplemented or modified through the Petition Date, the "Prepetition Financing Agreement" and, together with each of the Loan Documents (each as defined therein), the "Prepetition Term Loan Documents").

15.     Pursuant to the Prepetition Loan Documents, the Obligations (as defined in the Prepetition Financing Agreement) owed to the Prepetition Term Loan Secured Parties are secured by Liens (as defined in the Prepetition Financing Agreement) on, and security interests in, Collateral (as defined in the Prepetition Credit Agreement), subject to certain Permitted Liens (as defined in the Prepetition Credit Agreement) (collectively, the "<u>Prepetition Liens</u>" and the collateral on which such liens attach, the "<u>Prepetition Term Loan Collateral</u>").  Pursuant to the Prepetition Loan Documents, each of the Guarantors (as defined in the Prepetition Credit Agreement) (the "<u>Prepetition Term Loan Guarantors</u>") has provided to the Prepetition Agent an unconditional joint and several guaranty of the Obligations (as defined in the Prepetition Credit Agreement), which guaranty is secured by the Prepetition Term Loan Collateral.

16.     Since May 14, 2025, the Collateral Agent under the Prepetition Financing Agreement has extended $20,000,000 of Collateral Agent Advances (pursuant to Section 10.08(a) of the Prepetition Financing Agreement), which the Debtors used for the primary purpose of funding payroll, contractor fees, certain key vendor payments, and other professional fees (the "<u>Protective Advances</u>").  The Protective Advances provided the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.  As of the Petition Date, approximately $20 million unpaid principal of Protective Advances remains outstanding, plus interest, fees, and expenses.

17.     In connection with amendments to the Prepetition Financing Agreement, an affiliate of the Lender was issued warrants to purchase up to 40% common stock of AGDP Holding.  Those warrants have not been exercised as of the Petition Date.[4]

---

[4] Additionally, pursuant to a prepetition agreement between the Lender, AGDP Holding Inc., and Mr. Bildstein, the Lender received the right to appoint two independent directors in connection with amendments to the Prepetition Financing Agreement while Mr. Bildstein retained certain enumerated governance rights.

(ii)     *Prepetition LiveStyle Note*

18.     Avant Gardner, AGDP Holdings, Reynard Productions, EZ Festivals, and Made Events, as borrowers and guarantors, and LiveStyle Holdings, Inc., NYC Festivals LLC, NYC Club Event LLC, and SFXE IP LLC (collectively, the "LiveStyle Parties" or the "Prepetition LiveStyle Secured Parties," and together with the Prepetition Term Loan Secured Parties, the "Prepetition Secured Parties"), are parties to that certain Promissory Note, dated as of July 16, 2024 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition LiveStyle Note" and, together with each of the Loan Documents (each as defined therein), the "Prepetition LiveStyle Note Documents"), which evidences a loan in the original principal amount of $10,816,000 due December 31, 2026.  Pursuant to the Prepetition LiveStyle Note Documents, the Obligations (as defined in the Prepetition LiveStyle Note) are secured by Liens (as defined in the Prepetition LiveStyle Note) on, and security interests in, Collateral (as defined in the Prepetition LiveStyle Note), on the terms and subject to the conditions of the Loan Documents (collectively, the "Prepetition LiveStyle Liens" and the collateral on which such liens attach, the "Prepetition LiveStyle Collateral").

19.     The Prepetition LiveStyle Note and the Prepetition LiveStyle Liens are subject to the terms and provisions of that certain Intercreditor Agreement, dated as of November 16, 2023 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Intercreditor Agreement"), by and among the Prepetition Agent, as agent for the Prepetition Term Loan Lenders, the LiveStyle Parties, and the other parties signatory thereto.  Pursuant to the Prepetition Intercreditor Agreement, the LiveStyle Parties agreed to forbear from exercising certain remedies against the Debtors and agreed to subordinate their liens in the Prepetition LiveStyle Collateral to the liens of the Prepetition Term Loan Secured Parties in the Collateral.

20.     As of the Petition Date, approximately $11,849,828 unpaid principal and interest remains outstanding under the Prepetition LiveStyle Note, plus fees, and expenses.

**B.      Unsecured Debt**

(i)     *Prepetition Packin Note*

21.     Pursuant to an unsecured Promissory Note dated April 4, 2025 (the "Prepetition Packin Note"), Avant Gardner borrowed $1,500,000 from Packin Realty Company, LLC ("Packin"), the ultimate landlord of 110–128 Varick Avenue, which is the lot adjacent to the Avant Gardner complex that the Debtors sublease from Packin's tenant Stewart Purchaser LLC.

22.     The proceeds of the Prepetition Packin Note are to be used for improvements to the 110–128 Varick Avenue property.  The Debtors have used certain of the proceeds to pay for improvements to the property.  As of the Petition Date, approximately $1,500,000 unpaid principal remains outstanding under the Prepetition Packin Note, plus interest, fees, and expenses.

(ii)    *Disputed Transactions with TVT, Pinnacle, and Insta Funding*

23.     The Debtors are also party to a series of disputed financing transactions with TVT Capital Source LLC ("TVT"), Insta Funding LLC ("Insta Funding"), and Pinnacle Business Funding LLC ("Pinnacle").

24.     **January TVT Loan Agreement**.  On January 16, 2025, the Debtors entered into a Business Loan and Security Agreement with TVT for $3,000,000 with a maturity date of November 26, 2025 (the "January TVT Loan Agreement").  The January TVT Loan Agreement sets out a tiered weekly payment approach in an addendum, requiring Avant Gardner to pay $23,522.74 per week for the first 12 weeks, $47,045.46 per week between the thirteenth and twenty-fourth weeks, and $163,436.32 per week for the final twenty weeks.  TVT was granted a lien under the January TVT Loan Agreement, but did not file a UCC-1 financing statement.

25.     **February TVT Cash Advance Agreements**.  The following month, on February 3, 2025, the Debtors executed a Cash Advance Agreement with TVT (the "February 3 TVT Cash Advance Agreement") for $1,000,000, pursuant to which Avant Gardner was to pay TVT 3.53% of future receipts from each of Avant Gardner's sale of goods and services, including from the sale of tickets and food and beverages, until the receivables purchase amount was paid in full.  TVT was granted a lien under the February 3 TVT Cash Advance Agreement, but did not file a UCC-1 financing statement.

26.     The next day, February 4, 2025, the parties signed a new agreement where Avant Gardner received $500,000 as a "cash advance."  The agreement provided that Avant Gardner would pay this money back over 180 days, *i.e.*, roughly six months (the "February 4 TVT Cash Advance").  The February 4 TVT Cash Advance, like the January TVT Loan Agreement, had a tiered payment structure, with Avant Gardner required to pay $9,583.34 per week for the first 18 weeks and $28,750 per week for the last 18, *i.e.*, for a total of 36 weeks, which is inconsistent with the 180-day term listed on the same page.  TVT was granted a lien under the February 4 TVT Cash Advance, but did not file a UCC-1 financing statement.

27.     On February 25, 2025, the Debtors and TVT executed yet another cash advance agreement (the "February 25 TVT Cash Advance"), on terms nearly identical to the February 4 agreement.  Under this arrangement, Avant Gardner received $750,000 and was required to repay $14,375 per week for the first 18 weeks, followed by $43,125 per week for the next 18 weeks—totaling $1,035,000.  TVT was granted a lien under the February 25 TVT Cash Advance, but did not file a UCC-1 financing statement.

28.     **March TVT Cash Advance Agreement and Loan Agreement**.  On March 13, 2025, TVT and the Debtors entered into another cash advance agreement for $750,000, with terms

similar to the February 3 TVT Cash Advance Agreement. That same day, March 13, the Debtors entered into a "loan" agreement with TVT for $1,000,000, to be repaid over the course of nine months (the "March TVT Loan Agreement").  The March TVT Loan Agreement addendum provided for a tiered payment approach, where the Debtors would pay $19,166.67 a week for the first 18 weeks and $57,500 a week for the remaining 18, totaling $1,380,000.  TVT was granted a lien under these two agreements, but did not file a UCC-1 financing statement.

29.   **Pinnacle Financing**.  The Debtors also entered into a so-called receivables purchase agreement with Pinnacle on February 16, 2025 (the "Pinnacle Receivables Purchase Agreement").  The Pinnacle Receivables Purchase Agreement required the Debtors to provide Pinnacle 3.4% of its daily future receipts up to $1,380,000.  Pinnacle was granted a lien under the Pinnacles Receivables Purchase Agreement, but did not file a UCC-1 financing statement.

30.   **Insta Funding**.  The Debtors also entered into a so-called receivables purchase agreement with Insta Funding on April 1, 2025 (the "Insta Funding Receivables Purchase Agreement").  The Insta Funding Receivables Purchase Agreement required the Debtors to provide Insta Funding 29.57% of its receipts until it had paid back $4,100,000, a 38% markup.

31.   Insta Funding was granted a lien under the Insta Funding Receivables Purchase Agreement, but did not file a UCC-1 financing statement until June 10, 2025 or July 15, 2025, within 90 days of the Petition Date.[5]  On June 27, 2025, Insta Funding sent a letter to the Debtors demanding a total of $5,208,750.05, close to 170% of the original agreement.  On July 28, 2025, Insta Funding secured a prejudgment attachment of all of the Debtors' bank accounts at JPMorgan

---

[5] UCC-1 financing statements against all Debtors other than Avant Gardner, LLC were filed on June 10, 2025.  A UCC-1 financing statement against Avant Gardner, LLC was filed on July 15, 2025.

Chase.  Further, Insta Funding sent a notice to Block (one of the Debtors' payment processors) that resulted in a hold on the Debtors' account pending a release agreement or court order.

**DEBTORS' LIQUIDITY NEED AND MARKETING EFFORTS**[6]

**I.      The Debtors Have an Immediate Financing Need and Cannot Operate Their Business With Cash Collateral Alone.**

32.      The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use certain of the Prepetition Collateral (which, for the avoidance of doubt, includes Cash Collateral).[7]  The Debtors are currently facing an acute liquidity crisis and do not have sufficient available cash—including Cash Collateral (other than any funds escrowed or new collections from food and beverage sales)—to maintain their operations, fund payroll, pay critical vendors, or continue restructuring efforts.  The Debtors need additional liquidity to cover their restructuring expenses and to continue to operate in the ordinary course, and preserve their value as a going concern in connection with the sale process.

33.      As such, and given their current limited liquidity, the incurrence of new debt under the DIP Term Loan Note and use of Cash Collateral are necessary and vital to the preservation and maintenance of the going concern value of the Debtors, which is critical to maximizing the value realized from a sale of the Debtors' businesses.  Funding of the DIP Facility and the use of Cash Collateral will also instill confidence in the Debtors' employees, vendors, and ticketholders as the Debtors' focus on a "business as usual" message to these key parties.  Further, the failure to obtain access to the DIP Facility and the Prepetition Collateral will result in immediate and irreparable harm to the Debtors and will materially diminish the value of the Debtors' estates.

---

[6] **Note to Draft**: From Gasbarra Declaration version 3.

[7] As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties or DIP Lenders within the meaning of section 363(a) of the Bankruptcy Code.

33418081.6

4926-5953-8774v.4

34.     Accordingly, the proposed DIP Facility is necessary to provide the Debtors with the liquidity they need to fund these chapter 11 cases and consummate a sale.  Pursuant to Local Rule 4001-2(a)(iii), the Initial Budget is attached as Exhibit C to the Interim Order.  The Debtors believe that the Initial Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing and the Initial Budget.  The Initial Budget details the sources and uses of cash needed for ongoing operations on a weekly basis during the budget period.

## II.     The DIP Facility was Negotiated in Good Faith and at Arms' Length

35.     The DIP Facility is the product of exhaustive, good-faith, arms'-length negotiations among the Debtors and the DIP Lenders, each of which was represented by experienced counsel. The Debtors and their advisors actively negotiated the terms and provisions of the DIP Facility leading up to the Petition Date, including on material terms of the proposed financing, ultimately resulting in the deal embodied in the DIP Term Loan Note.

36.     Based on extensive negotiations among the parties, the DIP Facility represents the best financing option reasonably available to the Debtors under the current circumstances.  The claim priority, liens, and other protections to be granted to the DIP Lenders pursuant to the DIP Facility were essential features of the facility, without which the DIP Lenders would not have committed to provide funding for the Debtors and are reasonable under the circumstances.

37.     The roll-up of the Protective Advances with the proceeds of borrowings under the DIP Facility in accordance with this Interim Order is necessary as the Prepetition Term Loan Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve-Out and the DIP Liens, in each case as provided in the Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Facility.  Moreover, in consideration of the entry of the Interim Order authorizing the repayment

of the Protective Advances with the proceeds of the DIP Facility subject to the terms and conditions set forth herein, the Prepetition Term Loan Secured Parties have agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition Financing Agreement) and have agreed to reduce the interest rate on the Prepetition Advances subject to the Roll-Up from a current rate of 15% (inclusive of default interest) under the Prepetition Financing Agreement to 10.5% under the DIP Facility.

### III.    Alternative Sources of Financing Are Not Available on Better Terms.

38.    The Debtors considered a number of sources of potential debtor-in-possession financing, including internal sources of cash, existing lenders, and actual or potential transaction counterparties.  However, given the Debtors' prepetition capital structure, minimal liquidity, and the challenges facing their business, the DIP Facility represents the best and only actionable postpetition financing.

39.    The Debtors entered these chapter 11 cases to pursue a value-maximizing, going-concern sale process.  Prior to the filing, the Debtors were engaged in substantive discussions regarding a stalking horse purchase agreement with an affiliate of the Prepetition Term Loan Lender (the "Proposed Purchaser") for the sale of all or substantially all of the assets of Debtors AGDP Holding Inc., Avant Gardner, LLC, EZ Festivals LLC, Made Event LLC, and Reynard Productions, LLC for consideration comprised of a credit bid, assumption of certain liabilities, and provision of a wind-down budget for an orderly liquidation of the Debtors.  In connection with that proposed stalking horse bid, affiliates of the Prepetition Term Loan Lenders are also serving as the DIP Lenders and have agreed to finance such process and these chapter 11 cases by providing postpetition liquidity to fund the Debtors' operations.

40.    The terms of the DIP Facility were negotiated at arm's length and are, taken as a whole, fair and reasonable under the circumstances of these chapter 11 cases.  The Debtors do not

believe there are alternative sources of financing currently available, much less any other sources available on both better and executable terms than those being provided by the DIP Facility.

## IV.    Escrowed Funds and Food and Beverage Receipts

41.    The Debtors entered into the Insta Funding Receivables Purchase Agreement during the renovation of The Brooklyn Mirage.  Insta Funding loaned the Company $3,000,000 under that agreement, but on June 27, 2025, sent a letter to Avant Gardner demanding a total of $5,208,750.05, close to 170% of the original agreement.  Insta Funding filed UCC-1 financing statements against all Debtors other than Avant Gardner on June 10, 2025, and against Avant Gardner on July 15, 2025.

42.    Insta Funding then escalated its collection efforts dramatically.  Prior to the Petition Date, the Company received a notice from Square, one of the Company's payment processors, that Insta Funding had sent Square a UCC-1 filing, and therefore Square would no longer remit amounts owed to the Company absent a lien release or court order.  On July 24, 2025, Insta Funding initiated a lawsuit against certain of the Debtors in the Connecticut Superior Court of the Judicial District of Stamford.  Pursuant to a prejudgment remedy, a hold was placed and lien attached to the Debtors' Bank Accounts, forcing the Debtor to scramble and find alternative means to fund its payroll.  Finally, on July 27, 2025, Insta Funding used an auto-debit feature of their contract to debit over $1 million from the Company's bank accounts.

43.    Subsequently, the Prepetition Term Loan Lenders, who have senior liens on the Bank Accounts and the monies on deposit in such bank accounts, exercised their rights under a deposit account control agreement ("DACA") and instructed the Bank to release the hold on the Debtors' Bank Accounts.  The Debtors must use their Bank Accounts to operate, and allowing a rogue creditor to paralyze the Debtors' operations would cripple these Chapter 11 Cases.

44.     As of the Petition Date, Billfold did not remit net sales directly to the Debtors. Instead, pursuant to a receivables redirection letter that the Debtors sent to Billfold (as obligated under the TVT loan agreements), Billfold remits the funds to a TVT lockbox account, and a TVT employee makes payments from the TVT lockbox account for the TVT, Pinnacle, and Insta Funding loan.  TVT then remits any remaining balance to the Debtors.  On the Petition Date, the Debtors rescinded their receivables redirection letter to Billfold, from the Petition Date and onward, Billfold should remit all net sales directly to the Debtors, and all litigation pending against the Debtors should be stayed.

45.     Acknowledging the dispute over Insta Funding's, TVT,'s and Pinnacle's claims, the Debtors intend to escrow (i) escrow the amount that was in their Bank Accounts when the Insta Funding prejudgment lien attached pending resolution of the parties' disputes, and (ii) any amounts received due to food and beverage sales pending the outcome of potential litigation against TVT, Pinnacle, and Insta Funding.  Those amounts are not accounted for as receipts under the Initial Budget.  Escrowing the amounts received due to food and beverage sales, pending the outcome receivables of litigation, adequately protects any security interest that TVT, Pinnacle, or Insta Funding has in the or any other assets of the Debtors.  The funds held in escrow will be subject to the senior liens held by the Prepetition Term Loan Lenders and any other person or entity holding or asserting a security interest in such funds with the same order of priority as such liens attached to the applicable Bank Accounts.  To the extent TVT, Pinnacle, or Insta Funding purport to hold a lien on the Debtors' cash that may be primed by the DIP Facility, the Debtors submit that such parties are adequately protected by this method of escrowing.

## SUMMARY OF PRINCIPAL TERMS OF THE DIP FACILITY

46.     Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise summary of the proposed material terms of the DIP Facility and the DIP Term Loan Note.[8]

| Provision | Summary |
|---|---|
| **Borrowers** | AGDP Holding Inc. and Avant Gardner, LLC |
| **Guarantors** | EZ Festivals LLC; Made Event LLC; Reynard Productions, LLC; AG Management Pool LLC |
| **DIP Lenders** | The lenders party thereto from time to time |
| **Use of Cash Collateral:** | The Debtors are authorized to use "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code in accordance with the Budget, the Orders, and the terms of the DIP Term Loan Note.<br><br>Interim Order ¶¶ 1.2(b), 6.4(a). |
| **DIP Facility/Borrowing Limits** *Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(A), (N), and (O)* | The DIP Lenders will provide the Debtors an aggregate of approximately $45,803,621.66 in loans under a debtor-in-possession financing facility (such loans, the "DIP Loans"), subject to the conditions precedent set forth in the DIP Term Loan Note and in the Orders.  The DIP Loans will be comprised of an aggregate principal amount equal to $10,000,000 of Interim DIP Term Loans on an interim basis, together with applicable interest, expenses, fees, and other charges payable in connection with the DIP Facility and, subject to entry of the Final Order, an additional $15,000,000 of New Money DIP Term Loans and $20,803,621.66 of Roll-Up DIP Term Loans, together with applicable interest, expenses, fees, Protective Advances, |

---

[8] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Term Loan Note and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in this Motion, the DIP Loan Documents or the Interim Order, as applicable.

33418081.6

4926-5953-8774v.4

| Provision | Summary |
|---|---|
| | and other charges payable in connection with the DIP Facility. |
| | The Roll-Up DIP Term Loans are comprised of Protective Advances made by the Prepetition Term Loan Lenders from time to time between May 14, 2025 and August 1, 2025 to provide the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases. |
| | DIP Term Loan Note § 1(a); Interim Order ¶ 1.2(a). |
| **DIP Collateral; DIP Lien Priority**<br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of the DIP Secured Parties, shall have and are hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (the "<u>DIP Liens</u>") in and upon all DIP Collateral, subject to the Carve-Out, Permitted Prior Liens and the rankings and priority set forth in paragraph 2.1(b) of the Interim Order and as set forth on Exhibit B to the Orders.<br><br>The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, however, that the DIP Liens on (A) the Prepetition Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve-Out and Permitted Prior Liens; (B) assets of the Debtors (the "<u>Non-Lender Encumbered Assets</u>") that were subject to validly perfected liens or security interests as of the Petition Date other than the Prepetition Liens (if any, the "<u>Non-Lender Existing Liens</u>") shall be subject to such Non-Lender Existing Liens and the Carve-Out; and (C) any other assets |

| Provision | Summary |
|---|---|
| | of the Debtors ("Unencumbered Assets") that were not subject to any validly perfected liens or security interest as of the Petition Date (including, subject to the entry of a Final Order, Avoidance Proceeds) shall be subject to the Carve-Out, in each case as such priorities are set forth in Exhibit B to the Orders.<br><br>DIP Term Loan Note, § 11; Interim Order ¶ 2.1(a)–(b). |
| **Adequate Protection**<br>*Bankruptcy Rules 4001(b)(1)(B)(iv) and 4001(c)(1)(B)(ii)* | The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e), 364(d)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code and effective as of the Petition Date, to adequate protection of their respective interests in the Prepetition Collateral, including any Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after the Petition Date. On account of such adequate protection, the Prepetition Secured Parties are hereby granted the following, in each case subject to the priorities set forth on Exhibit B to the Orders and the Carve-Out (collectively, the "Adequate Protection").<br><br>As adequate protection against, and solely to the extent of, any postpetition Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral, the Prepetition Secured Parties are hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition Secured Parties' Adequate Protection Liens"), which liens shall be, with respect to: (A) the Prepetition Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve-Out, Permitted Prior Liens, and the DIP Liens, (B) the Non-Lender Encumbered Assets, subject to the Non-Lender Existing Liens, the Carve-Out and the DIP Liens, and (C) Unencumbered Assets, subject to the Carve-Out and the DIP Liens, .and in each case as such priorities are set forth in Exhibit B to the Orders.  For the avoidance of doubt, the Prepetition Secured Parties' Adequate Protections Liens shall be subject to the Prepetition Intercreditor Agreement. |

33418081.6

4926-5953-8774v.4

| Provision | Summary |
|---|---|
| | As adequate protection against, and solely to the extent of, any postpetition Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral, the Prepetition Secured Parties are hereby granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "Prepetition Secured Parties' Adequate Protection Claims"), which shall be allowed claims against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 365, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. The Prepetition Secured Parties' Adequate Protection Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject to the Carve-Out, Permitted Prior Liens and the rankings and priorities set forth in Exhibit B. For the avoidance of doubt, the Prepetition Secured Parties' Superpriority Claims shall be subject to the Prepetition Intercreditor Agreement. <br><br> The Debtors are authorized and directed to pay: (i) on the date of the first advance under the DIP Facilities, all reasonable and documented fees and out-of-pocket expenses of the Prepetition Agent that are required to be paid by the Debtors under the Prepetition Secured Debt Documents, including such fees and expenses of counsel and financial advisors to such Prepetition Agent; and (ii) on an ongoing basis, from time to time after the Petition Date, and without duplication, all reasonable and documented fees and out-of-pocket expenses incurred by such Prepetition Agent and required to be paid by the Debtors under the Prepetition Term Loan Documents, including the reasonable and documented fees and out-of-pocket expenses of McDermott, Will & Schulte LLP and Holland & Knight LLP (such professionals, the "Adequate |

33418081.6

4926-5953-8774v.4

| Provision | Summary |
|---|---|
| | Protection Professionals," and such fees and expenses, collectively, the "Adequate Protection Professional Fees and Expenses")<br><br>Interim Order ¶¶ 3.8(a) (i)-(ii), and 3.8(b). |
| **Conditions Precedent to Making Term Loans**<br><br>*Local Rule 4001-2(a)(i)(E)* | The obligation of the DIP Lender to fund the Term Loans requested to be made by it shall be subject to the prior or concurrent satisfaction (or waiver by the Agent) of each of:<br>1. the Borrowers shall have paid any Obligations then payable hereunder (including the reasonable and documented out-of-pocket fees and expenses of the Agent and DIP Lender, including, without limitation, those of counsel for the Agent and DIP Lender, provided, however, that any such payments shall be in accordance with any orders by the Bankruptcy Court if then applicable) or under any other DIP Document;<br>2. the Loan Parties shall have delivered guarantees of each of the Guarantors, each in form and substance reasonably satisfactory to the DIP Lender with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;<br>3. the Loan Parties shall have delivered fully executed copies of all other DIP Documents, each in form and substance reasonably satisfactory to the DIP Lender;<br>4. any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;<br>5. (i) with respect to the Interim Order Term Loans, (A) the Bankruptcy Court shall have entered the Interim Order (which order shall authorize the Loan Parties to use Cash Collateral of the Prepetition Secured Parties in a manner consistent with the Budget (subject to Permitted Variances)) and (B) the Interim Order shall not have been stayed, vacated, reversed, modified or amended without Agent's consent, or (ii) with respect to the Final Order Term Loans, (A) the Bankruptcy Court shall have entered the Final Order |

33418081.6

4926-5953-8774v.4

| **Provision** | **Summary** |
|---|---|
| | and (B) the Final Order shall not have been stayed, vacated, reversed, modified or amended without Agent's consent; |
| | 6. no Default or Event of Default shall have occurred and be continuing or would result after giving effect to the Term Loans and the transactions contemplated herein; |
| | 7. after giving effect to the making of the Term Loans, the outstanding principal amount of all Term Loans (inclusive of any "roll up" of protective advances constituting Obligations under the Prepetition Financing Agreement but excluding any interest or fees paid in kind) would not exceed the Maximum Amount; |
| | 8. the Agent shall have received and approved the Budget in accordance with this Note and the Financing Orders; |
| | 9. the Borrowing Liquidity Condition shall have been satisfied; and |
| | 10. the Agent shall have received from each Borrower on or prior to 12:00 p.m. New York City time at least one (1) Business Day (or such shorter period as the DIP Lender may agree) prior to the date of such Borrowing, a Borrowing Request and a calculation evidencing satisfaction of the Borrowing Liquidity Condition, which calculation shall be in form and substance satisfactory to the DIP Lender. |
| | Notwithstanding anything to the contrary herein, upon the occurrence of an Event of Default and the issuance of a Carve-Out Trigger Notice (as defined in the Financing Orders), the Borrowers may tender a Borrowing Request to the Agent for amounts that are to be funded into the Carve-Out Accounts (as defined in the Financing Orders) in accordance with the Budget, which Borrowing Request shall not be subject to the satisfaction of the conditions set forth in Sections 2(a)(1), (4), (6), (7), (8) or (9) of the DIP Term Loan Note. |
| | DIP Term Loan Note, § 2. |
| **Prepayments**<br><br>*Local Rule 4001-2(a)(i)(I)* | The Borrowers shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' written notice to the Agent by 1:00 p.m. New York City time (or such shorter time as the Agent may agree); provided that each such prepayment shall be in a |

| Provision | Summary |
|---|---|
| | minimum amount of $100,000. Any prepayment or repayment hereunder shall be accompanied by accrued and not capitalized interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment. Any principal amount of the Term Loans that is repaid or prepaid may not be reborrowed.<br><br>DIP Term Loan Note, § 6.<br><br>There are no mandatory prepayment obligations.<br><br>DIP Term Loan Note, § 7. |
| **Maturity Date**<br>*Bankruptcy Rule 4001(c)(1)(B)* | "<u>Maturity Date</u>" shall mean the earliest to occur of (i) the date which is 120 days following the Petition Date, or if such date is not a Business Day the immediately following Business Day, (ii) 35 days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, or if such date is not a Business Day the immediately following Business Day, (iii) the consummation of a sale of all or substantially of the Debtors' assets pursuant to the Sale Motion or otherwise, (iv) the substantial consummation of a plan of reorganization filed in these Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.<br><br>DIP Term Loan Note, § 18(a). |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(M)* | Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, defaults related to the budget, attachment defaults, judgment defaults, invalidity of loan documents, change of control, failure to achieve any of the Milestones, and the occurrence of any number of adverse actions or consequences in any of these Chapter 11 Cases.<br><br>Subject to the Remedies Notice Period and all of the rights of the Debtors and others parties in interest during the Remedies Notice Period (including to seek an emergency |

| Provision | Summary |
|---|---|
| | hearing), the DIP Lenders may exercise remedies upon an Event of Default. |
| | DIP Term Loan Note, § 16; Interim Order ¶¶ 4.2–4.7. |
| **Parties with an Interest in Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(i)* | The Prepetition Secured Parties have an interest in the Cash Collateral. Interim Order ¶ E(x). |
| **Purposes for Use of DIP Proceeds** *Bankruptcy Rule 4001(b)(1)(B)(ii)* | The DIP Facility and the Cash Collateral may be used, solely in accordance with the Orders and the applicable Approved Budget, subject to Permitted Variances and other exclusions set forth in the DIP Loan Documents, to (A) fund general corporate needs, including without limitation working capital and other general corporate purposes and (B) pay costs, premiums, fees, and expenses incurred to administer or related to these Chapter 11 Cases, including fees and expenses of professionals (including professional fees and expenses of the Debtors, the DIP Agent, the DIP Lenders, any Committee that may be appointed or any other party that are reimbursable by the Debtors, and including funding of the Carve-Out in accordance with the Orders) and adequate protection payments under the Orders. DIP Term Loan Note, § 1(d); Interim Order Preamble. |
| **Carve-Out** *Bankruptcy Rule 4001(c)(1)(B)* *Local Rule 4001-2(a)(i)(F)* | The "Carve-Out" is for certain statutory fees and allowed professional fees of the Debtors and any Committee appointed pursuant to section 1103 of the Bankruptcy Code, including Allowed Professional Fees incurred prior to delivery of a Carve Out Trigger Notice, and certain amounts, up to the Post-Carve Out Trigger Notice Cap, for Allowed Professional Fees incurred after delivery of the Carve-Out Trigger Notice, as more fully detailed in the Interim Order. Interim Order ¶¶ 3.1–3.7. |
| **Interest Rate & Expenses** *Local Rule 4001-2(a)(i)(B)* | Interest shall accrue on the DIP Loans at 10.5% *per annum*. Interest on the DIP Loans shall be payable in kind monthly, in arrears, on the last Business Day of each month. Facility fee: 2.0% of the Commitments constituting New Money DIP Term Loans, which shall be proportionately |

| Provision | Summary |
|---|---|
| | earned upon entry of the Interim Order and Final Order and payable in kind at maturity |
| | Agent fee: To be filed separately under seal. |
| | Exit fee: 2.0% of the Commitments constituting New Money DIP Term Loans, which shall be proportionately earned upon entry of the Interim Order and Final Order and payable on the Maturity Date |
| | DIP Term Loan Note, §§ 4, 8. |
| **Compliance with Budget** | The Budget contains a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive thirteen (13) weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the DIP Lender and shall be approved by the DIP Lender, in its sole discretion. |
| | DIP Term Loan Note, § 18(a); Interim Order ¶ F(iv). |
| **Reporting** | The Borrowers shall deliver to the DIP Agent each of the reports and other items set forth on Schedule I attached to the DIP Term Loan Note.  No more than once per week, the Borrowers shall make its senior management and its advisors available at reasonable times and upon reasonable advance request by the DIP Agent or DIP Lender to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Debtors. |
| | DIP Term Loan Note, § 14(i); Interim Order ¶ F(iv). |
| **Determination Regarding Prepetition Claims** *Bankruptcy Rule 4001(c)(1)(B)(iii)* | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition secured obligations. |
| | Interim Order ¶ E. |
| **Effect of Debtors' Stipulations on Third Parties** *Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)* | The stipulations, releases, agreements, and admissions contained in the Interim Order, including, without limitation, paragraph E hereof, and (subject to entry of a Final Order) the releases contained in clause (ix) thereof |

33418081.6

4926-5953-8774v.4

| Provision | Summary |
|---|---|
| | (collectively, the "<u>Debtors' Stipulations</u>"), shall be binding on the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes immediately upon entry of the Interim Order. The Debtors' Stipulations shall be binding on each other party in interest, including, without limitation, the Committee (if any), unless, and solely to the extent that (a) any such party in interest (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so), obtains requisite standing pursuant to an order of the Court entered prior to the Challenge Deadline (as defined in the Interim Order) and has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "**Challenge Proceeding**") by no later than the Challenge Deadline, (i) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, or otherwise objecting to or challenging any of the admissions, stipulations, findings or releases included in the Debtors' Stipulations, (ii) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action seeking reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery with respect to the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Secured Debt Documents, and (iii) asserting or prosecuting any other claim or Cause of Action of any nature or description whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition Secured Parties or their Representatives (subclauses (i)-(iii), collectively, the "**Challenges**", and each, a "**Challenge**"), and (b) there is entered a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such timely Challenge in any duly-filed Challenge Proceeding; |

33418081.6

26

4926-5953-8774v.4

| Provision | Summary |
|---|---|
| | provided, however, that as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date; provided, further, however, that any pleadings filed in connection with any Challenge Proceeding, including any motion filed with the Court seeking requisite standing and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall set otherwise forth with specificity the basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred. <br><br> Interim Order ¶ 5.1(a). |
| **Modification of Automatic Stay** <br> *Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay provisions of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition Secured Parties to accomplish the transactions contemplated by the Interim Order, including to: (a) permit the Debtors to grant the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Prepetition Secured Parties' Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent, Prepetition Agent or LiveStyle may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the Interim Order and the DIP Loan Documents; and (d) authorize the Debtors to pay, and the DIP Secured Parties and Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Final Order. <br><br> Following the expiration of the Remedies Notice Period and absent any order of the Court to the contrary, without further notice to, hearing or order from the Court, the automatic stay as to the DIP Agent shall automatically be vacated and modified for the purpose of permitting the applicable DIP Secured Parties to exercise any and all remedies available to them under or pursuant to the Interim Order, the DIP Loan Documents, and applicable law (including, without limitation, the enforcement of rights |

| Provision | Summary |
|---|---|
| | against DIP Collateral pursuant to paragraph 3.7), and following the payment in full in cash of all DIP Obligations, permitting the Prepetition Agent to exercise all rights and remedies available under the Prepetition Term Loan Documents or applicable law with respect to the Prepetition Collateral and the DIP Collateral.<br><br>Interim Order ¶ 1.7 and 4.6. |
| **Case Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)(vi)*<br><br>*Local Rule 4001-2(a)(i)(H)* | The Debtors agree to comply with the following Milestones:<br>(a)   No later than 2 Business Days after the Petition Date, the Interim Order shall be entered by the Bankruptcy Court;<br>(b)   No later than 5 Business Days after the Petition Date, the Debtors will file the Bidding Procedures Motion;<br>(c)   No later than 35 days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order;<br>(d)   No later than 35 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;<br>(e)   No later than 65 days after the Petition Date, the Debtors will have concluded accepting bid submissions;<br>(f)   No later than 75 days after the Petition Date, the Debtors will have concluded an auction for the sale of all or substantially all of the Debtors' assets and will have declared a successful bidder;<br>(g)   No later than 80 days after the Petition Date, the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Debtors' assets pursuant to one or a series of related or unrelated sale transactions;<br>(h)   No later than 95 days after the Petition Date, the sale of all or substantially all of the Debtors' assets approved by the Bankruptcy Court pursuant to one or a series of related or unrelated transactions shall have been consummated in full.<br><br>DIP Term Loan Note, § 14(h); Interim DIP Order Exh. D. |

| Provision | Summary |
|---|---|
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors are authorized to indemnify and hold harmless the DIP Agent, the DIP Lender, and their affiliates, officers, directors, employees, attorneys, and agents against any claims, losses, liabilities, or expenses (including reasonable legal fees) arising from the DIP Loan Transactions, except to the extent caused solely by such parties' bad faith, fraud, gross negligence, or willful misconduct; provided however such indemnification excludes liability for taxes (except in connection with non-tax claims) and any indirect, punitive, or consequential damages.<br><br>DIP Term Loan Note § 9; Interim Order ¶¶ E(viii); 1.6. |
| **Waiver of Rights under § 506(c)**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lender upon the DIP Collateral, or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against any of the DIP Agent, the DIP Lender, or the Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Secured Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).<br><br>Interim Order ¶ 6.11. |
| **Liens on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | Subject to entry of the Final Order, the DIP Collateral shall include the proceeds (the "**Avoidance Proceeds**") of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions")). |

| Provision | Summary |
|---|---|
| | Interim Order ¶ 2.1(b). |
| **Prohibition on Use of Estate Funds to Investigate Liens**<br><br>*Local Rule 4001-2(a)(i)(L)* | Notwithstanding the foregoing, no more than $25,000 in the aggregate of the proceeds of the DIP Facility, DIP Collateral, or Cash Collateral may be used by any Committee in connection with the investigation of, but not litigation of, any potential Challenge.<br><br>Interim Order ¶ 6.4(b). |

## LOCAL RULE 4001-2(a)(i) DISCLOSURES

47.     Local Rule 4001-2(a)(i) requires the disclosure of whether and where certain provisions are contained in post-petition financing motions and proposed orders or in the loan documents underlying those pleadings.  The Debtors hereby disclose the below provisions in accordance with Local Rule 4001-2(a)(i):

| | | | |
|---|---|---|---|
| (A) | See above – **DIP Facility / Borrowing Limits** | (M) | See above – **Events of Default** |
| (B) | See above – **Interest Rate & Expenses** | (N) | See above – **DIP Facility / Borrowing Limits** |
| (C) | None | (O) | See above – **DIP Facility / Borrowing Limits** |
| (D) | None | (P) | None |
| (E) | See above – **Conditions Precedent to Making Term Loans & Conditions Precedent to Withdrawal from the Escrow Account** | (Q) | See above - **Effect of Debtors' Stipulations on Third Parties** |
| (F) | See above – **Carve-Out** | (R) | None |
| (G) | See above – **DIP Collateral; DIP Lien Priority** | (S) | None |
| (H) | See above – **Milestones** | (T) | None |

| (I) | See above - **Prepayments** | (U) | None, subject to Final Order. |
|-----|------------------------------|-----|-------------------------------|
| (J) | None | (V) | None, subject to Final Order. |
| (K) | None | (W) | None, subject to Final Order. |
| (L) | See above - **Prohibition on Use of Estate Funds to Investigate Liens** | (X) | None, subject to Final Order. |

## BASIS FOR RELIEF REQUESTED

**I.  The Debtors Should Be Authorized to Obtain Post-Petition Financing Through the DIP Loan Documents.**

> **a.  Entering into the DIP Loan Documents is an Exercise of the Debtors' Sound Business Judgment.**

48.     The Court should authorize the Debtors, in exercising their sound business judgment, to enter into the DIP Loan Documents, obtain post-petition DIP financing under the DIP Facility, and continue using Cash Collateral as set forth in the Orders.  Courts grant considerable deference to a debtor's business judgment in obtaining post-petition secured credit so long as the agreement to obtain such credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

49.     To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006); *In re Dura Auto. Sys., Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at \*97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted); *see also In re Curlew Valley Assocs*., 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

50.     Courts generally will not second-guess a debtor's business decisions when those decisions are made on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See In re L.A. Dodgers LLC*, 457 B.R. at 313.  Further, in considering whether the terms of post-petition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc*., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

51.     The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility.

52.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms' length process and careful evaluation of their alternatives, or lack thereof.  Specifically, and in the face of severely limited cash on hand to fund these chapter 11 cases, the Debtors will require postpetition financing to preserve their assets through the sale and chapter 11 activities.  Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of its

advisors.  The Debtors believe that they have obtained the best and only financing option available at this time.

53.      The DIP Loans also contemplate a roll-up of certain Protective Advances that were made by the Prepetition Term Loan Lenders from time to time between May 14, 2025 and August 1, 2025 to provide the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.  The DIP Lenders were unwilling to provide the DIP Facility without the inclusion of the Roll-Up DIP Term Loans.   Additionally, general unsecured creditors or other parties in interest are not prejudiced by the Roll-Up DIP Term Loans because the Prepetition Term Loan Lenders are fully secured by perfected, first priority liens on property.  The Roll-Up DIP Term Loans merely affects the timing, not the amount, of the DIP Lender's recovery.  Given these circumstances, the Roll-Up DIP Term Loans are a reasonable and appropriate component of the DIP Facility and should be approved.

54.      Based on the circumstances of these chapter 11 cases, the DIP Facility represents a proper exercise of the Debtors' business judgment, and the Court should authorize the Debtors to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using Cash Collateral as set forth in the Orders.

> **b.  The Debtors Should Be Authorized to Grant Superpriority Liens and Superpriority Claims to Secure the DIP Facility.**

55.      The Debtors propose to obtain financing under the DIP Facility by providing superpriority security interests, liens, and superpriority claims as set forth in the DIP Loan Documents pursuant to section 364(c) and 364(d) of the Bankruptcy Code.  The liens set forth in the DIP Loan Documents on encumbered and unencumbered assets are common features of

postpetition financing facilities, and as set forth in the First Day Declaration, were a necessary feature to provide security for the proposed financing.

> i.    *The Debtors Satisfy the Condition Under Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis*

56.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under § 364(c)(2) was authorized, after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

57.    As described above and as set forth in the First Day Declaration, the DIP Lenders are providing the DIP Facility on a secured basis.  It is unlikely that any third-party lenders would be willing to provide a DIP facility on such terms or an unsecured or junior secured debt.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable, and adequate.

58.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over

any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  Given that the Debtors are unable to obtain unsecured credit, granting the DIP Liens on the basis set forth in the Orders and approving superpriority claims in favor of the DIP Lenders pursuant to section 364(c) is also reasonable and appropriate.

> ii.     The Debtors Should be Authorized to Obtain Priming Liens Under Section 364(d) of the Bankruptcy Code

59.     Section 364(d) provides that debtors may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the affected secured lenders consent, or (b) adequate protection exists for such priming lien.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

60.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets. Courts consider a number of factors, including, without limitation:

(a)     whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

(b)     whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(c)     whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

(d)     whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

(e)     whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *see also* 3 COLLIER ON BANKRUPTCY ¶ 364.04[1] (15th ed. rev. 2008).

61.     The Debtors submit that the priming of the Prepetition Liens by the DIP Liens should be approved by the Court.  *First*, as described above, the Debtors were unable to find alternative financing that preserved the Debtors as going-concern operations.  *Second*, the DIP Facility is necessary to preserve the Debtors' estates and continued operations.  *Third*, the terms of the DIP Financing are eminently reasonable under the circumstances.

62.     *Fourth*, the DIP Facility was negotiated at arm's length and in good faith.  The terms of the DIP Facility were the result of a thorough prepetition marketing process under the circumstances, and reflect a sound exercise of the Debtors' business judgment.  *Last*, the Debtors are offering their Prepetition Secured Creditors adequate protection in the form of replacement liens on all assets of the Debtors (subject and subordinate to the Carve Out, the DIP Liens, the Permitted Prior Liens, and the Non-Lender Existing Liens) and superpriority claims against the Debtors (subject and subordinate to the Carve-Out and the DIP superpriority claims).

63.     The Prepetition Term Loan Lenders and LiveStyle have consented to the Debtors'
incurrence of the DIP Facility and the priming of their respective Prepetition Liens.  This satisfies
the Bankruptcy Code's requirement for a priming lien with respect to those parties.

64.     With respect to the lenders with disputed transactions (TVT, Pinnacle, and Insta
Funding), the Debtors intend to assert several claims for relief, including (i) recharacterization of
the transactions as disguised financings rather than true sales of receivables, (ii) avoidance of the
unperfected security interests and/or sales of accounts receivable pursuant to section 544 of the
Bankruptcy Code and the applicable provisions of Article 9 of the Uniform Commercial Code,
(iii) recovery of amounts paid to TVT, Pinnacle, and Insta Funding as preferential and/or
fraudulent transfers, and (iv) disallowance of claims held by TVT, Pinnacle, and Insta Funding
under section 502(b) of the Bankruptcy Code.

65.     Nonetheless, in the interest of maintaining the status quo and avoiding lengthy
disputes at the first day hearing, the Debtors have agreed to escrow the amount that was in their
Bank Accounts when the Insta Funding prejudgment lien attached.  Insta Funding's prejudgment
lien would not extend to any amounts that enter the Bank Accounts after the Petition Date due to
the automatic stay under 11 U.S.C. § 362.  *See In re Manuel*, No. 14-53487, 2014 WL 7405571,
at *2 (Bankr. E.D. Mich. Dec. 24, 2014) (creditor's garnishment of debtor's bank account stops at
bankruptcy filing due to automatic stay); *In re Bailey*, 428 B.R. 694, 699 (Bankr. N.D.W. Va.
2010) (same). The Debtors believe that escrowing the amount that was present when the lien arose
pre-petition adequately protects any security interest that Insta Funding has in the account.  *See In
re Nine Point Energy Holdings, Inc.*, 2021 Bankr. LEXIS 1797, at *29 (Bankr. D. Del. July 7,
2021) (creating escrow sufficient to cover secured claim satisfies adequate protection).

66.     The Debtors have also agreed to escrow any amounts received due to food and

beverage sales pending the outcome of potential litigation against TVT, Pinnacle, and Insta Funding. Those amounts are not accounted for as receipts under the Initial Budget. Escrowing the amounts received due to food and beverage sales, pending the outcome of litigation, adequately protects any security interest that TVT, Pinnacle, or Insta Funding has in the receivables or any other assets of the Debtors. *Nine Point Energy Holdings*, 2021 Bankr. LEXIS 1797, at *29.

67.    Therefore, the Court should authorize the Debtors to grant superpriority liens and claims to the DIP Lenders to secure the DIP Facility.

### c.    The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate.

68.    After appropriate analysis, the Debtors have concluded that the DIP Facility presents the best route available at this time under the circumstances. Bankruptcy courts routinely defer to a debtor's business judgment on substantive business decisions, including the decision to borrow money, unless such decisions fail the arbitrary and capricious standard. *See Ames*, 115 B.R. at 40 (court should approve borrowings pursuant to § 364(c) and (d) if the debtor was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58–59 (Bankr. N.D.N.Y. 2005) (same); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of an interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgement... [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."). Indeed, "more exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interference with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (*citations omitted*).

69.    The terms and conditions of the DIP Facility are fair and reasonable. As discussed above, the Debtors properly assessed their financing needs and the DIP Facility proposal, and in

the sound exercise of the Debtors' business judgment, the DIP Facility represents the best option available under the circumstances. The Debtors and their restructuring advisors, on the one hand, and the DIP Lenders and their restructuring advisors, on the other hand, negotiated the terms of the DIP Facility in good faith and at arms'-length.

70.     The proposed DIP Facility subjects the security interests and secured claims of the DIP Lenders to the Carve-Out, thereby ensuring that, in the event of a default under the DIP Term Loan Note, the Debtors' estates and other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in this case. In *Ames*, the Court found such carve-outs for professional fees not only reasonable, but necessary to ensure that official committees and the debtors' estate could retain assistance from counsel. *See Ames*, 115 B.R. at 38–40 ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

71.     Further, the negotiated Milestones are a crucial element of the terms of the DIP Facility, and their inclusion in the DIP Term Loan Note is important to ensure that these chapter 11 cases proceed in a strategic, value-maximizing fashion. In similar contexts, this Court has entered interim financing orders that included express milestones for the progress of a debtor's case. *See, e.g.*, *In re Blink Holdings, Inc.*, Case No. 24-11686 (JKS) (Bankr. D. Del. Aug. 13, 2024) [Docket No. 63] (approving case milestones in the interim DIP financing order); *In re Coach USA, Inc.*, Case No. 24-11258 (MFW) (Bankr. D. Del. Jun. 13, 2024) [Docket No. 79] (same); *In re Nanostring Technologies, Inc.*, Case No. 24-10160 (CTG) (Bankr. D. Del. Feb. 6, 2024) [Docket No. 75] (same); *In re Pegasus Home Fashions, Inc.*, Case No. 23-11235 (MFW)

(Bankr. D. Del. Aug. 25, 2023) [Docket No. 34] (same); *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. Apr. 5, 2023) [Docket No. 71] (same).[9]

### d. The DIP Lenders Should Be Deemed a Good Faith Lender Under Section 364(e)

72.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11. U.S.C. § 364(e).

73.     The DIP Facility offers the most favorable terms available to the Debtors for post-petition financing and are the result of arm's length, good faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents with respect thereto, other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

---

[9]     The referenced orders are voluminous in nature and are not attached to this Motion.  However, in light of the requirements of Local Rule 7007-2(a)(vii), undersigned counsel has retained copies of each order and will make them available to the Court, if requested, or to any party that requests them.

33418081.6

4926-5953-8774v.4

## II.    The Use of Cash Collateral Is Appropriate

74.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) provides that:

> The trustee may not use, sell or lease cash collateral . . . unless—(A)   each entity that has an interest in such collateral consents; or (B)      the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

75.    The Debtors require the use of Cash Collateral to obtain services that are necessary to their business.  Although the use of Cash Collateral alone is insufficient to satisfy the Debtors' ongoing funding requirements for its business and the administration of these chapter 11 cases and consequently need to supplement with the funds provided by the DIP Facility, it is imperative that the Debtors obtain authority to use Cash Collateral, subject to the terms described herein and provided for in the Interim Order.  Accordingly, to obtain the necessary financing, and to avoid immediate and irreparable harm to its business and estate, the Debtors have an immediate need for authority to use the Cash Collateral as set forth in the Orders.

76.    During these chapter 11 cases, the Debtors will need access to their Cash Collateral to make payments that are essential for the operation of the Debtors' business.  An inability to use such funds during these chapter 11 cases could severely impact the success of these chapter 11 cases.  Indeed, without access to Cash Collateral, the Debtors and their estates will suffer immediate and irreparable harm.

77.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e) and should be authorized to use Cash Collateral.  As noted above, the Debtors intend to provide the Prepetition Secured Parties with adequate protection for the use of Cash Collateral that constitutes Prepetition Collateral.  Mitigating any potential operational damage from a consensual Cash Collateral agreement will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall value.  *See, e.g., 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); In re Sky Valley, Inc., 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

78.     The Prepetition Term Loan Lenders and LiveStyle have consented to the Debtors' use of Cash Collateral.  This satisfies the Bankruptcy Code's requirement for a priming lien with respect to those parties.

79.     With respect to the lenders with disputed transactions (TVT, Pinnacle, and Insta Funding), the Debtors intend to assert several claims for relief, including (i) recharacterization of the transactions as disguised financings rather than true sales of receivables, (ii) avoidance of the unperfected security interests and/or sales of accounts receivable pursuant to section 544 of the Bankruptcy Code and the applicable provisions of Article 9 of the Uniform Commercial Code, (iii) recovery of amounts paid to TVT, Pinnacle, and Insta Funding as preferential and/or fraudulent transfers, and (iv) disallowance of claims held by TVT, Pinnacle, and Insta Funding under section 502(b) of the Bankruptcy Code.

80.     Nonetheless, in the interest of maintaining the status quo and avoiding lengthy disputes at the first day hearing, the Debtors have agreed to escrow the amount that was in their Bank Accounts when the Insta Funding prejudgment lien attached.  Insta Funding's prejudgment lien would not extend to any amounts that enter the Bank Accounts after the Petition Date due to the automatic stay under 11 U.S.C. § 362.  *See In re Manuel*, 2014 WL 7405571, at \*2 (creditor's garnishment of debtor's bank account stops at bankruptcy filing due to automatic stay); *In re Bailey*, 428 B.R. at 699 (same). The Debtors believe that escrowing the amount that was present when the lien arose pre-petition adequately protects any security interest that Insta Funding has in the account.  *Nine Point Energy Holdings*, 2021 Bankr. LEXIS 1797, at \*29 (creating escrow sufficient to cover secured claim satisfies adequate protection).

81.     The Debtors have also agreed to escrow any amounts received due to food and beverage sales pending the outcome of potential litigation against TVT, Pinnacle, and Insta Funding.  Those amounts are not accounted for as receipts under the Initial Budget.  Escrowing the amounts received due to food and beverage sales, pending the outcome of litigation, adequately protects any security interest that TVT, Pinnacle, or Insta Funding has in the receivables or any other assets of the Debtors.  *Nine Point Energy Holdings*, 2021 Bankr. LEXIS 1797, at \*29.

82.     Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

## III.   Modification of the Automatic Stay is Appropriate

83.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Loan Documents require a modification of the automatic stay to implement the terms of the DIP Facility.  Stay modification provisions of this kind are ordinary

and standard features of postpetition DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

84.     Further, the Debtors have not been able to obtain DIP financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Facility, including the modification of stay provisions, are fair and reasonable, and were negotiated in good faith and at arms' length by parties represented by sophisticated counsel.  Accordingly, in light of the circumstances and the material benefits afforded to the Debtors by the DIP Facility, the modification of the automatic stay is warranted and appropriate.

## IV.     Interim Approval of the DIP Facility Should be Granted

85.     Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Fed. R. Bankr. P. 4001(c)(2).

86.     The Debtors request that the Court authorize the Debtors to obtain access to $10,000,000 in the aggregate on an interim basis pending the Final Hearing.  This relief will enable the Debtors to maintain their operations in a manner that will permit the Debtors to preserve and maximize value.

87.     Absent the Court's entry of the Interim Order, the Debtors' business  would suffer immediate and irreparable harm.  The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral to, among other things, pay the initial costs and expenses associated with administering these chapter 11 cases.  Without

access to the DIP Facility and the continued use of Cash Collateral to the extent authorized pursuant to the Interim Order, the Debtors and their estates would suffer immediate and irreparable harm, as the Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without access to the DIP Facility and the authorized use of Cash Collateral. Simply put, the failure to obtain interim and final approval of the DIP Facility will imperil the Debtors' chapter 11 efforts to the detriment of all stakeholders.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

88.     The Debtors assert that immediate relief is necessary to avoid immediate and irreparable harm. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, entry of the Proposed Interim Order is integral to the Debtors' ability to successfully transition into chapter 11 and run an orderly sale. Specifically, the relief requested is necessary to avoid a severe disruption of the Debtors' sale process and operations at this critical juncture and, in turn, to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully requests that the Court approve the relief requested in this Motion.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

89.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing

operations and value-maximization process.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

90.    Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## NOTICE

91.    Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) Alter Domus (US) LLC, as administrative agent and collateral agent under the Prepetition Financing Agreement and the DIP Facility; (d) counsel to the DIP Lenders and Prepetition Term Loan Lender; (e) counsel to LiveStyle; (f) all other parties asserting a lien on or a security interest in the assets of the Debtors

33418081.6

4926-5953-8774v.4

to the extent reasonably known to the Debtors; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms of the Interim Order filed with this Motion and the Final Order, granting the relief requested herein and granting such other relief as is just and proper.

Dated:    August 4, 2025
         Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ S. Alexander Faris*
Sean M. Beach (No. 4070)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
S. Alexander Faris (No. 6278)
Sarah Gawrysiak (No. 7403)
Evan S. Saruk (No. 7452)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:   sbeach@ycst.com
        emorton@ycst.com
        kenos@ycst.com
        afaris@ycst.com
        sgawrysiak@ycst.com
        esaruk@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*

33418081.6

48

4926-5953-8774v.4

**Exhibit A**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25- 11446([●]) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection To Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Motion")[2] of the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors"), for entry of an interim order (this "Interim Order") and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) 364(c)(3), 364(d), 364(e), 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001(b) and (c), 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals, LLC (8854); Made Event, LLC (6272); and Reynard Productions, LLC (5431).  The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

[2] Each capitalized term used but not defined herein shall have the meaning ascribed to it in the applicable DIP Loan Documents (as defined below).

1

Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (together, the "Local Rules"), requesting, among other things:

(1)        authorization for Avant Gardner, LLC, a New York limited liability company "Avant Gardner") and AGDP Holding Inc., a New York corporation ("AGDP" and, together with Avant Gardner, the "Borrowers") to obtain postpetition financing pursuant to the DIP Facility (as defined below), and for each of the Debtors (other than the Borrowers) (the "Guarantors") to guarantee unconditionally on a joint and several basis, and subject to the terms and limitations set forth in the DIP Loan Documents in all respects, the Borrowers' obligations under the DIP Facility, consisting of  a senior secured super-priority term loan facility (the "DIP Facility"), on the terms and conditions set forth in that certain Debtor in Possession Term Promissory Note in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Term Loan Note," and, together with any other related agreements, documents, guarantees, security agreements, or pledge agreements, including this Interim Order and the Final Order, collectively, the "DIP Loan Documents"), by and among the Borrowers, Alter Domus (US) LLC, as administrative agent and collateral agent (in each such capacity, the "DIP Agent"[3]), and the lenders party thereto from time to time (the "DIP Lenders," and, together with the DIP Agent, the "DIP Secured Parties"), in an aggregate principal amount of up to $45,803,621.66[4] in term loan commitments (of which $25,000,000.00 shall be in the form of new money term loans (the "New Money DIP Term Loans") and, subject to entry of the Final Order, $20,803,621.66 shall be in the

---

[3] Any reference to the DIP Agent set forth herein shall mean ADUS (as defined below in paragraph (E)(i)) in its capacity as administrative agent or collateral agent, as appropriate based on the context in which such term is used.

[4] The Roll-Up DIP Term Loans represent Protective Advances (as defined in the Prepetition Financing Agreement; defined below) made by the Prepetition Term Loan Lenders from time to time between May 14, 2025 and the Petition Date to provide the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.

form of roll-up term loans (the "Roll-Up DIP Term Loans," and together with the New Money
DIP Term Loans, the "DIP Term Loans")), of which an aggregate funded interim principal amount
of DIP Term Loans not to exceed $10,000,000.00 (the "Interim DIP Term Loans") shall be
available to the Borrowers upon entry of this Interim Order and satisfaction of the other conditions
set forth herein and in the DIP Loan Documents prior to entry of the Final Order, and (y) the
remainder of which (including the Roll-Up DIP Term Loans) shall be available upon entry of the
Final Order to the extent set forth therein.

(2)      authorization for the Debtors to execute, deliver, and enter into the DIP Loan
Documents and to perform all of the Debtors' respective obligations thereunder, and such other
and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorization for the Debtors to pay the principal, interest, fees, expenses and other
amounts payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including,
without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit
fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and
disbursements of the DIP Secured Parties (including the reasonable and documented out-of-pocket
fees and expenses of the DIP Secured Parties' attorneys, advisors, accountants and other
consultants) and any obligations in respect of indemnity claims, whether contingent or absolute,
in each case, to the extent constituting Borrower and/or Guarantor obligations of any kind under
the DIP Loan Documents (collectively, the "DIP Obligations");

(4)      authorization for the Debtors, immediately upon entry of this Interim Order, to use
proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and solely in
accordance with this Interim Order and the applicable Approved Budget (as defined below),
subject to Permitted Variances (as defined below) and other exclusions set forth in the DIP Loan

Documents, to: (A) fund general corporate needs, including without limitation working capital and other general corporate purposes and (B) pay costs, premiums, fees, and expenses incurred to administer or related to the Chapter 11 Cases, including fees and expenses of professionals (including professional fees and expenses of the Debtors, the DIP Agent, the DIP Lenders, any Committee (as defined below) that may be appointed or any other party that are reimbursable by the Debtors, and including funding of the Carve-Out in accordance with this Interim Order and the Final Order) and adequate protection payments under this Interim Order and the Final Order;

(5)     the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve-Out (as defined below);

(6)     granting the DIP Agent, for the benefit of itself and the other DIP Secured Parties, valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting Prepetition Collateral (as defined below), including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code and further defined below), to secure the DIP Obligations, which DIP Liens shall be subject only to the Carve-Out and Permitted Prior Liens (as defined below) and the relative rankings and priorities set forth herein and in **Exhibit B**;

(7)     authorization for the borrowing, funding and application of the Roll-Up DIP Term Loans for the Protective Advance Refinancing to the extent hereinafter set forth;

(8)     authorization for the Debtors to use, solely in accordance with the Approved Budget, subject to Permitted Variances and other exclusions set forth in the DIP Loan Documents, any Cash Collateral in which any of the Prepetition Secured Parties (as defined below) may have

an interest, and the granting of adequate protection solely to the extent of any postpetition diminution in the value of their respective interests in the Prepetition Collateral, including, without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral, (iii) the subordination of the Prepetition Secured Obligations to the Carve-Out, (iv) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (v) the priming of the Prepetition Liens by the DIP Liens on the Prepetition Collateral (as defined below), and (vi) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

(9)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(10)     a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and, subject to entry of the Final Order, the Prepetition Collateral, and subject to entry of the Final Order, any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(11)     this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(12)     the scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(13)     granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on August [___], 2025 (the "Interim Hearing"), and the Court having found that, under the circumstances, due and sufficient notice of the Motion and Interim Hearing was provided by the Debtors as set forth in Paragraph D of this Interim Order, and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration of Gary Richards in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. ___] (the "First Day Declaration"), the *Declaration of Jeffrey Gasbarra in Support of Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Providing Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing the Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Gasbarra Declaration") and the *Declaration of Stephen Golmont in Support of Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Providing Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing the Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Golmont Declaration" and together with the Gasbarra Declaration, the "DIP Declarations"), filed contemporaneously with the Motion; any exhibits in connection with the foregoing, and the filings and pleadings in these Chapter 11 Cases, the Court having found that the interim relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and

represents a sound exercise of the Debtors' business judgment and is essential for the continued operation and maintenance of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[5]

(A)    <u>Petition Date</u>. On August 4, 2025 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief (each, a "<u>Petition</u>") commencing these cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate and maintain their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No chapter 11 trustee or examiner has been appointed in any of the Chapter 11 Cases.

(B)    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Court may enter this Interim Order and a Final Order consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rule 4001-2.

---

[5] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(C)     Committee Formation. As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code or any other statutory committee has been appointed in the Chapter 11 Cases.

(D)     Notice.  Notice of the Motion, the interim relief requested therein, and the Interim Hearing (the "Notice") has been provided by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on: (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis) (the "30 Largest Unsecured Creditors"); (c) McDermott, Will & Schulte, LLP, as counsel to the Prepetition Term Loan Lenders (as defined below) and the DIP Lenders; (d) Holland & Knight LLP, as counsel to the Prepetition Agent (as defined below) and DIP Agent; (e) Cullen and Dykman LLP, counsel to LiveStyle Holdings, Inc., NYC Festivals, LLC, NYC Club Event, LLC and SFXE IP LLC (collectively, LiveStyle"); (f)  all other parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

(E)     Debtors' Acknowledgments, Agreements, and Stipulations. In requesting the DIP Facility and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Secured Parties and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facility, access to the Cash Collateral, and subordination of the Prepetition Liens (as defined below) to the DIP Liens and the Carve-Out, as provided herein, and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral as set forth herein, subject to the rights of parties in interest (other than the Debtors) set forth in paragraph 5.1 of this

8

Interim Order, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows:

   (i)  <u>Prepetition Term Loan Facility</u>. The Borrowers, EZ Festivals, LLC, a Delaware limited liability company, Made Event, LLC, a Delaware limited liability company ("<u>Made Event</u>"), and Reynard Productions LLC, a New York limited liability company ("<u>Reynard</u>") (each a "<u>Prepetition Guarantor</u>" and collectively, the "<u>Prepetition Guarantors</u>"; and together with the Borrowers, the "<u>Prepetition Loan Parties</u>"), the lenders from time to time party thereto (each a "<u>Prepetition Term Loan Lender</u>" and collectively, the "<u>Prepetition Term Loan Lenders</u>"), Alter Domus (US) LLC, a Delaware limited liability company ("<u>ADUS</u>"), as administrative agent and collateral agent for the Prepetition Term Loan Lenders (in each such capacity, together with its successors and assigns in such capacity, the "<u>Prepetition Agent</u>")[6] are parties to that certain Amended and Restated Financing Agreement, dated as of July 1, 2024 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Prepetition Financing Agreement</u>", and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Term Loan Secured Parties, including, without limitation, all security agreements, deposit account control agreements (including, without limitation, the Control Agreements (as defined below)), control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "<u>Prepetition Term Loan Documents</u>").  Pursuant to the Prepetition Financing Agreement, the Prepetition Term Loan Lenders made term loans and protective advances to the

---

[6] The Prepetition Agent and the Prepetition Term Loan Lenders are collectively referred to herein as the "Prepetition Term Loan Secured Parties."

Borrowers in the aggregate principal amount of $141,908,103.77 (the "Prepetition Term Loans"). As of the Petition Date, approximately $143,642,297.06 of indebtedness under the Prepetition Financing Agreement was outstanding, and, together with any other amounts outstanding under the Prepetition Term Loan Documents, including interest, fees, and expenses, the "Prepetition Term Loan Obligations").  Pursuant to the Prepetition Term Loan Documents, the Prepetition Loan Parties granted to the Prepetition Agent, for the benefit of the Prepetition Term Loan Secured Parties, properly perfected and continuing liens on and security interests in substantially all of the Prepetition Loan Parties' assets, including (without limitation) all "Collateral" (as defined in the Prepetition Term Loan Documents) (such liens and security interests, the "Prepetition Term Loan Liens").

(ii)    LiveStyle Subordinated Loan Obligations.  Avant Gardner, Parent, Made Event, and Reynard (collectively, the "Prepetition LiveStyle Credit Parties", and together with the Prepetition Term Loan Parties, the "Prepetition Secured Debt Obligors"), on the one hand, and LiveStyle (the "Prepetition LiveStyle Secured Parties", and together with the Prepetition Term Loan Secured Parties, the "Prepetition Secured Parties"), on the other hand, are parties to that certain Promissory Note dated as of July 16, 2024 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition LiveStyle Note", and together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition LiveStyle Credit Parties, including, without limitation, all security agreements, deposit account control agreements, control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition LiveStyle Debt Documents", and together with the Prepetition Term Loan

Documents, the "Prepetition Secured Debt Documents").   Pursuant to the Prepetition LiveStyle Note, the Prepetition LiveStyle Credit Parties agreed to pay LiveStyle an aggregate principal amount of $10,816,000.00.  As of the Petition Date, approximately $11,961,365.00 was owed by the Prepetition LiveStyle Credit Parties to LiveStyle, which includes interest, fees, and expenses (the "Prepetition LiveStyle Obligations" and together with the Prepetition Term Loan Obligations, the "Prepetition Secured Obligations").   Pursuant to the Security Agreement (as defined in the Prepetition LiveStyle Note), the Prepetition LiveStyle Credit Parties granted to LiveStyle properly perfected and continuing liens on and security interests in substantially all of the Prepetition LiveStyle Credit Parties' assets, including (without limitation) all "Collateral" (as defined in the Prepetition LiveStyle Debt Documents) (such liens and security interests, the "Prepetition LiveStyle Liens", and together with the Prepetition Term Loan Liens, the "Prepetition Liens").

(iii)     Prepetition Intercreditor Agreement. The Prepetition Agent, LiveStyle and the Prepetition Secured Debt Obligors (among others) are parties to that certain Intercreditor Agreement, dated as of November 16, 2023 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Intercreditor Agreement"). The Prepetition Agent and LiveStyle acknowledge and agree that the Prepetition Intercreditor Agreement is a valid and enforceable "subordination agreement" under section 510(a) of the Bankruptcy Code and other applicable non-bankruptcy law and is, as of the Petition Date, binding on the Prepetition Agent, the Prepetition Term Loan Lenders, LiveStyle and each of the other parties thereto.

(iv)     Prepetition Collateral. To secure the Prepetition Secured Obligations, the Debtors entered into certain guaranty and collateral agreements and certain other security documents governing the Prepetition Secured Parties' security interests in the Prepetition

Collateral (such agreements, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "<u>Prepetition Collateral Documents,</u>" and the assets subject to the liens and security interests granted thereunder, the "<u>Prepetition Collateral</u>"). Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein, the Debtors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition Collateral.

(v)     <u>Prepetition Secured Obligations</u>. The Prepetition Secured Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code and this Interim Order), and no portion of the Prepetition Secured Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases (as defined below).

(vi)     <u>Prepetition Liens</u>. The Prepetition Liens granted to the Prepetition Secured Parties (A) constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code and this Interim Order), and perfected security interests in and liens on the Prepetition Collateral, (B) were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and (C) are not subject to defense, counterclaim, recharacterization, subordination,

avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases.

(vii)    No Challenges/Claims. No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees with respect to the Prepetition Secured Debt Documents, the Prepetition Secured Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents. The Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(viii)    Indemnity. The DIP Agent and the DIP Lenders have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approval of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens (as defined below), any challenges or objections to the DIP Facility

or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the  DIP Agent and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. Except as otherwise provided in this paragraph E(viii), no exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph E(viii) or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the DIP Agent or the DIP Lenders, as the case may be.

(ix)     <u>Release</u>. Subject to paragraph 5.1 of this Interim Order and subject to entry of the Final Order, each of the Debtors, their Estates and the Prepetition Loan Parties, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns have agreed to provide releases to each of the Released Parties (as defined below) as provided in paragraph 5.17 of this Interim Order.

(x)     <u>Cash Collateral</u>. The Debtors admit, stipulate, acknowledge, and agree that all of the cash of the Debtors, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors, as income, proceeds, products, rents or profits of other Prepetition Collateral, or otherwise, constitutes "<u>cash collateral</u>" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

(F)     <u>Findings Regarding the Postpetition Financing and Use of Cash Collateral</u>.

(i)     <u>Request for Postpetition Financing</u>. The Debtors have requested from the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of this Interim

Order and satisfaction of the conditions set forth in the DIP Loan Documents, to extend the DIP Loans on the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(ii)    <u>Need for Postpetition Financing and Use of Cash Collateral</u>. The Debtors do not have sufficient liquidity, including Cash Collateral, to operate and maintain their businesses in the ordinary course of business without the financing requested in the Motion. The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations and other efforts and activities is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties and the use of Cash Collateral as set forth in this Interim Order, the DIP Term Loan Note and the other DIP Loan Documents, as applicable, is vital to the preservation, maximization and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in this Interim Order to, among other things, permit the orderly continuation of the operation and maintenance of their businesses, minimize the disruption of their business operations and other efforts and activities and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>. The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien

pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors demonstrated in the Motion, in the First Day Declaration, in the DIP Declarations, and on the record at the Interim Hearing, that it would be futile under the circumstances for the Debtors to undertake further efforts to seek, and they would not obtain, the necessary postpetition financing, let alone on terms more favorable, taken as a whole, than the financing offered by the DIP Secured Parties pursuant to the DIP Loan Documents. In light of the foregoing, and considering the futility of all other alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to the Debtors at this time, and are in the best interests of the Debtors, their Estates, and all of their stakeholders.

(iv)     Budget. The Debtors have prepared and delivered to the DIP Agent and DIP Lender an initial budget (the "Initial Budget"), a copy of which is attached hereto as **Exhibit C**. The Initial Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved by the DIP Agent (at the written direction of the DIP Lender) and then in effect, the "Approved Budget"), in each case, subject to (i) permitted variances with respect to maximum cumulative disbursement variances ("Permitted Variances"; which variances shall be tested on a biweekly basis (i.e., every two weeks)) of, in respect of the aggregate amount of actual Total Operating Disbursements, (x) 15% for the Initial Two Week Disbursements Period, (y) 15% for the Initial Three Week Disbursements Period, and (z) 15% for the Initial Four Week Disbursements Period and each Four Week Disbursements Period thereafter; and (ii) other exclusions set forth in the DIP Loan Documents.  The Debtors believe that the Initial Budget is

16

reasonable under the facts and circumstances. The DIP Secured Parties and Prepetition Secured Parties are relying upon the Debtors' agreement to comply with the terms set forth in the DIP Term Loan Note, the other DIP Loan Documents, this Interim Order, and with the Approved Budget, in determining to enter into the postpetition financing arrangements provided for herein and to consent to the Debtors' use of Cash Collateral as set forth herein. The Debtors shall provide the DIP Agent and the DIP Lender a revised proposed budget every Thursday beginning on August 21, 2025, and continuing each week thereafter (each, a "Proposed Budget"). If a Proposed Budget is approved by the DIP Agent (at the written direction of the DIP Lender), it shall become the Approved Budget. If the DIP Agent do not approve a Proposed Budget, the last Approved Budget prior to the delivery of the applicable Proposed Budget shall remain the Approved Budget as provided herein.

(v)     Sale Process. The DIP Lenders' willingness to make the DIP Loans and the Prepetition Secured Parties' willingness to consent to the use of Cash Collateral (each on the terms and subject to the conditions set forth in the DIP Loan Documents and this Interim Order) is predicated upon (i) the Debtors seeking authority to sell all or substantially of their assets to one or more buyers pursuant to section 363 of the Bankruptcy Code by filing a motion (the "Bid Procedures Motion") for entry of an order (a) authorizing and approving bid procedures for the sale of all or substantially all of their assets, (b) selecting Buyer as the stalking horse bidder, subject to higher or better offers, and (c) establishing other sale-related procedures and deadlines by no later than the Petition Date and (ii) the Debtors' retention of Portage Point Partners ("Portage Point") to advise them in connection with, among other things, the sale of the Debtors' assets. Absent such arrangements, the DIP Lenders and the Prepetition Secured Parties would not have

agreed to make the DIP Loans or consent to the use of Cash Collateral (as applicable) as provided in the DIP Loan Documents and this Interim Order.

(vi)    <u>Certain Conditions to DIP Facility</u>. The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things: (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the Debtors obtaining Court approval of, and the Debtors' compliance with, the "<u>Milestones</u>" set forth on **Exhibit D**, which are hereby approved in all respects; (c) the provision of adequate protection of the Prepetition Secured Parties' interests in the Prepetition Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code; and (d) the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facilities and all other obligations of the Debtors under the DIP Loan Documents, subject to the priorities described in **Exhibit B** annexed hereto, superpriority perfected security interests in and liens upon all property and assets of the Debtors (subject to the Carve-Out), including, but not limited to, a valid and perfected security interest in and lien upon all of the following now existing or hereafter arising or acquired property and assets: (i) all property and assets comprising Prepetition Collateral and (ii) all other property and assets of the Debtors, including any property or assets consisting of "<u>Excluded Assets</u>" under any of the Prepetition Secured Debt Documents (collectively hereinafter referred to as the "<u>DIP Collateral</u>" which, for the avoidance of doubt, shall, subject to the entry of the Final Order, include the proceeds (the "<u>Avoidance Proceeds</u>") of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "<u>Avoidance Actions</u>")).

(vii)    <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>. Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Facility, the DIP Liens, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(viii)    <u>Sections 552(b) and 506(c)</u>. The Debtors have agreed as a condition to obtaining financing under the DIP Facility and the use of Cash Collateral as set forth in this Interim Order that as a material inducement to the DIP Secured Parties to agree to provide the DIP Facility and the Prepetition Secured Parties' consent to the use of Cash Collateral as set forth in this Interim Order, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (c) the consensual use of Cash Collateral consistent with the Approved Budget, the terms of the DIP Term Loan Note, and the terms of this Interim Order, each of the DIP Secured Parties and the Prepetition Secured Parties are entitled (subject to the entry of the Final Order) to receive (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(ix)    <u>Good Cause</u>. Good cause has been shown for the entry of this Interim Order. The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest

of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' remaining operating businesses, ongoing operations and other applicable activities and efforts, including the pursuit of a Court-approved marketing and sale process, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets. The terms of the DIP Facilities and this Interim Order are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration. The DIP Facilities and this Interim Order are the product of reasonable, arm's length, good faith negotiations between the Debtors, the DIP Secured Parties and the Prepetition Secured Parties.

(x)      <u>Refinancing of the Protective Advances</u>.

(a)      The roll-up of the Protective Advances with the proceeds of borrowings under the DIP Facility in accordance with this Interim Order (but subject to the provisions of paragraph 5.1 hereof) is necessary as the Prepetition Term Loan Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve-Out and the DIP Liens, in each case as provided in this Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Facility.  Moreover, as set forth in the Golmont Declarations, in consideration of the entry of this Interim Order authorizing the roll-up of the Protective Advances with the proceeds of the DIP Facility subject to the terms and conditions set forth herein, the Prepetition Term Loan Secured Parties have agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition Financing Agreement) on $117,983,827.51 of Prepetition Term Loan Obligations. As set forth in the DIP

Declarations, the Protective Advances were made by the Prepetition Term Loan Lenders in the months leading up to the commencement of these Chapter 11 cases so as to avoid immediate and irreparable harm to the Debtors' businesses, their estates and their creditors.

(xi)    <u>Adequate Protection</u>. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), as set forth in this Interim Order.

(xii)    <u>Immediate Entry</u>. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled), and all reservations of rights included therein, are hereby denied and overruled on the merits.

(xiii)    <u>Interim Hearing</u>. Proper, timely, adequate, and sufficient notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules.  No order or further notice of the Motion or entry of this Interim Order shall be required.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.    <u>Authorization and Conditions to Financing and Use of Cash Collateral</u>.

1.1    <u>Motion Granted</u>. The Motion is granted solely to the extent provided in this Interim Order. Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled on the merits.

1.2    <u>Authorization of DIP Financing and Use of Cash Collateral</u>.

(a)     The Debtors are hereby authorized to execute and deliver the DIP Loan Documents and to borrow, incur, and guarantee (as applicable) DIP Term Loans, pursuant to the terms and conditions of the DIP Loan Documents, this Interim Order and the Approved Budget, in each case up to an aggregate principal amount equal to $10,000,000.00 of Interim DIP Term Loans on an interim basis, together with applicable interest, expenses, fees, Protective Advances and other charges payable in connection with the DIP Facility and, subject to entry of the Final Order, an additional $15,000,000.00 of New Money DIP Term Loans and $20,803,621.66 of Roll-Up DIP Term Loans, together with applicable interest, expenses, fees, Protective Advances, and other charges payable in connection with the DIP Facility, which shall be used for the purposes permitted under the DIP Loan Documents, including, without limitation, to "roll up" and refinance a portion of the Protective Advances pursuant to the Protective Advance Refinancing as provided herein and to pay interest, fees, expenses and other charges in accordance with this Interim Order, the DIP Loan Documents and the Approved Budget (subject to Permitted Variances).

(b)     The Debtors are hereby authorized to (i) borrow under the DIP Facilities and use Cash Collateral during the period (the "Interim Financing Period") commencing on the date of this Interim Order through and including the earlier to occur of (x) the date of entry of the Final Order or (y) the occurrence of a DIP Termination Event (as defined below) solely in accordance with, and for the purposes permitted by, the DIP Loan Documents, this Interim Order and the Approved Budget (subject to Permitted Variances), (ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Term Loan Note and other DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order, the Approved Budget, the DIP Term Loan Note, and the other DIP Loan Documents, and (iii) effectuate the

Protective Advance Refinancing (as defined below). The Initial Budget is hereby approved in all respects.

      1.3    <u>Financing Documents</u>.

      (a)    <u>Authorization</u>. The Debtors are hereby authorized to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents. No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or foreign law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

      (b)    <u>Approval; Evidence of Borrowing Arrangements</u>. The DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in any of these Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties in interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

      (c)    <u>Payment of DIP Fees and Other Expenses</u>. Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "<u>DIP Fees</u>") are hereby approved and the Debtors are hereby authorized to pay, in cash and on

a current basis, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agent and the DIP Lenders incurred at any time, to the extent and as provided by the DIP Loan Documents and this Interim Order in accordance with paragraph 6.15 hereof.

(d)     Amendments to DIP Loan Documents. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agent and/or DIP Lender may waive any provisions in the DIP Loan Documents, without further approval of the Court; *provided* that any amendments, modifications, or supplements to any DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "Material DIP Amendments"), shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the DIP Agent and the Prepetition Agent, (ii) counsels to the DIP Agent and DIP Lender; (iii) counsel for the other Prepetition Secured Parties, (iv) counsel to any Committee, or, in the event no such Committee is appointed at the time of such Material DIP Amendment, the 30 Largest Unsecured Creditors, and (v) the U.S. Trustee; *provided*, *further*, that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment that is subject to an objection filed within five (5) Business Days following receipt of such Material DIP Amendment must be approved by the Court.

1.4     Refinancing of Protective Advances.

(a)     Subject to entry of the Final Order, on the date of each borrowing of New Money DIP Term Loans under the DIP Loan Documents, the Prepetition Term Loan Obligations

in respect of Protective Advances held by the DIP Lenders shall, subject to paragraph 5.1 hereof, immediately, automatically and irrevocably be deemed to have been fully refinanced by, and the DIP Lenders shall be deemed to have funded, Roll-Up DIP Term Loans on the Final Order Closing Date (the "Protective Advance Refinancing"), which Roll-Up DIP Term Loans shall be entitled to all the priorities, privileges, rights and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Loan Documents, in each case subject to the terms and conditions set forth in the Final Order, the DIP Loan Documents and paragraph 5.1 below. Until (a) all objections and challenges (including, without limitation, any Challenge Proceeding (as defined in paragraph 5.1 hereof)) to (1) the liens, security interests and claims of the Prepetition Term Loan Agent (including, without limitation, liens granted for adequate protection purposes) and/or (2) the Prepetition Term Loan Obligations (in each case in respect of the Protective Advances[7]) have been waived, denied or barred, and (b) all of the Debtors' Stipulations (as defined in paragraph 5.1 hereof) have become binding on their estates and parties in interest in accordance with paragraph 5.1 hereof, all liens, security interests and claims of the Prepetition Term Loan Agent (including, without limitation, liens granted for adequate protection purposes) in respect of the Protective Advances and the Protective Advance Refinancing shall remain valid and enforceable with the same continuing priority as described herein and the Prepetition Term Loan Documents shall remain in full force and effect; *provided*, however, that, subject to the results of any applicable Challenge Proceeding, to the extent that Protective Advances have been rolled-up pursuant to the Protective Advance Refinancing and have become and are DIP Obligations, such Protective Advances shall not be due or owing separately under the Prepetition Term Loan Documents; *provided, further*, however, that nothing in the foregoing proviso shall alter or diminish, or be

---

[7] "Protective Advances" means the protective advances under the Prepetition Term Loans.

deemed to alter or diminish, the Adequate Protection (as defined herein) of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders.

      1.5    <u>DIP Term Loan Funding; Prepetition Intercreditor Agreement</u>.

      (a)    The proceeds of the DIP Term Loans shall be funded into an account under the Debtors' cash management system and such account shall be specified in a Borrowing Request delivered to the DIP Agent by a Responsible Officer of the Debtors.  The Debtors may request DIP Term Loans no more frequently than once per week.  The Debtors shall be permitted to receive proceeds of the DIP Term Loans if such Borrowing Request provides, among other things, that the amount of the requested DIP Term Loans complies with the Borrowing Liquidity Condition.[8]

      (b)    Except to the extent that it is modified as expressly set forth herein, the Prepetition Intercreditor Agreement shall remain in full force and effect.

      1.6    <u>Indemnification</u>. The Debtors are authorized to indemnify and hold harmless the DIP Agent, the DIP Lender, and, in each case solely in their capacities as such, each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents, and representatives (each, an "<u>Indemnified Party</u>"), in accordance with, and subject to, the DIP Loan Documents.

      1.7    <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order, including to: (a) permit the Debtors to grant the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Prepetition Secured Parties'

---

[8] The terms "Borrowing Request", "Responsible Officer", and "Borrowing Liquidity Condition" shall have the meanings ascribed thereto in the DIP Term Loan Note.

Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent, Prepetition Agent or LiveStyle may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under this Interim Order and the DIP Loan Documents; and (d) authorize the Debtors to pay, and the DIP Secured Parties and Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Final Order.

Section 2.      Postpetition Lien; Superpriority Administrative Claim Status.

2.1      Postpetition Lien.

(a)      Postpetition DIP Lien Granting. To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of the DIP Secured Parties, shall have and are hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (the "DIP Liens") in and upon all DIP Collateral, subject to the Carve-Out, Permitted Prior Liens and the rankings and priority set forth in paragraph 2.1(b) below and as set forth on **Exhibit B** hereto.

(b)      DIP Lien Priority in DIP Collateral.

(i)      The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or

any other section of the Bankruptcy Code or other applicable law;[9] *provided*, however, that the DIP Liens on (A) the Prepetition Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve-Out and Permitted Prior Liens[10]; (B) assets of the Debtors (the "Non-Lender Encumbered Assets") that were subject to validly perfected liens or security interests as of the Petition Date other than the Prepetition Liens (if any, the "Non-Lender Existing Liens") shall be subject to such Non-Lender Existing Liens and the Carve-Out; and (C) any other assets of the Debtors ("Unencumbered Assets") that were not subject to any validly perfected liens or security interest as of the Petition Date (including, subject to the entry of a Final Order, Avoidance Proceeds) shall be subject to the Carve-Out, in each case as such priorities are set forth in **Exhibit B**.[11]

(c)      Postpetition Lien Perfection. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Prepetition Secured Parties' Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any

---

[9] The DIP Liens shall "prime" and be senior to the Prepetition Liens pursuant to section 364(d)(1) if the Bankruptcy Code. The Prepetition Secured Parties have consented to the priming of their Prepetition Liens.

[10] For purposes of this Interim Order, "Permitted Prior Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens.

[11] In the event of any conflict or inconsistency between the terms and provisions of this Interim Order and **Exhibit B**, **Exhibit B** shall control.

certificates of title (a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if any DIP Agent or Prepetition Secured Party, as applicable, shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then such DIP Agent or Prepetition Secured Party, as applicable, is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents and this Interim Order, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law. The DIP Agent or Prepetition Secured Parties, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law. Should any DIP Agent or Prepetition Secured Party, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)    To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Prepetition Secured Parties' Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the

judicial power and authority of this Court; provided, however, that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens. By virtue of the terms of this Interim Order, to the extent that any DIP Agent or Prepetition Secured Party, as applicable, has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Interim Order without further action by the DIP Agent or Prepetition Secured Party, as applicable.

(e)    Except as provided in this Interim Order, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Parties' Adequate Protection Liens, and the Prepetition Secured Parties' Adequate Protection Claims (as defined below) (i) other than the Carve-Out, shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of these Chapter 11 Cases or any Successor Cases; (ii) shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or elected in these Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of these Chapter 11 Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim; and (iii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

2.2    Superpriority Administrative Expenses.

(a)    DIP Loans. Subject to the priorities set forth on **Exhibit B** and the Carve-Out, on account of all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agent, for the benefit of themselves and

the DIP Lender, are granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (the "DIP Superpriority Claims"), in each case, other than the Carve-Out which shall have priority over the DIP Superpriority Claims.

Section 3.        Carve-Out Provisions.

3.1        The Debtors' obligations to the DIP Secured Parties and the Prepetition Secured Parties, and the liens, security interests and superpriority claims granted by this Interim Order or the Final Order or under the Prepetition Secured Debt Documents and the DIP Loan Documents, and the payment of all such obligations, shall be subject and subordinate in all respects to payment of the following fees and expenses: (a) the payment of unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) reasonable and documented fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) Allowed Professional Fees (as defined below) of the Estate Professionals (as defined below) prior to the delivery by the DIP Agent of a Carve-Out Trigger Notice (defined below) (at the written direction of the DIP Lender) (the amounts set forth in this clause (c) being the "Pre Carve-Out Trigger Notice Cap"); and (d) the Allowed Professional Fees of (i) Debtor

Professionals in an aggregate amount not to exceed $500,000.00 (plus any prepetition retainer held by a Debtor Professional to the extent not previously applied or returned), and (ii) Committee Professionals in an aggregate amount not to exceed $100,000.00, in each case incurred on or after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (at the written direction of the DIP Lender) (the amounts set forth in this clause (d) being the "Post Carve-Out Trigger Notice Cap" and together with the Pre Carve-Out Trigger Notice Cap and the amounts set forth in clauses (a) and (b), the "Carve-Out Cap"); (the foregoing clauses (a) through (d), collectively, the "Carve-Out").  Notwithstanding anything to the contrary herein, the fees and expenses included in the Carve-Out shall be subject to and consistent with the amounts set forth in the Approved Budget.

(a)     As used in this paragraph, persons or firms retained by (x) the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code are referred to as "Debtor Professionals"), and (y) any official committee appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee") are referred to as "Committee Professionals" and, together with the Debtor Professionals, the "Estate Professionals".

(b)     The term "Allowed Professional Fees" means fees and expenses incurred prior to the applicable event set forth in this paragraph, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, or were invoiced after the Carve-Out Trigger Notice Date.  To the extent that professional fees and expenses of the Estate Professionals have been incurred by the Debtors or the Committee at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (at the written direction of the DIP Lender) but have not yet been allowed by the Court, such professional fees and expenses of the Estate Professionals shall constitute Allowed

Professional Fees benefiting from the Carve-Out upon their allowance by the Court, whether by interim or final compensation order, and the Carve-Out Accounts shall be funded to include such professional fees and expenses as set forth herein.  Allowed Professional Fees shall include any "success fee", "financing fee", or similar fee that is payable to Portage Point.

(c)     "Carve-Out Trigger Notice" means a written notice stating that the Post-Carve-Out Trigger Notice Cap has been invoked, delivered by hard copy or email by the DIP Agent (at the written direction of the DIP Lender) under the DIP Loan Documents to lead bankruptcy counsel for the Debtors, the U.S. Trustee, counsel to the Prepetition Agent, counsel to LiveStyle, and counsel to any Committee, which notice may be delivered following the occurrence and during the continued existence of a DIP Termination Event (as defined herein) under the terms of this Interim Order.

(d)     "Carve-Out Trigger Notice Date" means the day on which a Carve-Out Trigger Notice is received by the Debtors.

(e)     "Carve-Out Account" means a separate segregated account not subject to the control of the DIP Agent, the Prepetition Agent or any of the DIP Lenders or Prepetition Secured Parties.

3.2     Within five (5) business days of the initial funding of the Interim DIP Term Loans, the Debtors shall fund into two Carve-Out Accounts (one for Debtor Professionals and one for Committee Professionals) an amount equal to the total budgeted Debtor Professionals' and Committee Professionals' fees, respectively, for the first two (2) weeks set forth in the Approved Budget and, thereafter, the Debtors are authorized to transfer into the Carve-Out Accounts on a weekly basis cash in an amount equal to the Debtor Professionals' and Committee Professionals' fees, respectively, (excluding any restructuring, sale, success or other transaction fee of any

investment bankers or financial advisors) for such unfunded week as set forth in the Approved Budget.  Thereafter, the Debtors shall use such funds held in the Carve-Out Accounts to pay Estate Professional fees as they become allowed and payable pursuant to interim or final orders of the Court; provided, that the Debtors' obligations to pay the Allowed Professional Fees of the Estate Professionals shall not be limited or deemed limited to funds held in the Carve-Out Account. Notwithstanding anything in this Interim Order or the DIP  Loan Documents to the contrary, the budgeted Debtors' Professionals and Committees Professionals' fees that are to be funded into the Carve-Out Accounts (as applicable) upon the delivery of a Carve-Out Trigger Notice shall, pursuant to Section 2 of the DIP Term Loan Note, automatically constitute a permitted Borrowing and shall be funded in full without offset or deduction and shall not be subject to the Borrowing Liquidity Condition.

3.3     On the Carve-Out Trigger Notice Date, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to fund the Carve-Out Accounts in cash in an amount equal to the Carve-Out Cap, and immediately following receipt of a Carve-Out Trigger Notice, and prior to the payment of any DIP Obligations or Prepetition Secured Obligations, the Debtors shall be required to deposit into the Carve-Out Accounts cash in an amount equal to the difference between the applicable Carve-Out Cap and the balance held in the applicable Carve-Out Account as of the Carve-Out Trigger Notice Date.  Notwithstanding anything to the contrary herein or in the DIP Loan Documents, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Accounts have been fully funded as required herein in an amount equal to all obligations benefitting from the Carve-Out.

3.4     The amounts in the Carve-Out Accounts shall be available only to satisfy Allowed Professional Fees and other amounts included in the Carve-Out until such amounts are paid in full. Notwithstanding anything to the contrary herein, the failure of the Carve-Out Accounts to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.  All funds in the Carve-Out Accounts shall be used first to pay all obligations benefitting from the Pre Carve-Out Trigger Notice Cap, until paid in full, and then the obligations benefitting from the Post Carve-Out Trigger Notice Cap; *provided* that the amount in the Carve-Out Accounts shall be reduced on a dollar-for-dollar basis for Allowed Professional Fees that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Accounts shall not be replenished for such amounts so paid.

3.5     Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and appurtenant orders for the employment of each Estate Professional. The Debtors shall be permitted to pay compensation and reimbursement of expenses incurred prior to the occurrence of a DIP Termination Event or delivery of a Termination Notice to the extent allowed and payable under sections 330 and 331 of the Bankruptcy Code.

3.6     Notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be senior to all claims and liens, including liens securing the DIP Facility as well as any adequate protection liens and claims described herein, and the DIP Collateral and Prepetition Collateral shall exclude the Carve-Out Accounts; *provided* that if, after paying all amounts set forth in the definition of Carve-Out, the Carve-Out Account(s) have not been reduced to zero, all remaining funds shall be distributed first, to DIP Agent on account of the DIP Term Loans, unless the DIP Term Loans have been indefeasibly paid in full in cash, second to the Prepetition Secured Parties on account of the Prepetition Secured Obligations, and third to the Debtors.   The Carve-Out

Account shall not be subject to the control of the DIP Agent, DIP Lenders or Prepetition Secured Parties, and the funds transferred to the Carve-Out Account shall not be subject to the DIP Liens or Prepetition Liens, constitute DIP Collateral or Prepetition Collateral, nor be available to pay the DIP Superpriority Claims, Prepetition Secured Parties' Adequate Protection Claims or Prepetition Secured Obligations, until all amounts set forth in this paragraph 3.6 are paid in full.

3.7     The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or expenses of any Estate Professionals incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursement has been allowed by the Court.  Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in any way to pay compensation to or reimburse expenses of any Estate Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or expense reimbursement.

3.8     <u>Prepetition Secured Parties' Adequate Protection</u>.

(a)     <u>Adequate Protection Claims and Liens</u>. The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e), 364(d)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code and effective as of the Petition Date, to adequate protection of their respective interests in the Prepetition Collateral, including any Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after the Petition Date. On account of such adequate protection, the Prepetition Secured Parties are hereby granted the following, in each case subject to the priorities set forth on **Exhibit B** and the Carve-Out (collectively, the "<u>Adequate Protection</u>"):

(i)    <u>Prepetition Secured Parties' Adequate Protection Liens</u>. As adequate protection against, and solely to the extent of, any postpetition Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral, the Prepetition Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "<u>Prepetition Secured Parties' Adequate Protection Liens</u>"), which liens shall be, with respect to: (A) the Prepetition Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve-Out, Permitted Prior Liens, and the DIP Liens, (B) the Non-Lender Encumbered Assets, subject to the Non-Lender Existing Liens, the Carve-Out and the DIP Liens, and (C) Unencumbered Assets, subject to the Carve-Out and the DIP Liens, .and in each case as such priorities are set forth in **<u>Exhibit B</u>**. For the avoidance of doubt, the Prepetition Secured Parties' Adequate Protections Liens shall be subject to the Prepetition Intercreditor Agreement.

(ii)    <u>Adequate Protection Superpriority Claims</u>. As adequate protection against, and solely to the extent of, any postpetition Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral, the Prepetition Secured Parties are hereby granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "<u>Prepetition Secured Parties' Adequate Protection Claims</u>"), which shall be allowed claims against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328,

330, 331, 365, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. The Prepetition Secured Parties' Adequate Protection Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject to the Carve-Out, Permitted Prior Liens and the rankings and priorities set forth in **Exhibit B**.  For the avoidance of doubt, the Prepetition Secured Parties' Superpriority Claims shall be subject to the Prepetition Intercreditor Agreement.

(b)     Fees and Expenses. The Debtors are authorized and directed to pay: (i) on the date of the first advance under the DIP Facilities, all reasonable and documented fees and out-of-pocket expenses of the Prepetition Agent that are required to be paid by the Debtors under the Prepetition Secured Debt Documents, including such fees and expenses of counsel and financial advisors to such Prepetition Agent; and (ii) on an ongoing basis, from time to time after the Petition Date, and without duplication, all reasonable and documented fees and out-of-pocket expenses incurred by such Prepetition Agent and required to be paid by the Debtors under the Prepetition Term Loan Documents, including the reasonable and documented fees and out-of-pocket expenses of McDermott, Will & Schulte LLP and Holland & Knight LLP (such professionals, the "Adequate Protection Professionals," and such fees and expenses, collectively, the "Adequate Protection Professional Fees and Expenses").

(c)     Requests for Payment of Fees and Expenses. With respect to Adequate Protection Professional Fees and Expenses incurred postpetition, such Adequate Protection Professionals shall deliver an invoice in summary form (which shall not be required to include time entry detail, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted for privileged or confidential information)

to the Debtors, the U.S. Trustee, and any Committee, with a copy of such invoices delivered simultaneously to counsels to the DIP Lenders, the DIP Agent, the Prepetition Secured Parties and the Prepetition Agent. If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) calendar days after delivery of such invoice, the Debtors shall promptly pay such fees and expenses in full. If an objection to a professional's invoice is timely received, the undisputed portion of any such invoice will be deemed allowed, the Debtors shall promptly pay such undisputed amount and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Term Loan Note) all Adequate Protection Professional Fees and Expenses incurred on or prior to (including prior to the Petition Date) such date without the need for any Adequate Protection Professional to first deliver a copy of its invoice as provided for herein. The Adequate Protection Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their fees or out-of-pocket expenses (other than with respect to disputed amounts). Subject to Paragraph 5.1 hereof, payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination, or disgorgement.

Section 4.    <u>DIP Termination Events; Rights and Remedies; Relief from Stay</u>.

4.1    The occurrence of an "Event of Default" as defined in the DIP Loan Documents shall constitute a "<u>DIP Termination Event</u>" unless waived in writing by the DIP Secured Parties in accordance with the DIP Loan Documents.

4.2    Upon the occurrence of a DIP Termination Event, without further notice to, hearing, or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, subject to paragraphs

4.3 to 4.8 of this Interim Order, to (i) deliver to the Borrowers a notice declaring the occurrence of a DIP Termination Event, (ii) declare the termination, reduction or restriction of the commitments under the DIP Facility (to the extent any such commitment remains), (iii) declare the DIP Obligations then outstanding to be immediately due and payable, (iv) declare the termination of the DIP Facility and the DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens or the DIP Obligations, (v) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral (subject to paragraph 4.5 of this Interim Order), and (vii) charge interest at the default rate under and in accordance with the DIP Facility.

4.3     In addition, upon the occurrence and during the continuation of a DIP Termination Event, the DIP Agent shall provide counsel to the Debtors, counsel to any Committee, counsel to the Prepetition Agent, counsel to LiveStyle, and the U.S. Trustee, five (5) business days' prior written notice (the "Termination Notice") (which may be provided by email) of the occurrence of the DIP Termination Event.   After such five (5) business day period (the "Remedies Notice Period"), subject to paragraphs 4.3 through 4.8, without further notice to, hearing, or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent to (i) freeze all monies or balances in any deposit accounts of the Debtors, (ii) immediately exercise any and all rights of set-off under, and in accordance with, the DIP Loan Documents, (iii) direct the DIP Agent to exercise any right or remedy against the DIP Collateral, including, without limitation, the disposition of DIP Collateral for application towards the DIP Obligations, or (iv) take any other action or exercise any other right or remedy permitted under the DIP Loan Documents, this Interim Order or applicable law.

4.4     During the Remedies Notice Period, the Debtors and any Committee are each deemed to have standing and shall be permitted to request an emergency hearing before the Court (which request must be made prior to the conclusion of the Remedies Notice Period, and shall seek consideration of such request on an expedited basis).

4.5     Notwithstanding anything to the contrary in this Interim Order, during the Remedies Notice Period, the Debtors are permitted to use Cash Collateral and proceeds of the DIP Facility to the extent granted herein and consistent with the Approved Budget (without any Permitted Variance) to fund expenses necessary to preserve the value of the Debtors' business and the DIP Collateral (including payroll and other expenses), as determined by the Debtors in their reasonable discretion and to fund the Carve-Out Accounts in accordance with this Interim Order.

4.6     Following the expiration of the Remedies Notice Period and absent any order of the Court to the contrary, without further notice to, hearing or order from the Court, the automatic stay as to the DIP Agent shall automatically be vacated and modified for the purpose of permitting the applicable DIP Secured Parties to exercise any and all remedies available to them under or pursuant to this Interim Order, the DIP Loan Documents, and applicable law (including, without limitation, the enforcement of rights against DIP Collateral pursuant to paragraph 3.7), and following the payment in full in cash of all DIP Obligations, permitting the Prepetition Agent to exercise all rights and remedies available under the Prepetition Term Loan Documents or applicable law with respect to the Prepetition Collateral and the DIP Collateral.

4.7     Following the expiration of the Remedies Notice Period and absent any order of the Court to the contrary, the Debtors shall reasonably cooperate with the DIP Secured Parties and/or the Prepetition Term Loan Secured Parties in their efforts to enforce their liens and security interests in the DIP Collateral or the Prepetition Collateral, as applicable, in accordance with this

Interim Order and the other DIP Loan Documents and the Debtors shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral or the Prepetition Collateral, as applicable.

4.8    Nothing included herein shall prejudice, impair, or otherwise affect the DIP Secured Parties' or Prepetition Secured Parties' rights to seek any other supplemental relief in respect of the Debtors, the DIP Collateral, or the Prepetition Collateral.

Section 5.    <u>Representations and Covenants</u>.

5.1    <u>Reservation of Third Party Challenge Rights</u>.

(a)    The stipulations, releases, agreements, and admissions contained in this Interim Order, including, without limitation, paragraph E hereof, and (subject to entry of a Final Order) the releases contained in clause (ix) thereof (collectively, the "<u>Debtors' Stipulations</u>"), shall be binding on the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes immediately upon entry of this Interim Order. The Debtors' Stipulations shall be binding on each other party in interest, including, without limitation, the Committee (if any), unless, and solely to the extent that (a) any such party in interest (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so), obtains requisite standing pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below) and has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "**Challenge Proceeding**") by no later than the Challenge Deadline, (i) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt Documents, the Prepetition Secured Obligations, the Prepetition Liens or the Prepetition Collateral, or otherwise objecting to or challenging any of the admissions, stipulations, findings or

releases included in the Debtors' Stipulations, (ii) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action seeking reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery with respect to the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Secured Debt Documents, and (iii) asserting or prosecuting any other claim or Cause of Action of any nature or description whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against any of the Prepetition Secured Parties or their Representatives (subclauses (i)-(iii), collectively, the "**Challenges**", and each, a "**Challenge**"), and (b) there is entered a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such timely Challenge in any duly-filed Challenge Proceeding; provided, however, that as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date; provided, further, however, that any pleadings filed in connection with any Challenge Proceeding, including any motion filed with the Court seeking requisite standing and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall set otherwise forth with specificity the basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred.

(b)     If no such Challenge Proceeding is timely and properly filed by the Challenge Deadline, or if the Court does not rule in favor of the plaintiff in any such Challenge Proceeding, then, without further notice or order of the Court, (i) each of the admissions, stipulations, findings and releases contained in the Debtors' Stipulations shall be binding on all

parties-in-interest, including, without limitation, any Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), (ii) the Prepetition Secured Obligations shall constitute allowed claims against each of the Debtors in the Chapter 11 Cases and any Successor Cases, and the Prepetition Liens shall be deemed to be legal, valid, non-avoidable, binding, continuing, perfected and enforceable, as of the Petition Date, against each of the Debtors in the Chapter 11 Cases and any Successor Cases, (iii) the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Secured Debt Documents shall not be subject to any other or further Challenge, contest, attack, objection, challenge, defense, claim, counterclaim, reduction, setoff, offset, recoupment, avoidance, recharacterizationn, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), and (iv) all Challenges against any of the Prepetition Secured Parties or any of their Representatives (in their capacities as such) shall be deemed forever waived, released and barred.

(c)     If any such Challenge Proceeding is timely filed by the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive on any Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner

appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), except to the extent that any of the admissions, stipulations, findings or releases contained in the Stipulations were expressly challenged in such Challenge Proceeding (and solely as to the plaintiff party that timely filed such Challenge Proceeding and not, for the avoidance of doubt, any other party-interest).

(d)     The "**Challenge Deadline**" means the date that is (i) the earlier of (a) confirmation of any chapter 11 plan of reorganization in these bankruptcy cases, and (b) seventy-five (75) calendar days from entry of this Interim Order; or (ii) any such later date as has been ordered by the Court, for cause shown, upon a motion filed and served within the time period set forth in paragraph 5.1(d).

(e)     For the avoidance of doubt, the Debtors' stipulations, waivers, agreements and releases contained in paragraph E of this Interim Order shall not be subject to Challenge, and shall be binding upon the Debtors and their estates, and any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or selected in any of the Chapter 11 Cases or any Successor Cases), any Committee, all other creditors and all parties-in-interest and each of their respective successors and assigns, in all circumstances and for all purposes, immediately upon entry of this Interim Order.

(f)     Nothing in this Interim Order vests or confers on any person or entity, including any Committee, standing or authority to pursue any Challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

Section 6.     Other Rights and DIP Obligations.

6.1     No Modification or Stay of this Interim Order. The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facilities and with this Interim Order, and

their reliance on this Interim Order is in good faith, and the DIP Agent and the DIP Lenders are entitled to the protections of section 364(e) of the Bankruptcy Code.

6.2   <u>Rights of Access and Information</u>. The Debtors shall comply with the rights of access and information afforded to the DIP Secured Parties under the DIP Loan Documents and the Prepetition Secured Parties under the Prepetition Secured Debt Documents.

6.3   <u>Power to Waive Rights; Duties to Third Parties</u>.

(a)   Subject to the terms of the DIP Loan Documents, the DIP Agent (acting at the direction of the DIP Lender if so required by the applicable DIP Loan Documents) and/or the DIP Lender shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lender (the "<u>DIP Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights; *provided that*, the DIP Agent shall (subject to the Prepetition Intercreditor Agreement) obtain the prior written consent of the applicable Prepetition Secured Party for any waiver that affects any rights of the Prepetition Secured Parties hereunder or any treatment of the Prepetition Secured Obligations. Any waiver by the DIP Agent of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

6.4   <u>No Unauthorized Disposition of Collateral; Use of Cash Collateral; Investigation Budget</u>.

(a)     The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral), other than pursuant to the terms of this Interim Order or as permitted by the DIP Loan Documents and the Approved Budget (subject to Permitted Variances), and the Debtors are authorized to use Cash Collateral solely in a manner consistent with this Interim Order, the Approved Budget (subject to Permitted Variances), and the DIP Loan Documents (including exclusions to the Approved Budget permitted thereunder).

(b)     Notwithstanding anything herein to the contrary, other than as set forth in Section 4 hereof, no portion of the proceeds of the DIP Facility, the DIP Collateral or the Prepetition Collateral, including Cash Collateral, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (i) preventing, hindering, impeding, or delaying any of the DIP Secured Parties' or Prepetition Secured Parties' enforcement or realization upon, or exercise of rights in respect of, any of the DIP Collateral or Prepetition Collateral, other than to seek a determination that a DIP Termination Event (as defined below) has not occurred or is not continuing or in connection with a remedies hearing, (ii) seeking to amend or modify any of the rights or interests granted to the DIP Secured Parties or Prepetition Secured Parties under this Interim Order or the DIP Loan Documents, including seeking to use Cash Collateral on a contested basis, (iii) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any Challenge or any other actions under chapter 5 of the Bankruptcy Code (or any similar law), against any DIP Secured Party or Prepetition Secured Party, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, or (iv) asserting, joining, commencing, supporting, investigating, or prosecuting any Challenge, or any other action for any claim, counterclaim, action, cause of action,

proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of any DIP Secured Party or Prepetition Secured Party, arising out of, in connection with, or relating to the DIP Loan Documents or the Prepetition Secured Debt Documents, or the transactions contemplated thereunder, including, without limitation, (A) any action arising under the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity and extent of the DIP Obligations or the Prepetition Secured Obligations or the validity, extent, perfection and priority of the DIP Liens or the Prepetition Liens, (D) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, re-characterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens or the Prepetition Liens, in whole or in part, or (E) appeal or otherwise challenge this Interim Order or the Final Order.  Notwithstanding the foregoing, no more than $25,000 in the aggregate of the proceeds of the DIP Facility, DIP Collateral, or Cash Collateral may be used by any Committee in connection with the investigation of, but not litigation of, any potential Challenge.

6.5    <u>No Waiver</u>. The failure of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility, the Prepetition Secured Debt Documents, or this Interim Order, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' or Prepetition Secured Parties' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly

or implicitly, or otherwise impair the rights of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Secured Parties and the Prepetition Secured Parties to: (a) request conversion of the Chapter 11 Cases to cases under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties.

6.6     <u>Maintenance of Collateral</u>. Unless the DIP Agent (acting at the direction of the applicable DIP Lender) or the DIP Lender otherwise consent in writing, until (i) the payment in full or otherwise acceptable satisfaction of all DIP Obligations and (ii) the termination of the DIP Agent' and the DIP Lenders' obligations to extend credit under the DIP Facilities, the Debtors shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Lender) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and lender's loss payable on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

6.7     <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Secured Party and Prepetition Secured Party, as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, the Prepetition Secured Debt Documents, or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or

additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or granting of any interest in the DIP Collateral or the Prepetition Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

6.8     Binding Effect.

(a)     All of the provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, all liens, and claims granted hereunder in favor of each of the DIP Secured Parties and the Prepetition Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of each DIP Agent, DIP Lender, and Prepetition Secured Party set forth herein, including, without limitation, the parties' acknowledgements, stipulations, and agreements in Paragraph E of this Interim Order, subject to paragraph 5.1 hereof (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the priming of the Prepetition Liens as set forth herein and use of Cash Collateral provided for hereunder) provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective and enforceable as of the Petition Date immediately upon entry of this Interim Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or

replacement of the DIP Obligations, converting one or more of the Chapter 11 Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Chapter 11 Cases, approving any sale of any or all of the DIP Collateral or the Prepetition Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Interim Order or any provision hereof; *provided that*, in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order; provided further that such Final Order must affirm each of the provisions, protections, grants, statements, stipulations, and agreements in this Interim Order in order for such provisions, protections, grants, statements, stipulations, and agreements to remain in effect after entry of the Final Order.

(b)      Nothing in these Chapter 11 Cases may impair the DIP Superpriority Claim, the Prepetition Secured Parties' Adequate Protection Claims, and the DIP Secured Parties' and the Prepetition Secured Parties' respective liens on and security interests in the DIP Collateral and the Prepetition Collateral, respectively, and all other claims, liens, adequate protections, and other rights granted pursuant to the terms of this Interim Order, which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition Secured Obligations are indefeasibly paid and satisfied in full. Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of enforcing all such claims, liens, protections, and rights referenced in this paragraph and otherwise in this Interim Order.

(c)      Except as set forth in this Interim Order, in the event this Court modifies, reverses, vacates, or stays any of the provisions of this Interim Order or any of the DIP Loan Documents, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Secured Parties, as applicable, of the effective date of such

modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Parties' Adequate Protection Liens and the Prepetition Secured Parties' Adequate Protection Claims or (iii) rights or priorities of any DIP Secured Party or Prepetition Secured Party pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein.

(d)     Subject to paragraph 5.1 hereof, this Interim Order shall be binding upon the Debtors, all parties in interest in the Chapter 11 Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Chapter 11 Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law. This Interim Order shall also inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties, and each of their respective successors and assigns.

6.9     No Discharge. The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Prepetition Secured Parties' Adequate Protection Liens and the Prepetition Secured Parties' Adequate Protection Claims, shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, has otherwise agreed in writing.

52

6.10    <u>No Priming of Prepetition Secured Obligations</u>. Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the Prepetition Term Loan Lenders, no Debtor shall seek authorization from this Court to obtain or incur any indebtedness or enter into an alternative financing facility other than the DIP Facility (a "<u>Competing DIP Facility</u>") seeking to impose liens on any Prepetition Collateral ranking on a *pari passu* or priming basis with respect to the Prepetition Liens held by the Prepetition Secured Parties; provided, however, that nothing herein shall preclude the Debtors from seeking authorization to incur any indebtedness or enter into any Competing DIP Facility that provides for the payment in full of the DIP Obligations and the Prepetition Term Loan Obligations at the initial closing of such Competing DIP Facility.

6.11    <u>Section 506(c) Waiver</u>. Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lender upon the DIP Collateral, or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against any of the DIP Agent, the DIP Lender, or the Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Secured Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

6.12     Section 552(b) Waiver. Subject to entry of the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facility and using Cash Collateral as provided in this Interim Order that the Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section 552(b) shall not apply to the DIP Agent, the DIP Lenders, the DIP Obligations, the Prepetition Secured Parties, or the Prepetition Secured Obligations.

6.13     No Marshaling/Application of Proceeds.

(a)     Subject to entry of the Final Order, in no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Secured Debt Documents (including the Prepetition Intercreditor Agreement), as applicable.

(b)     Notwithstanding anything to the contrary in this Interim Order, but subject in all respects to the Carve-Out and the priorities set forth on **Exhibit B** hereto, the respective DIP Obligations shall be satisfied from the proceeds of DIP Collateral.

6.14     Right to Credit Bid.  The Debtors acknowledge and agree that, pursuant to section 363(k) of the Bankruptcy Code, each of the DIP Secured Parties and (subject to the Prepetition Intercreditor Agreement) the  Prepetition Secured Parties shall have the right to credit bid the full amount of the DIP Obligations or the Prepetition Secured Obligations (as applicable) held by such party in connection with any sale of the Debtors' assets pursuant to the Sale Motion or otherwise.

6.15     Payment of DIP Lender Fees and Expenses.

(a)     The Debtors shall pay (i) the reasonable and documented fees and expenses reimbursable under the DIP Facility, the DIP Term Loan Note, or the other DIP Loan Documents, as applicable, whether incurred before or after the Petition Date and (ii) all reasonable and documented out-of-pocket costs and expenses of the DIP Agent and the DIP Lender including, without limitation, reasonable and documented fees and disbursements of counsels in connection with the enforcement or preservation of any rights under the DIP Facility, the DIP Term Loan Note, or the other DIP Loan Documents. With respect to payment of fees and expenses incurred from and after the Petition Date, the DIP Agent and the DIP Lenders shall comply with the procedures set forth in paragraph 3.8(c) hereof.

6.16    <u>Limits on Lender Liability</u>.

(a)     Solely as a result of making any loan under the DIP Term Loan Note, authorizing the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties, and, subject to entry of the Final Order, the Prepetition Secured Parties, shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "<u>controlling person,</u>" "<u>responsible person,</u>" or "<u>owner or operator</u>" with respect to the operation or management of the Debtors, so long as the such party's actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors.

Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or, subject to the entry of the Final Order, the Prepetition Secured Parties, of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

(b)     As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

6.17    Release. Subject to paragraph 5.1 of this Interim Order and entry of the Final Order, each of the Debtors, their Estates and the Prepetition Secured Debt Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the DIP Secured Parties and the Prepetition Secured Parties, and (in such capacity) each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to (i) the Prepetition Secured Obligations and the DIP Facilities or (ii) the DIP Loan Documents and the Prepetition Secured Debt Documents, as applicable, including, without limitation, (a) any so-called "lender

liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Secured Obligations and the DIP Obligations, the Prepetition Secured Debt Documents and the DIP Loan Documents, or the Prepetition Liens and the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order. The Debtors are authorized in any payoff letter or similar agreement into which they enter upon payment in full of any DIP Obligations to provide a waiver and release substantially similar to the waiver and release set forth in this paragraph 6.17 of the applicable DIP Agent(s) and the applicable DIP Lenders and their respective related parties.

6.18    Survival. The provisions of this Interim Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Parties' Adequate Protection Liens, the Prepetition Secured Parties' Adequate Protection Claims, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by,

entry of any order that may be entered (a) confirming any plan of reorganization in any of these Chapter 11 Cases, (b) converting any or all of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these Chapter 11 Cases, (d) terminating the joint administration of these Chapter 11 Cases or any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents), or (f) pursuant to which the Court abstains from hearing any of these Chapter 11 Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of these Chapter 11 Cases, following dismissal of any of these Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facilities are terminated, and (ii) in respect of the Prepetition Secured Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties provided for in this Interim Order and under the Prepetition Secured Debt Documents have been indefeasibly paid in full in cash.

6.19   <u>Proofs of Claim</u>. None of the Prepetition Secured Parties shall be required to file proofs of claim in any of these Chapter 11 Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' Stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s).

6.20    No Third Party Rights. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

6.21    No Avoidance. No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facilities shall be avoidable or recoverable from the DIP Agent or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law, *provided that*, nothing within this paragraph is intended to limit or curtail the provisions of paragraph 5.1 hereof, with respect to the Prepetition Secured Obligations.

6.22    Reliance on Order. All postpetition advances under the DIP Loan Documents are made in reliance on this Interim Order.

6.23    Payments Free and Clear. Subject to paragraph 5.1, any and all payments or proceeds remitted to the DIP Agent on behalf of the applicable DIP Secured Parties, or to the Prepetition Secured Parties, pursuant to the provisions of this Interim Order, any subsequent order of this Court or the DIP Loan Documents, shall be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve-Out in all respects.

6.24    Interim Order Governs. In the event of a conflict between the terms and provisions of any of the DIP Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern.

6.25    Headings. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

6.26    Bankruptcy Rules. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

6.27    General Authorization. The Debtors, the DIP Secured Parties, and the Prepetition Secured Parties are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

6.28    Retention of Exclusive Jurisdiction. This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Term Loan Note, and the other DIP Loan Documents.

6.29    Final Hearing and Response Dates. The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on _____, 2025, at __:__ _.m., prevailing Eastern Time. The Debtors shall promptly send copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or the Committee's counsel if same shall have filed a request for notice. The Debtors may serve the Motion and this Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at the Debtors' claims and noting agent's website: veritaglobal.net/agdp, and such notice is deemed good and sufficient and no further notice need be given. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon the Notice Parties and shall be filed with the Clerk of the Court, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Eastern Time), on _____, 2025.

### #  END OF ORDER  # # #

**EXHIBIT A**
(DIP Term Loan Note)

## DEBTOR IN POSSESSION SECURED
## TERM PROMISSORY NOTE

$45,803,621.66                                                    New York, New York
                                                                 August 4, 2025

       On August 4, 2025 (the "<u>Petition Date</u>"), AGDP Holding Inc., a New York corporation ("<u>Parent</u>"), Avant Gardner, LLC, a New York limited liability company ("<u>Avant Gardner</u>," and together with Parent, each a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), and certain of Parent's direct and indirect subsidiaries[1] commenced Chapter 11 cases, which cases are being jointly administered under Chapter 11 Case No. 25-11446 (___) (each, a "<u>Chapter 11 Case</u>" and collectively, the "<u>Chapter 11 Cases</u>"), by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").  The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

       The Borrowers have requested that the lender (the "<u>DIP Lender</u>") party to this Debtor in Possession Secured Term Promissory Note (as amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, this "<u>Note</u>"), make term loans from time to time evidenced by this Note.  Certain subsidiaries of Parent (other than Avant Gardner) who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrowers' Obligations under this Note (collectively, the "<u>Guarantors</u>"), and are simultaneously executing Guarantees in favor of Alter Domus (US) LLC, as agent for the DIP Lender (the "<u>Agent</u>").  The Borrowers intend to utilize such Term Loans for the uses described in this Note and the Financing Orders, in each case in accordance with the Budget (subject to any Permitted Variances), or as otherwise provided by the Financing Orders.  Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

       1.    <u>Term Loans</u>.

       (a)    Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request (as defined below), the DIP Lender agrees to provide the Borrowers with Term Loans (i) from time to time on and after the Interim Closing Date and until the entry of the Final Order in the principal amount of up to $10,000,000.00 (the "<u>Interim Order Term Loans</u>"), and (ii) on and after the Final Closing Date in the principal amount of up to $35,803,621.66 (of which $20,803,621.66 shall be in the form of a "roll up" of protective advances constituting Obligations under the Prepetition Financing Agreement; the "<u>Final Order Term Loans</u>", and together with the Interim Order Term Loans, the "<u>Term Loans</u>").  The Borrowers may request the Term Loans no more frequently than once per week pursuant to written notice (which may be

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Avant Gardner, LLC, a New York limited liability company (6504), AGDP Holding Inc., a New York corporation (6504), EZ Festivals LLC, a Delaware limited liability company (8854), Made Event LLC, a Delaware limited liability company (6272), Reynard Productions, LLC, a New York limited liability company (5431), and AG Management Pool LLC, a New York limited liability company (9962). The Debtors' service address is 140 Stewart Avenue, Brooklyn, NY 11237.

by email) (a "<u>Borrowing Request</u>") delivered to the Agent and the DIP Lender by a Responsible Officer no later than 12:00 p.m. New York City time one (1) Business Day prior to the proposed borrowing day (or such shorter later time as the DIP Lender may agree). The Borrowing Request shall be in the form attached hereto as <u>Exhibit B</u> or otherwise reasonably satisfactory to the Agent and shall specify (i) the principal amount of the proposed Term Loan, (ii) the proposed Borrowing Date, which must be a Business Day, (iii) that the Borrowing Liquidity Condition has been satisfied, and (iv) the account into which the proceeds of the Term Loans shall be deposited. Subject to the terms of the Financing Orders, the DIP Lender shall provide Term Loans in an aggregate amount not to exceed its Commitment. Upon receipt of a Borrowing Request with respect to any Term Loan, subject to the satisfaction (or waiver) of the conditions set forth in Section 2 hereof, the DIP Lender shall make the proceeds of such Term Loan available to the Borrowers on the applicable date of funding of the Term Loan by transferring immediately available funds equal to such proceeds to the account indicated in the Borrowing Request. The Commitment of the DIP Lender shall be permanently reduced upon the making of the relevant Term Loan in an amount equal to such Term Loan advanced by the DIP Lender.

(b)    The aggregate principal amount of Terms Loans outstanding (inclusive of $20,803,621.66 of aggregate "roll ups" of protective advances constituting Obligations under the Prepetition Financing Agreement but excluding any interest or fees paid in kind) shall not exceed $45,803,621.66, subject to any limitation of credit extensions under this Note and the Financing Orders (the "<u>Maximum Amount</u>").

(c)    The Agent and the DIP Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent and the DIP Lender to be genuine. The Agent may assume that each Person executing and/or delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)    The Borrowers shall utilize the proceeds of Term Loans to (i) fund general corporate needs, including without limitation working capital and other general corporate purposes and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to the Chapter 11 Cases, including fees and expenses of professionals (including professional fees and expenses of the Debtors, the DIP Term Agent (as defined in the Interim Order), the DIP Term Lender (as defined in the Interim Order), any official committee that may be appointed or any other party that are reimbursable by the Debtors, and including funding of the Carve-Out in accordance with the Financing Orders) and adequate protection payments, if any, under the Financing Orders, in each case in accordance with the Budget (subject to any Permitted Variances), this Note, the Bankruptcy Code, and the Financing Orders; <u>provided</u>, that, unless otherwise provided in the Budget, subject to any Permitted Variance, or approved by the DIP Lender, no portion of any Term Loan shall be used, directly or indirectly: (A) to make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness or to finance or make any Restricted Payment, except pursuant to the terms of the Financing Orders, (B) to pay any fees or similar amounts payable to any Person who has proposed or may propose to purchase interests in any of the Borrowers or any of their respective Subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrowers or any of their respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (C) to make any distribution under a plan of reorganization in the Chapter

11 Cases or any similar proceeding of the Borrowers or any of the Subsidiaries or affiliates of any of the Borrowers.

     2.    <u>Certain Conditions to Making Term Loans</u>.

     (a)    The effectiveness of this Note and the obligation of the DIP Lender to fund the Term Loans requested to be made by it shall be subject to the prior or concurrent satisfaction (or waiver by the Agent and the DIP Lender) of each of the conditions precedent set forth in this clause (a):

     (1)    the Borrower shall have paid any Obligations then payable hereunder (including the reasonable and documented out-of-pocket fees and expenses of the Agent and DIP Lender, including, without limitation, those of any counsel for the Agent and DIP Lender, provided, however, that any such payments shall be in accordance with any orders by the Bankruptcy Court if then applicable) or under any other DIP Document;

     (2)    the Loan Parties shall have delivered guarantees of each of the Guarantors, substantially in the form of Exhibit C hereto with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

     (3)    the Loan Parties shall have delivered fully executed copies of all other DIP Documents, each in form and substance reasonably satisfactory to the DIP Lender;

     (4)    any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

     (5)    (i) with respect to the Interim Order Term Loans, (A) the Bankruptcy Court shall have entered the Interim Order (which order shall authorize the Loan Parties to use Cash Collateral of the Prepetition Secured Parties in a manner consistent with the Budget (subject to Permitted Variances)) and (B) the Interim Order shall not have been stayed, vacated, reversed, modified or amended without Agent's and DIP Lender's consent, or (ii) with respect to the Final Order Term Loans, (A) the Bankruptcy Court shall have entered the Final Order and (B) the Final Order shall not have been stayed, vacated, reversed, modified or amended without Agent's and DIP Lender's consent;

     (6)    no Default or Event of Default shall have occurred and be continuing or would result after giving effect to the Term Loans and the transactions contemplated herein;

(7)    after giving effect to the making of the Term Loans, the outstanding principal amount of all Term Loans would not exceed the Maximum Amount;

(8)    the Agent shall have received and approved the Budget in accordance with this Note and the Financing Orders;

(9)    the Borrowing Liquidity Condition shall have been satisfied; and

(10)    the Agent shall have received from the Borrower on or prior to 12:00 p.m. New York City time at least one (1) Business Day (or such shorter period as the DIP Lender may agree) prior to the date of such Borrowing, a Borrowing Request and a calculation evidencing satisfaction of the Borrowing Liquidity Condition, which calculation shall be in form and substance satisfactory to the DIP Lender.

Notwithstanding anything to the contrary herein, upon the occurrence of an Event of Default and the issuance of a Carve-Out Trigger Notice (as defined in the Financing Orders), the Borrowers may tender a Borrowing Request to the Agent for amounts that are to be funded into the Carve-Out Accounts (as defined in the Financing Orders) in accordance with the Budget, which Borrowing Request shall not be subject to the satisfaction of the conditions set forth in Sections 2(a)(1), (4), (8) or (9).

3.    <u>Payment of Principal</u>.  FOR VALUE RECEIVED, the Borrowers promise to pay to the Agent, for the benefit of the DIP Lender, the unpaid principal amount of all Term Loans, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent required by this Note or the Financing Orders.

4.    <u>Payment of Interest</u>.

(a)    Subject to the terms of this Note, the Term Loans or any portion thereof shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to 10.50% per annum.

(b)    Interest on the Term Loans shall be payable in kind monthly, in arrears, on the last Business Day of each month, commencing on the last Business Day of the month in which the applicable Term Loan is made (such period, the "<u>Interest Period</u>").  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.  All interest paid in kind shall be capitalized on the date otherwise due and thereafter treated as principal for all purposes, including the calculation of interest that thereafter becomes due.

(c)    All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable (including the first day and the last day).  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)       So long as an Event of Default shall have occurred and be continuing, and at the election of the DIP Lender (with written notice of such election to the Agent), the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived (notwithstanding when the election by the Agent was made) and shall be payable upon demand.

(e)       It is the intention of the parties hereto that the Agent and the DIP Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or the DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or the DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed that the aggregate of all consideration which constitutes interest under law applicable to the Agent or the DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or the DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or the DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or the DIP Lender, as applicable, to the Borrowers).  If at any time and from time to time (i) the amount of interest payable to the Agent or the DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or the DIP Lender pursuant to this Section 4(e) and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or the DIP Lender would be less than the amount of interest payable to the Agent or the DIP Lender computed at the highest lawful rate applicable to the Agent or the DIP Lender, then the amount of interest payable to the Agent or the DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or the DIP Lender until the total amount of interest payable to the Agent or the DIP Lender shall equal the total amount of interest which would have been payable to the Agent or the DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)       If, after the date hereof, the DIP Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (ii) compliance by the DIP Lender or its parent bank holding company (if any) with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing

policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrowers thereof.  Following receipt of such notice, the Borrowers agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly (but in no event later than fifteen (15) days) after presentation by the DIP Lender to the Borrowers of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

5.     <u>Payments</u>.  Other than payments of interest or fees payable in kind in accordance with the terms of this Note, all payments of principal, interest and all other Obligations in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrowers.  Each payment made hereunder shall be credited first to fees and expenses then due and payable, second to interest then due and payable, third to  principal, and the remainder shall be for the account of and paid to whoever may be lawfully entitled thereto, and interest shall thereupon cease to accrue upon the principal so repaid.  The Borrowers shall make each payment required to be made under this Note prior to 2:00 p.m. New York City time on the date when due, in immediately available funds.  Any amounts received by the Agent after such time on any date may, in the sole discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

6.     <u>Optional Prepayments</u>.  Subject to the terms and conditions of the Financing Orders, the Borrowers shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' written notice to the Agent by 1:00 p.m. New York City time (or such shorter time as the Agent may agree); <u>provided</u> that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third-party funds or the consummation of certain transactions that are not received or consummated.  Any prepayment or repayment hereunder shall be accompanied by accrued and not capitalized interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.  Any principal amount of the Term Loans that is repaid or prepaid may not be reborrowed.

7.     <u>Mandatory Prepayments</u>.  [Reserved]

8.     <u>Fees</u>.  Borrower shall pay to the Agent the following fees:

(a)     <u>Facility Fee</u>.  On the Maturity Date, the Borrowers shall pay to the Agent, in kind, for the account of the DIP Lender, an upfront fee in an aggregate amount equal to 2.0% of the aggregate principal amount of the Commitments (minus aggregate "roll ups" of protective advances constituting Obligations under the Prepetition Financing Agreement), of which, an amount equal to 2.0% of the Term Loans authorized to be borrowed on the Interim Closing Date

shall be earned upon the entry of the Interim Order and the remainder of which shall be earned upon entry of the Final Order, and which shall be non-refundable when paid.

(b)    <u>Agent Fee</u>.  On the Interim Closing Date, the Borrowers shall pay to the Agent in cash an annual agent administration fee in the amounts and at the times set forth in the Agent Fee Letter.

(c)    <u>Exit Fee</u>.  On the Maturity Date, the Borrower shall pay to the Agent, for the account of the DIP Lender, an exit fee equal to 2.0% of the aggregate principal amount of the Commitments (minus aggregate "roll ups" of protective advances constituting Obligations under the Prepetition Financing Agreement), of which, an amount equal to 2.0% of the Term Loans authorized to be borrowed on the Interim Closing Date shall be earned upon the entry of the Interim Order and the remainder of which shall be earned upon entry of the Final Order, and which shall be non-refundable when paid.

9.    <u>Indemnity</u>.  The Borrowers shall, jointly and severally, indemnify and hold harmless the Agent and each of its respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (the "<u>Agent Indemnitees</u>") and the DIP Lender and each of its respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (the "<u>Lender Indemnitees</u>"; together with the Agent Indemnitees, each, an "<u>Indemnified Person</u>"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable and documented out-of-pocket attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited to the legal fees and reasonable and documented out-of-pocket costs and expenses of one legal counsel (and one local counsel in each relevant jurisdiction) for the Agent Indemnitees, taken as a whole and one legal counsel (and one local counsel in each relevant jurisdiction) for the Lender Indemnitees, taken as a whole) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of, or related to, the DIP Documents, the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lender on the one hand and the Loan Parties on the other hand; <u>provided</u>, that (i) the Borrowers shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as determined in a final non-appealable judgment by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims or damages arising from any non-tax claim.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**  The obligations

33421474.4

of the Borrowers under this Section 9 shall survive the payment in full of the Term Loans, the termination of this Note and the other DIP Documents and the resignation of the Agent.

10.     <u>Adjustments for Withholding, Capital Adequacy Etc.</u>All payments to the Agent by the Borrowers under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all interest, additions to tax or penalties applicable thereto (all such taxes, duties, levies, imposts, deductions, charges, withholdings, interest, additions to tax and penalties being referred to as "<u>Taxes</u>") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrowers shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrowers shall make such deductions or withholdings, and (C) the Borrowers shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrowers (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lender)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrowers agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrowers agree to timely pay any present or future stamp, court or documentary, intangible, recording, filing or similar Taxes (all such Taxes being referred to as "<u>Other Taxes</u>") which arise from any payment made by the Borrowers under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrowers shall indemnify the Agent and the DIP Lender for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrowers hereunder) paid by the Agent or the DIP Lender and any reasonable expenses arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or the DIP Lender's overall net income.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Indemnified Taxes submitted to the Borrowers by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrowers to the DIP Lender.

33421474.4

The DIP Lender shall indemnify the Agent for (i) any Indemnified Taxes attributable to the DIP Lender (but only to the extent that the Borrowers have not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 21(m) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to the DIP Lender, in each case, that are payable or paid by the Agent in connection with any DIP Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to DIP Lender by the Agent shall be conclusive absent manifest error. DIP Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to the DIP Lender under any DIP Document or otherwise payable by the Agent to the DIP Lender from any other source against any amount due to the Agent under this paragraph.

The Borrowers shall furnish to the DIP Lender the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrowers pursuant to this Section 10 within thirty (30) days after the date of any such payment.  If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrowers have paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section 10 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrowers promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Agent on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction (if any) required to be made; provided that Agent shall provide a duly executed and completed IRS Form W-9.  In addition, any such Recipient, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Recipient is subject to backup withholding or information reporting requirements.  Each DIP Lender shall provide such additional documentation required by law or reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine that such DIP Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment under FATCA. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

The obligations of the Borrowers and the DIP Lender under this Section 10 shall survive the payment in full of the Term Loans, the termination of this Note and the other DIP Documents and the resignation of the Agent.

11.    <u>Priority of Obligations and Agent's and DIP Lender's Liens</u>.

(a)    To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrowers and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders (including with respect to the Carve-Out), having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases or any Successor Case), and, except as set forth in the Financing Orders (including with respect to the Carve-Out), shall at all times be senior to the rights of the Borrowers or any domestic or foreign Subsidiary of the Borrowers, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, and (ii) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code and subject to clauses (b) and (c) below, Liens on, and security interests in, the Collateral.  The security interests and Liens granted to the Agent hereunder pursuant to Sections 364(c)(2) shall not be (i) subject to any Lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estate under Section 551 of the Bankruptcy Code, or (ii) except as set forth in the Financing Orders (including with respect to the Carve-Out), subordinated to or made <u>pari</u> <u>passu</u> with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)    The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)    Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lender from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the priorities set forth in the Financing Orders, the Carve-Out and Permitted Prior Liens, and (ii) no Person entitled to the Carve-Out shall be entitled to sell, or otherwise Dispose, or seek or object to the sale or other Disposition of, such Collateral, subject to any such Person's fiduciary obligations.

(d)    Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, except as set forth in the Financing Orders (including with respect to the Carve-Out), including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code,.

12.    <u>Further Assurances</u>.  The Borrowers agrees that they shall, at the Borrowers' expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be

duly executed and delivered, to the Agent or the DIP Lender, as the Agent shall direct (as directed by the DIP Lender), such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the DIP Lender to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent (as directed by the DIP Lender) and in form and substance reasonably satisfactory to the Agent and the DIP Lender, security agreements, UCC-1 financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of itself and the DIP Lender, of the Liens (subject to the Financing Orders) in the Collateral to secure the Obligations.

13.    [Reserved.]

14.    <u>Affirmative Covenants</u>.  The Borrowers agree that until the Commitments shall have expired or been terminated and the Obligations payable under the DIP Documents shall have been paid in full in cash:

(a)    Upon reasonable request of the DIP Lender, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the DIP Lender to audit, review, make extracts from or copy, at the Borrowers' expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice, to discuss the Loan Parties' affairs with any of their directors, officers (including chief restructuring officer), employees or accountants, so long as a Responsible Officer of a Loan Party is invited to attend such discussions.  The Borrowers will permit the DIP Lender, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice.  Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the DIP Lender (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)    (i) The Borrowers and their Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (ii) the Borrowers and their Subsidiaries will obtain, maintain in effect and comply with all material permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget or the Financing Orders.

(c)    The Borrowers and their Subsidiaries will pay or discharge, when due, (i) all material Taxes, assessments and governmental charges levied or imposed upon them or upon their income or profits, upon any properties of the Borrowers and their Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrowers or such Subsidiary, or (2) Taxes the nonpayment of which is permitted or required by the Bankruptcy Code, this Note, the Budget or the Financing Orders, and (ii) all lawful claims

33421474.4

for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrowers and their Subsidiaries.

(d)      (i) The Borrowers and each of their Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget or the Financing Orders, (ii) the Borrowers and each of their Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Borrowers and each of their Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances and liens otherwise permitted by the Financing Orders.

(e)      The Borrowers and their Subsidiaries will:

(1)      Maintain insurance with respect to the Collateral, covering casualty, hazard, theft, flood and other risks, in amounts, with endorsements and with insurers satisfactory to the Agent and in accordance with the Budget.  All proceeds under each policy covering Collateral shall be payable to the Agent as a lender's loss payable/mortgagee, other than proceeds required by an order of the Bankruptcy Court to be applied to the repayment of debt secured by a Lien on the related assets that is senior to the Liens securing the Obligations under this Note.  From time to time upon request, the Borrowers shall deliver to the Agent a schedule of its insurance policies.  Unless the Agent shall agree otherwise, each policy shall include satisfactory endorsements that (i) provide for not less than 30 days' prior notice to the Agent of termination, lapse or cancellation of such insurance, (ii) with respect to insurance covering Collateral, name the Agent as lender's loss payable/mortgagee and additional insured, and (iii) specify that the interest of the Agent shall not be impaired or invalidated by any act or negligence of any Loan Party or the owner of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy.  If the Borrowers fail to provide and pay for any insurance, the Agent may, at its option, but shall not be required to, procure the insurance and charge the Borrowers therefor.  The Borrowers agree to deliver to the Agent, promptly as rendered, copies of all reports made to insurance companies.  The Loan Parties may settle, adjust or compromise any insurance claim on terms reasonably acceptable to the Agent, as long as the proceeds are delivered to the Agent pursuant to this Note and the Financing Orders.

(2)      In addition to the insurance required under clause (e)(1) with respect to Collateral, maintain insurance with insurers satisfactory to the Agent, with respect to the properties and business of the Loan Parties, of such type, in such amounts, and with such coverages and deductibles as are at the time of placing such insurance customary for companies similarly situated and which are available at commercially reasonable rates and as provided for in the Budget.

(f)      The Borrowers and their Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal

33421474.4

conduct of its business, except to the extent contemplated by the Budget or the Financing Orders or as permitted hereunder.

(g)    [Reserved.]

(h)    The Borrowers and their Subsidiaries each agree that they shall take all commercially reasonable actions necessary to cause each of the following to occur (unless waived by the DIP Lender, which waiver may be by electronic communication (including email from counsel)):

(1)    no later than 2 Business Days after the Petition Date, the Interim Order shall be entered by the Bankruptcy Court;

(2)    no later than 5 Business Days after the Petition Date, the Loan Parties shall file a motion seeking entry of an order (a) authorizing and approving bid procedures for the sale of all or substantially all of their assets, (b) selecting Buyer as the stalking horse bidder, subject to higher or better offers, and (c) establishing other sale-related procedures and deadlines (the "Bid Procedures Order"), which motion shall be in form and substance acceptable to the DIP Lender;

(3)    no later than 35 days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order;

(4)    no later than 35 days after the Petition Date, the Final Order approving shall be entered by the Bankruptcy Court;

(5)    no later than 80 days after the Petition Date the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Loan Parties' assets pursuant to one or a series of related or unrelated sale transactions; and

(6)    no later than 95 days after the Petition Date the sale of all or substantially all of the Debtors' assets approved by the Bankruptcy Court pursuant to one or a series of related or unrelated sale transactions shall have been consummated in full.

(i)    The Borrowers agree that they shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule I attached hereto no later than the times specified therein (or such later time as the DIP Lender may agree).  No more than once per week, the Borrowers shall make its senior management and its advisors available at reasonable times and upon reasonable advance request by the Agent or DIP Lender to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Loan Parties.

15.    Negative Covenants.  So long as the DIP Lender shall have any Commitment hereunder, or any Term Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Borrowers shall not, nor shall they permit any Subsidiary to, without the prior written consent of the DIP Lender, other than, in each case, any such action approved by the Budget or the Financing Orders:

33421474.4

(a)    Neither the Borrowers nor any of their Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Equity Interests of, or otherwise combine with or acquire, any Person other than another Loan Party.

(b)    Neither the Borrowers nor any of their Subsidiaries shall create, incur, or assume, and shall not permit to exist, any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)    Neither the Borrowers nor any of their Subsidiaries shall create, incur, or assume, and shall not permit to exist, any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(d)    Neither the Borrowers nor any of their Subsidiaries shall (i) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrowers paid to the Borrowers or other wholly-owned Subsidiaries of the Borrowers and (ii) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders.

(e)    Neither the Borrowers nor any of their Subsidiaries will assume, guarantee, or endorse, and shall not become directly or contingently liable in connection with, any obligations of any other Person (other than the Borrowers or any of their Subsidiaries), except the endorsement of negotiable instruments by Borrowers and their Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(f)    Neither the Borrowers nor any of their Subsidiaries will Dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (i) the sale of Inventory or other property and assets in the ordinary course of business, (ii) the Disposition of obsolete equipment, (iii) the sale of other property on terms acceptable to the DIP Lender, or (iv) the Disposition of assets approved by an order of the Bankruptcy Court.

(g)    Neither the Borrowers nor any of their Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to (i) the Financing Orders or (ii) the Prepetition Obligations.  Except for (A) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, and (B) payments permitted by the Financing Orders or the Budget (subject to Permitted Variances), neither the Borrowers nor any of their Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness.

(h)    Neither the Borrowers nor any of their Subsidiaries shall make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

(i)    Neither the Borrowers nor any of their Subsidiaries shall change its fiscal year.

33421474.4

(j)     For each most recently ended Variance Testing Period, the Borrowers shall not permit the aggregate amount of Actual Operating Disbursement Amounts to exceed the aggregate amount of Budgeted Operating Disbursement Amounts (calculated on a cumulative basis as opposed to on a line by line basis) for such Variance Testing Period, by more than the Permitted Variance.

(k)     Neither the Borrowers nor any of their Subsidiaries shall, directly or indirectly, use the Term Loans or the proceeds of the Term Loans, or lend, contribute or otherwise make available the Term Loans or the proceeds of the Term Loans to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as DIP Lender, Agent or otherwise) of Sanctions.

16.     Events of Default; Rights and Remedies.  Except as provided in the Financing Orders, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)     The Borrowers (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent or the DIP Lender for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's or DIP Lender's demand for such reimbursement or payment following the passage of any notice period required in the Financing Orders (and subject to the terms of the Financing Orders or other applicable order of the Bankruptcy Court).

(b)     Any Loan Party shall fail to comply with any of the provisions of Sections 1(d), 14(a), 14(f), 14(h), 14(i) and 15 of this Note.

(c)     Any Loan Party shall fail to comply with any other provision of this Note, any of the other DIP Documents or any of the Financing Orders (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) Business Days after the earlier of the date (i) a Responsible Officer of any Loan Party becomes aware of such failure and (ii) the date written notice of such default shall have been given by the Agent to such Loan Party.

(d)     Except for defaults triggered by or related to the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code, this Note, any other DIP Document, or the Budget prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any agreement, document or instrument to which any Loan Party is a party (other than agreements, documents and instruments evidencing Prepetition Obligations) that is not stayed and is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $100,000.00 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $100,000.00 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates

of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(e)        Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to thew DIP Lender by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

(f)        Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than the DIP Lender under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full all of the Obligations under this Note; or (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing secured by such Lien would be used to repay in full all of the Obligations under this Note.

(g)        The entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for the termination of the DIP Lender's Commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note on or before the effective date of such plan or plans.

(h)        The filing of any motion by the Borrowers or any Loan Party against the DIP Lender seeking, or the entry of any order in the Chapter 11 Cases in respect of, (i) any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, (ii) any challenge to the application of any payments authorized by any of the Financing Orders pursuant to section 506(b) of the Bankruptcy Code, (iii) any challenge (whether by the Loan Parties or any party in interest) seeking to limit or prevent the DIP Lender, the Agent or the Prepetition Secured Parties from exercising their credit bid rights in connection with the sale of any assets of the Loan Parties (provided, that the Loan Parties' response to any information request by a party in interest shall not constitute "support" of a challenge), and (iv) relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (A) the rights and remedies of any of the DIP Lender, the Agent or the Prepetition Secured Parties against the Debtors provided in any Financing Orders, any of the DIP Documents or the Prepetition Financing Agreement or (B) the exercise of such rights or remedies by the DIP Lender, the Agent or the Prepetition Secured Parties against the Debtors in accordance with the DIP Documents, any of the Financing Orders or the Prepetition Financing Agreement.

(i)        The sale, without the DIP Lender's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and termination of the DIP Lender's Commitment to make Term Loans.

(j)　　　The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

(k)　　　The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

(l)　　　The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

(m)　　　The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Orders including without limitation, the Carve-Out), unless (i) consented to by the DIP Lender or (ii) the Obligations are paid in full in cash and the DIP Lender's Commitment to make Term Loans is terminated.

(n)　　　The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $100,000.00.

(o)　　　The Financing Orders (or either of them) shall be stayed, amended, modified, vacated reversed or revoked in any respect without the DIP Lender's prior written consent.

(p)　　　There shall commence any suit or action against the Agent or the DIP Lender by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases (other than a motion for standing to commence a suit or action), in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the DIP Lender and, if such suit or action is commenced by any Person other than Borrowers or any Subsidiary, officer, or employee of the Borrowers, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or the DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

(q)　　　Any material provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any material Lien created under any DIP Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

(r)　　　[Reserved]

33421474.4

(s)       Any DIP Document or Financing Order is modified in a manner adverse to the DIP Lender, the Agent or the Prepetition Secured Parties without the prior written consent of such party.

(t)       Assets of any Loan Party with a fair market value of $100,000.00 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

(u)       A breach by any Loan Party of the terms of the Financing Orders.

(v)       Any agreement for the sale of the Loan Parties' assets entered into pursuant to the Sale Motion and approved by the Bankruptcy Court, or any provision thereof, (i) shall fail to be in full force and effect or binding upon and enforceable against any Loan Party or any other party thereto in accordance with its terms, (ii) has been amended or modified without the consent of the Agent, or (iii) has been breached due to the action or inaction of any Loan Party or any other party thereto.  Any party to a sale agreement shall have notified any other party to such agreement of its intent to terminate such agreement or any other event shall occur, or shall fail to occur, which, subject to a notice requirement or passage of time, would result in the termination of any such agreement.

(w)       The Sale Motion is withdrawn and/or the Debtors propose or support an alternative restructuring transaction, chapter 11 plan or course of the Chapter 11 Cases other than a sale of substantially all assets pursuant to the Sale Motion (in any event, the "New Approach") that, in any case, does not provide for the repayment in full, in cash of the Obligations and the Prepetition Obligations substantially contemporaneously with such withdrawal of the Sale Motion or proposal of such New Approach.

(x)       Entry of an order authorizing and/or directing any party in interest to reclaim any of the Collateral, granting any party in interest relief from the automatic stay with respect to the Collateral, or requiring that Debtors turnover any of the Collateral, in each case, prior to full, final and indefeasible repayment of all DIP Obligations and Prepetition Obligations and with respect to Collateral having value in excess of $100,000.00.

If any Event of Default shall have occurred and be continuing, then the Agent shall have all of the rights and remedies described in the Financing Orders.

Except as otherwise provided for in this Note, the Financing Orders or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrowers may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal,

marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

Any amount or payment received by the Agent or any DIP Lender from any Loan Party or from the proceeds of Collateral (subject to the terms of the Financing Orders) following (i) any acceleration of the Obligations under this Note or (ii) at the direction of the Agent or the DIP Lender after any Event of Default, shall be applied to the Obligations by the Agent as follows:

(a)    first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnitees and other amounts then due and payable to the Agent until paid in full;

(b)    second, to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the DIP Lender until paid in full;

(c)    third, to pay interest then due and payable in respect of the Term Loans until paid in full;

(d)    fourth, to pay principal of the Term Loan until paid in full;

(e)    fifth, to the ratable payment of all other Obligations then due and payable; and

(f)    sixth, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

17.    <u>Reference Agreements</u>.  This Note evidences the Term Loans that may be made to Borrowers from time to time in the aggregate principal amount outstanding of up to the Maximum Amount and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    <u>Definitions; Certain Terms</u>.

(a)    <u>Definitions</u>.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

33421474.4

"Actual Cash Receipts" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operating Receipts" as determined by reference to the Budget as then in effect.

"Actual Net Operating Cash Flow" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"Actual Operating Disbursement Amounts" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operating Disbursements" in the Budget as then in effect.

"Actual Outstanding Debt" shall mean with respect to any period, the actual amount that corresponds to the "Ending Loan Balance" line item under the "DIP Lender Loan Balance" in the Budget as then in effect.

"Agent Fee Letter" means that certain Fee Letter dated as of August __, 2025, by and among Borrowers and Agent, as may be amended, amended and restated and modified from time to time.

"Approved Budget Variance Report" shall mean a report provided by the Borrowers to the Agent and the DIP Lender on a biweekly basis (*i.e.*, every two weeks) (a) showing, in each case, on a line item by line item and a cumulative basis, the Actual Operating Disbursement Amounts, the Actual Net Operating Cash Flow and the Actual Outstanding Debt, in each case as of the last day of the Variance Testing Period then most recently ended, noting therein all variances, on a cumulative basis, from the Budgeted Operating Disbursement Amounts, the Budgeted Net Operating Cash Flow and the Budgeted Outstanding Debt for such period as set forth in the Budget as in effect for such period, (b) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (c) certifying compliance or non-compliance in such Variance Testing Period with the Permitted Variances and (d) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Borrower has taken or intend to take with respect thereto and in each case, such reports shall contain supporting information, satisfactory to the Agent and the DIP Lender.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Borrowers" shall have the meaning given such term in the recital to this Note.

"Borrowing" means a Term Loan that is made on a Borrowing Date in accordance with Section 2.

"Borrowing Date" means the date of the making of any Borrowing.

"Borrowing Liquidity Condition" shall mean, with respect to any Borrowing, the

amount of the requested Borrowing does not exceed the positive difference of (a) the amount of disbursements reasonably anticipated to be made during the period from such Borrowing Date to the last Business Day of the second week following such Borrowing Date as set forth in the Budget (subject to Permitted Variances), minus (b) the sum of (i) the amount of cash receipts reasonably expected to be received by the Debtors during the period from such Borrowing Date to the last Business Day of the week following such Borrowing Date as set forth in the Budget (subject to Permitted Variances), and (ii) estimated cash in Debtor bank accounts as of such Borrowing Date.  For purposes of determining compliance with the Borrowing Liquidity Condition, (x) the amount of anticipated disbursements attributable to the costs and expenses for rescheduling, cancelling or moving the location of events held at any of the Debtors' venues shall only include such costs and expenses that are approved by the DIP Lender, in writing, in its sole discretion, and (y) no variance shall be permitted with respect to anticipated disbursements for professional fees.

"Budget" shall mean a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive thirteen (13) weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the DIP Lender and shall be approved by the DIP Lender, in its sole discretion.  The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Budgeted Cash Receipts" shall mean with respect to any period, the amount that corresponds to the line item "Total Cash Receipts" in the Budget, as then in effect.

"Budgeted Net Operating Cash Flow" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"Budgeted Operating Disbursement Amounts" shall mean with respect to any period, the amount that corresponds to the line item "Total Operating Disbursements" in the Budget.

"Budgeted Outstanding Debt" shall mean with respect to any period, the actual amount that corresponds to the "Ending Loan Balance" line item for the "DIP Lender Loan Balance" in the Budget as then in effect.

"Business Day" shall mean for all purposes, any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve-Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall have the meaning given to such term in the Financing Orders.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of itself and the DIP Lender, to secure the Obligations and the Guaranteed Obligations.  Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean each agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" shall mean the commitment of the DIP Lender to make the Term Loans to the Borrower in the principal amount set forth herein, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" shall mean an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"Designated Jurisdiction" shall mean any country or territory that is the target of a Sanction.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, the Agent Fee Letter and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent in connection with this Note.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, amendments and restatements supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lender" shall have the meaning given such term in the recital to this Note.

"Dispose" or "Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.  For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (c) the early termination or modification of any contract resulting in the receipt by any Loan Party of a

cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification) or (d) any sale of merchant accounts (or any rights thereto (including, without limitation, any rights to any residual payment stream with respect thereto)) by any Loan Party.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Equity Interests" shall have the meaning given such term in the Prepetition Financing Agreement whether or not such agreement remains in effect.

"Estate" shall have the meaning given to such term in the Financing Orders.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of the DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), or Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any DIP Document, or sold or assigned an interest in any Term Loan or DIP Document) (b) in the case of the DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of the DIP Lender with respect to an applicable interest in Term Loans or Commitment pursuant to a law in effect on the date on which (i) the DIP Lender acquires such interest in the Term Loans or Commitment or (ii) the DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to the DIP Lender's assignor immediately before the DIP Lender became a party hereto or to the DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrowers with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Extraordinary Receipts" shall mean any cash received by any Borrower or any of their Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Sections 7(a)(i) and 7(a)(ii) hereof) from (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance (other than to the extent such insurance proceeds are immediately payable to a Person that is not Parent, Avant Gardner or any of their Subsidiaries), (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments (other than to the extent such payments described in the foregoing clauses (iv), (v) and (vi) are immediately payable to a Person that is not an affiliate of the Parent

or any of its Subsidiaries) and (vii) any purchase price adjustment received in connection with any purchase agreement.

"FATCA" shall mean Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Note (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"Final Closing Date" shall mean the Business Day when each of the conditions applicable to the funding of the Final Order Term Loans and listed in Section 2(a) of this Note shall have been satisfied or waived in a manner satisfactory to the Agent and the DIP Lender.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, in form and substance satisfactory to the Agent and the DIP Lender, together with all extensions, modifications and amendments thereto, authorizing (i) Borrowers to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation and (ii) the Loan Parties to use Cash Collateral of the Prepetition Secured Parties in a manner consistent with the Budget (subject to Permitted Variances), all as set forth in such order.

"Final Order Term Loan" shall have the meaning given such term in Section 1(a).

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order, as applicable.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Agent.

"Indebtedness" shall have the meaning given such term in the Prepetition Financing Agreement (and the defined terms used in such definition and defined in the Prepetition Financing Agreement shall have the meanings given such terms therein, unless any such term is also defined herein, in which case each such defined term used in such definition shall have the meaning provided herein) whether or not such agreement remains in effect and without giving effect to any amendments or other modifications thereto made after the Interim Closing Date.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Closing Date" shall mean the Business Day when each of the conditions applicable to the funding of the Interim Order Term Loans and listed in Section 2(a) of this Note shall have been satisfied or waived in a manner satisfactory to the Agent and DIP Lender.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent and the DIP Lender, authorizing, on an interim basis, (i) Borrowers to execute and perform under the terms of this Note and the other DIP Documents and (ii) the Loan Parties to use Cash Collateral of the Prepetition Secured Parties in a manner consistent with the Budget (subject to Permitted Variances).

"Inventory" shall have the meaning given such term in the Prepetition Financing Agreement, whether or not such agreement remains in effect.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Party" shall mean the Borrowers and any Guarantors.

"Material Adverse Effect" shall mean a material adverse effect on (i) the operations, business, assets, properties or financial condition of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any DIP Document, (iii) the legality, validity or enforceability of this Note or any other DIP Document, (iv) the rights and remedies of the Agent and the DIP Lender under any DIP Document, or (v) the validity, perfection or priority of a Lien in favor of the Agent for its benefit and the DIP Lender on any of the Collateral; provided, however, that "Material Adverse Effect"

shall expressly exclude any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases.

"Maturity Date" shall mean the earliest to occur of (i) the date which is 120 days following the Petition Date, or if such date is not a Business Day the immediately following Business Day, (ii) thirty-five (35) days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, or if such date is not a Business Day the immediately following Business Day, (iii) the consummation of a sale of all or substantially of the Debtors' assets pursuant to the Sale Motion or otherwise, (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Net Cash Proceeds" means, with respect to, any issuance or incurrence of any indebtedness, any Disposition or the receipt of any Extraordinary Receipts by any Loan Party or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Loan Party, in connection therewith after deducting therefrom only, (a) in the case of any Disposition or the receipt of any Extraordinary Receipts consisting of insurance proceeds or condemnation awards, the amount of any indebtedness secured by a Lien which is senior to the Liens securing the Obligations under this Note, the amount of such proceeds required by an order of the Bankruptcy Court to repay such third-party obligations, (b) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (c) transfer taxes paid to any taxing authorities by such Loan Party in connection therewith and (d) taxes to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to such Loan Party that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Loan Party and (ii) properly attributable to such transaction or to the asset that is the subject thereof.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to Agent and the DIP Lender arising under the Note or any of the other DIP Documents, and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under the Note or any of the other DIP Documents, in each case subject to the Financing Orders. This term includes all principal, interest, fees, charges, expenses, reasonable and documented out-of-pocket attorneys' fees and any other sum chargeable to Borrowers under the Note or any of the other DIP Documents, in each case subject to the Financing Orders.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers', or other similar possessory liens arising in the ordinary course of business; (e) materialmen's, workmen's, mechanic's, or other similar liens (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546 of the Bankruptcy Code); (f) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (g) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (h) the Agent's and DIP Lender's Liens; (i) Liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546 of the Bankruptcy Code); (j) Liens in favor of the Prepetition Secured Parties and other Liens granted pursuant to the Financing Orders (including, to the extent constituting a Lien, the Carve-Out); and (k) to the extent constituting Liens, Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean: (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) the Prepetition Obligations; (d) taxes and other expenses incurred in the ordinary course of business; (e) any Indebtedness existing on the Petition Date; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall mean certain permitted senior liens as expressly set forth in the Financing Orders.

"Permitted Variances" shall have the meaning given to such term in the Financing Orders.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county,

city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given such term in the recital to this Note.

"Prepetition Financing Agreement" shall have the meaning given to such term in the Financing Orders.

"Prepetition Obligations" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Recipient" shall mean the Agent or the DIP Lender, as applicable.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Related Parties" shall mean, with respect to any specified Person, such Person's affiliates and the respective managers, administrators, trustees, partners, investors, directors, officers, employees, agents, advisors, sub-advisors or other representatives of such Person and such Person's affiliates.

"Resignation Effective Date" shall have the meaning given such term in Section 20(g)(1).

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Responsible Officer" means the chief executive officer, chief financial officer, chief operating officer, secretary, treasurer, president, vice president, manager, general counsel or chief restructuring officer of the Borrowers.

"Sale Motion" shall have the meaning given such term in Section 14 of this Note.

"Sanction" shall mean any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"Stalking Horse Asset Purchase Agreement" means any Asset Purchase Agreement by and among AG Acquisition 1 LLC, as purchaser, and the Loan Parties, as sellers.

"Subsidiary" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Parent.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Variance Testing Period" shall mean, in respect of Actual Operating Disbursement Amounts, (w) the two-week period ending on August __, 2025 ("Initial Two Week Disbursements Period"), (x) the three-week period ending on August __, 2025 ("Initial Three Week Disbursements Period"), (y) the four-week period ending on September __, 2025 ("Initial Four Week Disbursements Period"), and (z) thereafter the rolling four-week period ending on each Friday (each a, "Four Week Disbursements Period").

19.    Representations and Warranties.  The Borrowers and each of the other Loan Parties represents as follows:

(a)    the Borrowers and each of the Loan Parties are duly formed and/or organized and validly existing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrowers of the Borrowers' obligations hereunder and under the other DIP Documents are within its corporate or limited liability company powers, have been duly authorized by all necessary corporate or limited liability company action of the Borrowers, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable material law or of the Borrowers' corporate charter, certificate of formation, limited liability company agreement or by-laws or of any agreements binding upon or applicable to the Borrowers or any of their Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate or limited liability company action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders, this Note and each other DIP Document is a legal, valid and binding obligation, enforceable against the Loan Parties in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the entry of the

33421474.4

-29-

Financing Orders and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(e)     other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court, the Borrowers and the other Loan Parties have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Borrowers and their Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)     no written statement furnished by or on behalf of the Borrowers and their Subsidiaries to the DIP Lender pursuant to the terms of this Note (other than any projections, the Budget, estimates and information of a general economic nature or general industry nature), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of all of the circumstances under which they were made;

(g)     upon entry of the Financing Orders, the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, and having the priorities set forth in the Financing Orders;

(h)     except for proceedings in or related to the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrowers, threatened in writing against the Borrowers or their Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrowers or their Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)     each Loan Party is in compliance in all material respects with the requirements of all laws and regulations and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of law or regulation or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted, (b) permitted or contemplated by the Financing Orders or the Budget or (c) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(j)     none of the Loan Parties is an "investment company", "affiliated person", "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended;

(k)     no Loan Party, nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is, (i) currently the subject or target of any Sanctions or (ii) located, organized or resident in a Designated Jurisdiction;

(l)     since the Petition Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect; and

(m)    other than as previously disclosed to the DIP Lender or as contemplated to be assumed by the purchaser under the Stalking Horse Asset Purchase Agreement, the Borrowers and their Subsidiaries have filed all material federal, state and other tax returns and reports required to be filed, and have paid all material federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable other than (i) those not yet delinquent or are being contested in good faith by appropriate proceedings or (ii) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

20.    Agent.

(a)    Appointment.  The DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of the DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lender and paid to the Agent; (ii) to distribute to the DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term  Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lender with respect to the Borrowers and the other Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.  The Agent may perform any of its duties hereunder or under the other DIP Documents by or through any one or more sub-agents or attorneys-in-fact appointed by the Agent.  The Agent and any such sub-agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions set forth in this Section 20 shall apply to any such sub-agent or attorney-in-fact and the Related Parties of the Agent, any such sub-agent and any such attorney-in-fact and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.  The Agent shall not be responsible for the negligence or misconduct of any sub-agents or attorney-in-fact except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents or supplemental agents.

(b)    Nature of Duties.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents. The duties of the Agents shall be mechanical and administrative in nature. The Agents shall not have by reason of

33421474.4

this Agreement or any other DIP Document a fiduciary relationship in respect of the DIP Lender. Nothing in this Note or any other DIP Document, express or implied, is intended to or shall be construed to impose upon the Agent any obligations in respect of this Note or any other DIP Document except as expressly set forth herein or therein. DIP Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Term Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral without reliance upon the Agent, and neither the Agent nor any of its Related Parties shall have any duty or responsibility, either initially or on a continuing basis, to provide the DIP Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Term Loan hereunder or at any time or times thereafter, provided that, upon the reasonable written request of the DIP Lender, Agent shall provide to the DIP Lender any documents or reports delivered to Agent by the Loan Parties pursuant to the terms of this Note or any other DIP Document.

(c)     Rights, Exculpation, Etc.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Notwithstanding anything contained herein to the contrary, no action taken or omitted to be taken by the Agent at the direction of the DIP Lender shall be considered gross negligence or willful misconduct of the Agent. Without limiting the generality of the foregoing, the Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof (conspicuously stating that such notice is a "notice of default" and providing sufficient detail related thereto) is given to the Agent by the Borrowers or the DIP Lender. The Agent (i) makes no warranty or representation to and shall not be responsible for any statements, certificates, warranties or representations made in or in connection with this Note or the other DIP Documents; (ii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Note or the other DIP Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (iii) shall not be responsible to for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Note or the other DIP Documents or any other instrument or document furnished pursuant hereto or thereto; and (iv) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Borrower in connection therewith, nor shall the Agent be responsible or liable for any failure to monitor or maintain any portion of the Collateral. The Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Note or of any of the other DIP Documents the Agent are permitted or required to take or to grant, and if such instructions are requested, the Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the DIP Documents until it shall have received such instructions from the DIP Lender and, if it so requests, it shall first be indemnified to its satisfaction by the DIP Lender against any and all liability and expense which may be incurred by reason of taking, continuing to take such action or refraining from taking such action. Notwithstanding the foregoing, the Agent shall not be required to take, or refrain from taking, any action that is, in the opinion of the Agent or its

counsel, contrary to any DIP Document or applicable requirements of law. The Agent shall not be liable for any action taken or refrained to be taken by it with the consent or at the request of the DIP Lender.

(d)    Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it. Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Term Loan, that by its terms must be fulfilled to the satisfaction of the DIP Lender, Agent may presume that such condition is satisfactory to DIP Lender unless Agent shall have received written notice to the contrary from DIP Lender prior to the making of such Term Loan. Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(e)    Indemnification.  To the extent that any Agent Indemnitee is not timely reimbursed and indemnified by the Borrowers, and whether or not the Agent has made demand on any Borrower for the same, the DIP Lender will, within five days of written demand by such Agent, reimburse, pay and protect, indemnify and hold the Agent Indemnitees harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to any such Agent Indemnitee), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent Indemnitee in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by such Agent Indemnitee under this Note or any of the other DIP Documents and any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Agent Indemnitee is a party thereto and whether or not brought by or against any other Indemnified Person. Without limiting the foregoing, DIP Lender shall promptly, following written demand therefor, pay or reimburse the Agent Indemnitees for all  reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Note or the other DIP Documents (including all such reasonable out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any debtor relief law, and including all respective reasonable fees, charges and disbursements of any counsel, to the extent that the Agent Indemnitees are not timely reimbursed for such expenses by or on behalf of the Borrowers. The obligations of the DIP Lender under this Section 20(e) shall survive the payment in full of the Term Loans, the termination of this Note and the other DIP Documents and the resignation of the Agent.

(f)    Collateral Matters.

(1)    The DIP Lender hereby irrevocably authorizes the Agent, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of

33421474.4

the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property Disposed of in the ordinary course of any Borrower's business or otherwise in compliance with or as permitted by the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lender.

(2)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lender, the DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to the DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

(g)    Successor Agent.

(1)    The Agent may at any time give at least 30 days prior written notice of its resignation to the DIP Lender and the Borrowers.  Upon receipt of any such notice of resignation, the DIP Lender shall have the right to appoint a successor Agent which is reasonably acceptable to the Borrowers.  If no such successor Agent shall have been so appointed by the DIP Lender and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the DIP Lender) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the DIP Lender, appoint a successor Agent.  Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(2)    With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other DIP Documents (except that in the case of any Collateral held by such Agent on behalf of the DIP Lender under any of the DIP Documents, the retiring Agent shall continue to hold, as gratuitous bailee, such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to the DIP Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above.  Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall (to the

33421474.4

extent not already discharged as provided above) be discharged from all of its duties and obligations hereunder or under the other DIP Documents.  After the retiring Agent's resignation hereunder and under the other DIP Documents, the provisions of this Section 20, Section 9 and Section 21(b) shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

(h)     No Fiduciary Relationship. It is understood and agreed that the use of the term "agent" herein or in any other DIP Document (or any other similar term) with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(i)     Erroneous Payments.

(1)     DIP Lender hereby agrees that (i) if Agent notifies DIP Lender that Agent has determined in its sole discretion that any funds received by DIP Lender from Agent or any of its affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or  mistakenly received by, DIP Lender (whether or not known to DIP Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), DIP Lender shall promptly, but in no event later than one Business Day thereafter, return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by DIP Lender to the date such amount is repaid to Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, DIP Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of Agent to DIP Lender under this clause (1) shall be conclusive, absent manifest error.

(2)     Without limiting immediately preceding clause (1), DIP Lender hereby further agrees that if it receives a payment from Agent (or any of its affiliates) (x) that is in a different amount than,  or on a different date from, that specified in a notice of payment sent by Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that DIP Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each DIP Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, DIP Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim,

counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. DIP Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify Agent of such occurrence and, upon demand from Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by DIP Lender to the date such amount is repaid to Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(3)     The Borrowers and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from DIP Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting Agent's rights and remedies under this Section 20(i)), Agent shall be subrogated to all the rights of DIP Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrowers or any other Loan Party; provided that in no event shall this Section 20(i)(3) result in any duplicative payment by any Borrower or any Loan Party.

(4)     In addition to any rights and remedies of Agent provided by law, the Agent shall have the right, without prior notice to DIP Lender, any such notice being expressly waived by DIP Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 20(i) and which has not been returned to Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Agent or any of its affiliate, branch or agency thereof to or for the credit or the account of DIP Lender. The Agent agrees promptly to notify the DIP Lender after any such setoff and application made by Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(5)     Each party's obligations under this Section 20(i) shall survive the resignation or replacement of the Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any DIP Document.

21.    <u>Miscellaneous</u>.

(a)     All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

33421474.4

If to Borrowers:

AGDP Holding Inc.
140 Steward Avenue
Brooklyn, New York  11237
Attn: Faisal Lateef, General Counsel
Email: faisal@avant-gardner.com

with copies to
(which shall not
constitute notice):

Young Conway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Attn: Sean M. Beach
Email: sbeach@ycst.com

If to Agent or DIP
Lender:

Alter Domus (US) LLC
225 W. Washington Street, 9th Floor
Chicago, Illinois 60606
Attn: Legal Department – Agency, Emily Ergang Pappas
and Samuel Buhler
Email: legal_agency@alterdomus.com;
Emily.ergangpappas@alterdomus.com; and
Samuel.buhler@alterdomus.com

AG Acquisition 1 LLC
c/o Axar Capital Management LP
1330 Avenue of the Americas, 30th floor
New York, New York  10019
Attn:  Andrew Axelrod
Email:  aaxelrod@axarcapital.com

with copies to
(which shall not
constitute notice):

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Attention: Joshua M. Spencer
Email: joshua.spencer@hklaw.com and
alterdomus@hklaw.com

McDermott Will & Schulte LLP
919 Third Avenue
New York, New York 10022
Attn:  Adam Harris
Email: adam.harris@srz.com

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)    The Borrowers shall reimburse the Agent and the DIP Lender for all reasonable and documented out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court, including fees, costs and expenses of financial and other advisors.  In addition, the Borrowers shall reimburse the Agent and the DIP Lender for all reasonable and documented out-of-pocket fees, costs and expenses, including reasonable and documented out-of-pocket fees, costs and expenses of financial and other advisors, in connection with:

(1)    any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)    the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Successor Case, attendance at meetings related to the Chapter 11 Cases and any Successor Case, and general monitoring of the Chapter 11 Cases and any Successor Case;

(3)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Borrowers or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against any Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)    any attempt to enforce any remedies of the Agent against any or all of the Borrowers or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)    any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)    any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrowers or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise Dispose of any of the Collateral and (D) monitor any sales;

all of which shall, subject to the Financing Orders, be payable within 10 Business Days of the Borrowers' receipt of an invoice.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs

and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall constitute Obligations under the DIP Documents (subject in all respects to the terms of the Financing Orders).  The obligations of the Borrowers under this Section 21(b) shall survive the payment in full of the Term Loans, the termination of this Note and the other DIP Documents and the resignation of the Agent.

(c)        No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrowers and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrowers in any case shall entitle the Borrowers to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)        Borrowers and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)        If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)        **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

(g)        Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

(h)    **THE BORROWERS AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, THE DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWERS RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrowers and, by their acceptance of this Note, the Agent, the DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)    The Borrowers shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent.  The DIP Lender may, with the prior written consent of the Agent and, to the extent no Event of Default then exists, the Borrowers (which consent of the Borrowers shall not be required for any assignment to the Agent, the DIP Lender, a Related Fund or an affiliate of the Agent or a DIP Lender or which consent shall not be unreasonably conditioned, withheld or delayed), assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.  An assigning DIP Lender shall deliver to the Agent (and notify the Borrowers thereof) an assignment agreement in a form approved by the Agent, which shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee, together with a processing and recordation fee of $3,500 and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations.

(j)    The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain, or cause to be maintained at one of its offices, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose

name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note. The Register shall be available for inspection by Borrower and the DIP Lender at any reasonable time and from time to time upon reasonable prior written notice.

(k)     Upon receipt by the Agent of an assignment notice, subject to the consent rights in clause (i) above, the Agent shall accept such assignment and record the information contained therein in the Register.

(l)     A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register. Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(m)     In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register. Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and the DIP Lender at any reasonable time and from time to time upon reasonable prior notice.

(n)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrowers, the Agent and the DIP Lender.

(o)     This Note may be executed and delivered in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute one and the same instrument. Execution of this Note via facsimile or electronic mail shall be effective, and signatures received via facsimile or electronic mail shall be binding upon the parties hereto and shall be effective as originals. The parties hereto irrevocably and unreservedly agree that this Note may be executed by way of electronic signatures and the parties agree that neither this Note, nor any part hereof, shall be challenged or denied any legal effect, validity and/or enforceability solely on the ground that it is in the form of an electronic record.

(p)     This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrowers and each other Loan Party, the estates of the Borrowers, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Note and the other DIP Documents and the Financing Orders

shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lender and each of their respective permitted assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent and DIP Lender file financing statements or otherwise perfect its security interests or Liens under applicable law.

(q)     In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

(r)     THIS WRITTEN NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*     *     *     *     *

      IN WITNESS WHEREOF, the Borrowers have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

**AGDP HOLDING, INC., as Debtor and Debtor in Possession**

By: _____
    Name:
    Title:

**AVANT GARDNER, LLC, as Debtor and Debtor in Possession**

By: _____
    Name:
    Title:

ACKNOWLEDGED AND AGREED TO BY:

**AG ACQUISITION 1 LLC, as DIP Lender**


By: _____
    Name: Andrew Axelrod
    Title: Authorized Signatory



**ALTER DOMUS (US) LLC, as Agent**

By: _____
    Name:
    Title:

Schedule 1

Deliver (which delivery may be made by electronic communication (including email)) to the Agent and the DIP Lender, the monthly reports and quarterly reports and other information required by Section 7.01(a) (commencing with the fiscal quarter ending September 30, 2025) of the Prepetition Financing Agreement (and the defined terms used in such sections and defined in the Prepetition Financing Agreement shall have the meanings given such terms therein, unless any such term is also defined herein, in which case each such defined term used in such definition shall have the meaning provided herein) (whether or not such agreement remains in effect and without giving effect to any amendments or other modifications thereto made after the Closing Date unless the Agent and DIP Lender shall otherwise agree) and each of the financial statements, reports, or other items set forth below at the following times in form reasonably satisfactory to the Agent and the DIP Lender:

| on [__], 2025 and every other Monday thereafter with respect to the two weeks preceding such date | (a)     a certificate which shall include such detail as is reasonably satisfactory to the DIP Lender (i) certifying that the Loan Parties are in compliance with the covenants contained in Section 15(j) and (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and attaching thereto the Approved Budget Variance Report which shall be prepared by the Borrower as of the last day of the most recently ended Variance Testing Period, |
|---|---|
| on [__], 2025 and every Thursday of each week ending thereafter | (b)     a revised proposed budget (it being understood that upon written approval of such proposed budget by the DIP Lender (and not before such written approval), in its sole discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the DIP Lender, |
| promptly, to the extent reasonably feasible, | (c)     copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; provided that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, but in any event within five (5) Business Days after any Borrower has knowledge of any event or | (d)     notice of such event or condition and a statement of the curative action that Borrowers propose to take with respect thereto, and |

| | |
|---|---|
| condition that constitutes a Default, | |
| upon the reasonable request of the DIP Lender, | (e)    any other information relating to the business, financial, legal or corporate affairs of the Borrower or its Subsidiaries. |

EXHIBIT A

Budget

EXHIBIT B

Form of Borrowing Request

EXHIBIT C

Form of Guarantee

**EXHIBIT B**

**Lien and Superpriority Claim Priority**

| Order of Priority | Prepetition Collateral (whether in existence on the Petition Date or thereafter arising) | Non-Lender Encumbered Assets | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|
| **1st** | Carve-Out and Permitted Prior Liens | Non-Lender Existing Liens | Carve-Out | Carve-Out |
| **2nd** | DIP Liens | Carve-Out | DIP Liens | DIP Superpriority Claim |
| **3rd** | Prepetition Liens | DIP Liens | Prepetition Secured Parties' Adequate Protection Liens | Prepetition Secured Parties' Adequate Protection Claims |
| **4th** | Prepetition Secured Parties' Adequate Protection Liens | Prepetition Secured Parties' Adequate Protection Liens | | |

**<u>EXHIBIT C</u>**
**(Approved Budget)**

**Avant Gardner**
*Cash Flow Forecast*

August 4, 2025

| Week Ending | 8/10/2025 | 8/17/2025 | 8/24/2025 | 8/31/2025 | 9/7/2025 | 9/14/2025 | 9/21/2025 | 9/28/2025 | 10/5/2025 |
|---|---|---|---|---|---|---|---|---|---|
| **Total Cash Receipts** | $ 84,366 | $ 151,587 | $ 124,233 | $ 117,581 | $ 92,405 | $ 160,699 | $ 94,811 | $ 135,155 | $ 122,703 |
| **Total Refunds** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| ***Methodology Disbursements*** | | | | | | | | | |
| Payroll and Employee Benefits | $ 236,665 | $ 416,701 | $ 107,698 | $ 468,869 | $ 281,159 | $ 226,371 | $ 107,698 | $ 81,614 | $ 591,043 |
| Rent and Real Estate Taxes | 710,557 | - | - | - | 594,016 | - | - | - | 594,016 |
| Insurance | 49,583 | 24,500 | 350,000 | 20,000 | 2,049 | 7,722 | 40,000 | 150,000 | 80,049 |
| Utilities | - | - | - | - | 105,200 | - | - | - | 105,200 |
| Ordinary Course Professionals | 40,000 | - | - | - | 43,000 | 6,000 | - | - | 43,000 |
| Advertising and Marketing | 43,000 | - | - | - | 35,000 | 8,000 | - | - | 35,000 |
| Other Methodology Disbursements | 63,800 | 72,750 | 19,411 | 7,750 | 49,669 | 45,950 | 38,750 | 23,530 | 36,019 |
| **Total Methodology Disbursements** | $ 1,143,606 | $ 513,951 | $ 477,109 | $ 496,619 | $ 1,110,094 | $ 294,043 | $ 186,448 | $ 255,144 | $ 1,484,327 |
| ***Non-Methodology Disbursements*** | | | | | | | | | |
| Artist Payments | $ 802,563 | $ 425,338 | $ 64,938 | $ 322,500 | $ 157,813 | $ 65,500 | $ 238,500 | $ 84,500 | $ 286,500 |
| Show Related Expenses | 490,379 | 428,733 | 153,512 | 112,498 | 87,819 | 145,926 | 175,768 | 311,385 | 224,434 |
| Net Show Relocation Costs | 89,291 | - | - | 9,876 | 238,835 | - | 292,919 | - | - |
| Other Non-Methodology Disbursements | 3,101 | 1,299 | 3,007 | 3,096 | 25,075 | 1,029 | 534 | 917 | 11,635 |
| **Total Non-Methodology Disbursements** | $ 1,385,333 | $ 855,369 | $ 221,456 | $ 447,971 | $ 509,541 | $ 212,455 | $ 707,722 | $ 396,803 | $ 522,569 |
| **Operating Cash Flow** | $ (2,444,573) | $ (1,217,733) | $ (574,332) | $ (827,008) | $ (1,527,229) | $ (345,799) | $ (799,359) | $ (516,792) | $ (1,884,194) |
| ***Non-Operating Receipts*** | | | | | | | | | |
| DIP Funding | 10,000,000 | | | | 15,000,000 | | | | |
| **Total Non-Operating Receipts** | $ 10,000,000 | $ - | $ - | $ - | $ 15,000,000 | $ - | $ - | $ - | $ - |
| ***Non-Operating Disbursements*** | | | | | | | | | |
| Building Construction and Consultants | - | 750,000 | - | - | - | - | - | - | - |
| Board & Advisor Fees | 30,000 | 58,988 | - | - | 65,000 | - | 58,988 | - | 65,000 |
| Past Due Taxes | 60,000 | 40,000 | - | - | - | - | 40,000 | - | - |
| **Total Non-Operating Disbursements** | $ 90,000 | $ 848,988 | $ - | $ - | $ 65,000 | $ - | $ 98,988 | $ - | $ 65,000 |
| ***Restructuring Costs*** | | | | | | | | | |
| Debtor Counsel | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | 150,000 |
| Debtor Advisors | 253,750 | 153,750 | 153,750 | 153,750 | 208,750 | 123,750 | 123,750 | 123,750 | 201,000 |
| Lender / Agent Advisors | 105,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Director Fees | 70,000 | - | - | - | 70,000 | - | - | - | 70,000 |
| UCC Advisors | - | - | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 |
| **Total Professional Fees** | $ 728,750 | $ 503,750 | $ 538,750 | $ 538,750 | $ 663,750 | $ 508,750 | $ 508,750 | $ 508,750 | 506,000 |
| ***Other Restructuring Costs*** | | | | | | | | | |
| US Trustee Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Equity Counsel | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 |
| Winddown Costs | - | - | - | - | - | - | - | - | - |
| Utility Deposit | 74,008 | - | - | - | - | - | - | - | - |
| Other Restructuring | 137,500 | 137,500 | 137,500 | 137,500 | - | - | - | - | - |
| **Total Other Restructuring Costs** | $ 236,508 | $ 137,500 | $ 137,500 | $ 137,500 | $ 25,000 | $ - | $ - | $ - | $ 25,000 |
| **Total Restructuring Costs** | $ 965,258 | $ 641,250 | $ 676,250 | $ 676,250 | $ 688,750 | $ 508,750 | $ 508,750 | $ 508,750 | $ 531,000 |
| **Total Disbursements** | $ 3,584,197 | $ 2,859,558 | $ 1,374,815 | $ 1,620,839 | $ 2,373,385 | $ 1,015,248 | $ 1,501,908 | $ 1,160,697 | $ 2,602,896 |
| Beginning Cash (Book) | $ - | $ 6,500,169 | $ 3,792,198 | $ 2,541,615 | $ 1,038,357 | $ 13,757,378 | $ 12,902,829 | $ 11,495,732 | $ 10,470,191 |
| *Net Cash Flow* | *6,500,169* | *(2,707,971)* | *(1,250,582)* | *(1,503,258)* | *12,719,021* | *(854,549)* | *(1,407,097)* | *(1,025,542)* | *(2,480,194)* |
| **Ending Cash (Book)** | $ 6,500,169 | $ 3,792,198 | $ 2,541,615 | $ 1,038,357 | $ 13,757,378 | $ 12,902,829 | $ 11,495,732 | $ 10,470,191 | $ 7,989,997 |

**Avant Gardner**
*Cash Flow Forecast*

August 4, 2025

| Week Ending | 10/12/2025 | 10/19/2025 | 10/26/2025 | 11/2/2025 | 11/9/2025 | 11/16/2025 | 11/23/2025 | 11/30/2025 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Total Cash Receipts** | $ 463,488 | $ 136,650 | $ 159,069 | $ 79,715 | $ - | $ - | $ - | $ - | $ 1,922,462 |
| **Total Refunds** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| ***Methodology Disbursements*** | | | | | | | | | |
| Payroll and Employee Benefits | $ 113,404 | $ 220,665 | $ 159,866 | $ 218,697 | $ 158,414 | $ 194,581 | $ - | $ - | $ 3,583,443 |
| Rent and Real Estate Taxes | - | - | - | 594,016 | - | - | - | - | 2,492,605 |
| Insurance | 7,722 | 40,000 | 150,000 | 25,049 | - | - | - | - | 946,675 |
| Utilities | - | - | - | 105,200 | - | - | - | - | 315,600 |
| Ordinary Course Professionals | 6,000 | - | - | 43,000 | - | - | - | - | 181,000 |
| Advertising and Marketing | 8,000 | - | - | 35,000 | - | - | - | - | 164,000 |
| Other Methodology Disbursements | 46,831 | 67,694 | 43,530 | 42,019 | - | - | - | - | 557,703 |
| **Total Methodology Disbursements** | $ 181,957 | $ 328,359 | $ 353,396 | $ 1,062,981 | $ 158,414 | $ 194,581 | $ - | $ - | $ 8,241,026 |
| ***Non-Methodology Disbursements*** | | | | | | | | | |
| Artist Payments | $ 164,000 | $ 264,605 | $ 638,612 | $ 71,276 | $ - | $ - | $ - | $ - | $ 3,586,643 |
| Show Related Expenses | 222,315 | 512,303 | 32,591 | 53,670 | - | - | - | - | 2,951,332 |
| Net Show Relocation Costs | - | - | - | - | - | - | - | - | 630,922 |
| Other Non-Methodology Disbursements | 2,496 | 10,746 | 3,874 | 15,361 | - | - | - | - | 82,172 |
| **Total Non-Methodology Disbursements** | $ 388,811 | $ 787,654 | $ 675,076 | $ 140,306 | $ - | $ - | $ - | $ - | $ 7,251,068 |
| **Operating Cash Flow** | $ (107,280) | $ (979,363) | $ (869,403) | $ (1,123,572) | $ (158,414) | $ (194,581) | $ - | $ - | $ (13,569,631) |
| ***Non-Operating Receipts*** | | | | | | | | | |
| DIP Funding | | | | | | | | | 25,000,000 |
| **Total Non-Operating Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 25,000,000 |
| ***Non-Operating Disbursements*** | | | | | | | | | |
| Building Construction and Consultants | - | - | - | - | - | - | - | - | 750,000 |
| Board & Advisor Fees | - | 58,988 | - | 65,000 | - | 58,988 | - | - | 460,952 |
| Past Due Taxes | - | 40,000 | - | - | - | 40,000 | - | - | 220,000 |
| **Total Non-Operating Disbursements** | $ - | $ 98,988 | $ - | $ 65,000 | $ - | $ 98,988 | $ - | $ - | $ 1,430,952 |
| ***Restructuring Costs*** | | | | | | | | | |
| Debtor Counsel | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 3,750,000 |
| Debtor Advisors | 106,000 | 106,000 | 106,000 | 851,000 | 113,750 | 113,750 | 113,750 | 113,750 | 3,120,000 |
| Lender / Agent Advisors | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 905,000 |
| Director Fees | - | - | - | 70,000 | - | - | - | - | 280,000 |
| UCC Advisors | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 525,000 |
| **Total Professional Fees** | $ 341,000 | $ 341,000 | $ 341,000 | $ 1,156,000 | $ 348,750 | $ 348,750 | $ 348,750 | $ 348,750 | $ 8,580,000 |
| ***Other Restructuring Costs*** | | | | | | | | | |
| US Trustee Fees | $ 193,728 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 193,728 |
| Equity Counsel | - | - | - | - | 25,000 | - | - | - | 100,000 |
| Winddown Costs | - | - | - | - | - | - | - | 500,000 | 500,000 |
| Utility Deposit | - | - | - | - | - | - | - | - | 74,008 |
| Other Restructuring | - | - | - | - | - | - | - | - | 550,000 |
| **Total Other Restructuring Costs** | $ 193,728 | $ - | $ - | $ - | $ 25,000 | $ - | $ - | $ 500,000 | $ 1,417,736 |
| **Total Restructuring Costs** | $ 534,728 | $ 341,000 | $ 341,000 | $ 1,156,000 | $ 373,750 | $ 348,750 | $ 348,750 | $ 848,750 | $ 9,997,736 |
| **Total Disbursements** | $ 1,105,496 | $ 1,556,001 | $ 1,369,472 | $ 2,424,287 | $ 532,164 | $ 642,319 | $ 348,750 | $ 848,750 | $ 26,920,781 |
| Beginning Cash (Book) | $ 7,989,997 | $ 7,347,989 | $ 5,928,638 | $ 4,718,235 | $ 2,373,663 | $ 1,841,500 | $ 1,199,181 | $ 850,431 | $ - |
| *Net Cash Flow* | *(642,008)* | *(1,419,351)* | *(1,210,403)* | *(2,344,572)* | *(532,164)* | *(642,319)* | *(348,750)* | *(848,750)* | *1,681* |
| **Ending Cash (Book)** | $ 7,347,989 | $ 5,928,638 | $ 4,718,235 | $ 2,373,663 | $ 1,841,500 | $ 1,199,181 | $ 850,431 | $ 1,681 | $ 1,681 |

**EXHIBIT D**
**(Milestones)**

| EVENT | TARGET COMPLETION DATE |
|---|---|
| Entry of Interim DIP Financing Order | No later than 2 business days following the Petition Date |
| Filing of Bid Procedures Motion and entry into the Stalking Horse APA | No later than 5 business days following the Petition Date |
| Entry of Order Approving Bid Procedures | No later than 35 days following the Petition Date |
| Entry of Final DIP Order | No later than 35 days following the Petition Date |
| Bid submission deadline | No later than 65 days following the Petition Date |
| Auction; Declaration of successful bidder | No later than 75 days following the Petition Date |
| Entry of Order Authorizing and Approving Sale to Buyer | No later than 80 days following entry of the Interim Order |
| Closing | No later than 95 days following the Petition Date (subject to the satisfaction of closing conditions in the Definitive Documents) |