## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 (___) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF GARY RICHARDS IN SUPPORT
### OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Gary Richards, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.  I am the Chief Executive Officer and President (together, "CEO") of Avant Gardner, LLC ("Avant Gardner") and its debtor affiliates in the above-captioned chapter 11 cases (together with Avant Gardner, the "Debtors," or the "Company"). I am over the age of 18 and authorized to submit this declaration (this "Declaration") on behalf of each of the Debtors.

2.  I started in my role as interim CEO of the Debtors on May 18, 2025. Prior to that time, I served as a member of the board of directors of AGDP Holding Inc., a position I continue to hold today. Additional information on my background and experience is provided below.

3.  In my capacity as CEO of the Debtors, I am familiar with the facts and circumstances set forth herein, which, except as otherwise noted, are based on my actual knowledge as well as information and advice provided to me by the Company's management and certain of its professionals and advisors. In addition, the statements made herein are based, in whole or in part, upon my review of public and non-public documents and my discussions with

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

other members of the Debtors' management team and advisors on whom I have relied.  I am generally familiar with the Debtors' businesses, financial condition, day-to-day operations, and the circumstances leading to the commencement of these chapter 11 cases (these "<u>Chapter 11 Cases</u>").  I believe, to the best of my knowledge, that the facts and circumstances set forth herein are true and correct.  References to bankruptcy, the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanation provided by counsel to the Debtors.  If called upon to testify, I would testify competently to the facts set forth herein.

4.     On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").  I submit this Declaration for the purpose of apprising the Court and other parties in interest of the history of the Company, its capital structure and debt, and the circumstances that led to the commencement of these Chapter 11 Cases.  It is my understanding that the Debtors have also filed certain motions and other applications with the Court, including the "first day motions" (the "<u>First Day Motions</u>").

## **<u>INTRODUCTION</u>**

5.     Avant Gardner is a leading live music entertainment operator based in Brooklyn, New York. The Company is best known for its iconic venue—The Brooklyn Mirage—which first opened in 2017 and has since become a premier destination for live music events, particularly within the electronic dance music ("<u>EDM</u>") scene. The Avant Gardner complex is renowned for its unique and multifunctional design, combining both indoor and outdoor spaces across three distinct stages: The Brooklyn Mirage, The Great Hall, and The Kings Hall. Each of these spaces can operate independently or together, allowing for a wide range of event formats and experiences.

6.     The Brooklyn Mirage is the largest and most recognizable of the three stages, featuring an expansive open-air courtyard and panoramic views of the New York City skyline. It

is primarily used during the warmer months, from May through early November, and is closed in the winter. The Great Hall and The Kings Hall are both indoor spaces, designed with flexibility in mind to accommodate a variety of events year-round. The Great Hall, with its industrial warehouse aesthetic, is known for its large dance floor and immersive lighting, while The Kings Hall offers a more intimate setting and a world-class sound system.  The Avant Gardner complex's design allows for rapid adaptation between events, with mobile and temporary elements that can be reconfigured to suit different needs and seasons. This flexibility, combined with a strong brand and loyal customer base, has resulted in consistently high demand, frequent sold-out events, and a significant number of repeat attendees.

7.      Avant Gardner has established itself as a central hub for world-class touring talent, regularly hosting some of the most prominent DJs and music artists globally, especially in the EDM space.  Some of the prominent artists scheduled for the remainder of this year's season are The Chainsmokers, Illenium, and Tiesto.  The Company's operations extend beyond hosting shows.  Avant Gardner also produces and hosts festivals and private events, and provides a variety of ancillary services such as food and beverage, VIP table service, and merchandise sales.

8.      I joined Avant Gardner as a director of AGDP Holding Inc. in July 2024.  I was appointed by the Company's sole shareholder, Jürgen "Billy" Bildstein at the direction of the Prepetition Term Loan Lender (the "Lender").  The Lender had the right to appoint two independent directors in connection with amendments to the Prepetition Financing Agreement executed in July 2024 (as further described in Part II below).  Additionally, the Lender appointed Hooman Yazhari as an independent director; and Mr. Bildstein retained certain enumerated governance rights.

33419882.6

9.      I have an extensive background in the EDM business including both concert and event promotion as well as being a professional performer myself.  I have toured worldwide as a DJ under the name Destructo, and have been included in Rolling Stone's "50 Most Important People in EDM" list and Billboard's "EDM Power Players" list.  I was also the founder and CEO of Hard Events, a concert brand that put on popular music festivals and which was acquired by Live Nation Entertainment in 2012.  Additionally, I served as the President, North America for LiveStyle, Inc., a Los Angeles-based company focused on producing live events and digital entertainment content, primarily in the EDM space.  Given my extensive experience in live events generally and EDM specifically, I was asked to step into the CEO role for Avant Gardner when the prior CEO departed, as discussed further below.

10.     While Avant Gardner experienced success, including with its iconic venue The Brooklyn Mirage, the Company looked to further grow its business and enhance the concertgoer experience.  Accordingly, Avant Gardner embarked on a large-scale and ambitious overhaul of The Brooklyn Mirage which was slated to open in May 2025.  The project included technology and design elements that would completely reimagine the Brooklyn Mirage experience.  Most notably, the redesign included a large timber structure well above the crowd, kinetic shutter system to configure the digital screens as a performer desired, and custom precision sound system.

11.     As detailed more fully in Part III below, the Company experienced certain construction and permitting issues and ultimately was unable to open The Brooklyn Mirage for the 2025 season.  While certain shows are going forward in The Great Hall and The Kings Hall, or otherwise being relocated to non-Company venues, the loss of The Brooklyn Mirage for the 2025 season prompted a significant liquidity crisis thereby necessitating the filing of these Chapter 11 Cases.  These events and challenges include: project development delays, lack of sufficient cash

flow generation, unresolved litigation, and unsuccessful divestiture efforts of certain of the Debtors' assets prior to the commencement of these Chapter 11 Cases.

12.     The Debtors engaged legal counsel at Sidley Austin LLP and Young Conaway Stargatt & Taylor, LLP, as well as financial advisor and investment banker Portage Point Partners LLC.  Prior to the Petition Date, Sidley Austin LLP transitioned the restructuring legal work to Young Conaway Stargatt & Taylor, LLP. The Debtors, with the assistance of their advisors, engaged with the Lender with respect to strategic alternatives for the Debtors' businesses.  The Debtors, with the assistance of their advisors, after deliberately and diligently coordinating with the Lenders and other key stakeholders, determined that the sale of the Debtors' assets in these Chapter 11 Cases, subject to the Court's approval, would be in the best interests of the Debtors' estates and all of their stakeholders.

13.     Also prepetition, the Debtors engaged in extensive arms'-length negotiations with the Lender, who has agreed to provide DIP financing to fund these Chapter 11 Cases, which the Lender will use, together with secured obligations owing under the Prepetition Financing Agreement (defined below), to credit bid as the stalking horse bidder (the "Stalking Horse Bidder") for all or substantially all of the Debtors' assets.  The Debtors and the Lender/Stalking Horse Bidder anticipate their negotiations on the stalking horse bid to conclude early in these Chapter 11 Cases.  Once the documentation of the Stalking Horse Bidder's bid is complete (likely in the very near term), the Debtors intend to file a motion seeking approval of bidding procedures and a sale process (the "Bidding Procedures Motion"), and will market all of their assets subject to Court-approved bidding procedures, in order to facilitate a competitive sale to the highest or otherwise best bidder.  The Debtors are targeting a sale closing with the Stalking Horse Bidder (or other bidder if a higher or otherwise better offer is received pursuant to the Bidding Procedures Motion)

before November 2025.  The proposed timeline is intended to avoid the operational disruption of a lengthy process balanced with providing sufficient time for a competitive process.

14.     For ease of reference, the remainder of this Declaration is organized into five sections.  Part I provides background information on the Company's corporate history, operations and assets.  Part II outlines the Debtors' capital structure and other debt obligations.  Part III describes the circumstances leading to the filing of these Chapter 11 Cases.  Part IV provides factual support for the First Day Motions, summarizes the Debtors' primary objectives in these Chapter 11 Cases, and adds insight into proposed immediate next steps.

## I.     COMPANY AND OPERATIONS

### A.     Corporate Structure

15.     Each of Debtors Avant Gardner, LLC, AG Management Pool LLC ("AG Pool") Reynard Productions, LLC ("Reynard Productions"), EZ Festivals LLC ("EZ Festivals"), and Made Event LLC ("Made Event") are wholly-owned subsidiaries of AGDP Holding Inc. ("AGDP Holding").  AGDP Holding is 100% owned by Jürgen Bildstein.

16.     A corporate structure chart of the Debtors is attached hereto as **Exhibit A**.

### B.     Board of Directors and Officers

17.     AGDP Holding has three directors: Jürgen Bildstein, Hooman Yazhari, and me. Each of the remaining Debtors are wholly-owned subsidiaries of AGDP Holding that are member-managed by AGDP Holding.

18.     I am the CEO of each of the Debtors.[2]  Alec Ifshin is the Treasurer of the Debtors. Faisal Lateef is the Debtors' Secretary and General Counsel.

---

[2] By way of further disclosure, the Debtors are obligated to indemnify and reimburse me for certain expenses under prepetition agreements between me and the Debtors.  In addition, I have entered into an agreement with an entity affiliated with the Lender prior to the Petition Date, pursuant to which the Lender affiliate has agreed to backstop the Debtors' indemnification and reimbursement obligations in the event the applicable Debtors fail to do so.

19.     On July 31, 2025, the board of directors of AGDP Holding constituted a Restructuring Committee with authority to review, recommend, and reject transactions with potentially interested parties.  Currently, Hooman Yazhari is the sole member of the Restructuring Committee, but the Debtors anticipate adding an additional member in the near term.  Members of the Restructuring Committee are paid $35,000 a month in the ordinary course.

### C.     The Company's Business

20.     Avant Gardner officially opened its doors in July 2017 in Brooklyn, New York, establishing itself as a new force in the city's live music and nightlife scene. The flagship outdoor stage, The Brooklyn Mirage, was built and began hosting events, quickly gaining attention for its innovative design and immersive experience.  The venue's unique blend of indoor and outdoor spaces, modular design, and large capacity set it apart from other New York venues. Early programming focused on EDM and live concerts, leveraging industry relationships to attract top-tier talent.

21.     Over the years of 2018–2019, Avant Gardner expanded its footprint by opening The Great Hall and The Kings Hall, two indoor venues adjacent to The Brooklyn Mirage.  This allowed for year-round operations and the ability to host multiple, simultaneous events, allowing for creative event formats and high utilization.  Avant Gardner diversified its venue programming and honed its event production, hospitality, and customer experience.

22.     From March 2020 through June 2021, Avant Gardner, like the rest of the live entertainment industry, was forced to shut down all events due to the COVID-19 pandemic and related government restrictions.  In June 2021, Avant Gardner reopened its doors as restrictions eased.  The return was marked by pent-up demand for live music and nightlife, with audiences eager to return to in-person events.  Avant Gardner resumed hosting events, though the year was

still impacted by lingering COVID-19 effects, including capacity restrictions, health protocols, and a cautious return of international touring artists.

23.     2022 was a year of growth, acquisitions, and strategic initiatives for Avant Gardner. In May 2022, Avant Gardner acquired EZ Festivals LLC and Made Event LLC, the owners and promoters of the Electric Zoo festival, bringing New York's largest EDM festival under its umbrella.  This move expanded the Company's portfolio and created new synergies in talent booking, marketing, and operations.  The Brooklyn Mirage underwent significant renovations, including the installation of a massive LED video wall, further enhancing the venue's visual and experiential appeal.  Avant Gardner had strong revenue growth and high demand into 2023.

24.     Avant Gardner did face some setbacks in 2023.  The 2023 Electric Zoo festival faced operational and financial challenges, which led to a class action lawsuit and hurt the Company's financial and reputational standing.  In 2023 and 2024, Avant Gardner executed a renovation of The Great Hall, adding a new mezzanine and LED screens.  Avant Gardner planned a reimagining of the main stage—The Brooklyn Mirage—through May 2025.  The three event spaces and their respective capacities (when open) and styles are summarized in this chart:

| Event Space | Capacity (when Open) | Style |
| --- | --- | --- |
| The Brooklyn Mirage | Approximately 5,300 (pre-renovation) | Indoor-Outdoor |
| The Great Hall | Approximately 2,800 | Industrial warehouse aesthetic |
| The Kings Hall | Approximately 540 | Intimate, wood paneling |

25.     However, as described in Part III below, the Company experienced certain construction and permitting issues and ultimately was unable to open The Brooklyn Mirage for the 2025 season.  The Company's financial position has suffered dramatically as a result.

## II.     PREPETITION CAPITAL STRUCTURE

26.     As of the Petition Date, the Debtors had approximately $150,000,000 in secured funded debt obligations and approximately $1,500,000 in unsecured funded debt obligations.  A summary of the funded debt obligations is set forth below:

| Debt Facility | Estimated Principal Amount Outstanding as of the Petition Date | Security, Priority, and Dispute |
|---|---|---|
| Prepetition Financing Agreement | $121,104,482.11 | Secured – first lien Undisputed |
| Protective Advances | $20,803,621.66 | Secured – first lien Undisputed |
| Prepetition LiveStyle Note | $11,849,828 (inclusive of interest) | Secured – subordinated Undisputed |
| Prepetition Packin Note | $1,500,000 | Unsecured Undisputed |
| Total | $155,257,931.77 | |

### A.     Secured Debt

#### i.   *Prepetition Financing Agreement*

27.     Avant Gardner and AGDP Holdings, as borrowers, Reynard Productions, EZ Festivals, and Made Events, as guarantors, and the various lenders from time to time party thereto (the "Prepetition Term Loan Lenders") and Alter Domus (US), LLC, as administrative and collateral agent (in such capacity, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Term Loan Secured Parties") are parties to that certain Amended and Restated Financing Agreement, dated as of July 1, 2024 (as amended by Amendment No. 1 to A&R Financing Agreement, dated as of August 27, 2024, Amendment No. 2 to A&R Financing Agreement, dated as of October 25, 2024, Amendment No. 3 to A&R Financing Agreement, dated as of January 30, 2025 Amendment No. 4 to A&R Financing Agreement, dated as of February 7, 2025, and as further amended, restated, supplemented or modified through the Petition Date, the

"Prepetition Financing Agreement" and, together with each of the Loan Documents (each as defined therein), the "Prepetition Term Loan Documents").

28.     Pursuant to the Prepetition Loan Documents, the Obligations (as defined in the Prepetition Financing Agreement) owed to the Prepetition Term Loan Secured Parties are secured by Liens (as defined in the Prepetition Financing Agreement) on, and security interests in, Collateral (as defined in the Prepetition Credit Agreement), subject to certain Permitted Liens (as defined in the Prepetition Credit Agreement) (collectively, the "Prepetition Liens" and the collateral on which such liens attach, the "Prepetition Term Loan Collateral").  Pursuant to the Prepetition Loan Documents, each of the Guarantors (as defined in the Prepetition Credit Agreement) (the "Prepetition Term Loan Guarantors") has provided to the Prepetition Agent an unconditional joint and several guaranty of the Obligations (as defined in the Prepetition Credit Agreement), which guaranty is secured by the Prepetition Term Loan Collateral.

29.     Since May 14, 2025, the Collateral Agent under the Prepetition Financing Agreement has extended approximately $20,000,000 of Collateral Agent Advances (pursuant to Section 10.08(a) of the Prepetition Financing Agreement), which the Debtors used for the primary purpose of funding contractor fees, certain key vendor payments, and other professional fees (the "Protective Advances").  The Protective Advances provided the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.

30.     In connection with amendments to the Prepetition Financing Agreement an affiliate of the Lender was issued warrants to purchase up to 40% common stock of AGDP Holding.  Those warrants have not been exercised as of the Petition Date.

33419882.6

ii. *Prepetition LiveStyle Note*

31.     Avant Gardner, AGDP Holdings, Reynard Productions, EZ Festivals, and Made Events, as borrowers and guarantors, and LiveStyle Holdings, Inc., NYC Festivals LLC, NYC Club Event LLC, and SFXE IP LLC (collectively, the "LiveStyle Parties" or the "Prepetition LiveStyle Secured Parties," and together with the Prepetition Term Loan Secured Parties, the "Prepetition Secured Parties"), are parties to that certain Promissory Note, dated as of July 16, 2024 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition LiveStyle Note" and, together with each of the Loan Documents (each as defined therein), the "Prepetition LiveStyle Note Documents"), which evidences a loan in the original principal amount of $10,816,000 due December 31, 2026.  Pursuant to the Prepetition LiveStyle Note Documents, the Obligations (as defined in the Prepetition LiveStyle Note) are secured by Liens (as defined in the Prepetition LiveStyle Note) on, and security interests in, Collateral (as defined in the Prepetition LiveStyle Note), on the terms and subject to the conditions of the Loan Documents (collectively, the "Prepetition LiveStyle Liens" and the collateral on which such liens attach, the "Prepetition LiveStyle Collateral").

32.     The Prepetition LiveStyle Note and the Prepetition LiveStyle Liens are subject to the terms and provisions of that certain Intercreditor Agreement, dated as of November 16, 2023 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Intercreditor Agreement"), by and among the Prepetition Agent, as agent for the Prepetition Term Loan Lenders, the LiveStyle Parties, and the other parties signatory thereto.  Pursuant to the Prepetition Intercreditor Agreement, the LiveStyle Parties agreed to forbear from exercising certain remedies against the Debtors and agreed to subordinate their liens in the Prepetition LiveStyle Collateral to the liens of the Prepetition Term Loan Secured Parties in the Collateral.

33.     As of the Petition Date, approximately $11,849,828 unpaid principal and interest remains outstanding under the Prepetition LiveStyle Note, plus fees and expenses.

**B.     Unsecured Debt**

i.   *Prepetition Packin Note*

34.     Pursuant to an unsecured Promissory Note dated April 4, 2025 (the "Prepetition Packin Note"), Avant Gardner borrowed $1,500,000 from Packin Realty Company, LLC ("Packin"), the ultimate landlord of 110–128 Varick Avenue, which is the lot adjacent to the Avant Gardner complex that the Debtors sublease from Packin's tenant Stewart Purchaser LLC.

35.     The proceeds of the Prepetition Packin Note are to be used for improvements to the 110–128 Varick Avenue property.  The Debtors have used certain of the proceeds to pay for improvements to the property.  As of the Petition Date, approximately $1,500,000 unpaid principal remains outstanding under the Prepetition Packin Note, plus interest, fees, and expenses.

ii.   *Disputed Transactions with TVT, Pinnacle, and Insta Funding*

36.     The Debtors are also party to a series of disputed financing transactions with TVT Capital Source LLC ("TVT"), Insta Funding LLC ("Insta Funding"), and Pinnacle Business Funding LLC ("Pinnacle"), pursuant to which the Debtors have alleged outstanding debt obligations totaling approximately $11.4 million in the aggregate as set forth below.

| Debt Facility | Original Principal Amount | Priority, and Dispute |
|---|---|---|
| January TVT Loan Agreement | $3,000,000 | Unsecured – Disputed |
| February 3 TVT Cash Advance Agreement | $1,000,000 | Unsecured – Disputed |
| February 4 TVT Cash Advance | $500,000 | Unsecured – Disputed |
| February 25 TVT Cash Advance | $1,500,000 | Unsecured – Disputed |
| March TVT Loan Agreement / Cash Advance | $1,750,000 (additional cash advance of $750,000 and loan of $1,000,000) | Unsecured – Disputed |

| | | |
|---|---|---|
| Pinnacle Receivables Purchase Agreement | $1,380,000 | Unsecured – Disputed |
| Insta Funding Receivables Purchase Agreement | $4,100,000 | Unsecured – Disputed |
| Total | $13,230,000 | |

37.    **January TVT Loan Agreement**.  On January 16, 2025, the Debtors entered into a Business Loan and Security Agreement with TVT for $3,000,000 with a maturity date of November 26, 2025 (the "January TVT Loan Agreement").  The January TVT Loan Agreement sets out a tiered weekly payment approach in an addendum, requiring Avant Gardner to pay $23,522.74 per week for the first 12 weeks, $47,045.46 per week between the thirteenth and twenty-fourth weeks, and $163,436.32 per week for the final twenty weeks.  TVT was granted a lien under the January TVT Loan Agreement, but did not file a UCC-1 financing statement.

38.    **February TVT Cash Advance Agreements**.  The following month, on February 3, 2025, the Debtors executed a Cash Advance Agreement with TVT (the "February 3 TVT Cash Advance Agreement") for $1,000,000, pursuant to which Avant Gardner was to pay TVT 3.53% of future receipts from each of Avant Gardner's sale of goods and services, including from the sale of tickets and food and beverages, until the receivables purchase amount was paid in full.  TVT was granted a lien under the February 3 TVT Cash Advance Agreement, but did not file a UCC-1 financing statement.

39.    The next day, February 4, 2025, the parties signed a new agreement where Avant Gardner received $500,000 as a "cash advance."  The agreement provided that Avant Gardner would pay this money back over 180 days, *i.e.*, roughly six months (the "February 4 TVT Cash Advance").  The February 4 TVT Cash Advance, like the January TVT Loan Agreement, had a tiered payment structure, with Avant Gardner required to pay $9,583.34 per week for the first 18

weeks and $28,750 per week for the last 18, *i.e.*, for a total of 36 weeks, which is inconsistent with the 180-day term listed on the same page.  TVT was granted a lien under the February 4 TVT Cash Advance, but did not file a UCC-1 financing statement.

40.     On February 25, 2025, the Debtors and TVT executed yet another cash advance agreement (the "February 25 TVT Cash Advance"), on terms nearly identical to the February 4 agreement.  Under this arrangement, Avant Gardner received $750,000 and was required to repay $14,375 per week for the first 18 weeks, followed by $43,125 per week for the next 18 weeks—totaling $1,035,000.  TVT was granted a lien under the February 25 TVT Cash Advance, but did not file a UCC-1 financing statement.

41.     **March TVT Cash Advance Agreement and Loan Agreement**.  On March 13, 2025, TVT and the Debtors entered into another cash advance agreement for $750,000, with terms similar to the February 3 TVT Cash Advance Agreement.  That same day, March 13, the Debtors entered into a "loan" agreement with TVT for $1,000,000, to be repaid over the course of nine months (the "March TVT Loan Agreement").  The March TVT Loan Agreement addendum provided for a tiered payment approach, where the Debtors would pay $19,166.67 a week for the first 18 weeks and $57,500 a week for the remaining 18, totaling $1,380,000.  TVT was granted a lien under these two agreements, but did not file a UCC-1 financing statement.

42.     **Pinnacle Financing**.  The Debtors also entered into a so-called receivables purchase agreement with Pinnacle on February 16, 2025 (the "Pinnacle Receivables Purchase Agreement").  The Pinnacle Receivables Purchase Agreement required the Debtors to provide Pinnacle 3.4% of its daily future receipts up to $1,380,000.  Pinnacle was granted a lien under the Pinnacles Receivables Purchase Agreement, but did not file a UCC-1 financing statement.

43.     **Insta Funding**.  The Debtors also entered into a so-called receivables purchase agreement with Insta Funding on April 1, 2025 (the "Insta Funding Receivables Purchase Agreement").  The Insta Funding Receivables Purchase Agreement required the Debtors to provide Insta Funding 29.57% of its receipts until it had paid back $4,100,000, a 38% markup.

44.     Insta Funding was granted a lien under the Insta Funding Receivables Purchase Agreement, but did not file a UCC-1 financing statement until June 10, 2025 or July 15, 2025, within 90 days of the Petition Date.[3]  On June 27, 2025, Insta Funding sent a letter to the Debtors demanding a total of $5,208,750.05, close to 170% of the original agreement.  On July 28, 2025, Insta Funding secured a prejudgment attachment of all of the Debtors' bank accounts at JPMorgan Chase.  Further, Insta Funding sent a notice to Block (one of the Debtors' payment processors) that resulted in a hold on the Debtors' account pending a release agreement or court order.

45.     On the date hereof, the Debtors are commencing an adversary proceeding and filing a complaint against TVT, Pinnacle, and Insta Funding.  The complaint asserts several claims for relief, including (i) recharacterization of the transactions as disguised financings rather than true sales of receivables, (ii) avoidance of the unperfected security interests and/or sales of accounts receivable pursuant to section 544 of the Bankruptcy Code and the applicable provisions of Article 9 of the Uniform Commercial Code, (iii) recovery of amounts paid to TVT, Pinnacle, and Insta Funding as preferential and/or fraudulent transfers, and (iv) disallowance of claims held by TVT, Pinnacle, and Insta Funding under section 502(b) of the Bankruptcy Code.

---

[3] UCC-1 financing statements against all Debtors other than Avant Gardner, LLC were filed on June 10, 2025.  A UCC-1 financing statement against Avant Gardner, LLC was filed on July 15, 2025.

III.    **EVENTS LEADING TO THESE CHAPTER 11 CASES**

46.    As set forth in more detail below, the Company faced a crippling operational and liquidity challenges after being unable to open The Brooklyn Mirage as expected on May 1, 2025. Further, certain contractors and financiers have taken increasingly aggressive collection activities to collect their prepetition debts in various forums and in various enterprise-threatening ways. After exploring various potential pathways, the Company, with the assistance of its advisors, ultimately determined to file these Chapter 11 Cases, all in an effort to maximize the value of its assets and operations for the benefit of its creditors and all parties in interest.

A.    **The Company Expended Resources but Could Not Open the Brooklyn Mirage for the 2025 Season.**

47.    Avant Gardner embarked on a large-scale and ambitious overhaul of The Brooklyn Mirage which was slated to open in May 2025.  The project included technology and design elements that would completely reimagine the Brooklyn Mirage experience.  Most notably, the redesign included a large timber structure well above the crowd, kinetic shutter system to configure the digital screens as a performer desired, and custom precision sound system.

48.    The ambitious project was beset by delays and cost overruns.  In order to try and meet the May 1, 2025 deadline to open, the Company's management (at the time) and project developer expended significant Company resources to pay architects and contractors in an effort to open.  The Company incurred significant liabilities owed to construction personnel and others in connection with the work, and entered into the usurious financing arrangements with TVT, Pinnacle, and Insta Funding in a concerted effort to raise funds to complete the renovation.  The project also faced unexpected expenses, such as import tariffs on materials shipped from Europe.

49.    Unfortunately, on April 29, 2025, the Company received a letter from the New York City Department of Buildings (the "DOB") revoking the temporary permit that The Brooklyn

Mirage had been operating under for various reasons detailed in the letter, most of which were related to the DOB's perception that the structure was actually permanent, not temporary. Then on May 1, 2025, the Company received a letter from the DOB stating that the Company was not permitted to operate The Brooklyn Mirage without a temporary permit. Despite numerous meetings between the Company and the DOB, the Company was unable to obtain a permit.

50.     The Debtors believe that several contractors (including the primary contractor, Heini) and other related parties contributed to the construction problems. The Debtors are actively continuing their investigation into the matter. Regardless, the loss of The Brooklyn Mirage was catastrophic for the Company's operations and liquidity because the Company could no longer receive food and beverage receipts from the primary venue in the Avant Gardner complex and has been issuing refunds to ticketholders.

51.     With the support of its Prepetition Term Loan Lenders, the Company is working collaboratively with the DOB to prepare a remedial plan that complies with the DOB's requirements and provide a reimagined ticketholder experience. The Company expects to continue to work, with the support of the Prepetition Term Loan Lenders, with the DOB to ensure a remedial plan with respect to the structure is completed responsibly and safely.

**B.     Engagement with Prepetition Term Loan Lenders**

52.     As the Company's liquidity and operations were reeling from the inability to open The Brooklyn Mirage, the Company turned to its Prepetition Term Loan Lenders. Since May 2025, the Prepetition Term Loan Lenders (or affiliates) provided approximately $20 million in Protective Advances to give the Debtors necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.

53.     The Company began negotiating a strategic transaction for a foreclosure by the Prepetition Term Loan Lenders on the Company's Collateral. The parties engaged in good faith

33419882.6

17

arms'-length negotiations, and ultimately decided that the most value-maximizing transaction for the Company and its stakeholders would be the commencement of these Chapter 11 Cases, along with an anticipated credit bid by the Stalking Horse Bidder for substantially all of the Company's assets, in addition to assumption of certain liabilities and the provision of a wind-down budget.

### C.    Aggressive Collection Activity from Contractors and Financiers.

54.    These Chapter 11 Cases were more acutely precipitated by aggressive collection activity by creditors that have compelled the Company to file these Chapter 11 Cases to provide a breathing spell from disorganized creditor collection efforts in many forums.

55.    *Mechanic's Liens*.  Several contractors or other potential holders of mechanic's liens have threatened to file mechanic's liens against the Company.  Although the Company does not own any real property, the mechanic's liens would still trigger adverse consequences under various contracts.  The Company intends to raise all available defenses to the mechanic's liens and underlying obligations, including that the Company was overcharged or for subpar workmanship.

56.    *Insta Funding, TVT, Pinnacle*.  As described above, prior to the Petition Date, the Debtors entered into loan agreements with three parties to finance the renovations of The Brooklyn Mirage: TVT, Insta Funding, and Pinnacle.  Insta Funding increased collection efforts in the months leading up to the Petition Date which efforts, ultimately, led to a prejudgment lien attaching to the Bank Account ending in x2368, thereby blocking the Debtors' use of such account.  Additionally, the Debtors' food and beverage payment processor—Billfold (as defined and described in the Cash Management Motion)—remits the funds to a TVT lockbox account, and TVT for the TVT, Pinnacle, and Insta Funding loan.  TVT then remits any remaining balance to the Debtors.  On the Petition Date, the Debtors rescinded their receivables redirection letter to Billfold and instructed Billfold to remit all net sales directly to the Debtors.  The Debtors dispute Insta Funding's, TVT's, and Pinnacle's claims and purported liens.

57.     In the week prior to the Petition Date, Insta Funding, TVT, and Pinnacle attempted to utilize an auto-debit feature of their respective loan agreements to debit over $1 million from the Debtors' accounts to TVT's lockbox account.  It is my understanding that the funds currently remain in the Debtors' bank account as restricted cash.

58.     Following Insta Funding's collection activity against the Debtors, and the attachment of the prejudgment lien, the Prepetition Term Loan Lenders, who hold a validly perfected senior lien on the Bank Accounts and monies on deposit, exercised their rights under a deposit account control agreement ("DACA") and instructed the Bank to release the hold on the Debtors' Bank Accounts.

59.     As a result of the liquidity and operational issues precipitated by the inability to open The Brooklyn Mirage for the 2025 season and the aggressive collection activity by contractors and a usurious financier, the Company filed these Chapter 11 Cases.

## IV.    CHAPTER 11 FILING AND NEXT STEPS

### A.    First Day Motions

60.     In addition to the DIP Motion, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet, including the following:

- *Debtors' Motion for Entry of an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases* (the "Joint Administration Motion");

- *Debtors' Application for Entry of an Order Authorizing the Debtors to Employ Kurtzman Carson Consultants, LLC dba Verita Global as their Claims and Noticing Agent Effective as of the Petition Date* (the "Claims Agent Retention Application");

- *Debtors' Motion for Entry of an Order (I) Authorizing (A) the Debtors to Redact Certain Personal Identification Information and (B) Electronic Noticing*

*Procedures for Customers; and (II) Granting Related Relief* (the "<u>Redaction and Service Motion</u>");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Enter into New Financing Agreements in the Ordinary Course of Business, and (II) Granting Related Relief* (the "<u>Insurance Motion</u>");

- *Debtors' Motion for Entry of Interim and  Final Orders (I) Authorizing Debtors to Pay Certain Taxes and Fees and (II) Granting Related Relief* (the "<u>Taxes Motion</u>");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving Proposed Adequate Assurance of Payment, (III) Establishing Procedures for Resolving Requests for Additional Assurance of Payment, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Maintain and Administer Certain Customer Programs and Practices, (II) Authorizing Debtors to Pay and Honor Related Prepetition and Postpetition Obligations, and (III) Granting Related Relief* (the "<u>Customer Programs Motion</u>");

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Critical Vendor Claims and PACA/PASA Claims, and (II) Granting Related Relief* (the "<u>Critical Vendor Motion</u>");

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs and (II) Granting Related Relief* (the "<u>Wages Motion</u>"); and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Use of Their Existing Cash Management System, Bank Accounts, and Business Forms, (B) Continue Intercompany Transactions, (C) Pay Related Obligations, (D) Pay and Honor Processing Obligations, (E) Authorizing and Directing the Banks and Payment Processors to Cease any Holds on, or Redirection of, Cash or Receivables of the Debtors, (II) Waiving Certain Investment and Deposit Guidelines, and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>").

61.     I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' advisors to ensure that I understand each First Day Motion and the relief requested therein. To the best of my knowledge and belief, the factual statements

33419882.6

contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

62.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is: (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value; and (b) critical to the Debtors' achieving a successful restructuring.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business and their estates will suffer immediate and irreparable harm. Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

**B.      Joint Administration Motion[4]**

63.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of the Debtors' chapter 11 cases and the consolidation thereof for procedural purposes only.

64.     Many, if not virtually all, of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect all of the Debtors.  For this reason, the Debtors respectfully submit that the interests of the Debtors, their creditors, and other parties in interest would be best served by the joint administration of these Chapter 11 Cases.  To optimally and economically administer the Debtors' chapter 11 cases, the Debtors believe that such cases should be jointly administered, for procedural purposes only, under the case number assigned to Debtor AGDP Holding Inc. ("AGDP").

---

[4] **Note to Draft**: Based on version 7.

33419882.6

65.     The Debtors also request that the Clerk of the Court maintain one (1) file and one (1) docket for all of the Debtors' chapter 11 cases, which file and docket shall be the file and docket for AGDP. Based on the foregoing, I believe the Joint Administration Motion should be granted.

### C.     Claims Agent Retention Application

66.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 10,000 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

67.     Prior to the Petition Date, the Debtors provided Verita a retainer in the amount of $30,000, which remains undrawn.    Verita seeks to first apply the retainer to all pre-petition invoices, and thereafter, to have the retainer replenished to the original retainer amount, and thereafter, to hold the retainer under the Services Agreement during the cases as security for the payment of fees and expenses incurred under the Services Agreement.

68.     Additionally, under the terms of the Services Agreement, the Debtors have agreed, subject to certain exceptions, to indemnify, defend, and hold harmless Verita and its affiliates, members, directors, officers, employees, consultants, subcontractors, and agents under certain circumstances specified in the Services Agreement, except in circumstances resulting solely from Verita's gross negligence or willful misconduct or as otherwise provided in the Services Agreement or the Proposed Order.   I believe that such an indemnification obligation is customary, reasonable, and necessary to retain the services of a Claims and Noticing Agent in these Chapter 11 Cases.

### D.     Redaction and Service Motion

69.     Pursuant to the Redaction and Service Motion, the Debtors seek authorization, but not directing, to (a) redact certain personally identifiable information from their consolidated list

of creditors (the "Creditor Matrix"), the Debtors' schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements"), and other documents filed in these Chapter 11 Cases and (b) provide individual Customers (as defined below) with electronic notice; and (ii) grant related relief.

70.     If the home and email addresses of individuals, including the Debtors' employees, former employees, and customers (the "Personal Identification Information"), such information could be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking who have otherwise taken steps to conceal their whereabouts.  With potentially thousands of individual creditors, the Debtors cannot reasonably know with sufficient certainty whether a release of such individual creditors' and interest holders' personal information could potentially jeopardize their safety.

71.     The Debtors sell tickets to their events through online platforms. As of the Petition Date, the Debtors estimate that there are no less than approximately 90,000 current holders of tickets to upcoming events and thousands of holders of tickets to past events at the Debtors' facility (collectively, the "Customers") who may require service of various pleadings or other documents in these Chapter 11 Cases.  If the Debtors were to provide actual notice by mail of pleadings and hearings to all such customers, the costs could be astronomical. Furthermore, in the ordinary course of their business, the Debtors communicate with their Customers primarily through email. Providing the Customers with traditional forms of notice will be unduly burdensome and cost prohibitive.  Based on the foregoing, I believe the Redaction and Service Motion should be granted.

### E.     Insurance Motion

72.     Pursuant to the Insurance Motion, the Debtors seek authorization, but not directing, to: (a) pay their obligations under prepetition insurance policies, including all premiums, deductibles, administration fees, audited amounts, and other obligations related thereto;

33419882.6

(b) continue to pay certain brokerage fees; (c) renew, supplement, modify, or purchase insurance coverage in the ordinary course of business; (d) enter into new premium financing agreements in the ordinary course of business; and (e) grant related relief.

73.    As of the Petition Date, the Debtors maintained approximately 18 insurance policies (collectively, the "Insurance Policies") administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers").  The Insurance Policies vary in amounts and types of coverage in accordance with prudent business practices, and state and local laws governing the Debtors' operations and various contracts.  The Insurance Policies provide coverage for, among other things, general liability, statutory disability, workers compensation, D&O, employment practices, crime coverage, deadly weapons, commercial property, standalone terrorism, inland marine, and pollution.  As of the Petition Date, the aggregate annual premium for the Insurance Policies totaled approximately $ 2,851,990, plus applicable taxes, audited amounts, and surcharges (collectively, the "Insurance Premiums").  All Insurance Premiums are paid in accordance with certain premium financing agreements (the "Premium Financing Agreements"). For example, an annual policy is generally paid with a 20% downpayment followed by ten equal installments made over the course of the year.  As of the Petition Date, the Debtors believe that approximately $25,000 in prepetition amounts are owed on account of the Insurance Policies.

74.    The Insurance Policies are essential to preserve the value of the Debtors' business, property, and assets during these Chapter 11 Cases.  Not only are some of the Insurance Policies required by the various regulations, laws, and contracts that govern the Debtors' commercial activities, but section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C).  Moreover, the *Operating*

*Guidelines for Chapter 11 Cases* of the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") require debtors to maintain insurance coverage throughout the pendency of chapter 11 cases.

75.     It is not always economically advantageous for the Debtors to pay the premiums on their Insurance Policies on a lump-sum basis.  Accordingly, the Debtors finance the premiums for their Insurance Policies pursuant to premium financing agreements with third-party lenders.

76.     Currently, the Debtors are financing the premiums for all of their Insurance Policies through two (2) Premium Finance Agreements with AFCO Direct.  Pursuant to the Premium Finance Agreements, the Debtors paid down payments totaling $681,816 and are financing premiums and related fees totaling $2,162,760 through four to ten monthly payments.  The next payment is due August 21, 2025 and the Debtors seek authority to make that payment through the Proposed Interim Order.

77.     Because certain of the premiums for the Insurance Policies are financed pursuant to a Premium Financing Agreement as of the Petition Date, the Debtors seek authority to enter into new premium financing agreements as necessary or appropriate in the ordinary course of their business, without further Court approval.

78.     Continuation of the Insurance Policies and entry into new insurance policies and premium financing agreements, as applicable, in the ordinary course, are essential to the preservation of the value of the Debtors' properties and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirement of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of their chapter 11 cases.

33419882.6

79.     By this Motion, the Debtors request authority, but not direction, to maintain their existing Insurance Policies and Premium Financing Agreements; pay any prepetition obligations related thereto, including the Insurance Premiums; enter into new insurance policies and premium financing agreements, as applicable, in the ordinary course of business; supplement, amend, renew, or extend any existing Insurance Policies, as applicable, in the ordinary course of business; and continue paying Insurance Premiums on a postpetition basis in the ordinary course of business.

80.     HGR Group and CAC Group (the "Insurance Brokers") assist the Debtors with: (a) obtaining comprehensive insurance coverage for their operations; (b) negotiating policy terms, provisions, and premiums; (c) assisting the Debtors with claims; and (d) providing ongoing support throughout policy periods.  The Insurance Brokers are paid for their services through standard commissions that are built into the price of the insurance premiums and become due and payable simultaneously with the payment of the insurance premiums (the "Insurance Brokerage Fees").

81.     The Insurance Brokers' services are necessary to the Debtors ability to obtain Insurance Policies on advantageous terms and at competitive rates.  The Insurance Brokers' services will also facilitate the proper maintenance of the Debtors' Insurance Policies postpetition and ensure adequate protection of the Debtors' property.

82.     19.     Additionally, the Debtors pre-funded approximately $200,000 to CAC Group (the "CAC Deposit") on account of a D&O Insurance Policy for any independent director(s) that the Debtors may appoint during these Chapter 11 Cases.  The Debtors request authority, but not direction, to use the CAC Deposit to fund premiums for a D&O Insurance Policy that the Debtors purchase for any independent director.

83.     Based on the foregoing, I believe the Insurance Motion should be granted.

33419882.6

**F.**     **Taxes Motion**

84.     Pursuant to the Taxes Motion, the Debtors seek authorization to remit and pay certain accrued and outstanding prepetition taxes and fees; and grant related relief.

85.     In the ordinary course of business, the Debtors incur and pay certain taxes, fees, charges, and assessments (collectively, the "Taxes and Fees") to the relevant federal, state, and local taxing authorities (the "Taxing Authorities").  Specifically, the Taxes and Fees consist of sales and use tax, real and personal property tax, income tax, franchise tax, and foreign withholding taxes.  The Taxes and Fees are paid monthly, quarterly, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.

86.     As of the Petition Date, the Debtors estimate that they owe approximately $6.5 million in unremitted Taxes and Fees, $500,000 of which will come due in the first thirty (30) days of these Chapter 11 Cases.  The unpaid Taxes and Fees are comprised entirely of current tax obligations and are not in respect of "catch-up" payments; *provided that* the Debtors have entered into an informal settlement agreement with the State of New York for certain sales taxes, pursuant to which the Debtors pay the State of New York approximately $40,000 per month.  The Debtors seek authority, but not direction, to continue making such payments during these Chapter 11 Cases.

87.     The Debtors seek authority to continue making such payments where:  (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees have accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c) payments made prepetition by the Debtors were lost or otherwise not received in full by any of the Taxing Authorities, which may give rise to interest and other penalties; and (d) Taxes and Fees incurred for prepetition periods will become due and payable after the commencement of these Chapter 11 Cases.

33419882.6

88.     The Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways.  First, failing to pay certain of the Taxes and Fees likely would cause the Debtors to lose their ability to conduct business in certain jurisdictions.  Second, the Taxing Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from their sale and winddown process.  Third, failing to pay Taxes and Fees could potentially subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to the Debtors' sale and winddown process.  Fourth, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business and estate value.  Accordingly, the Debtors seek authority, but not direction, to pay the Taxes and Fees in the ordinary course of business consistent with historic practice as set forth more fully herein.

89.     Based on the foregoing, I believe the Taxes Motion should be granted.

**G.     Utilities Motion**

90.     Pursuant to the Utilities Motion, the Debtors seek the following relief: (a) prohibiting the Utility Providers (as defined below) from altering, refusing, or discontinuing utility service on account of any outstanding amounts for services rendered prepetition; (b) determining that adequate assurance of payment for postpetition Utility Services (as defined below) has been furnished to the Utility Providers; (c) establishing procedures for resolving future requests by Utility Providers for additional assurance of payment; and (d) granting related relief.

91.     To operate their business in the ordinary course and manage their headquarters and other office locations, the Debtors obtain electricity, gas, water and sewage, telecommunication services, internet, waste services, fire protection, and similar utility services (collectively, the "Utility Services") from a number of different utility providers (collectively, the "Utility

Providers"). As used herein, the Utility Providers do not include any utility provider the Debtors pay indirectly through rent payments.

92. Historically, the Debtors have maintained a satisfactory payment history with the Utility Providers. Based on their monthly average cost for the twelve-month (12-month) period before the Petition Date, the Debtors estimate that their cost of Utility Services for the next thirty (30) days will be approximately $97,541.

93. Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of these Chapter 11 Cases. The Debtors require the Utility Services to run their operations, including to run concerts at the Debtors' venues. Accordingly, the Debtors require uninterrupted access to Utility Services. Any disruption to the Utility Services, even for a brief period of time, would seriously interfere with, and could result in cessation of, the Debtors' operations. Any interference or cessation of the Debtors' operations would jeopardize the Debtors' ability to maintain stability in their operations at a critical juncture of these Chapter 11 Cases and endanger the Debtors' ability to achieve their objectives in these Chapter 11 Cases. Accordingly, it is critical that the Utility Services continue on an uninterrupted basis throughout these Chapter 11 Cases.

94. The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. The Debtors expect that the proceeds of DIP Financing, cash flow from operations, and their proposed use of cash collateral will be sufficient to pay postpetition obligations related to the Utility Services in the ordinary course of business.

95. I understand that pursuant to section 366(c)(2) of the Bankruptcy Code, a utility provider may alter, refuse, or discontinue a debtor's utility service if the utility provider does not receive "adequate assurance of payment" for postpetition utility services from the debtor within

thirty (30) days after the commencement of the debtor's chapter 11 case.  11 U.S.C. § 366(c)(2).

Section 366(c)(1) of the Bankruptcy Code defines "assurance of payment" of postpetition charges

as "(i) a cash deposit, (ii) a letter of credit, (iii) a certificate of deposit, (iv) a surety bond, (v) a

prepayment of utility consumption, or (vi) another form of security that is mutually agreed on

between the utility provider and the debtor or the trustee." 11 U.S.C. § 366(c)(1).

96.     As noted above, the Debtors intend to pay all postpetition obligations owed to the

Utility Providers in a timely manner and will have sufficient funds to do so.  Nevertheless, to

provide the Utility Providers with adequate assurance pursuant to section 366 of the Bankruptcy

Code, the Debtors propose depositing cash in an amount of $53,245 (the "<u>Adequate Assurance</u>

<u>Deposit</u>") into a segregated account (the "<u>Adequate Assurance Account</u>"), within twenty (20) days

of the Petition Date, for the benefit of the Utility Providers.  The Adequate Assurance Deposit is

in an amount equal to approximately two (2) weeks' payment for Utility Services, calculated using

the historical average for such payments over the full twelve (12)-month period before the Petition

Date.  Based on the foregoing, I believe the Utilities Motion should be granted.

### H.    Customer Programs Motion

97.     Pursuant to the Customer Programs Motion, the Debtors seek authorization to

maintain and administer the Customer Programs (as defined below); (b) to honor their Customer

Programs (as defined below) in the ordinary course of business (including paying any amounts

associated with the Customer Programs), whether such obligations arise before, on, or after the

Petition Date; and (c) to grant related relief.

98.     The Debtors experienced financial distress leading to these Chapter 11 Cases

because they were unable to reopen the Brooklyn Mirage, their prominent indoor/outdoor event

venue in Brooklyn, New York.  The Brooklyn Mirage had a capacity of approximately 5,300 (pre-

renovation), while the smaller stages in the Avant Gardner complex—The Great Hall and The

33419882.6

Kings Hall—have capacities of approximately 2,800 and 540, respectively. The Brooklyn Mirage was slated to open on May 1, 2025, and tickets were sold for event at the Brooklyn Mirage venue through November 7, 2025.

99.     For upcoming shows in the Brooklyn Mirage, the Debtors can relocate shows to smaller venues (either inside or outside the Avant Gardner complex), can turn one event into multiple events (thereby spreading capacity over multiple days in a small venue), or can provide partial or full creditors or refunds to ticketholders. The Debtors, in their business judgment, select whatever option is most feasible for the artist, ticketholders, and other venues.

100.    The Debtors must be authorized to continue offering refunds, credits, vouchers or otherwise addressing show relocations (collectively, the "Show Accommodations") in order to maintain positive, productive, and profitable relationships with their customers and artists that ultimately promote customer satisfaction, encourage ticket sales, and ensure that the Debtors remain competitive.

101.    Further, as described in the Cash Management Motion, the Debtors' payment processors withhold certain amounts to pay for refunded goods and services, and sometimes the Debtors are asked to refund *de minimis* leftover balances on Billfold wristbands (collectively, the "Other Refunds", and with the Show Accommodations, the "Customer Accommodations").

102.    The Debtors regularly conduct sales promotions to its customers. The Sales Promotions consist of seasonal memberships; discounted tickets to underperforming shows; ticket bundles to back-to-back shows or to multiple events with the same performing artist; VIP tickets; and other promotions (the "Sales Promotions," and with the Customer Accommodations, the "Customer Programs"). These Sale Promotions help increase sale volume by allowing the Debtors to adjust prices and bundles to changing market conditions and artist popularity.

103.    By this Motion, the Debtors are requesting authorization to continue conducting their Customer Programs and paying and otherwise honoring their Customer Programs in the ordinary course of business, including with respect to any obligations that arose before the Petition Date.    The Debtors' ability to maintain and administer the Customer Programs is therefore necessary to protect the value and reputation of the Debtors' brand, meet competitive market pressures, ensure continued customer satisfaction, and, in turn, maximize the value of the Debtors' estates to the benefit of all interested parties. Based on the foregoing, I believe the Customer Programs Motion should be granted.

I.    **Critical Vendor Motion**

104.    Pursuant to the Critical Vendor Motion, the Debtors seek authorization, but not directing, to pay, in the ordinary course of business, certain prepetition and postpetition Critical Vendor Claims and PACA/PASA Claims (each as defined below, and, together, the "Trade Claims") on a postpetition basis, and grant related relief.

105.    As part of their business, the Debtors offer a wide selection of products, including food and beverage items, to their customers (collectively, the "Goods").  The Trade Claimants (as defined below) provide the Debtors with the Goods as well as other essential services (the "Services") that facilitate the Debtors' business, receipt of which will help ensure that the Debtors are able to continue to operate their business as required during these Chapter 11 Cases.

106.    The Debtors therefore request authorization to pay the Trade Claims, subject to the limitations set forth in the Proposed Interim Order and the Proposed Final Order.  The Debtors intend to pay only those Trade Claims that, as determined in their business judgment and discretion, are held by persons or entities that are critical to maintaining the Debtors' operations and maximizing stakeholder value.

107.    The Debtors' business and path in these Chapter 11 Cases require them to rely heavily on certain vendors and service providers (collectively, the "Critical Vendors").[5] Many of the Critical Vendors are the sole provider of certain Goods or Services, or otherwise have the specific requisite knowledge and experience with the Debtors' business. Attempting to replace such Critical Vendors on short notice would prove catastrophic to the Debtors' value-maximization efforts in these Chapter 11 Cases. Accordingly, to maximize the value of the Debtors' business, it is essential that the Debtors are able to maintain their business relationships with the Critical Vendors.

108.    Under some non-bankruptcy laws, it is my understanding that the Critical Vendors may have a lien, or may be able to assert liens, on Goods in their possession to secure payment of the charges or expenses incurred in connection with the Critical Vendor Claims. In the event these Critical Vendors Claims remain unpaid, the Critical Vendors could attempt to assert liens or otherwise disrupt Debtors' operations until their claims are satisfied and their liens redeemed.

109.    The Debtors anticipate that some Critical Vendors will demand immediate payment from the Debtors. Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Critical Vendors may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

110.    The Debtors have determined, in their business judgment, that paying prepetition claims owing to the Critical Vendors (the "Critical Vendor Claims") is the most effective way to ensure that the Critical Vendors continue providing critical Goods and Services during these Chapter 11 Cases. If the Debtors are unable to honor the Critical Vendor Claims, the Debtors face

---

[5] Certain of the Critical Vendors may be entitled to assert claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, as detailed further herein.

the significant and very real possibility that the Critical Vendors will refuse to continue delivering Goods or providing Services that are essential to maximizing the value of their estates—reducing their operational effectiveness and ability to maximize sales revenue, risking the management and safety of the venues, including vis-à-vis customers and employees. Thus, in order to prevent interruptions in the provision of critical Goods and Services, the Debtors seek the authority, but not direction, to pay Critical Vendor Claims pursuant to the terms described herein.

111.    With the assistance of their advisors, the Debtors have spent considerable time reviewing and analyzing their books and records, consulting with management and personnel responsible for operations and purchasing, reviewing contracts, and analyzing applicable laws, regulations, and historical practice to identify critical business relationships and/or suppliers of critical goods and services.

112.    The Debtors believe that jeopardizing their relationships with any of the entities identified as Critical Vendors would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss. Even a temporary interruption of the provision of the Critical Vendors' Goods and Services would impede the Debtors' operations, and the cumulative impact of such interruptions could have a catastrophic adverse effect on the Debtors and the ability to maximize the value of the Debtors' business during this critical period. The Debtors believe that the harm to their estates of not having the Goods or Services provided by the Critical Vendors would far outweigh the cost of paying the Critical Vendor Claims. Thus, the requested relief will allow the Debtors to preserve the value of their estates.

113.    In the twelve-month period ending July 23, 2025, the Debtors paid in the ordinary course of business approximately $250,000 per month to the Critical Vendors. The Debtors

33419882.6

34

estimate that, as of the Petition Date, the outstanding amount of Critical Vendor Claims is $1,000,000, all of which may be due or may become due during the Interim Period.

114.    Additionally, as set forth in the Critical Vendor Motion (which is incorporated herein by reference), it is my understanding that certain eligible vendors may be beneficiaries of a statutory trust in certain of the Debtors' goods under PACA and PASA.  The continuous delivery of goods provided by the PACA/PASA Claimants is critical to the Debtors' ability to maximize revenue at their stores for the benefit of these estates.  Because the PACA/PASA Claimants may seek to impose statutory trusts on the applicable Goods and thereby obtain priority over all other secured and unsecured creditors of the Debtors' estates, payment of valid PACA/PASA Claims will not prejudice or affect the amount available for distributions to the Debtors' other creditors.  Accordingly, the Debtors seek the authority, but not direction, to pay the PACA/PASA Claims pursuant to the terms described herein.

115.    In the twelve-month period ending July 23, 2025, the Debtors paid in the ordinary course of business approximately $30,000 per month to the PACA/PASA Claimants.  The Debtors estimate that, as of the Petition Date, the outstanding amount of the PACA/PASA Claims is $50,000, approximately all of which is due or will become due during the Interim Period.

116.    Based on the foregoing, I believe the Critical Vendors Motion should be granted.

**J.    Wages Motion**

117.    Pursuant to the Wages Motion, the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors to: (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, each as set forth herein; and (ii) granting related relief.

118.    As of the Petition Date, the Debtors employ approximately 465 employees, working in both full- and part-time positions (collectively, the "Employees"). Of these, approximately 15 are salaried Employees, and approximately 450 Employees are paid on an hourly basis when they work.  The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced.  Without the continued, uninterrupted services of the Employees, the Debtors simply could not run their business and preserve value for the benefit of the stakeholders.

119.    In addition to the Debtors' Employees, as of the Petition Date, the Debtors utilize the services of one independent contractor (the "Independent Contractor").  The Independent Contractor, along with the Debtors' Employees, is critical to the success of the Debtors' business and is responsible for ensuring, among other things, that the Debtors' operations continue to run smoothly and effectively.  The Independent Contractor performs a number of functions for the Debtors, but is primarily focused on management and executive advisory services.

120.    With respect to the broader relief sought in the Wages Motion, many of the Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial hardship if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors' ability to maximize value through these Chapter 11 Cases.

121.    The Debtors estimate that, as of the Petition Date, they owe certain outstanding amounts in connection with the Employee Compensation and Benefits Program.  The following chart summarizes these amounts owed:

| Employee Compensation and Benefits | Interim Amounts | Total Amounts |
|---|---|---|
| **Compensation** | **$410,000** | **$430,000** |
| Employee Wages | $350,000 | $350,000 |
| Independent Contractor Obligations | $30,000 | $30,000 |
| Additional Compensation Obligations | $30,000 | $50,000 |
| **Withholding Obligations** | **$150,000** | **$150,000** |
| **Payroll Processing Fees** | **$20,000** | **$20,000** |
| **Reimbursable Expenses** | **$60,000** | **$60,000** |
| **Employee Benefit Obligations** | **$94,200** | **$94,200** |
| **Total (with cushion)** | **$750,000** | **$800,000** |

122.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to maximize the value of their assets during these Chapter 11 Cases. Accordingly, the Debtors respectfully request that the relief set forth in the Wages Motion be approved

**K.      Cash Management Motion**

123.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing and directing the Banks and Payment processors to cease any holds on, or redirection of, cash or receivables of the Debtors; (ii) authorizing, but not directing, the Debtors to: (a) continue use of their existing cash management system, bank accounts, and business forms; (b) continue intercompany transactions; (c) pay obligations related thereto; and (d) pay or otherwise honor the Processing Obligations (as defined below); (iii) waiving certain investment and deposit requirements under the U.S. Trustee Guidelines (as defined herein); and (iv) granting related relief, including scheduling a hearing to consider approval of the Motion on a final basis.

33419882.6

124.    The Debtors operate a streamlined cash management system (the "Cash Management System"), an illustrative schematic of which is attached as Exhibit C to the Cash Management Motion. The Debtors use the Cash Management System to collect, transfer, and disburse funds, pay their financial obligations, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, ensure cash availability and liquidity, and to facilitate cash monitoring, forecasting, and reporting.   The Cash Management System is narrowly tailored to meet the Debtors' operating needs while reducing administrative expenses.

125.    The Debtors maintain daily oversight over the Cash Management System and implement controls for entering, processing, and releasing funds. The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

126.    The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.

127.    Because of the nature and operation scale of the Debtors' business, any disruption to the Cash Management System could have an immediate and significant adverse effect on the Debtors' business and operations to the detriment of their estates and stakeholders. Accordingly, the Debtors request authority, but not direction, to continue using their existing Cash Management System during the pendency of these Chapter 11 Cases, subject to the terms described herein.

128.    As of the Petition Date, the Debtors' Cash Management System consists of 12 bank accounts (each, a "Bank Account," and, collectively, the "Bank Accounts"), each of which is

identified on Exhibit D, attached to the Cash Management Motion. All of the prepetition Bank Accounts used in the Cash Management System are maintained at J.P. Morgan Chase Bank, N.A. ("JPM"). Immediately prior to the Petition Date, however, to avoid further issues with collection activities by prepetition creditors, the Debtors opened an account with Flagstar Bank, N.A. ("Flagstar," and together with JPM, the "Banks"), which the Debtors intend to use as their primary operating account during these Chapter 11 Cases. The schematic attached to the Cash Management Motion as Exhibit C reflects both (a) the prepetition operation of the Debtors' Cash Management System and (b) how the Debtors intend to operate their Cash Management System during these Chapter 11 Cases. In the near term, the Debtors intend to open additional accounts with Flagstar to hold certain cash reserves associated with relief granted pursuant to interim orders entered in these Chapter 11 Cases.

129.    The Debtors incur periodic service charges and other fees related to the Cash Management System (collectively, the "Bank Fees"). The Debtors pay the Banks an aggregate of approximately $6,500 per month in Bank Fees, which are generally due and payable monthly.

130.    As of the Petition Date, the Debtors estimate that they owe approximately $6,500 in prepetition, unpaid Bank Fees, all of which will become due and payable within thirty (30) days of the Petition Date. The Debtors request authority, but not direction, to continue paying Bank Fees, including the prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practice.

131.    The Debtors maintain an intercompany Cash Management System to help maintain bank accounts for operating, ticketing, and payroll (the "Intercompany System").

132.    Through the Intercompany System, the Debtors maintain relationships with each other and occasionally engage in transactions (the "Intercompany Transactions") that result in

intercompany receivables and payables among the Debtors (the "Intercompany Balances").  As such, there may periodically be Intercompany Balances owing by one Debtor to another Debtor.

133.    The Debtors seek authority, but not direction, to continue Intercompany Transactions in the ordinary course of business consistent with historical practice.

134.    The Debtors sell various goods and services in the ordinary course of business and accept payment from their customers through various payment methods via different processors.[6] The Debtors are party to certain agreements (the "Payment Processing Agreements") with the applicable payment processors (the "Payment Processors").  Under the Payment Processing Agreements, the Debtors generally receive gross proceeds of customer purchases, less any chargebacks, returns, reserves, and/or processing fees debited from the payment balance by the Payment Processors, and such proceeds are swept to the main bank account or held in an escrow account.  The Payment Processors charge processing fees between 2.7%-2.9%[7] of the total transaction value (the "Processing Fees").  While the Debtors believe that they are current on all Processing Fees, certain *de minimis* prepetition Processing Fees may become due and payable within thirty (30) days of the Petition Date.  The following table summarizes which Payment Processors handle certain good and services:

| Good or Service | Payment Processor |
|---|---|
| Tickets sold in advance | DICE |
| Tickets sold on site | Square |
| Food and beverage | Billfold |
| Table sales deposits | Seven Rooms / Stripe |
| Table sales balance | Toast |
| Artist merchandise | Square |

---

[6] The Debtors have also filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Maintain and Administer Certain Customer Programs and Practices, (II) Authorizing Debtors to Pay and Honor Related Prepetition and Postpetition Obligations, and (III) Granting Related Relief* seeking relief to continue providing customer refunds in the ordinary course of business.

[7] Certain Payment Processors also charge a flat fee of $0.28 per transaction in addition to the percentage fee.

135.    To avoid disruption to the vital services provided by the Payment Processors, the Debtors seek authority, but not direction, to continue honoring the Payment Processing Agreements and Processing Obligations, and any obligations related thereto, whether arising pre- or post-petition, in the ordinary course and consistent with past practices.

136.    As part of the Cash Management System, the Debtors utilize a number of preprinted business forms (the "<u>Business Forms</u>"), including, but not limited to, letterhead, purchase orders, invoices, and preprinted and future checks. The Debtors also maintain books and records to document their financial results and a wide array of operating information (the "<u>Books & Records</u>").

137.    To avoid significant disruption to their business operations and to minimize administrative expenses to their estates, the Debtors request authorization to continue using all of the Business Forms and Books & Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession, and to, upon exhaustion of the Debtors' existing supply of checks, to reorder (or with respect to checks the Debtors or their agents print themselves) checks that include the "Debtor in Possession" designation and corresponding bankruptcy case number(s).

**L.    Upcoming Events**

138.    As previously discussed herein, prior to the commencement of these Chapter 11 Cases, the Debtors secured the Lender as the Stalking Horse Bidder for substantially all of their assets, which will be subject to a competitive marketing and auction process during the cases in order to maximize the value of the assets.  Accordingly, the Debtors intend to file the Bidding Procedures Motion and will market all of their assets subject to the Court-approved bidding procedures, in order to facilitate a competitive sale to the highest or otherwise best bidder, and are

targeting a sale closing with the Stalking Horse Bidder (or other bidder if a higher or otherwise better offer is received pursuant to the Bidding Procedures Motion) before November 2025.

139.    In the near term, however, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stage of these Chapter 11 Cases, with as little disruption to the Debtors' operations as possible.  I believe that, if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving this objective and maximizing value for the benefit of all stakeholders will be substantially enhanced.  Moreover, if the relief requested in the First Day Motions is not granted, I believe the Debtors' business and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

*[Remainder of page left intentionally blank.]*

33419882.6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August 4, 2025

/s/ Gary Richards
Gary Richards
Chief Executive Officer
AGDP Holding Inc. and its subsidiaries

33419882.6

## EXHIBIT A

**Organizational Structure Chart**

