IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AGDP HOLDING INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-11446 ([•])<br><br>(Joint Administration Requested) |

**DECLARATION OF STEPHEN GOLMONT IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT
TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF THE BANKRUPTCY CODE,
(I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED
SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND
(B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS;
(III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) SCHEDULING A
FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1764, I, Stephen Golmont, declare as follows under the penalty of perjury:

1. I am a Director at Triple P Securities, LLC ("Triple P Securities"), the proposed investment banker to the debtors and debtors in possession (the "Debtors" or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). Triple P Securities has its principal place of business at 640 Fifth Ave, 10th Floor, New York, New York 10019. Triple P Securities and Triple P TRS, LLC, the Debtors' proposed restructuring advisor ("Triple P TRS" and together with Triple P Securities, "Portage Point") are each wholly owned by Portage Point Partners, LLC. I am authorized to submit this declaration ("Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

33419953.3

4913-1825-9799v.4

*of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "DIP Motion").[2]

2. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management, other members of the Portage Point team, and the Debtors' other advisors, as well as my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or opinion.

## Background and Qualifications

3. Portage Point is a business advisory, interim management, investment banking and financial services firm whose professionals have a wealth of experience in providing financial advisory, restructuring advisory, investment banking and turnaround management services and which enjoys an excellent reputation for services it has rendered on behalf of debtors and creditors throughout the United States, both in chapter 11 cases and out-of-court restructurings. The Portage Point team is comprised of operators and advisors with proven skills necessary to identify, preserve

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Motion, the proposed interim order attached as Exhibit A thereto (the "Interim DIP Order"), and the *Declaration of [•] in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith, as applicable.

and create value in the most challenging and complex situations. Portage Point's professionals have extensive experience across a wide range of industries.

4. Portage Point's professionals have assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous cases, including the following: *In re Merit Street Media, Inc.*, Case No. 25-80156 (SWE) (Bankr. N.D. Tex. Jul. 2, 2025); *In re Omega Therapeutics, Inc.*, Case No. 25-10211 (BLS) (Bankr. D. Del. Feb. 10, 2025); *In re Dig. Media Solutions, Inc.*, Case No. 24-90468 (ARP) (Bankr. S.D. Tex. Sept. 11, 2024); *In re Blink Holdings, Inc. et al.*, Case No. 24-11686 (JKS) (Bankr. D. Del. Aug. 12, 2024); *In re DRF Logistics, LLC*, Case No. 24-90447 (CML) (Bankr. S.D. Tex. Aug. 8, 2024); *In re Supply Source Enters., Inc.*, Case No. 24-11054 (BLS) (Bankr. D. Del. May 21, 2024); *In re Appgate, Inc.*, Case No. 24-10956 (CTG) (Bankr. D. Del. May 6, 2024); *In re Ambri, Inc.*, Case No. 24-10952 (LSS) (Bankr. D. Del. May 5, 2024); *In re Nogin, Inc.*, Case No. 23-11945 (CTG) (Bankr. D. Del. Dec. 5, 2023); *In re Benitago Inc.*, Case No. 23-11394 (SHL) (Bankr. S.D.N.Y Aug. 31, 2023); *In re Plastiq*, Case No. 23-10174 (BLS) (Bankr. D. Del. June 19, 2023); *In re Big Village Holding LLC*, Case No. 23 10174 (CTG) (Bankr. D. Del. Mar. 6, 2023); *In re Performance Powersports Grp. Inv., LLC*, Case No. 23-10047 (LSS) (Bankr. D. Del. Jan. 16, 2023); *In re VJGJ, Inc. (f/k/a Teligent, Inc.)*, Case No. 21-11332 (BLS) (Bankr. D. Del. Oct. 14, 2021); *In re Alex and Ani, LLC*, Case No. 21-10918 (CTG) (Bankr. D. Del. July 15, 2021); *In re Alamo Drafthouse Cinemas Holdings, LLC*, Case No. 21-10474 (MFW) (Bankr. D. Del. Mar. 29, 2021); *In re LGA3 Corp.*, Case No. 20-11456 (LSS) (Bankr. D. Del. June 1, 2020).

5. Prior to joining Portage Point, I was a Director in the Restructuring and Liability Management group at Lazard Frères & Co. LLC ("Lazard") for 11 years. Prior to joining Lazard, I was an analyst at Zolfo Cooper, a distressed and turnaround advisory firm. I have approximately

33419953.3

4913-1825-9799v.4

14 years of experience in corporate restructuring, and I have advised companies and creditors in a broad range of restructuring, reorganization, merger & acquisition, and capital raising transactions in traditional and distressed situations across a variety of industries.

6.  I have a Bachelor of Science in Finance and a minor in Classical Studies from the Dolan School of Business at Fairfield University. I hold FINRA Series 79 and 63 licenses.

### Portage Point's Retention

7.  Prior to the Petition Date, in July 2025, the Debtors retained Portage Point to provide restructuring advisory and investment banking services in connection with these Chapter 11 Cases. In this role, Portage Point has, among other things (i) assisted the Debtors in assessing their liquidity, (ii) reviewed and analyzed the Debtors' financing needs, (iii) assisted the Debtors with negotiating and documenting the DIP Facility, including assisting management in developing the Approved Budget, (iv) solicited parties for debtor-in-possession financing proposals, (v) assisted the Debtors with preparing to market and sell the Debtors' assets, and (vi) assisted the Debtors and their advisors in the preparation for the commencement of these Chapter 11 Cases. Throughout its engagement, Portage Point has worked closely with the Debtors' management and other restructuring professionals and has become knowledgeable and familiar with the Debtors' liquidity needs and business operations.

### Background to the Proposed DIP Financing

8.  As described in detail in the First Day Declaration, the Debtors have incurred substantial losses through the Petition Date, which have been exacerbated by the inability to continue to secure permits to operate the highly anticipated new music venue. It is my understanding the Debtors are currently facing an acute liquidity crisis and do not have sufficient available cash, including Cash Collateral, to maintain their operations, fund payroll, pay critical vendors or continue restructuring efforts. It is my understanding that the Debtors had continued

to use certain of the Prepetition Collateral until it was no longer possible to do so. I have been informed the Prepetition Term Loan Secured Parties had been providing incremental liquidity to the Debtors in the amount of approximately $20 million in the form of Protective Advances prior to the Petition Date. Despite these capital infusions, it is my understanding the Debtors need additional liquidity to continue to operate in the ordinary course and preserve their value as a going concern in connection with the proposed sale process as well as to cover their restructuring expenses to pursue and effectuate such a process.

9. In light of the Company's strained liquidity position, it is my understanding the incurrence of new debt under the DIP Term Loan Note and use of Cash Collateral are necessary and vital to the preservation and maintenance of the going concern value of the Debtors, which is critical to maximizing the value realized from a sale of the Debtors' business.

### The Debtor's Efforts to Obtain Postpetition Financing

10. To provide adequate liquidity runway to effectuate these Chapter 11 Cases, the Prepetition Term Loan Secured Parties have committed to providing the Debtors with up to approximately $45 million of debtor-in-possession financing ("DIP Financing") consisting of a senior secured super-priority term loan facility (the "DIP Facility") comprising (A) approximately $25 million of new money term loans and (B) approximately $20 million of rolled-up term loans (upon entry of a final order approving DIP Financing).

11. In addition, at the direction of the Debtors, Portage Point solicited third-party interest in providing debtor in possession financing to the Debtors. However, at this time, despite diligent and comprehensive efforts to canvass the market, Portage Point was unable to obtain alternative postpetition financing on terms more favorable and executable than those provided under the DIP Facility. The parties contacted by Portage Point indicated they were unwilling to extend financing to the Debtors for several reasons including (i) the Debtors' material, existing

33419953.3

5

4913-1825-9799v.4

funded debt obligations, (ii) potential priming disputes with the Prepetition Secured Parties, and (iii) the unease over providing financing on a purely junior or unsecured basis.

13. Leading up to the Petition Date, the Debtors and their advisors actively negotiated the terms and provisions of the DIP Facility with the DIP Lender and its counsel, including on material terms of the DIP Term Loan Note. Based on these negotiations, I believe the DIP Facility was the product of extensive, good faith, arm's-length negotiations among the Debtors, the DIP Lenders and the DIP Agent.

13. Based on the negotiations between the parties, I believe the DIP Facility represents the best financing option reasonably available to the Debtors under the current circumstances.

**Terms of DIP Financing**

14. Upon receipt of the DIP Term Loan Note from DIP Secured Parties and during the period leading up to the commencement of these Chapter 11 Cases, the Debtors and their professionals sought to negotiate the best available terms with DIP Secured Parties. The negotiations resulted in concessions made by DIP Secured Parties, including reducing the interest rate and limiting the amount of the Roll Up DIP Term Loans to only include the Protective Advances.

15. It is my understanding that the roll-up of the Protective Advances with the proceeds of borrowings under the DIP Facility in accordance with the Interim Order (but subject to the provisions of paragraph 5.1 thereof) is necessary as the Prepetition Term Loan Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve-Out and the DIP Liens, in each case as provided in this Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Facility. Moreover, as set forth in the Gasbarra Declaration, in consideration of the entry of the Interim

33419953.3

6

4913-1825-9799v.4

Order authorizing the roll-up of the Protective Advances with the proceeds of the DIP Facility subject to the terms and conditions set forth therein, the Prepetition Term Loan Secured Parties have agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition Financing Agreement) on $117,983,827.51 million of Prepetition Term Loan Obligations. As set forth in the First Day Declaration, the Protective Advances were made by the Prepetition Term Loan Lenders in the months leading up to the commencement of these Chapter 11 cases so as to avoid immediate and irreparable harm to the Debtors' businesses, their estates and their creditors.

16. Based on my experience in representing debtors and creditors in chapter 11 cases and distressed financial transactions, I believe that the terms of the proposed DIP Facility are reasonable under the circumstances. The fees are an integral component of the overall terms of the DIP Facility and were required by the DIP Lender as consideration for the extension of postpetition financing. Additionally, the roll-up of the Protective Advances into the DIP Facility upon entry of the Final Order was negotiated by the parties and is an integral component of the overall terms of the DIP Facility required by the DIP Secured Parties as consideration for the extension of postpetition financing. As I understand, the DIP Secured Parties, in their capacity as Prepetition Term Loan Secured Parties, would not otherwise consent to the use of their Cash Collateral, or, in their capacity as DIP Secured Parties, would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up DIP Term Loans. The contemplated fees and other terms of the DIP Financing (including the Roll-Up DIP Term Loans) were the subject of arm's-length and good faith negotiations.

17. Based on my understanding of the Debtor's liquidity needs, as described further in the First Day Declaration, as well as our recent inquiries to potential third-party DIP financing

sources, I do not believe alternative sources of postpetition financing are readily available to the Debtors on terms better than or comparable to the DIP Facility.

## Conclusion

18. For all the reasons stated above, I believe that the DIP Facility is in the best interests of the Debtors' estate and is a sound exercise of the Debtors' business judgment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: August 4, 2025

Respectfully Submitted,

*/s/ Stephen Golmont*
Stephen Golmont
Director, Triple P Securities, LLC