## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 ([•]) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JEFFREY GASBARRA IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS,
PURSUANT TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF
THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO OBTAIN
SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING
(A) LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION
LENDERS; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV)
SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

I, Jeffrey Gasbarra, hereby declare under penalty of perjury:

1.     I am a Managing Director at Triple P TRS, LLC ("Triple P TRS"), the proposed restructuring advisor to the debtor and debtor-in-possession (the "Debtor" or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). Triple P TRS has its principal place of business at 300 North LaSalle, Suite 1420, Chicago, IL 60654. Triple P TRS and Triple P Securities, LLC, the Debtor's proposed investment banker ("Triple P Securities" and together with Triple P TRS, "Portage Point") are each wholly owned by Portage Point Partners, LLC.

2.     Based on my work with the Debtors, I have become generally familiar with the financial and operational aspects of the Debtors' business. I am authorized to make this declaration

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

(the "Declaration") on behalf of the Debtors and Portage Point.  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.[2]

3.       I submit this declaration in support of the *Debtors' Motion For Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (a) Liens and Superpriority Administrative Expense Claims and (b) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "DIP Financing Motion"),[3] which among other things seeks authority to (a) obtain postpetition financing pursuant to a senior secured, super-priority term loan facility (the "DIP Facility") in an aggregate principal amount of up to approximately $45 million (of which, upon entry of the Final Order, approximately $20 million shall be in the form of a "roll up" of protective advances constituting Obligations under the Prepetition Financing Agreement); (b) grant liens and provide superpriority administrative expense claims; (c) modify the automatic stay; (d) schedule a final hearing; and (e) grant related relief.[4]

4.       In my role as leader of Portage Point's engagement as restructuring advisor, I am actively involved in the Debtors' analysis of their operations and liquidity, including their financing needs, and their efforts to obtain debtor in possession financing to fund these chapter 11 cases.

---

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Portage Point and are based on information provided by them.

[3] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Financing Motion or the DIP Term Loan Note, as applicable.

[4] The material terms of the proposed DIP Facility are described in detail in the DIP Financing Motion.  In the event of conflict among any description of the proposed terms of the DIP Facility herein, in the DIP Financing Motion, or in the DIP Term Loan Note, the terms of the DIP Term Loan Note shall control.

5.      Except as otherwise indicated, all facts or opinions set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' advisors, professionals, boards of directors or managers, or other members of the Portage Point team, my review of relevant documents and information concerning the Debtors' financial affairs and restructuring initiatives, or my experience.  I am not being specifically compensated for this testimony other than through payments received by Portage Point as a professional whose retention the Debtors will seek pursuant to an application to be filed with this Court.  I am over the age of eighteen (18) years and am authorized to submit this Declaration.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## **Personal Background**

6.      I have over 12 years of experience in the restructuring industry and extensive experience have extensive experience in advising companies, senior executives, boards of directors, and creditors in distressed situations.

7.      Portage Point's professionals have assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous cases, including the following: *In re Omega Therapeutics, Inc*., Case No. 25-10211 (BLS) (Bankr. D. Del. Feb. 10, 2025); *In re Dig. Media Sols., Inc.*, Case No. 24-90468 (ARP) (Bankr. S.D. Tex. Sept. 11, 2024); *In re Blink Holdings, Inc. et al*., Case No. 24-11686 (JKS) (Bankr. D. Del. Aug. 12, 2024); *In re DRF Logistics, LLC*, Case No. 24-90447 (CML) (Bankr. S.D. Tex. Aug. 8, 2024); *In re Supply Source Enters., Inc.*, Case No. 24-11054 (BLS) (Bankr. D. Del. May 21, 2024); *In re Appgate, Inc.*, Case No. 24-10956 (CTG) (Bankr. D. Del. May 6, 2024); *In re Ambri, Inc*., Case No. 24-10952 (LSS) (Bankr. D. Del. May 5, 2024); *In re Nogin, Inc*., Case No. 23-11945 (CTG) (Bankr. D. Del. Dec. 5, 2023); *In re Benitago Inc*., Case No. 23-11394 (SHL) (Bankr. S.D.N.Y Aug. 31,

2023); *In re Plastiq*, Case No. 23-10174 (BLS) (Bankr. D. Del. June 19, 2023); *In re Big Village Holding LLC*, Case No. 23 10174 (CTG) (Bankr. D. Del. Mar. 6, 2023); *In re Performance Powersports Grp. Inv., LLC*, Case No. 23-10047 (LSS) (Bankr. D. Del. Jan. 16, 2023); *In re VJGJ, Inc. (f/k/a Teligent, Inc.)*, Case No. 21-11332 (BLS) (Bankr. D. Del. Oct. 14, 2021); *In re Alex and Ani, LLC*, Case No. 21-10918 (CTG) (Bankr. D. Del. July 15, 2021); *In re Alamo Drafthouse Cinemas Holdings, LLC*, Case No. 21-10474 (MFW) (Bankr. D. Del. Mar. 29, 2021); *In re LGA3 Corp.*, Case No. 20-11456 (LSS) (Bankr. D. Del. June 1, 2020).

**The Debtors Have an Immediate Financing Need and Cannot Operate Their Business With Cash Collateral Alone**

8.      The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use certain of the Prepetition Collateral (which, for the avoidance of doubt, includes Cash Collateral).[5]  The Debtors are currently facing an acute liquidity crisis and do not have sufficient available cash—including Cash Collateral—to maintain their operations, fund payroll, pay critical vendors, or continue restructuring efforts.  The Debtors need additional liquidity to cover their restructuring expenses and to continue to operate in the ordinary course, and preserve their value as a going concern in connection with the sale process.

9.      As such, and given their current limited liquidity, the incurrence of new debt under the DIP Term Loan Note and use of Cash Collateral are necessary and vital to the preservation and maintenance of the going concern value of the Debtors, which is critical to maximizing the value realized from a sale of the Debtors' businesses.  Funding of the DIP Facility and the use of Cash Collateral will also instill confidence in the Debtors' employees, vendors, and ticketholders as the Debtors' focus on a "business as usual" message to these key parties.  Further, the failure to obtain

---

[5] As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties or DIP Lenders within the meaning of section 363(a) of the Bankruptcy Code.

access to the DIP Facility and the Prepetition Collateral will result in immediate and irreparable harm to the Debtors and will materially diminish the value of the Debtors' estates.

10.     Accordingly, the proposed DIP Facility is necessary to provide the Debtors with the liquidity they need to fund these chapter 11 cases and consummate a sale.  Pursuant to Local Rule 4001-2(a)(iii), the Initial Budget is attached as Exhibit C to the Interim Order.  The Debtors believe that the Initial Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing and the Initial Budget.  The Initial Budget details the sources and uses of cash needed for ongoing operations on a weekly basis during the budget period.

### Reserved Funds and Food and Beverage Receipts

11.     The Debtors entered into the Insta Funding Receivables Purchase Agreement during the renovation of The Brooklyn Mirage.  Insta Funding loaned the Company $3,000,000 under that agreement, but on June 27, 2025, sent a letter to Avant Gardner demanding a total of $5,208,750.05, close to 170% of the original agreement.  Insta Funding filed UCC-1 financing statements against all Debtors other than Avant Gardner on June 10, 2025, and against Avant Gardner on July 15, 2025.

12.     Insta Funding then escalated its collection efforts dramatically.  Prior to the Petition Date, the Company received a notice from Square, one of the Company's payment processors, that Insta Funding had sent Square a UCC-1 filing, and therefore Square would no longer remit amounts owed to the Company absent a lien release or court order.  Insta Funding's efforts ultimately led to a prejudgment lien attaching to the Bank Account ending in x2368, thereby blocking the Debtors' use of such account.

13.     In the week prior to the Petition Date, Insta Funding, TVT, and Pinnacle attempted to utilize an auto-debit feature of their respective loan agreements to debit over $1 million from

the Debtors' accounts to TVT's lockbox account.  The funds currently remain in the Debtors' bank account as restricted cash.

14.     Subsequently, I understand that the Prepetition Term Loan Lenders, who hold a validly perfected senior lien on the Bank Accounts and monies on deposit, exercised their rights under a deposit account control agreement ("DACA") and instructed the Bank to release the hold on the Debtors' Bank Accounts.  The Debtors must use their Bank Accounts to operate, and allowing a rogue creditor to paralyze the Debtors' operations would cripple these chapter 11 cases.

15.     I understand that the Debtors have agreed to segregate and restrict the amount that was in their Bank Accounts when the Insta Funding prejudgment lien attached.  I understand that Insta Funding's prejudgment lien would not extend to any amounts that enter the Bank Accounts after the Petition Date due to the automatic stay under 11 U.S.C. § 362.  In my opinion, escrowing the amount that was present when the lien arose pre-petition adequately protects any security interest that Insta Funding has in the account.

16.     Additionally, as of the Petition Date, Billfold did not remit net sales directly to the Debtors.  Instead, pursuant to a receivables redirection letter that the Debtors sent to Billfold (as obligated under the TVT loan agreements), Billfold remits the funds to a TVT lockbox account, and a TVT employee makes payments from the TVT lockbox account for the TVT, Pinnacle, and Insta Funding loan.  TVT then remits any remaining balance to the Debtors.  On the Petition Date, the Debtors rescinded their receivables redirection letter to Billfold, from the Petition Date and onward, Billfold should remit all net sales directly to the Debtors, and all litigation pending against the Debtors should be stayed.

17.     I understand that the Debtors have agreed to segregate in a separate Bank Account and restrict any amounts received due to certain food and beverage sales pending the outcome of

potential litigation against TVT, Pinnacle, and Insta Funding.  Therefore, those amounts are not accounted for as receipts under the Initial Budget.  In my opinion, segregating and restricting the amounts received due to food and beverage sales, pending the outcome of litigation, adequately protects any security interest that TVT, Pinnacle, or Insta Funding has in the receivables or any other assets of the Debtors.

## **Conclusion**

18.     In sum, I believe that granting the relief requested in the DIP Motion is appropriate and in the best interests of the Debtors' estates and creditors.

*[Remainder of page intentionally left blank.]*

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 4th day of August, 2025

*/s/ Jeffrey Gasbarra*
Jeffrey Gasbarra
Triple P TRS, LLC

*Proposed Restructuring Advisor to the Debtors*