# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 (MFW) |
| Debtors. | (Jointly Administered) |
|  | **Hearing Date: September 4, 2025 at 2:00 p.m. (ET)**<br>**Obj. Deadline: August 28, 2025 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) AUTHORIZING THE DEBTORS TO DESIGNATE THE STALKING HORSE BIDDER, (C) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF SOME, ALL, OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE PURCHASE AGREEMENT(S), (E) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING THE MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER OR ORDERS (A) AUTHORIZING THE SALE OF SOME, ALL, OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OR ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE POTENTIALLY ASSIGNED CONTRACTS, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (the "Motion"):[2]

## RELIEF REQUESTED

1.      The Debtors seek entry of:

   i.   an order substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), granting, among other things, the following relief:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431).  The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Gary Richards in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 13] (the "First Day Declaration").  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

a. approving proposed bidding procedures (the "<u>Bidding Procedures</u>") in connection with the sale or sales (collectively, the "<u>Sale(s)</u>") of some, all or substantially all of the Debtors' assets or any portion thereof (the "<u>Assets</u>") (which, for the avoidance of doubt, may include equity interests in the Debtors other than Debtor AGDP Holding, Inc.), in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u>, and approving the form and manner of notice thereof in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "<u>Sale Notice</u>");

b. authorizing the Debtors to designate the Stalking Horse Bidder (as defined below) in accordance with the Bidding Procedures Order;

c. scheduling an auction (the "<u>Auction</u>") and a sale hearing (the "<u>Sale Hearing</u>") in connection with the Sale(s);

d. subject to final court approval at the Sale Hearing (as defined below), authorizing and approving the Debtors to enter into and perform under a purchase agreement or purchase agreements consistent with the Bidding Procedures (the "<u>Purchase Agreement(s)</u>");

e. establishing procedures for the assumption and assignment (the "<u>Assumption and Assignment Procedures</u>") of the executory contracts and unexpired leases identified in the Cure Schedule (as defined below) (each, a "<u>Potentially Assigned Agreement</u>," and collectively, the "<u>Potentially Assigned Agreements</u>") and the form and manner of notice thereof in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "<u>Cure Notice</u>"); and

f. granting related relief; and

ii. an order or orders (each such order, a "<u>Sale Order</u>"):

a. authorizing and approving the Debtors' entry into the Purchase Agreement(s) with the Successful Bidder(s) (as defined below) or Back-Up Bidder(s) (as defined below), as applicable;

b. authorizing the Sale(s) of the Assets to the party or parties that are the Successful Bidder(s) at the Auction, free and clear of all liens, claims, and encumbrances (collectively, the "<u>Encumbrances</u>"), except for certain assumed liabilities;

c. authorizing and approving the assumption and assignment of the Potentially Assigned Agreements in connection with the Sale(s), including proposed Cure Amounts (as defined below) (if any); and

d. granting related relief.

2.     In support of this Motion, the Debtors incorporate the statements contained in the *Declaration of Jason Cohen in Support of Debtors' Motion for Entry of an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Debtors to Designate the Stalking Horse Bidder, (C) Scheduling an Auction and a Hearing on the Approval of the Sale of Some, All, or Substantially All of the Debtors' Assets, (D) Authorizing the Debtors to Enter Into the Purchase Agreement(s), (E) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (F) Granting Related Relief; and (II) An Order or Orders (A) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of Encumbrances, (B) Approving the Assumption and Assignment of the Potentially Assigned Contracts, and (C) Granting Related Relief* (the "Cohen Declaration") , filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

3.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion, to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory and legal bases for the relief requested in this Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6004-1.

## BACKGROUND OF THE DEBTORS

6. The Debtors operate a multi-space entertainment venue complex, specializing in large-scale live entertainment—concerts, festivals, corporate functions, and multimedia events—and are known for state-of-the-art audiovisual production, including a 2022 upgrade featuring one of the world's highest-resolution video walls.  The Debtors focus on industry-leading production capabilities, immersive audiovisual experiences, and status as one of North America's largest standing-room-only entertainment venues.

7. On August 4, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

8. Additional information regarding the Debtors' businesses, capital structures and circumstances preceding the Petition Date may be found in the First Day Declaration.

## RELEVANT BACKGROUND

9. The Debtors have a clear strategy for these chapter 11 cases: to execute a sale process for all or substantially all of their Assets, benefitting all of their stakeholders, including employees, customers, and vendors. Among other things, the sale process will provide a transparent and comprehensive avenue through which the Debtors will seek bids for the Assets. In connection with the sale process, the Debtors have selected the binding bid submitted by AG

Acquisition 1, LLC (the "Stalking Horse Bidder"). The *Asset Purchase Agreement* between certain of the Debtors and the Stalking Horse Bidder (the "Stalking Horse Purchase Agreement"), which is described more fully below, will serve as the baseline for all prospective bidders to negotiate from, and will be subject to higher or otherwise better bids for the Assets pursuant to the Bidding Procedures.

10.     As part of the Debtors' efforts to ensure that they secure a value-maximizing transaction for the Assets, prior to the Petition Date, the Debtors retained Triple P Securities, LLC ("Triple P Securities"), an experienced and well-known investment banker who has appeared before the Bankruptcy Court on numerous occasions, to canvass the market for interested buyers. The Debtors will work with Triple P Securities to market the Assets, and obtain the highest and best value.

11.     Triple P Securities has commenced a formal post-petition marketing process for the Assets by circulating a "teaser" to various prospective strategic, financial and hybrid buyers. The teaser includes a brief description of the Assets and the sale process, and is accompanied by a form non-disclosure agreement (an "NDA"). In addition, Triple P Securities has finalized a confidential information memorandum for the Assets, and populated an electronic data room with related diligence information.

12.     In furtherance of Triple P Securities' ongoing efforts to actively market the Assets for sale, and consistent with the Milestones and the Stalking Horse Purchase Agreement, the Debtors have filed this Motion seeking authority to proceed with a bidding and auction process to consummate a sale that the Debtors expect will generate maximum value for the Assets. To facilitate the Sale, the Debtors, in consultation with Triple P Securities' and their other professional advisors, have developed certain customary Bidding Procedures (i.e., the Bidding Procedures) to

preserve flexibility in the sale process, generate the greatest level of interest in the Assets, and result in the highest or otherwise best value for those Assets. Among other things, these procedures, in the Debtors' business judgment, create an appropriate timeline for the sale process, consistent with the Milestones and the Stalking Horse Purchase Agreement.

## THE PROPOSED SALE PROCESS AND SELECTION
## OF THE STALKING HORSE BIDDER

### I.  The Bidding Procedures

13.  The Debtors seek approval of the Bidding Procedures to establish a controlled, fair, and open process for the solicitation, receipt, and evaluation of Bids (as defined in the Bidding Procedures) in a fair and accessible manner.  The Bidding Procedures describe, *inter alia*: (a) the Assets available for sale; (b) the manner in which bids become "qualified"; (c) the coordination of diligence efforts among the bidders and the Debtors; (d) the receipt and negotiation of bids received; (e) the conduct of the Auction (if any); and (f) the process for the selection and approval of the bid or bids that constitute the highest or otherwise best bid (the "Successful Bid(s)," and the maker(s) of the Successful Bid, the "Successful Bidder(s)") and the next-highest bid(s) (the "Back-Up Bid(s)," and the maker(s) of the Back-Up Bid(s), the "Back-Up Bidder(s)").

14.  The following is a summary of the proposed Bidding Procedures, as required by Local Rule 6004-1.[3]

> i.  **Public Announcement of the Auction:** As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall: (a) serve the Sale Notice by email, if available, or otherwise by first-class mail upon the Sale Notice Parties (as defined in the Bidding Procedures Order); provided, however, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of

---

[3] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order. To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures reflected in Exhibit 1 to the Bidding Procedures Order, the terms and conditions of the Bidding Procedures shall control in all respects.

33435880.4

the Bidding Procedures Order; *provided, further* that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence; (b) publish the Sale Notice (as defined in the Bidding Procedures Motion), with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) or another publication with similar national circulation as soon as practicable after entry of the Bidding Procedures Order; and (c) post the Sale Notice on their case website, https://www.veritaglobal.net/AGDP. Further, the Debtors propose that within **2 business days of the entry of the Bidding Procedures Order**, the Debtors shall serve the initial Cure Notice in accordance with the Bidding Procedures Order.

ii. **Participation Requirements:** To participate in the Bidding Process (as defined below) or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets must deliver or have previously delivered to the Debtors and their advisors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

   a. an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance reasonably acceptable to the Debtors

   b. sufficient information, as reasonably determined by the Debtors and their advisors in their sole discretion, to allow the Debtors to determine that such person or entity (i) has or can reasonably obtain the financial wherewithal to consummate the applicable Sale, and (ii) intends to access the Data Room (as defined below) for a purpose consistent with these Bidding Procedures; and

   c. a statement detailing whether the person or entity is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

iii. **Determination by the Debtors:**

   a. As appropriate throughout the Bidding Process, the Debtors will consult with: (a) any statutory committee appointed in the Chapter 11 Cases, if any (each, a "Committee") and such Committee's counsel; and (b) any other party the Debtors deem appropriate (collectively, the "Consultation Parties" and each, a "Consultation Party"); *provided that*, notwithstanding anything to the contrary in these Bidding Procedures, the Debtors shall not consult with a Consultation Party (or

33435880.4

its advisors) that is actively participating as a Potential Bidder for the Assets, including, for the avoidance of doubt, by pursuing a Credit Bid (as defined below).

b.    For the avoidance of doubt, if one of the Consultation Parties (or its affiliates, as applicable) is actively participating as a Potential Bidder for the Assets, then the remaining Consultation Parties and their respective counsel shall continue to be Consultation Parties but shall not provide any information they receive as Consultation Parties to such Potential Bidder. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any party that is not a Potential Bidder or a Consultation Party.[4]

iv.    **Due Diligence:**

a.    The Debtors have established a confidential electronic data room concerning the Assets (the "Data Room") and will grant each Potential Bidder or Consultation Party, as applicable, access to such Data Room. ***No Potential Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***.

b.    Up to and including the Bid Deadline, the Debtors shall afford any Potential Bidder or Consultation Party such due diligence access or additional information as may be reasonably requested by the Potential Bidder or the Consultation Party that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. The Debtors may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders and/or Consultation Parties, as applicable. In the event that any such due diligence materials are prepared by the Debtors in written form and have not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide access to such materials to: (a) all Potential Bidders; and (b) all Consultation Parties. Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

c.    Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person or entity who is not a Potential Bidder or a Consultation

---

[4] Notwithstanding anything to the contrary in these Bidding Procedures, no Prepetition Term Loan Secured Party or DIP Secured Party shall be considered a Consultation Party to the extent that the Stalking Horse Bidder is actively participating as a Potential Bidder for the Assets; provided, however, to the extent that that the Stalking Horse Bidder stops participating as a Potential Bidder for the Assets, the Prepetition Term Loan Secured Parties and DIP Secured Parties may be considered as Consultation Parties.

Party who does not otherwise comply with the participation requirements set forth above.

**v. Bid Deadline:** A Potential Bidder that desires to make a Bid shall deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) to the following **by no later than Wednesday, October 8, 2025, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"):

   a. proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, DE, Attn: Sean M. Beach (sbeach@ycst.com), S. Alexander Faris (afaris@ycst.com) and Evan S. Saruk (esaruk@ycst.com); and

   b. proposed investment banker to the Debtors, Portage Point, 640 Fifth Avenue, 10th Floor, New York, NY 10019, Attn: Jason Cohen (jcohen@pppllc.com) and Stephen Golmont (sgolmont@pppllc.com).

**vi. Qualified Bid Requirements:** To participate in the Auction, a Potential Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of all, substantially all, or some of the Assets (each, a "Bid"), and shall meet the following criteria (collectively, the "Qualified Bid Requirements"), in each case, on or prior to the Bid Deadline:

   a. **Bid Description and Representations:** Bid Description and Representations: Each Bid (other than, for the avoidance of doubt, the Stalking Horse Bid) must be accompanied by a letter or email:

   i. fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating a proposed Sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

   ii. setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price;

   iii. identifying separately the cash and non-cash components of the purchase price;

   iv. if such Bid relates to the Assets contemplated to be sold under the Stalking Horse Purchase Agreement, providing for consideration to the Debtors of at least the sum of the Stalking Horse Bid and an incremental overbid of $350,000, which may be adjusted for any Bid relating to Assets not contemplated to be sold under the Stalking Horse Purchase Agreement (such incremental overbid,

the "Incremental Overbid"); provided that any such Bid must include a cash component sufficient to satisfy the DIP Obligations (as defined in the DIP Order);

v.    specifying whether the Bid is conditioned on purchasing all Assets included in the Bid or whether the Bid should be viewed as separate Bids for one or more sets of Assets;

vi.    indicating the allocation of the purchase price among the applicable Assets; provided that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation;

vii.    stating with specificity the Assets (including any specific Potentially Assigned Agreements) such Potential Bidder wishes to bid on and the liabilities and obligations (including any applicable cure costs) to be assumed by the Potential Bidder in the Sale;

viii.    indicating, as applicable, whether the Potential Bidder intends to operate the Debtors' business as a going-concern or to liquidate the Assets;

ix.    providing that the Bid is not subject to any bidding fee, break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of reimbursement, and including an express waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets;

x.    containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than **November 7, 2025**, contingent upon receiving the necessary Consent Rights (as defined below), if any;

xi.    providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

xii.    providing that such Potential Bidder has procured and provided all necessary information required to procure any necessary approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights (collectively, the "Consent Rights") required for the sale or purchase of Assets contemplated in the Bid, or, in the alternative, the Potential Bidder will endeavor to procure and provide all necessary information required for such Consent Rights by no later than **October 31, 2025**;

33435880.4

10

xiii.    containing an acknowledgement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid;

xiv.    agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s); and

xv.    providing that the Potential Bidder agrees to serve as a back-up bidder (the "<u>Back-Up Bidder</u>") if the Potential Bidder's Qualified Bid (as defined below) is the next highest or best bid after the Successful Bid (as defined below) (the "<u>Back-Up Bid</u>") with respect to the relevant Assets through the Closing Date.

b.    **Qualified Bid Purchase Agreement:** Each Bid must be accompanied by:

    i.    an executed purchase agreement in form and substance reasonably satisfactory to the Debtors (a "<u>Qualified Bid Purchase Agreement</u>"); and

    ii.    a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Stalking Horse Purchase Agreement or the form purchase agreement (if provided by the Debtors), as applicable, and the applicable schedules and exhibits.

c.    **Adequate Assurance Information:** Each Bid must be accompanied by adequate assurance of future performance information (the "<u>Adequate Assurance Information</u>"), which may include (i) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate a proposed Sale; (ii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid; and (iii)such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.

d.    **Good Faith Deposit:** Each Bid must be accompanied by a deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in the amount of ten percent (10%) of the cash consideration of the Bid, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "<u>Good Faith Deposit</u>"); <u>provided</u> that, to the extent a Bid is modified at or prior to the Auction in any manner that increases the proposed

purchase price contemplated by such Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent (10%) of the increased aggregate purchase price promptly and in no event no later than one (1) business day following the conclusion of the Auction.

e.  **Acknowledgement of Compliance with the Bidding Procedures, the Bidding Order, the Bankruptcy Code, and Non-Bankruptcy Law**: Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, and any applicable non-bankruptcy law.

f.  **No Collusion:** The Potential Bidder must acknowledge in writing: (i) that it has not engaged in any collusion with respect to any Bid(s) or any Sale(s); (ii) that it did not agree with any Potential Bidders to control price; and (iii) that it will not engage in any collusion with respect to any Bids, the Auction, or the Sale(s). For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (e-mail shall suffice), in consultation with the Consultation Parties.

g.  **Irrevocable:** Each Bid must state that in the event such Bid is chosen as a Back-Up Bid, it shall remain irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s).

h.  **Regulatory Approvals and Covenants:** A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to after **October 31, 2025**, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

i.  **Expected Closing Date:** Each Bid must state the Potential Bidder's expected date of closing of the applicable Sale(s) and be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid, by no later than **November 7, 2025**.

vii. **Right to Credit Bid:** Subject to any applicable intercreditor agreement, any Qualified Bidder that has a valid and perfected lien on any Assets of the Debtors' estates (each, a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code (a "Credit Bid"); provided that a Secured Creditor shall

have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; provided further that a Credit Bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full all claims for which there are valid, perfected, and unavoidable liens on any assets included in such bid that are senior in priority to those of the Secured Creditor seeking to credit bid.

viii. **Evaluation of Qualified Bids:** The Debtors, in consultation with the Consultation Parties, will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder." The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than **Monday, October 13, 2025, at 12:00 p.m. (prevailing Eastern Time)**. For the avoidance of doubt, the Stalking Horse Bid is deemed a Qualified Bid, and the Stalking Horse Bidder is deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.

A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent in their reasonable business judgment (in consultation with the Consultation Parties), including, among other things: (a) the amount of the Qualified Bid; (b) the risks and timing associated with consummating the transaction(s) with the Qualified Bidder; (c) any excluded Assets or Potentially Assigned Agreements; (d) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement; (e) the net benefit to the Debtors' estates; (f) the tax consequences of such Qualified Bid; and (g) any other factors that the Debtors, in consultation with the Consultation Parties, reasonably may deem relevant.

The Debtors, in their business judgment, reserve the right to reject any Bid if such Bid, among other things:

a.  requires any indemnification of the Potential Bidder in any Qualified Bid Purchase Agreement submitted as part of the Bid;

b.  is not received by the Bid Deadline;

c.  does not comport with the Qualified Bid Requirements;

d.  is subject to any contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; or

e.  does not, in the Debtors' determination (after consultation with the Consultation Parties), include a fair and adequate price or the

acceptance of which would not be in the best interests of the Debtors' estates or the Auction.

Any Bid rejected pursuant to the foregoing shall not be deemed to be a Qualified Bid; provided that the Debtors may work with the parties to any rejected Bid to cure any such defect(s). In the event that any Bid is so rejected, the Debtors shall cause the Good Faith Deposit of such Potential Bidder (including all accumulated interest thereon) to be refunded to such Potential Bidder as soon as reasonably practicable.

ix. **Stalking Horse Bid Protections**: None.

x. **No Qualified Bids:** If no Qualified Bids other than the Stalking Horse Bid are received for the Assets included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may cancel the Auction with respect to such Assets. If the Stalking Horse Bid is the only Qualified Bid received by the Bid Deadline, the Debtors may decide, in their reasonable business judgment, after consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid as to the applicable Assets and pursue entry of an order approving a Sale with respect to such Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court and request the Sale Hearing as set forth herein.

If only one Qualified Bid is received for the Assets not included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may designate such Qualified Bidder as the Successful Bidder with respect to such Assets and pursue entry of an order approving a Sale with respect to such Assets. The Debtors shall promptly file notice of any such designation and request approval of such Sale at the Sale Hearing.

xi. **Auction:** Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct the Auction to determine the Successful Bidder(s) in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of the Assets. If the Debtors do not receive a Qualified Bid for any particular Asset by the Bid Deadline, the Debtors will not conduct the Auction with respect to such Asset. If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to the applicable Assets, then the Debtors shall conduct the Auction with respect to such Assets. In addition, the Debtors, in consultation with the Consultation Parties, shall determine which Qualified Bid is the highest or other best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "Starting Bid(s)"). The determination of which Qualified Bid(s) constitutes the Starting Bid(s) shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates. The Starting

Bid(s) will be provided to the Qualified Bidders prior to the commencement of the Auction.

The Auction, if required, will be conducted on **Wednesday, October 15, 2025** at Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Each Qualified Bidder participating in the Auction will be required to confirm, in writing and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Bidding Process, (b) its Qualified Bid is a good-faith, *bona fide* offer, and (c) that it intends to consummate the applicable Sale(s) if selected as a Successful Bidder. For the avoidance of doubt, the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these chapter 11 cases.

Bidding at the Auction for the Assets (or subset thereof) that are subject to Qualified Bids will begin with the Starting Bid(s) and continue, in one or more rounds of bidding, so long as during each round: (a) at least one Qualified Bidder submits a Qualified Bid that improves on such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid"); and (b) the Debtors reasonably determine, in consultation with the Consultation Parties, that such Subsequent Bid is (i) for the first round, a higher or otherwise better offer than the Starting Bid, and (ii) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).

Each Subsequent Bid at the Auction shall provide additional net value to the estates over the Starting Bid or the Leading Bid (as defined below) in an amount equal to or greater than the Incremental Overbid amount. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer for the subject Assets (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures as set forth below.

The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bidding Procedures; provided that such rules are disclosed to each Qualified

Bidder during the Auction. The bidding at the Auction shall be transcribed and the Debtors shall maintain a transcript of all Bids made and announced at the Auction.

Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will, for the Assets (or subset thereof) that were subject to the Auction:

a. determine, consistent with the Bidding Procedures, which bid(s) constitutes the highest or otherwise best bid (the "Successful Bid(s)"); and

b. notify all Qualified Bidders at the Auction of the subject Assets, prior to its conclusion, of the name(s) of the maker of the Successful Bid(s) (the "Successful Bidder(s)") with respect to the subject Assets, and the amount and other material terms of the Successful Bid(s).

The Debtors may, in consultation with the Consultation Parties, designate the Back-Up Bid(s) and the Back-Up Bidder(s) with respect to the subject Assets in the event that the Successful Bidder(s) does not close the Sale(s). Unless the Court orders otherwise upon application by the Debtors, the Debtors shall not consider any Bids or Subsequent Bids submitted after the conclusion of the Auction, and any and all such Subsequent Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

The Debtors shall file a notice on the Court's docket identifying the Successful Bidder(s) for the Assets and any applicable Back-Up Bidder(s) as soon as practicable upon the conclusion of the Auction.

All bidders at the Auction will be deemed to have consented to the core jurisdiction and constitutional authority of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale(s), and all agreements entered into in connection with any proposed Sale(s).

xii. **Sale Hearing:** Each Successful Bid and Back-Up Bid shall be subject to approval by the Court. The hearing to approve a Successful Bid and Back-Up Bid shall take place **Thursday, October 23, 2025, at a time to be determined**, or as soon as thereafter as counsel and interested parties may be heard (as applicable, the "Sale Hearing"). The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of these chapter 11 cases. For the avoidance of doubt, the Debtors' presentation to the Court for approval of a selected Qualified Bid as a Successful Bid (or a Back-Up Bid) does not constitute the Debtors' acceptance of such Bid. The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing.

33435880.4

xiii. **Return of Good Faith Deposit:** The Good Faith Deposits of all Qualified Bidders shall be held in escrow, but shall not become property of the Debtors' estates absent further order of the Court. The Debtors shall retain any Good Faith Deposit submitted by each Successful Bidder. At the closing of a Sale contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposit of any Back-Up Bidder shall be retained until five (5) business days after the date of consummation of the applicable Sale (the "Closing Date"). The Good Faith Deposits of any other Qualified Bidders will be returned as soon as reasonably practicable, but no later than ten (10) business days following the Auction.

If a Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) fails to consummate the applicable Sale(s) because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the applicable Qualified Bid Purchase Agreement (as such agreement may be amended or modified at the Auction) or any other form of purchase agreement reasonably satisfactory to the Debtors, the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform; provided, however, retaining a Successful Bidder's Good Faith Deposit upon such bidder's breach does not constitute liquidated damages, and the Debtors reserve all rights, remedies, and causes of action that may be available to the Debtors and their estates as a consequence of such bidder's breach.

xiv. **Reservation of Rights and Modifications:** Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, reserve the right to modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Qualified Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing; provided that the Debtors may not amend these Bidding Procedures or the Bidding Process to reduce or otherwise modify its obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court; provided further that notwithstanding anything to the contrary herein, any such modification (including, for the avoidance of doubt, extension of the Bid Deadline, postponement of the Auction, cancellation of the Auction, or termination of the proposed Sale) shall not override any milestones set forth in the DIP Order or the DIP Loan Documents.

## II.     The Stalking Horse Purchase Agreement

15.     Following arm's-length and good-faith negotiations, the Debtors and the Stalking Horse Bidder have agreed upon the Stalking Horse Purchase Agreement whereby the Stalking Horse Bidder will purchase certain of the Assets. A true and correct copy of the Stalking Horse Purchase Agreement is attached hereto as **Exhibit B**.  The Debtors submit that the Stalking Horse Purchase Agreement promotes competitive bidding and maximizes value by establishing a baseline bid for the Assets, which is subject to higher or otherwise better offers at the Auction.

16.     The material terms of the Stalking Horse Purchase Agreement are summarized in the following table.[5]

| Summary of the Stalking Horse Purchase Agreement[6] | |
|---|---|
| **Parties**<br><br>*See* **Preamble**<br>**L.R. 6004-1(b)(iv)(A)** | <u>Sellers</u>: Avant Gardner, LLC; AGDP Holding Inc.; EZ Festivals LLC; Made Event LLC; Reynard Productions, LLC]<br><br><u>Buyer</u>: AG Acquisition 1 LLC.  The Stalking Horse Bidder is not an insider of the Debtors. |
| **Consideration**<br><br>*See* §§ 2.3; 3.1 | The consideration for the sale and transfer of the Transferred Assets from the Sellers to the Buyer shall be as follows:<br><br>a.    The aggregate consideration for the sale, transfer and delivery of the Purchased Assets (the "Purchase Price") shall consist of the following: (a) a credit bid of (i) all DIP Term Loan Obligations that are outstanding under the DIP Term Loan Facility as of the Closing Date and (ii) a portion of the Prepetition Term Loan Secured Obligations, in the amount of $110,000,000 (the "Credit Bid"), which Credit Bid shall exclude the Retained Obligations, which Retained Obligations shall remain outstanding following the Transaction; (b) the assumption of the Assumed Liabilities (including payment of applicable Cure Amounts with respect to the Assumed Contracts); and (c) the provision of an amount equal to (i) $[_____] for the Post-Closing Wind-Down Budget, less (ii) the amount of Excluded Cash (not to exceed the amount in clause (i)). |
| **Transferred Assets** | On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Sellers, in consideration for the payment of the Purchase Price in accordance with |

---

[5] Any summary of the Stalking Horse Purchase Agreement contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse Purchase Agreement attached hereto as **Exhibit B**. to the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Stalking Horse Purchase Agreement, the terms and conditions of the Stalking Horse Purchase Agreement shall control in all respects. Further, solely with respect to usage in this table (and not elsewhere in this Motion), capitalized terms used but not defined in this table shall have the meanings ascribed to such terms in the Stalking Horse Purchase Agreement.

[6] Section references included in this table relate to those sections in the Stalking Horse Purchase Agreement unless otherwise indicated.

| | |
|---|---|
| *See* § 2.1 | Section 3.1 and the assumption of the Assumed Liabilities in accordance with Section 2.3, agree to grant, sell, assign, transfer and deliver to the Purchaser, and the Purchaser agrees to purchase, accept and acquire from the Sellers, all of the Sellers' rights, title and interest, in and to all of the assets, properties and rights of the Sellers existing as of the Closing, free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities), but excluding the Excluded Assets (collectively, the "Purchased Assets"), including: |

a) any cash, cash equivalents on hand or marketable securities of the Sellers in excess of Excluded Cash;

b) all Inventory, wherever located, including any Inventory that is located at any Leased Real Property Location or is stored on behalf of or is in transit to the Sellers;

c) all fixed assets, equipment, furnishings, computer hardware, vehicles, fixtures and all other tangible personal property, in each case whether owned or leased, whether situated on the Leased Real Property Locations or elsewhere, and all of the Sellers' rights under warranties, indemnities, licenses or similar rights against Third Parties with respect to any item referenced in this <u>clause (c)</u>;

d) subject to <u>Section **Error! Reference source not found.**</u>, all rights, title and interest of the Sellers in, to and under the Contracts and Leases designated as Assumed Contracts pursuant to <u>Section 6.7</u>;

e) all Owned Intellectual Property and AG Data, including all tangible embodiments thereof, and all related files and documentation thereof;

f) all accounts receivable (whether billed or unbilled), notes and other documents which evidence any indebtedness to the Sellers;

g) (i) to the extent transferable, all rights in and under all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights in favor of the Sellers and (ii) any claims against suppliers, insurers, or other Third Parties, in each case, solely to the extent related to the Purchased Assets or the Assumed Liabilities;

h) all Licenses, to the extent that they are transferable under applicable Law (the "<u>Transferred Licenses</u>")[7];

i) all customer information and mailing lists related to the Business, in whatever media retained or stored;

j) to the extent transferrable, the Insurance Policies maintained by any Seller for the benefit of the Purchased Assets and the Business, in each case, solely to the extent related to the Purchased Assets, the Business or the Assumed Liabilities and as set forth on <u>Schedule 2.1(j)</u>, and to the extent

---

[7] NTD:  NY Liquor License to be included in this schedule.  **Note to SRZ**: We understand from Company's liquor counsel that the existing Liquor License is not technically transferable and that Purchaser will have to (a)  obtain a temporary liquor license and (b) apply for its own permanent liquor license (and we've added a covenant whereby Sellers agree to cooperate with Purchaser to obtain such permanent liquor license). Further, has Purchaser engaged its own liquor counsel? If so, it would make sense for both liquor counsels to connect and align on approach. **Note to Sellers**: Remains subject to review by Purchaser's liquor counsel.  **Note to Purchaser:** Sellers' liquor counsel has advised that the license is not transferable.

33435880.4

|  | any Insurance Policies are not transferrable, all insurance proceeds, credits, premium refunds, reserves, benefits or claims of any Seller thereunder; |
|---|---|
|  | k) all goodwill directly associated with the Purchased Assets; |
|  | l) all Pre-Paid Expenses; |
|  | m) all Documents other than the Excluded Documents; |
|  | n) all commercial tort claims of the Sellers, in each case, relating solely to the Purchased Assets or the Assumed Liabilities, which shall include, without limitation, commercial tort claims related to construction work performed on any of the Leased Real Property Locations; |
|  | o) all actions, Claims, lawsuits, causes of action and demands available to any Seller in the Business under chapter 5 of the Bankruptcy Code, including sections 542 through 553 of the Bankruptcy Code ("Avoidance Actions"), and all recoveries therefrom, in each case, relating solely to the Purchased Assets, the Business or the Assumed Liabilities; provided, that, for the avoidance of doubt, no Avoidance Actions relating solely to the Excluded Assets or Excluded Liabilities will be included as Purchased Assets; |
|  | p) all actions, Claims, lawsuits, causes of action and demands available to any Seller in the Business in connection with the action entitled *AGDP Holding Inc. v. TVT Capital Source LLC, Insta Funding LLC and Pinnacle Business Funding LLC,* Adv. Pro. No. 25-51803 (MFW), and all recoveries therefrom and proceeds thereof; |
|  | q) all motor vehicles; |
|  | r) any amounts designated as a Purchased Asset pursuant to (a)a.i.i; |
|  | s) any Tax assets, including Tax refunds, credits or payments, of the Sellers relating to the Business or the Purchased Assets for any period; and |
|  | t) all other assets set forth on Schedule 2.1(t). |
| **Excluded Assets**<br><br>*See* § 2.2 | Notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include the following or the proceeds thereof (collectively, the "Excluded Assets"), and nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey any Excluded Assets to the Purchaser, and the Sellers will retain all right, title and interest to, in and under the Excluded Assets: |
|  | a) any cash, cash equivalents on hand or marketable securities of the Sellers necessary to fund the Post-Closing Wind-Down Budget pursuant to Section 3.1(c) (the "Excluded Cash"); |
|  | b) (i) any Excluded Contract; and (ii) any Assumed Contract for which applicable Law requires the consent of a Third Party to be assumed and assigned hereunder as to which, by the Closing Date or upon termination of the Contract Designation Period, as applicable, such consent has not been obtained; |
|  | c) all Insurance Policies maintained by any Seller (including (i) existing and any tail directors or officers liability insurance policies and (ii) any other Insurance Policy maintained by any Seller that provide or may provide coverage in respect of any Excluded Asset or Excluded Liability (in each |

case, including any tail policies or coverage thereon, together with all rights, claims, demands, proceedings, credits, cause of action or rights of set off thereunder)), other than those assigned to the Purchaser pursuant to a)a.i.j);

d) any equity interest of a Seller;

e) the Purchase Price payable to the Sellers pursuant to Section **Error! Reference source not found.**;

f) the rights that accrue to the Sellers under this Agreement or in connection with the Transactions;

g) all actions, Claims, lawsuits, causes of action and demands available to any Seller and all recoveries therefrom, to the extent relating solely to any Excluded Liability;

h) the Sellers' documents, written files, papers, books, reports and records (i) prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Cases or corporate governance of any Seller, or (ii) that any Seller is required by Law to retain (collectively, the "Excluded Documents"); provided, that the Purchaser shall have the right to make copies of any portions of such Excluded Documents (A) relating to any Purchased Assets, the Business or Assumed Liabilities; or (B) that any Seller is required by Law to retain;

i) all retainers or similar prepaid amounts to the accountants, attorneys, consultants, advisors, investment bankers or other professional service providers of the Sellers; provided, that to the extent all or any portion of such retainers or similar prepaid amounts is returned to any Seller, the amount so returned shall be designated as a Purchased Asset;

j) subject to Section 8.3, the sponsorship of, and all assets, properties and rights (including all trusts, insurance policies and administrative services contracts related thereto) related to any Employee Benefit Plan and any other benefit or compensation plan, program, policy, agreement or arrangement at any time maintained, sponsored, participated in or contributed to (or required to be contributed to) by the Sellers or any of their Affiliates or under or with respect to which the Sellers or any of their Affiliates has (or has had) any liability or obligation, including on account of an ERISA Affiliate;

k) all Tax returns relating to the income taxes of the Sellers;

l) all assets listed on Schedule 2.2(l), notwithstanding anything to the contrary set forth herein.

| | |
|---|---|
| **Assumed Liabilities**<br><br>*See* § 2.3 | Upon the terms and subject to the conditions of this Agreement, effective as of the close of business on the Closing Date, the Purchaser agrees to assume, pay, perform and discharge, promptly when payment or performance is due or required, only the following liabilities of the Sellers (together with such other liabilities as are expressly assumed by the Purchaser in accordance with the terms of this Agreement, including Section 3.1, collectively, the "Assumed Liabilities"):<br>a) Cure Amounts and those liabilities or obligations of the Sellers first arising and accruing under the Assumed Contracts from and after the |

<table>
<tr><td></td><td>Petition Date, and solely to the extent relating to the period from and after the Petition Date;</td></tr>
</table>

|  |  |
|---|---|
|  | b) government charges or fees related to the Purchased Assets first arising and accruing on and after the Closing Date (other than Taxes attributable to a Pre-Closing Tax Period); |
|  | c) accounts payable incurred by the Sellers in the ordinary course of business from and after the commencement of the Bankruptcy Cases in accordance with the Approved Budget; |
|  | d) all liabilities and obligations relating to the Purchased Assets and the Business arising from and after the Closing Date; |
|  | e) accrued and unpaid liabilities pursuant to 28 U.S.C. §1930(a) as of the Closing Date; |
|  | f) all liabilities required to be paid to any holder of a Permitted Lien; |
|  | g) all accrued but unpaid liabilities and obligations of the Sellers in respect of any Transferred Employee (or the beneficiaries and dependents of any of them, to the extent applicable), including, without limitation, accrued vacation and/or other paid time off, compensation of any kind, including wages, payments, entitlements, holiday pay, vacation pay, sick pay, bonuses, commissions, severance pay (to the extent applicable), retiree or other post-employment medical or life obligations, pension contributions, indemnification obligations, insurance premiums and/or Taxes, arising prior to the Closing and set forth in the Approved Budget; |
|  | h) Event Cancellation Obligations; |
|  | i) Outstanding Event Obligations; |
|  | j) Subject to Section 8.3, the 401(k) Sponsorship Obligations; and |
|  | k) to the extent not otherwise included in clauses (a) through (j), all accrued and unpaid liabilities constituting allowed administrative expense claims of the Sellers as of the Closing Date and set forth in the Approved Budget (for the avoidance of doubt, such Approved Budget may include liabilities (including payroll and vendor obligations) accrued as of the Closing Date but not due and payable until after the Closing Date). |
| **Excluded Liabilities**<br><br>*See* § 2.4 | Notwithstanding any other provision of this Agreement to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming and will be deemed not to have assumed any other liability or obligation of (or Claim against) the Sellers or any, subject to Section 8.3 with respect to the 401(k) Sponsorship Obligations, any Employee Benefit Plan (including any liability or obligation in respect of the sponsorship of any Employee Benefit Plan and/or any other compensation or benefit plan, program, policy, agreement or arrangement of any kind at any time maintained, sponsored, participated in or contributed to (or required to be contributed to) by any of the Sellers or any of their Affiliates, or under or with respect to which any of the Sellers or any of its respective Affiliates has (or has had or could reasonably be expected to have) any liability or obligation, including on account of any ERISA Affiliates, as well as any claims and liabilities thereunder or in any way related thereto) of whatever nature, whether presently in existence or arising hereafter, known or unknown, |

| | |
|---|---|
| | disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise (all such Claims, liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities"). Without limiting the generality of the foregoing, Excluded Liabilities shall include: (a) any other liability or obligation of (or Claim against) any of the Sellers in respect of any Employee who is not a Transferred Employee, including any former employee, director, manager, officer, consultant, independent contractor, contingent worker or leased employee of any of the Sellers or any of their Affiliates (or the beneficiaries and/or dependents of any of them), arising or incurred by any of the Sellers or any of their Affiliates under, or in connection with, or non-compliance with, any applicable Law relating to labor (including the Worker Adjustment and Retraining Notification Act and any similar Law), employment, employment practices, terms and conditions of employment, wages and hours, or occupational safety and health; (b) all liabilities owed by any of the Sellers to NYC Festivals, LLC, NYC Club Event, LLC, SFXE IP LLC, LiveStyle Holdings, Inc., TVT Capital Source LLC, Pinnacle Business Funding LLC, Insta Funding LLC, or any of their respective Affiliates or assignees; (c) all liabilities attributable to: (i) Taxes of any Seller; (ii) Taxes with respect to the Purchased Assets, the Assumed Liabilities or the Business for any Pre-Closing Tax Period; and (iii) payments under any Tax allocation, sharing or similar agreement (whether oral or written) of any Seller or any of its predecessors in interest; and (d) all liabilities and obligations related to the Retained Obligations under the Prepetition Term Loan Facility. |
| **Sale Free and Clear**<br><br>*See § 4.4* | Subject to Section 2.5, and subject to entry of the Sale Order, the Sellers own, or in the case of Purchased Assets that are leased, hold a valid leasehold interest in, the Purchased Assets free and clear of all Liens (other than Permitted Liens). Upon consummation of the Transactions, the Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens. The Purchased Assets together with the services to be provided to the Purchaser pursuant to the Transition Services Agreement constitute all the properties, assets, interests in properties and rights to operate the Business immediately following the Closing (or after the termination of the Contract Designation Period, as applicable) in the ordinary course of business as conducted by the Sellers prior to Closing. |
| **Transfer Taxes**<br><br>*See § 7.3* | The Purchaser shall be responsible to pay any and all sales, use, stamp, documentary, filing, recording, transfer, real estate transfer, stock transfer, gross receipts, registration, duty, securities transactions or similar fees or taxes or governmental charges (together with any interest or penalty, addition to tax or additional imposed) as levied by any Tax Authority in connection with the Transactions (collectively, "Transfer Taxes"). To the extent the Purchaser or the Sellers are liable for such Transfer Taxes under applicable Law, such Party required by applicable Law to file shall timely file or cause to be filed (with the cooperation of the Sellers) all necessary documents (including all Tax Returns) with respect to such Transfer Taxes. |
| **Agreements with Management**<br><br>**L.R. 6004-1(b)(iv)(B)** | As disclosed in the First Day Declaration, the Debtors' chief executive officer, Gary Richards, is party to an agreement with an entity affiliated with the Stalking Horse Bidder pursuant to which the Stalking Horse Bidder's affiliate has agreed to backstop the Debtors' indemnification and reimbursement obligations in the event the applicable Debtors fail to do so. |
| **Releases**<br><br>*See § 7.3*<br><br>**L.R. 6004-1(b)(iv)(C)** | Customary mutual releases between the Sellers and the Stalking Horse Bidder. |
| **Private Sale/No Competitive Bidding** | N/A |

| | |
|---|---|
| **L.R. 6004-1(b)(iv)(D)** | |
| **Closing**<br><br>*See* § 11.1(b)<br><br>**L.R. 6004-1(b)(iv)(E)** | The outside closing date under the Stalking Horse Purchase Agreement is November 7, 2025 |
| **Good Faith Deposit**<br><br>*See* § 7.3<br><br>**L.R. 6004-1(b)(iv)(C)** | None. |
| **Interim Arrangements with Proposed Buyer**<br><br>*See* § 1.1<br><br>**L.R. 6004-1(b)(iv)(G)** | The Sellers and the Stalking Horse Bidder may enter into a Transition Services Agreement by and between the Purchaser and the Sellers, which, if deemed necessary by the Purchaser in its sole discretion prior to the Closing Date, shall be acceptable in form and substance to each of the Purchaser and the Sellers in their respective sole discretion and pursuant to which the Sellers will perform certain management services and back-office functions as determined by the Purchaser, at the sole cost and expense of the Purchaser, subject to any applicable third-party prohibitions on the provision of such management services and back-office functions by the Sellers and further subject to the availability to the Sellers of sufficient assets and personnel to reasonably provide such management services and back-office functions following the Closing. |
| **Use of Proceeds**<br><br>**L.R. 6004-1(b)(iv)(H)** | None. |
| **Tax Exemption**<br><br>**L.R. 6004-1(b)(iv)(I)** | None. |
| **Record Retention**<br><br>*See* § 6.2(b)<br><br>**L.R. 6004-1(b)(iv)(J)** | The Sellers will retain reasonable access to records as necessary to administer these chapter 11 cases. |
| **Sale of Avoidance Actions**<br><br>*See* § 2.1(o)<br><br>**L.R. 6004-1(b)(iv)(K)** | Avoidance Actions are among the Purhcased Assets. |
| **Requested Findings as to Successor Liability**<br><br>**L.R. 6004-1(b)(iv)(L)** | The Debtors are seeking to sell the Purchased Assets free and clear of successor liability claims. |
| **Sale Free and Clear of Unexpired Leases**<br><br>**L.R. 6004-1(b)(iv)(M)** | The Debtors intend to seek entry of a Sale Order that provides, among other things, Court approval of the sale of the Purchased Assets free and clear of all Encumbrances pursuant to (among other provisions) sections 105, 363, and 365 of the Bankruptcy Code. |
| **Credit Bid**<br><br>**L.R. 6004-1(b)(iv)(N)** | Purchase Price includes a credit bid of the DIP Term Loan Obligations and $110,000,000 of the Prepetition Term Loan Secured Obligations. |
| **Relief from Fed. R. Bankr. P. 6004(h)**<br><br>**L.R. 6004-1(b)(iv)(O)** | To maximize the value received for the Purchased Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |

17.     As set forth above, the Stalking Horse Purchase Agreement contains certain key provisions, each of which were specifically negotiated by the Stalking Horse Bidder and which are a condition required by the Stalking Horse Bidder for the deal encapsulated in the Stalking Horse Purchase Agreement.  As set forth in the Cohen Declaration, the Debtors, following arm's-length negotiations with the Stalking Horse Bidder, concluded that these provisions were necessary to secure the Stalking Horse Bidder's commitment to acquire the Assets in accordance with the terms of the Stalking Horse Purchase Agreement.

18.     The Debtors submit that the terms set forth above and in the Bidding Procedures Order are the result of extensive, good-faith, arm's-length negotiations, and that the Stalking Horse Bid is currently the highest and best proposal. Accordingly, the Debtors' proposed entry into the Stalking Horse Purchase Agreement is in the best interest of the Debtors' estates, constitutes a sound exercise of the Debtors' business judgment, and should be approved.

### III.     The Sale(s) and Auction Dates and Deadlines Schedule

19.     The Debtors are seeking approval of the Bidding Procedures and the following proposed timeline for the sale process (the dates set forth below, respectively, the "Sale Schedule") to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the Debtors to consummate a Sale. Moreover, the Debtors, in their sound business judgment, reserve the right, in consultation with the Consultation Parties, to alter the timing of the Sale Schedule as necessary under the circumstances, or to conduct multiple Sales across one or more Auctions in order to maximize the value of the Debtors' estates, in each case in accordance with the Bidding Procedures; *provided that*, for the avoidance of doubt, any such alteration will not alter any DIP Milestones. The Debtors respectfully request that the Court approve the Sale Schedule as set forth herein.

33435880.4

| Dates | All Scenarios – Deadline/ Event |
| --- | --- |
| Thursday, September 4, 2025 | Bidding Procedures Hearing |
| As soon as practicable after entry of the Bidding Procedures Order | Sale Notice Filing Deadline |
| 2 business days after entry of the Bidding Procedures Order | Cure Notice Filing Deadline |
| 14 calendar days after service of the Cure Notice (or the Supplemental Cure Notice) at 4:00 p.m. (prevailing Eastern Time) | Cure Objection Deadline |
| Monday, September 29, 2025, at 4:00 p.m. (prevailing Eastern Time) | Sale Objection Deadline |
| Wednesday, October 8, 2025, at 12:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| Monday, October 13, 2025 | Qualified Bid Designation Deadline |
| Wednesday, October 15, 2025 | Auction (if necessary) |
| Deadline to File and Serve Notice of Successful Bidder | As soon as practicable after completion of the Auction |
| Friday, October 17, 2025 | Deadline to file Proposed Sale Order |
| Monday, October 20, 2025, at 4:00 p.m. (prevailing Eastern Time) | Post-Auction Objection Deadline |
| Wednesday, October 22, 2025 | Sale Objection Reply Deadline |
| Thursday, October 23, 2025, subject to the Court's availability | Sale Hearing |
| Friday, November 7, 2025 | Targeted Closing |

20.     The timeline contemplated in the foregoing Sale Schedule will allow Potential Bidders (as defined in the Bidding Procedures) sufficient time to evaluate the Assets and formulate bids. The Debtors have been, and will continue to actively market the Assets (including, for the avoidance of doubt, causes of action).

21.     The Debtors believe that the relief sought by this Motion appropriately balances the need to provide all parties in interest with notice and due process and affords the Debtors sufficient time to generate interest in any or all of the Assets. In short, the relief sought by this Motion is the Debtors' best chance to preserve and maximize value to stakeholders. Accordingly, the Debtors believe the relief requested herein is in the best interests of the Debtors' estates, will provide interested parties with sufficient opportunity to participate in the process, and should be approved.

IV.     **Notice Procedures**

22.     The Debtors also request approval of the Sale Notice substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>.

23.     As soon as practicable after the entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by email, if available, or otherwise by first-class mail upon the following: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors or, if an official committee of unsecured creditors has been appointed at that time, such committee; (c) Alter Domus (US) LLC; (d) counsel to the DIP Lenders and the Prepetition Term Loan Lender; (e) Livestyle; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) all parties who are known by the Debtors to assert liens against the Assets; (i) all non-Debtor parties to the Potentially Assigned Agreements; (j) any party known or reasonably believed to have expressed an interest in acquiring some, all, or substantially all of the Assets; (k) all known and reasonably identifiable creditors of the Debtors; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Sale Notice Parties</u>").

24.     In addition, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will post the Sale Notice on their restructuring website,

33435880.4

https://www.veritaglobal.net/AGDP, and publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) or another publication with similar national circulation to provide notice to any potentially interested parties.

25.    The Sale Notice, and the manner of serving and publishing such notice, is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale(s), including the date, time, and place of the Auction (if any), the Bidding Procedures, and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Auction be required.

## V.    Assumption and Assignment Procedures

26.    To facilitate the Sale, the Debtors seek authority to assume and assign the Potentially Assigned Agreements to any Successful Bidder(s) in accordance with the Assumption and Assignment Procedures provided herein and the form and manner of the Cure Notice.

27.    By no later than **2 business days** after the entry of the Bidding Procedures Order, the Debtors will file the Cure Notice, which shall include a schedule of cure obligations (the "Cure Schedule") for the Potentially Assigned Agreements. The Cure Schedule will include a description of each Potentially Assigned Agreement potentially to be assumed and assigned by a potential buyer and the amount, if any, necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). A copy of the Cure Notice, including the Cure Schedule, will be served on each of the non-Debtor parties listed on the Cure Schedule by email, where available, or otherwise by first-class mail on the date that the Cure Notice is filed with the Court.

28.    The Debtors propose that to the extent the Debtors, at any time after the filing of the Cure Notice (a) identify additional Potentially Assigned Agreements that may be assumed and

33435880.4

assigned to the Successful Bidder(s), (b) remove any Potentially Assigned Agreement from the Cure Notice, and/or (c) modify the previously stated Cure Costs associated with any Potentially Assigned Agreement, the Debtors shall promptly file with this Court and serve such Cure Notice (the "Supplemental Cure Notice") on each of the affected non-Debtor parties therein by email, where available, or otherwise by first-class mail on the date the Supplemental Cure Notice is filed with this Court. Each Supplemental Cure Notice will include the same information with respect to listed Potentially Assigned Agreements as was included in the Cure Notice.

29.     The Debtors propose that any objections to the assumption and assignment of any Potentially Assigned Agreement identified on the Cure Schedule, including, but not limited to, the Cure Costs set forth on such Cure Schedule, must be filed with Court no later than 4:00 p.m. (prevailing Eastern Time) on the date that is **14 calendar days** from the date of service of the Cure Notice, and be served on the following parties (collectively, the "Objection Notice Parties"):

i.   counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com), S. Alexander Faris (afaris@ycst.com) and Evan S. Saruk (esaruk@ycst.com);

ii.  counsel to the DIP Lender and the Stalking Horse Bidder, McDermott Will & Schulte LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam Harris (adam.harris@srz.com) and Reuben Dizengoff (reuben.dizengoff@srz.com);

iii. the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Jonathan W. Lipshie (Jon.Lipshie@usdoj.gov);

iv.  counsel to any statutory committee that has been appointed in these chapter 11 cases; and

v.   any Successful Bidder identified prior to such objection deadline, if applicable.

30.     Any such objections shall: (a) be in writing; (b) state with specificity the nature of the objection, and, if the objection pertains to the proposed Cure Amount, state the amount alleged

 

to be owed, together with any applicable and appropriate documentation in support thereof; (c) be filed with the Clerk of the Court; and (d) be served upon the Cure Notice Parties.

31.     If no objection is timely and properly received with respect to a Potentially Assigned Agreement, then any non-Debtor counterparty to the Potentially Assigned Agreement shall be: (a) forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to the Potentially Assigned Agreement, and the Debtors and Successful Bidder(s) shall be entitled to rely solely upon the Cure Costs set forth in the Cure Schedule; (b) deemed to have consented to the assumption and assignment of such Potentially Assigned Agreement; and (c) forever barred, estopped, and permanently enjoined from asserting or claiming against the Debtors, the Successful Bidder(s), or their respective property that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Potentially Assigned Agreement, or that there is any objection or defense to the assumption and assignment of such Potentially Assigned Agreement. In addition, the Cure Costs set forth in the Cure Schedule shall be binding upon the non-Debtor parties to the Potentially Assigned Agreement for all purposes in the Chapter 11 Cases and will constitute a final determination of the Cure Costs required to be paid by the Debtors in connection with the assumption and assignment of the Potentially Assigned Agreement.

32.     Where a non-Debtor counterparty to a Potentially Assigned Agreement timely and properly files an objection asserting a cure amount higher or different than the proposed Cure Costs (the "Disputed Cure Amount"), then: (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount, the cure amount (the "Cure Amount") shall be as agreed between the parties; or (b) to the extent the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed

Cure Amount will be determined at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court. All other objections to the proposed assumption and assignment of the Potentially Assigned Agreements will be heard at the Sale Hearing, unless adjourned by agreement of the parties.

## VI.    The Proposed Sale Order(s)

33.    The Debtors anticipate that the Sale Order(s) will contain certain provisions that require disclosure under Local Rule 6004-1.  Accordingly, the Debtors make the following statements:

  i.    <u>Local Rule 6004-1(b)(iv)(A)</u>: The Stalking Horse Bidder is not an insider (within the meaning of section 101(31) of the Bankruptcy Code) of the Debtors.  To the extent a Successful Bidder is an insider, the Debtors will make the necessary disclosures to the Court.

  ii.    <u>Local Rule 6004-1(b)(iv)(B)</u>: The Stalking Horse Bid does not contemplate any agreement between the Stalking Horse Bidder and the Debtors' management or key employees.  However, as disclosed herein and in the First Day Declaration, the Debtors' chief executive officer, Gary Richards, is party to an agreement with an entity affiliated with the Stalking Horse Bidder pursuant to which the Stalking Horse Bidder's affiliate has agreed to backstop the Debtors' indemnification and reimbursement obligations in the event the applicable Debtors fail to do so.

  iii.    <u>Local Rule 6004-(b)(iv)(C)</u>: Sections 9.1 and 9.2 of the Stalking Horse Purchase Agreement contain, subject to closing, customary mutual releases between the Debtors and the Stalking Horse Bidder.

  iv.    <u>Local Rule 6004-1(b)(iv)(D)</u>: The Debtors intend to hold the Auction with respect to the Assets unless the only Qualified Bid for the Assets included in the Stalking Horse Bid received is that of the Stalking Horse Bidder and there is no more than one Qualified Bid for any Assets not included in the Stalking Horse Bid.

  **v.**    <u>Local Rule 6004-1(b)(iv)(E)</u>: The contemplated closing date for the Sale(s) is no later than **<u>Friday, November 7, 2025</u>**.

  vi.    <u>Local Rule 6004-1(b)(iv)(F)</u>: The Debtors are requiring Qualified Bids to include the Good Faith Deposit; *provided that*, to the extent a Bid is modified at or prior to the Auction in any manner that increases the proposed purchase price contemplated by such Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so

that it equals the greater of ten percent (10%) of the increased aggregate purchase price or $500,000 promptly and in no event no later than one (1) business day following the conclusion of the Auction. Further, the Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties, including by requiring Qualified Bidders to provide a Good Faith Deposit for any non-cash consideration based on such Qualified Bidder's estimate of the value of any such non-cash consideration.

vii.  Local Rule 6004-1(b)(iv)(G): The Stalking Horse Purchase Agreement contemplates entry into a Transition Services Agreement (as defined therein) which the Debtors and the Stalking Horse Bidder may enter into prior to the Closing Date, pursuant to which the Debtors would perform certain management services and back-office functions as determined by the Stalking Horse Bidder at the sole cost and expense of the Stalking Horse Bidder.

viii.  Local Rule 6004-1(b)(iv)(H): Other than with respect to a potential credit bid under section 363(k) of the Bankruptcy Code by the Stalking Horse Bidder, the Debtors are not seeking to release or allocate any sale proceeds without further order of the Court.

ix.  Local Rule 6004-1(b)(iv)(I): The Debtors are not seeking to have the Sale(s) declared exempt from taxes under section 1146(a) of the Bankruptcy Code pursuant to this Motion.

x.  Local Rule 6004-1(b)(iv)(J): The Debtors will retain necessary books and records, copies thereof, or include as part of the Purchase Agreement(s) appropriate access to such information, to enable the Debtors to administer the Chapter 11 Cases following any Sale.

xi.  Local Rule 6004-1(b)(iv)(K): The Debtors may seek to sell avoidance actions.

xii.  Local Rule 6004-1(b)(iv)(L): The Debtors are seeking to sell the Assets free and clear of successor liability claims. The Debtors may have unpaid prepetition unsecured claims after the closing of the Sale(s). Likely, no party would be willing to purchase the Debtors' assets if it were at risk of liability for those claims under principles of successor liability.

xiii.  Local Rule 6004-1(b)(iv)(M): The Debtors are seeking to sell the Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

xiv.  Local Rule 6004-1(b)(iv)(N): The Stalking Horse Bid contemplates that the sale of certain of the Debtors' Assets will be subject to the Bidding Procedures, which provide for credit bidding pursuant to section 363(k) of the Bankruptcy Code by any secured creditor.

xv.  <u>Local Rule 6004-1(b)(iv)(O)</u>: The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any Sale(s), as further described below.

## BASIS FOR RELIEF REQUESTED

## I.    Approval of the Sale(s) Is Warranted Under Section 363(b) of the Bankruptcy Code

34.    Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Debtors must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

35.    Courts typically consider the following factors in determining whether a proposed sale meets this standard:

i.   whether a sound business justification exists for the sale;

ii.  whether adequate and reasonable notice of the sale was given to interested parties;

iii. whether the sale will produce a fair and reasonable price for the property; and

iv.  whether the parties have acted in good faith.

*In re Decora Indus., Inc.,* 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

36.    When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*

*(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

37.    The Debtors submit that their decision to pursue a sale on the terms set forth in this Motion represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale(s) should be approved under section 363(b) of the Bankruptcy Code.

38.    The Debtors will continue to conduct an extensive and fulsome process to market the Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder(s), and establish that the Debtors and the Successful Bidder(s) proceeded in good faith.

39.    Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rules 2002(a) and 2002(c) require the Debtors to notify creditors of the Sale(s), the terms and conditions of the Sale(s), the time and place of the Auction, and the deadline for filing any objections. The Debtors assert that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Sale(s), the Auction, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

40.    The Sale(s), conducted in accordance with the Bidding Procedures, will provide the Debtors with the best opportunity to generate maximum value for the Debtors' estates, and

represents the best path forward for maximizing recoveries. The Debtors submit that ample business justification exists for the consummation of the Sale(s), and therefore request that the Court approve the Bidding Procedures.

**II.    The Sale(s) of the Assets Free and Clear of All Encumbrances is Authorized Under Section 363(f) of the Bankruptcy Code.**

41.    The Debtors request approval to sell the Assets free and clear of any and all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> i.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> ii.    such entity consents;
>
> iii.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> iv.    such interest is in bona fide dispute; or
>
> v.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

42.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.   Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all Encumbrances, except with respect to any interest that may be assumed liabilities under the applicable Purchase Agreement(s). *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 354 (E.D. Pa. 1988) (holding that a sale "free and clear"

33435880.4

may be approved provided the requirements of at least on subsection of section 363(f) of the Bankruptcy Code are met).

43.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of the Assets free and clear of any claims against the Debtors. *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f) of the Bankruptcy Code); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

44.     The Debtors submit that the Sale(s) of the Assets free and clear of the Encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code. The Debtors also assert that the service of the Sale Notice in accordance with the terms set forth in this Motion will afford creditors sufficient notice of the Stalking Horse Bidder, the Stalking Horse Purchase Agreement, and the Sale(s) and therefore provides additional justification for approval of the Sale(s) free and clear of all Encumbrances.

## III.   The Sale(s) Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code.

45.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. See 11 U.S.C. § 363(m).

46.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in good faith. While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *In re Abbots Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

47. The Debtors submit that the Stalking Horse Bidder or any Successful Bidder(s) will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement with the Stalking Horse Bidder is a good-faith, arm's-length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.[8] *First*, as detailed above, the consideration to be received by the Debtors from a Successful Bidder will be substantial, fair, and reasonable. *Second*, any sale agreement with a Successful Bidder will presumably be the culmination of a competitive auction process in which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, at the Sale Hearing, the facts will demonstrate no fraud, collusion between the purchaser and other bidders or

---

[8] The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder(s). Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as a Successful Bidder or a Back-Up Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

the trustee, or an attempt to take grossly unfair advantage of other bidders or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code. Further, with respect to Potential Bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. *Fourth*, any Bids that the Debtors ultimately determine to be a Successful Bid will have been evaluated and approved by the Debtors in consultation with their advisors and the Consultation Parties. Accordingly, the Debtors believe that a Successful Bidder, if any, and any Purchase Agreement associated with a Successful Bid should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

48.     In approving the Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that any Successful Bidder of the Assets purchased in accordance with the Bidding Procedures is entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that the selection of the Successful Bidder(s) will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) of the Bankruptcy Code where notice is provided to lienholders).

## IV.    Entry Into the Stalking Horse Purchase Agreement Has a Sound Business Purpose and Should Be Approved.

49.     The Court should authorize the Debtors' entry into the Stalking Horse Purchase Agreement. To determine whether a debtor's sale of assets outside of the ordinary course of business satisfies the "business judgement" standard under section 363(b) of the Bankruptcy Code, courts consider whether "(1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has

acted in good faith." *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Delaware Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *see also In re Elpida Memory, Inc.*, 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) ("The section 363(b) standard is well-settled. A debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment."). If a debtor demonstrates a valid business justification for a decision, such as preserving the value of the estate for the benefit of all stakeholders, "courts will generally not entertain objections" and "a strong presumption follows that the agreement was negotiated in good faith and is in the best interests of the estate." *In re Culp*, 545 B.R. 827, 844 (D. Del. 2016), *aff'd*, 681 F. App'x 140 (3d Cir. 2017).

50.     The Debtors entry into the Stalking Horse Purchase Agreement is a sound exercise of the Debtors' business judgment. The use of a stalking horse bidder in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum LLC*, No. 11-CV-219, 2011 WL 2671254, at *1 (E.D. Wis. Jul. 7, 2011).

51.     Accordingly, for the reasons set forth above, the Debtors respectfully request that the Court grant the Debtors the authority to enter into the Stalking Horse Purchase Agreement.

## V.     The Court Should Approve the Bidding Procedures.

52.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtors "had a fiduciary duty to protect and maximize the estate's assets"); *see also* John J. Jerome & Robert D. Drain, Bankruptcy Court Is Newest Arena for M&A Action, N.Y.L.J.,

33435880.4

Jun. 3, 1991 ("When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold."). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtor's assets").

53.    The Debtors and their professional advisors have designed the Bidding Procedures to balance the goals of promoting a competitive and fair bidding process and maximizing value for the Debtors' estates by running an efficient process that results in a sale before the end of the year.

54.    The Bidding Procedures will allow the Debtors to reach a broad universe of potential buyers and conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets. *See, e.g.*, *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures "intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"). The Bidding Procedures ensure efficiency and maximize value for the Debtors' estates.

55.    Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their independent fiduciaries and professional advisors, in consultation with the

33435880.4

Consultation Parties, to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtors' estates and their stakeholders.

56.    The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best bids for the Assets. Therefore, the Debtors request that the Court approve the Bidding Procedures.

## VI.    The Assumption and Assignment of the Potentially Assigned Agreements Satisfies Section 365 of the Bankruptcy Code.

57.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

58.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover,

pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

59.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party. 11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the Debtor's estate."); *In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtors' assets). Section 365(f)(2)(B) of the Bankruptcy Code requires that the non-debtor contract counterparty be given adequate assurance of future performance by an assignee. 11 U.S.C. § 365(f)(2)(B). The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment. *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant. *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

60.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial

health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from a debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

61.     The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtors' business judgment. Additionally, the Debtors submit that the notice provisions and the objection deadline for counterparties to raise objections to the assumption and assignment of the Potentially Assigned Agreements as proposed in this Motion are adequate to protect the rights of counterparties to the Debtors' contracts and leases. Furthermore, the Debtors will demonstrate adequate assurance of future performance at the Sale Hearing.

**VII.    The Stalking Horse Bidder Should be Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code**

62.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006).

63.     As a result, the Debtors propose that the Stalking Horse Bidder, which holds secured claims on account of the DIP Term Loan Obligations and the Prepetition Term Loan

Secured Obligations, be entitled to credit bid all or a portion of the amounts then outstanding under section 363(k) of the Bankruptcy Code and as provided for in the Bidding Procedures.

## VIII.    Relief Under Bankruptcy Rules 6004(h) and 6004(d) Is Appropriate.

64.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

65.    The Debtors request that the Sale Order(s) be effective immediately upon its (or their) entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

66.    To maximize the value received for the Assets, the Debtors seek to close the Sale(s) as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

67.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent under the Prepetition Financing Agreement and the DIP Facility; (d) counsel to the DIP Lenders and the Prepetition Term Loan Lender; (e) LiveStyle; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.


*[Remainder of the page intentionally left blank]*

33435880.4

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated:    August 14, 2025
          Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ S. Alexander Faris*

Edmon L. Morton (No. 3856)
Sean M. Beach (No. 4070)
Kenneth J. Enos (No. 4544)
S. Alexander Faris (No. 6278)
Sarah Gawrysiak (No. 7403)
Evan S. Saruk (No. 7452)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:   sbeach@ycst.com
         emorton@ycst.com
         kenos@ycst.com
         afaris@ycst.com
         sgawrysiak@ycst.com
         esaruk@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*