**<u>Exhibit B</u>**

**Stalking Horse Purchase Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

By and Among

**AG ACQUISITION 1 LLC,**
as Purchaser

and

**AVANT GARDNER, LLC, AGDP HOLDING INC., EZ FESTIVALS LLC, MADE EVENT LLC AND REYNARD PRODUCTIONS, LLC,**
as Sellers

Effective Date: August 14, 2025

# TABLE OF CONTENTS

**Page**

ARTICLE I CONSTRUCTION; DEFINITIONS ........................................................................2

    Section 1.1    Construction.............................................................................2
    Section 1.2    Definitions ................................................................................2
    Section 1.3    Other Definitions ...................................................................12

ARTICLE II PURCHASE AND SALE ....................................................................................14

    Section 2.1    Purchase and Sale .................................................................14
    Section 2.2    Excluded Assets ....................................................................15
    Section 2.3    Assumption of Assumed Liabilities.......................................17
    Section 2.4    Excluded Liabilities ..............................................................17
    Section 2.5    Non-Assignment of Assets ...................................................18
    Section 2.6    Withholding Rights ...............................................................19
    Section 2.7    Prorations and Utilities .........................................................19

ARTICLE III PURCHASE PRICE; ALLOCATIONS..............................................................20

    Section 3.1    Purchase Price.......................................................................20
    Section 3.2    Allocation of Purchase Price .................................................20
    Section 3.3    Closing ..................................................................................20
    Section 3.4    Deliveries by the Sellers.......................................................21
    Section 3.5    Deliveries by the Purchaser ..................................................21

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS .............................22

    Section 4.1    Organization ..........................................................................22
    Section 4.2    Authorization ........................................................................22
    Section 4.3    Real Property ........................................................................22
    Section 4.4    Title to the Purchased Assets.................................................23
    Section 4.5    Employees .............................................................................23
    Section 4.6    Environmental Matters..........................................................25
    Section 4.7    Insurance ...............................................................................25
    Section 4.8    Legal Proceedings.................................................................26
    Section 4.9    Intellectual Property and Privacy..........................................26
    Section 4.10    Consents ................................................................................27
    Section 4.11    Validity of Assignable Contracts ..........................................27
    Section 4.12    Financial Advisors ................................................................27
    Section 4.13    Compliance With Laws; Licenses; Financial Assurances.......27
    Section 4.14    Taxes ....................................................................................28
    Section 4.15    Accounts Receivable .............................................................29

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................29

    Section 5.1    Organization .........................................................................29

Section 5.2    Authorization for Agreement; Consents and No Violations ..................29
Section 5.3    Financial Wherewithal; Solvency.................................................................30
Section 5.4    Adequate Assurances Regarding Executory Contracts...........................30
Section 5.5    Litigation ...............................................................................................30
Section 5.6    Financial Advisors ................................................................................30
Section 5.7    Non-reliance ..........................................................................................30

ARTICLE VI CERTAIN COVENANTS AND AGREEMENTS ...........................................31

Section 6.1    Conduct of the Sellers ...........................................................................31
Section 6.2    Inspection and Access to Information.....................................................32
Section 6.3    Notices of Certain Events.......................................................................33
Section 6.4    Reasonable Efforts; Further Assurances; Cooperation ..........................34
Section 6.5    Risk of Loss ...........................................................................................35
Section 6.6    Bankruptcy Actions................................................................................35
Section 6.7    Assumed Contracts ................................................................................35
Section 6.8    Transferred License Matters...................................................................38
Section 6.9    Insurance Cooperation ...........................................................................38
Section 6.10   Publicity .................................................................................................39
Section 6.11   Transaction Documents.........................................................................39
Section 6.12   Delivery of Schedules; Supplements to Schedules................................39
Section 6.13   Survival of Representations and Warranties ..........................................39
Section 6.14   Sale Free and Clear ...............................................................................40
Section 6.15   Post-Closing Obligations.......................................................................40
Section 6.16   Post-Closing Wind-Down Budget and Purchaser Commitments...........40

ARTICLE VII TAX MATTERS .........................................................................................40

Section 7.1    Tax Cooperation ....................................................................................40
Section 7.2    Computation of Tax Liabilities...............................................................40
Section 7.3    Transfer Taxes .......................................................................................41

ARTICLE VIII EMPLOYEE MATTERS ...........................................................................41

Section 8.1    Employees and Offers of Employment....................................................41
Section 8.2    Employee Benefit Plans .........................................................................42
Section 8.3    Section 401(k) Plan Matters ...................................................................42
Section 8.4    Workers' Compensation..........................................................................43
Section 8.5    Third Parties ..........................................................................................43

ARTICLE IX ....................................................................................................................43

Section 9.1    Release of the Sellers ............................................................................43
Section 9.2    Release of the Purchaser and Lenders....................................................44
Section 9.3    California Civil Code ..............................................................................45

ARTICLE X CONDITIONS TO CLOSING .......................................................................46

Section 10.1    Conditions to Obligations of the Purchaser ........................................... 46
Section 10.2    Conditions to Obligations of the Sellers ................................................ 47
Section 10.3    Sale Order ............................................................................................. 48

ARTICLE XI TERMINATION ....................................................................................... 48

Section 11.1    Termination ........................................................................................... 48
Section 11.2    Effect of Termination ............................................................................ 49
Section 11.3    Exclusive Remedies .............................................................................. 49

ARTICLE XII MISCELLANEOUS PROVISIONS ...................................................... 50

Section 12.1    Notices ................................................................................................... 50
Section 12.2    Schedules and Exhibits ......................................................................... 51
Section 12.3    Assignment; Successors in Interest ....................................................... 51
Section 12.4    Captions ................................................................................................. 51
Section 12.5    Controlling Law; Amendment; Venue ................................................... 51
Section 12.6    Waiver of Jury Trial .............................................................................. 51
Section 12.7    Severability ............................................................................................ 52
Section 12.8    Counterparts ........................................................................................... 52
Section 12.9    Enforcement of Certain Rights .............................................................. 52
Section 12.10   Waiver .................................................................................................... 52
Section 12.11   Integration .............................................................................................. 52
Section 12.12   Compliance with Bulk Sales Laws ........................................................ 52
Section 12.13   Cooperation Following the Closing ....................................................... 52
Section 12.14   Expenses ................................................................................................ 53
Section 12.15   "AS IS" TRANSACTION ..................................................................... 53
Section 12.16   No Recourse ........................................................................................... 53

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), executed this 14th day of August, 2025 (the "Effective Date"), is made and entered into by and among the Purchaser (as defined below) and each of the Sellers (as defined below). The Purchaser and the Sellers are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

W I T N E S S E T H:

WHEREAS, the Sellers are engaged in the business of, among other things, the operation of indoor and outdoor event spaces known as The Great Hall, The Kings Hall and The Brooklyn Mirage in East Williamsburg, Brooklyn, New York (the "Business");

WHEREAS, the Parties desire to enter into this Agreement pursuant to which the Sellers propose to sell, transfer, convey and assign to the Purchaser, and the Purchaser proposes to purchase from the Sellers, the Purchased Assets (as defined below), and to assume from the Sellers the Assumed Liabilities (as defined below), in each case upon the terms and subject to the conditions set forth herein;

WHEREAS, on August 4, 2025 (the "Petition Date"), each of the Sellers filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101, et seq.) (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Debtors' (as defined below) chapter 11 cases (collectively, the "Bankruptcy Cases") are being jointly administered for procedural purposes under Case No. 25-11446 (MFW);

WHEREAS, on August 14 2025, the Debtors filed the Debtors' Motion for Entry of (I) an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Debtors to Designate the Stalking Horse Bidder, (C) Scheduling an Auction and a Hearing on the Approval of the Sale of Some, All, or Substantially All of the Debtors' Assets, (D) Authorizing the Debtors to Enter into the Purchase Agreement(s), (E) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (F) Granting Related Relief; and (II) an Order or Orders (A) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of Encumbrances, (B) Approving the Assumption and Assignment of the Potentially Assigned Contracts, and (C) Granting Related Relief (the "Bidding Procedures Motion");

WHEREAS, the Purchaser and the Sellers have entered into this Agreement for the purchase and sale of the Purchased Assets and for the assumption by the Purchaser of the Assumed Liabilities as a "stalking horse" bid, which shall be subject to higher or otherwise better offers solicited by the Debtors in accordance with the procedures to be set forth in the Bidding Procedures Order; and

WHEREAS, the Parties desire to consummate the Transactions (as defined below) in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with

and pursuant to the Sale Order (as defined below) to be entered in the Bankruptcy Cases under sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and both the Purchaser and the Sellers acknowledge that the Transactions and this Agreement are subject to (a) the Transactions contemplated hereby being determined to constitute the highest or otherwise best bid for the Purchased Assets, and (b) the entry of the Sale Order and approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, promises, agreements and conditions set forth herein, and in order to set forth the terms and conditions of such purchase and sale, intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I
## CONSTRUCTION; DEFINITIONS

Section 1.1    Construction. Unless the context of this Agreement otherwise clearly requires: (a) references to the plural include the singular, and references to the singular include the plural; (b) references to any gender include the other genders; (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation"; (d) the term "or" has the inclusive meaning represented by the phrase "and/or"; (e) the terms "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (f) the terms "day" and "days" mean and refer to calendar day(s); (g) the terms "year" and "years" mean and refer to calendar year(s); (h) references in this Agreement to any document, instrument or agreement (including this Agreement): (A) includes and incorporates all exhibits, schedules and other attachments thereto; (B) includes all documents, instruments or agreements issued or executed in replacement thereof; and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time; and (i) all accounting terms not specifically defined herein shall be construed in accordance with GAAP. All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it.

Section 1.2    Definitions. The following terms, as used herein, have the following meanings:

"Affiliate" of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person. For the avoidance of doubt, neither the Lenders, the Purchaser nor any direct or indirect parent company or subsidiary of the Lenders or the Purchaser (nor any of their respective equity holders) shall be deemed Affiliates of any of the Sellers or any other Person Controlling, Controlled by or under direct or indirect common Control with one or more of the Sellers (and vice versa).

"AG Data" means data and information Processed by the Business that is subject to binding contractual restrictions or obligations (e.g., confidentiality or data protection) relating to such Processing in Contracts between any Seller and third parties, and data and information Processed by the Business that are subject to other binding legal or fiduciary obligations or requirements.

"Approved Budget" shall have the meaning set forth in the DIP Order.

"Assumed Contracts" means, subject to Section 6.7, those certain executory Contracts and Leases (including Leases for the Leased Real Property Locations) specified by the Purchaser on Schedule 6.7(a) to be assumed by the Sellers and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code that are unexpired as of the Closing Date (or upon termination of the Contract Designation Period, as applicable) and that have not been rejected (and are not the subject of a notice of rejection or a pending rejection motion), in each case, as any such Assumed Contract may have been amended or otherwise modified prior to the date hereof (or as permitted in accordance with the terms of this Agreement).

"Auction" means, if necessary, the auction to be held for the sale of all or substantially all of the Sellers' assets (the "Assets"), pursuant to the Bidding Procedures Order.

"Back-Up Bid" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bidding Procedures.

"Bidding Procedures" means the procedures for soliciting bids for the sale of the Assets, including the conduct of the Auction, pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court granting the Bidding Procedures Motion.

"Business Day" means any day except Saturday, Sunday or any day on which banks are generally not open for business in New York, New York.

"Claim" means a "claim" as defined in section 101 of the Bankruptcy Code.

"Closing Date" means the date on which the Closing occurs.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Commercially Reasonable Efforts" means the diligent, good faith efforts that a reasonably prudent Person desirous of achieving a result in an economically reasonable manner would use in similar circumstances to achieve the desired result. The obligation of a Person under this Agreement to use Commercially Reasonable Efforts to achieve a result that benefits another party to this Agreement requires such Person to use the same resources that such Person would have reasonably used in achieving a similar result that would have benefited such Person.

"Confidential Information" means any data or information of the Sellers (including trade secrets, techniques, know-how, processes, equipment, algorithms, software, design details and specifications, financial information, customer lists, business forecasts and sales and marketing plans, as well as all notes, analysis, reports, compilations, studies, interpretations, summaries or

other documents) that are valuable to the operation of the Business and not generally known to the public or competitors.

"<u>Contract</u>" means any binding and enforceable contract, agreement, commitment, understanding, arrangement, promise, undertaking, indenture, note, bond, license, instrument, purchase order or other legally binding agreement (exclusive of Leases).

"<u>Control</u>" means, when used with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"<u>Cure Amounts</u>" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to the Purchaser as provided herein, as such amounts are agreed upon by the Purchaser or determined by the Bankruptcy Court.

"<u>Debtor</u>" or "<u>Debtors</u>" means, individually or collectively, a Seller or the Sellers, as debtor(s) in possession.

"<u>Delayed Transfer Date</u>" means the day immediately following the last day of the Transition Services Period.

"<u>DIP Order</u>" means, collectively: (a) the Interim DIP Order; (b) the Final DIP Order; and (c) any other supplemental, interim or final order entered by the Bankruptcy Court in respect of the post-petition financing that is the subject of the Interim DIP Order and/or the Final DIP Order.

"<u>DIP Term Loan Obligations</u>" means all obligations due to the DIP Secured Parties (as defined in the DIP Order, as applicable) under the DIP Term Loan Facility (as defined in the DIP Order, as applicable).

"<u>Documents</u>" means all books, records (including employee records), files, invoices, Inventory records, product specifications, cost and pricing information, business plans and quality control records and manuals, in each case exclusively relating to any Purchased Asset, including all such data and other information stored in any format or media (including on hard drives, hard copy or other media), and including all Tax Returns and any related work papers and any other Tax information or records relating to the Business or the Purchased Assets (other than the income Tax Returns of the Sellers and their Affiliates); <u>provided</u>, that the Sellers may retain a copy of all such Tax Returns, work papers and other Tax information or records.

"<u>Employee</u>" means any current employee of the Sellers.

"<u>Employee Benefit Plan</u>" means each plan, fund, program, agreement, arrangement or scheme (a) that is sponsored or maintained, or required to be sponsored or maintained, by any of the Sellers, (b) to which any of the Sellers makes, or could reasonably be expected to have an obligation to make, contributions or (c) under or with respect to which any of the Sellers have, or could reasonably be expected to have, any liability (including contingent liability), including on account of any ERISA Affiliate, in each case, whether written or oral, and that provides for

benefits, compensation or other remuneration to current or former Employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of any of the Sellers (or the beneficiaries and dependents of any of them), including any "employee benefit plan" within the meaning of Section 3(3) of ERISA (determined without regard to whether such plan is subject to ERISA) and each deferred compensation, bonus, incentive compensation, equity-based compensation, employment, change in control, retention, fringe benefit, tuition reimbursement, equity-based compensation, severance, health, vacation, paid time off, supplemental unemployment benefit, hospitalization insurance, medical or dental plan, fund, program, agreement, arrangement or scheme.

"Employment Agreement" means an agreement of any Seller with or addressed to an Employee, the primary purpose of which is to govern the terms of such Employee's employment with the Sellers, and to which any of the Sellers has any actual or contingent liability or obligation to provide compensation and/or benefits in consideration for past, present or future services, but excluding offer letters for "at will" employment with no severance, change in control or other similar entitlements that are terminable upon notice and without any liability to any of the Sellers.

"Environmental Law" means any and all Laws relating to: (a) pollution or the cleanup thereof; (b) the protection of the environment and natural resources; (c) worker health and safety (to the extent relating to human exposure to Hazardous Materials); (d) the Release or threatened Release of any Hazardous Material, including investigation, cleanup, remediation, or other action to address such a Release; or (e) the regulation of any substance defined, listed, classified or regulated as hazardous, toxic, a pollutant or a contaminant under such Law.

"Environmental Permit" means any License or any other authorization, approval, registration or entitlement required by or issued pursuant to any Environmental Law.

"Event Cancellation Obligations" means all amounts set forth on Schedule 1(a) that are payable by Sellers to (a) artists and performers and (b) ticketholders, in each case, arising out of the cancellation of events at The Brooklyn Mirage on or prior to the Effective Date and, in each case of clauses (a) and (b), solely to the extent such amounts have been approved in writing by Purchaser and the Lenders and are included in the Approved Budget.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any Person engaged in a trade or business that would, at any relevant time, be treated together with any Seller as a "single employer" under Section 414 of the Code or Section 4001(b) of ERISA.

"Final DIP Order" means, collectively, the Bankruptcy Court's *Final Order Pursuant to Sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*.

"Fraud" means actual, knowing and intentional common law fraud under the Laws of the State of Delaware in the making of a specific representation or warranty expressly set forth in Article IV or Article V of this Agreement (as opposed to any fraud claim based on constructive knowledge, negligent or reckless misrepresentation or a similar theory). A claim for Fraud may only be made against the Party committing such Fraud or against an Affiliated Person of such Party that had actual conscious awareness that such Fraud was committed.

"GAAP" means generally accepted accounting principles as applied in the United States.

"Governmental Entity" means any federal, state or local or foreign government, any political subdivision thereof or any court, arbitrator, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency, domestic or foreign, or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law).

"Hazardous Material" means any substance, pollutant, contaminant, material or waste that is classified in any applicable Environmental Law as "hazardous," "toxic," "dangerous," a "pollutant," a "contaminant" or words of similar meaning, including asbestos, asbestos-containing materials, lead-based paints, polychlorinated biphenyls, per- and polyfluoroalkyl substances, petroleum or petroleum products, radioactive materials and radon gas.

"Intellectual Property" means any or all of the following and all rights arising out of or associated therewith: (a) all United States, international and foreign patents and applications therefor and all reissues, divisionals, renewals, extensions, reexaminations, provisionals, continuations and continuations-in-part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, processes, methods, techniques, formulae, algorithms, technical data and customer lists, and all documentation relating to any of the foregoing throughout the world; (c) all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto throughout the world; (d) all industrial designs or community design registrations and any registrations and applications therefor throughout the world; (e) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (f) all databases and data collections and all rights therein throughout the world; (g) all moral and economic rights of authors and inventors, however denominated, throughout the world; (h) all rights in software, data, databases and associated documentation throughout the world; (i) goodwill and the right to sue and obtain damages and other relief for past, present and future claims of infringement, dilution, violation and misappropriation of any and all of the foregoing; and (j) any similar or equivalent rights to any of the foregoing anywhere in the world.

"Interim DIP Order" means, collectively, the Bankruptcy Court's *Interim Order Pursuant to Sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* Docket No. 46.

6

"Inventory" means all inventory, packaging, raw materials or other finished or unfinished goods owned by the Sellers and held for processing or sale by or on behalf of the Business.

"IP Assignments" means the one or more Intellectual Property assignment agreements each to be executed by the Sellers, as applicable, at the Closing, in form and substance reasonably acceptable to the Parties, pursuant to which the Sellers assign to the Purchaser all Owned Intellectual Property and Assumed Contracts governing any material Licensed Intellectual Property included in the Purchased Assets.

"Knowledge" with respect to the Sellers means all facts actually known after reasonable inquiry by any of the following individuals of such individual's direct reports: Gary Richards, Faisel Lateef and Alic Ifshin.

"Laws" means all statutes, rules, codes, regulations, restrictions, ordinances, Orders, decrees, approvals, directives, judgments, injunctions, writs, awards and decrees of, or issued by, all Governmental Entities.

"Lease" means each lease, sublease, license, occupancy agreement or other agreement (including all amendments, supplements, modifications, extensions, restatements, renewals and other related agreements with respect thereto and guaranties thereof) under which any Seller is a lessee, sublessee, licensee, user or occupant with respect to the Leased Real Property Locations.

"Leased Real Property Locations" means, specifically excluding any Excluded Asset, the parcels of real property used in connection with the Business of which a Seller is the lessee, sublessee, licensee, user or occupant (together with all fixtures and improvements thereon and rights with respect thereto).

"Lenders" means, collectively, the Prepetition Term Loan Secured Parties and the DIP Term Loan Secured Parties (each as defined in the DIP Order, as applicable).

"Licensed Intellectual Property" means any and all Intellectual Property licensed or sublicensed by any third party to the Sellers and primarily used or held for use in the Business.

"Licenses" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates (including industry certifications), approvals, exemptions, classifications, registrations, consents and other similar documents and authorizations issued by any Governmental Entity or trade organization, and applications therefor, used or held for use by the Sellers or required by applicable Law to be used or held for use by the Sellers in connection with the operation of the Business or the Purchased Assets.

"Liens" means any and all "interests" as that term is used in section 363(f) of the Bankruptcy Code, liens (statutory or otherwise), Claims, covenants, encumbrances, security interests, rights of setoff, mortgages, security instruments, pledges, deeds of trust, restrictions on the use or transfer of any property, options, charges, rights of first offer or first refusal, leases, subleases, licenses, and other similar encumbrances.

"Liquor Management Agreement" means either or both a reasonable and customary liquor management agreement and concession agreement whereby Purchaser shall assist in the operation

of liquor concessions on behalf of the applicable Seller pending the issuance of a liquor license or a temporary permit to operate on behalf of the existing licensee. Any Liquor Management Agreement shall (i) be cost-neutral, (ii) provide that Purchaser will indemnify, defend, and hold the Sellers harmless from and against any and all claims, liabilities, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) arising from such operation or a breach of such Liquor Management Agreement, and (iii) require the Purchaser to obtain reasonable insurance coverage for the benefit of Sellers against any liability arising from or relating to the operation of such liquor concessions.

"Material Adverse Effect" means any state of facts, change, event, condition (financial or otherwise), effect or occurrence (when taken together with all other states of fact, changes, events, effects or occurrences) that has had or would reasonably be expected to have a material and adverse effect on the Purchased Assets, the Assumed Liabilities or the financial condition, results of operations or value of the Business, in each case, taken as a whole; provided, however, the term "Material Adverse Effect" shall not include any change, effect, event, occurrence, circumstance, state of facts or development that, directly or indirectly, alone or taken together, arises out of or is attributable to: (a) any change generally affecting the international, national or regional markets applicable to the Business; (b) any changes in, or effects arising from or relating to, national or international political or social conditions, including the engagement by the United States or any other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, or any epidemic, pandemic or disease outbreak (including the COVID-19 virus), and in each case, governmental actions related thereto; (c) changes in, or effects arising from or relating to, financial, banking or securities markets (including (i) any disruption of any of the foregoing markets, (ii) any change in currency exchange rates, (iii) any decline or rise in the price of any security, commodity, contract or index and (iv) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (d) changes in Law, GAAP or official interpretations of the foregoing; (e) acts of God, including hurricanes, storms or other naturally occurring events; (f) the effect of any action required to be taken by this Agreement; (g) the pendency of the Chapter 11 Cases; (h) any changes arising from, or effects of, any objections in the Bankruptcy Court to (i) this Agreement and the other Purchaser Ancillary Documents and Seller Ancillary Documents and the transactions contemplated hereby and thereby, (ii) the Sale Order or any related motion filed with the Bankruptcy Court, or (iii) the assumption or rejection of any Contract or Lease pursuant to Section 365 of the Bankruptcy Code; (i) except as set forth herein, the execution and delivery of this Agreement; and (j) any action taken by the Sellers at the express written request of the Purchaser; which, in the case of any of the foregoing clauses (a) through (e) does not disproportionately affect the Business relative to other companies that participate in the markets and industries similar or applicable to the Business.

"Obligations" means, collectively, the Prepetition Term Loan Secured Obligations and the DIP Term Loan Obligations.

"Order" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any Governmental Entity.

"Outstanding Event Obligations" means (a) all amounts set forth on Schedule 1(b) that are payable by Sellers to (i) artists and performers and (ii) ticketholders, in each case, arising out of the cancellation of scheduled events at The Brooklyn Mirage after the Effective Date and (b) obligations to honor any tickets sold to ticketholders to attend scheduled events at The Brooklyn Mirage that are relocated to another venue, including, The Great Hall or The Kings Hall, in each case of clauses (a) and (b), solely to the extent such amounts have been approved in writing by Purchaser and the Lenders and are included in the Approved Budget.

"Owned Intellectual Property" means any and all Intellectual Property that is owned or purported to be owned by the Sellers and primarily used or held for use in the Business. Owned Intellectual Property includes Registered Intellectual Property.

"Permitted Liens" means (a) Liens granted by the Purchaser in connection with any financing of the Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement, (b) non-monetary Liens that do not materially detract from the value of any underlying tangible Purchased Asset or materially interfere with the ability of the Purchaser to own and operate any underlying tangible Purchased Asset in connection with the Business in substantially the manner as historically conducted (without regard to events transpiring and affecting the operation of the Business since January 1, 2025), (c) easements, rights of way, zoning ordinances, building codes, land use Laws and other similar Liens that do not materially detract from the value of any underlying tangible Purchased Asset or materially interfere with the ability of the Purchaser to own and operate any underlying tangible Purchased Asset in connection with the Business in substantially the manner as historically conducted (without regard to events transpiring and affecting the operation of the Business since January 1, 2025), (d) Liens securing obligations of the Purchaser and granted or otherwise created by the language of any Assumed Contract, including Assumed Contracts related to Leased Real Property Locations, (e) Liens for Taxes, assessments or other governmental charges which are not delinquent or remain payable without penalty or which are being contested in good faith with adequate reserves maintained in accordance with GAAP, (f) mechanics, materialmen's, carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business that do not detract from the value of any underlying tangible Purchased Asset or interfere with the ability of the Purchaser to own and operate any underlying tangible Purchased Asset in connection with the Business in substantially the manner as historically conducted (without regard to events transpiring and affecting the operation of the Business since January 1, 2025), but solely to the extent the Bankruptcy Court determines that such Liens are valid and enforceable and constitute Assumed Liabilities, (g) Liens or other title matters on the underlying fee interest of any Leased Real Property Locations, (h) any statutory Lien of a lessor under any Lease for unpaid rent, and (i) restrictions and limitations on the rights of the Sellers or any of their Affiliates under any Contract or Lease that are expressly set forth in such Contract or Lease.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization, Governmental Entity or other legal entity.

"Personal Information" means any personal information, personal data, personally identifiable information, personal financial information, protected health information, and any other information that identifies or reasonably identifies or is associated with an individual natural

9

person that is Processed by the Sellers in connection with the Business and subject to regulation under Privacy Laws applicable to the Business.

"<u>Post-Closing Wind-Down Budget</u>" means a budget in form and substance acceptable to the Purchaser in its reasonable discretion that provides for the funding of all fees, costs and expenses arising out of or relating to the Bankruptcy Cases and all other transactions contemplated by this Agreement that are expected to be incurred by the Sellers to wind-down their respective corporate existence and operations following the Closing Date, including (but not limited to) professional advisor and legal fees, noticing fees and any other fees, costs and expenses incurred for the Bankruptcy Cases to be compliant with the Bankruptcy Code.

"<u>Pre-Closing Tax Period</u>" means (a) any Tax period ending before the Closing Date and (b) with respect to a Tax period that commences before but ends on or after the Closing Date, the portion of such period ending on the Closing Date as determined in accordance with <u>Section 7.2</u>.

"<u>Pre-Paid Expenses</u>" means any of the Sellers' rights with respect to all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates, refunds, credits, rebates and prepayment(s) or deposits of property Taxes that are in respect of the Purchased Assets or the Business, and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), to the extent related solely to the Business, <u>provided</u>, <u>however</u>, that professional fee retainers and pre-paid deposits related thereto and any Tax assets described in <u>Section 2.2(j)</u> shall not be included in the definition of "Pre-Paid Expenses."

"<u>Prepetition Term Loan Secured Obligations</u>" means all obligations due to the Prepetition Term Loan Secured Parties (as defined in the DIP Order, as applicable) under the Prepetition Term Loan Facility (as defined in the DIP Order, as applicable).

"<u>Privacy Law</u>" means all Laws applicable to the Sellers related to data or information privacy, data protection and/or data security, and the Payment Card Industry Data Security Standard ("<u>PCI-DSS</u>").

"<u>Privacy Policy</u>" means the current public and internal privacy policies of the Sellers applicable to Personal Information Processed in connection with the Business.

"<u>Process</u>" or "<u>Processing</u>" or "<u>Processed</u>" means any operation or set of operations which is performed upon information, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure, deletion or destruction.

"<u>Purchaser</u>" means AG Acquisition 1 LLC.

"<u>Purchaser Ancillary Documents</u>" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by the Purchaser in connection with the Transactions.

"Registered Intellectual Property" means all United States, international and foreign: (a) patents and patent applications (including reissues, divisionals, renewals, extensions, reexaminations, provisionals, continuations and continuations-in-part thereof); (b) registered trademarks and service marks, applications to register trademarks and service marks, including intent-to-use applications, or other registrations or applications related to trademarks and service marks; (c) registered copyrights and applications for copyright registration; (d) domain name registrations; and (e) any other Intellectual Property that is the subject of an application, certificate filing, registration or other document issued, filed with, or recorded with any federal, state, local or foreign Governmental Entity or other public or supranational body or registry.

"Release" means any emission, spill, seepage, leak, escape, leaching, discharge, injection, pumping, pouring, emptying, dumping, disposal or release of Hazardous Materials from any source on or into the indoor or outdoor environment or into or out of any property.

"Representative" means, with respect to any Person, the Affiliates of such Person and any director, manager, trustee, member, member shareholder, partner, officer or employee of such Person and any agent, consultant, legal, accounting, financial or other advisor, investment banker, financing source, auditor or other representative authorized by such Person to represent or act on behalf of such Person.

"Retained Obligations" means that portion of the Prepetition Term Loan Secured Obligations in excess of the amount of the Credit Bid.

"Sale Hearing" means the hearing to be held before the Bankruptcy Court to consider approval of the sale of Assets pursuant to the terms of the Bidding Procedures Order.

"Sale Order" means the Order entered by the Bankruptcy Court authorizing and approving (among other things) the execution, delivery and performance of this Agreement by the Sellers and the consummation of the Transactions, which Order shall be in form and substance acceptable to the Purchaser.

"Sellers' Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by the Sellers or an Affiliate thereof in connection with the Transactions.

"Seller" or "Sellers" means, individually or collectively: (a) Avant Gardner, LLC; (b) AGDP Holding Inc.; (c) EZ Festivals LLC; (d) Made Event LLC; and (e) Reynard Productions, LLC.

"Schedule Delivery Date" means the date that is three (3) Business Days prior to the date of the Bankruptcy Court's scheduled hearing to consider the Bidding Procedures Motion and entry of the Bidding Procedures Order.

"Straddle Period" means any taxable year or period beginning before the Closing Date and ending on or after the Closing Date.

"Tax Authority" means any Governmental Entity having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"Taxes" means all federal, state, local, foreign or other taxes, assessments, charges, duties, fees, levies and other governmental charges, including gross income, net income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, social contribution, unemployment compensation, stamp, disability, transfer, sales, use, *ad valorem*, environmental, excise, gross receipts, value-added, import, export, alternative minimum, "trust fund" and all other taxes of any kind imposed by any Governmental Entity, and any charges, interest or penalties imposed by any Governmental Entity.

"Tax Return" means any report, return, declaration, claims for refunds, elections, forms or other documents (including any amendments, related or supporting schedules, statements or other information) required to be supplied to a Governmental Entity in connection with Taxes, including estimated returns.

"Termination Date" means the date on which this Agreement is terminated by the Purchaser and/or the Sellers in accordance with Section 11.1 hereof.

"Third Party" or "Third Parties" means any Person that is not the Purchaser or the Sellers.

"Transactions" means the transactions contemplated by this Agreement and any ancillary document contemplated by this Agreement.

"Transition Services Agreement" means the Transition Services Agreement by and between the Purchaser and the Sellers, which, if deemed necessary by the Purchaser in its sole discretion prior to the Closing Date, shall be acceptable in form and substance to each of the Purchaser and the Sellers in their respective sole discretion and pursuant to which the Sellers will perform certain management services and back-office functions as determined by the Purchaser, at the sole cost and expense of the Purchaser, subject to any applicable third-party prohibitions on the provision of such management services and back-office functions by the Sellers and further subject to the availability to the Sellers of sufficient assets and personnel to reasonably provide such management services and back-office functions following the Closing.

"Transition Services Period" means the period specified in the Transition Services Agreement during which the Sellers shall provide services to the Purchaser.

"Treasury Regulations" means regulations promulgated under the Code, including temporary and proposed regulations.

"Wind-Down Funding Amount" means the amount proposed by the Sellers and agreed to by the Purchaser set forth on Schedule 1(c) to fund expenditures under the Post-Closing Wind-Down Budget.

Section 1.3    Other Definitions. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| 401(k) Sponsorship Obligations | 8.3 |
| Agreement | Preamble |
| Allocation Principles | 3.2 |

12

Alternate Transaction ........................................................................... 10.1(h)

Assets ................................................................................................... 1.2

Assignable Contracts ........................................................................... 6.7(a)

Assumed Liabilities.............................................................................. 2.3

Avoidance Actions ............................................................................... 2.1(o)

Bankruptcy Rules ................................................................................ 6.6

Bill of Sale, Assignment and Assumption Agreement......................... 3.4(a)

Business............................................................................................... Recitals

Closing ................................................................................................ 3.3

Collective Bargaining Agreements ...................................................... 4.5(a)

Contract Designation Period................................................................ 6.7(f)

Credit Bid ............................................................................................ 3.1

Designation Right Contract ................................................................. 6.7(f)

Effective Date ...................................................................................... Preamble

Excluded Assets ................................................................................... 2.2

Excluded Benefits ................................................................................ 8.1(a)

Excluded Contract................................................................................ 6.7(d)

Excluded Documents ........................................................................... 2.2(h)

Excluded Liabilities ............................................................................. 2.4

Expiration Date .................................................................................... 11.1(b)

Final Tax Allocation Schedule ............................................................ 3.2

Final Tax Allocation Statement ........................................................... 3.2

Financial Assurances............................................................................ 4.13(b)

Insurance Policies ................................................................................ 4.7

Interim Period ...................................................................................... 6.8(b)

IT Systems............................................................................................ 4.9(b)

Leave Employees ................................................................................. 8.1(a)

Liquidating Plan .................................................................................. 6.16

Material Contracts................................................................................ 6.7(a)

Necessary Consent ............................................................................... 2.5

Parties .................................................................................................. Preamble

Party .................................................................................................... Preamble

PCI-DSS ............................................................................................... 1.2

Petition Date ........................................................................................ Recitals

Purchase Price...................................................................................... 3.1

Purchased Assets .................................................................................. 2.1

Purchaser Group Members ................................................................... 11.17

Purchaser/Lender Released Claims....................................................... 9.2

Purchaser/Lender Releasees ................................................................. 9.2

Purchaser Releasors ............................................................................. 9.1

Related Proceedings ............................................................................. 12.5

Schedules Delivery Date ...................................................................... 6.12

Security Breach.................................................................................... 4.9(c)

Seller Group Members ......................................................................... 11.17

Seller Released Claims ......................................................................... 9.1

Seller Releasees ................................................................................... 9.1

Seller Releasors ................................................................................ 9.2
Tax Matters Accounting Firm ........................................................... 3.2
Transfer Taxes ................................................................................. 7.3
Transferred Employees .................................................................... 8.1(a)
Transferred Licenses ....................................................................... 2.1(h)

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Sellers, in consideration for the payment of the Purchase Price in accordance with Section 3.1 and the assumption of the Assumed Liabilities in accordance with Section 2.3, agree to grant, sell, assign, transfer and deliver to the Purchaser, and the Purchaser agrees to purchase, accept and acquire from the Sellers, all of the Sellers' rights, title and interest, in and to all of the assets, properties and rights of the Sellers existing as of the Closing, free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities), but excluding the Excluded Assets (collectively, the "Purchased Assets"), including:

(a)    any cash, cash equivalents on hand or marketable securities of the Sellers in excess of Excluded Cash;

(b)    all Inventory, wherever located, including any Inventory that is located at any Leased Real Property Location or is stored on behalf of or is in transit to the Sellers;

(c)    all fixed assets, equipment, furnishings, computer hardware, vehicles, fixtures and all other tangible personal property, in each case whether owned or leased, whether situated on the Leased Real Property Locations or elsewhere, and all of the Sellers' rights under warranties, indemnities, licenses or similar rights against Third Parties with respect to any item referenced in this clause (c);

(d)    subject to Section 6.7, all rights, title and interest of the Sellers in, to and under the Contracts and Leases designated as Assumed Contracts pursuant to Section 6.7;

(e)    all Owned Intellectual Property and AG Data, including all tangible embodiments thereof, and all related files and documentation thereof;

(f)    all accounts receivable (whether billed or unbilled), notes and other documents which evidence any indebtedness to the Sellers;

(g)    (i) to the extent transferable, all rights in and under all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights in favor of the Sellers and (ii) any claims against suppliers, insurers, or other Third Parties, in each case, solely to the extent related to the Purchased Assets or the Assumed Liabilities;

(h)    all Licenses, to the extent that they are transferable under applicable Law (the "Transferred Licenses");

14

(i)      all customer information and mailing lists related to the Business, in whatever media retained or stored;

(j)      to the extent transferrable, the Insurance Policies maintained by any Seller for the benefit of the Purchased Assets and the Business, in each case, solely to the extent related to the Purchased Assets, the Business or the Assumed Liabilities and as set forth on Schedule 2.1(j), and to the extent any Insurance Policies are not transferrable, all insurance proceeds, credits, premium refunds, reserves, benefits or claims of any Seller thereunder;

(k)      all goodwill directly associated with the Purchased Assets;

(l)      all Pre-Paid Expenses;

(m)      all Documents other than the Excluded Documents;

(n)      all commercial tort claims of the Sellers, in each case, relating solely to the Purchased Assets or the Assumed Liabilities, which shall include, without limitation, commercial tort claims related to construction work performed on any of the Leased Real Property Locations;

(o)      all actions, Claims, lawsuits, causes of action and demands available to any Seller in the Business under chapter 5 of the Bankruptcy Code, including sections 542 through 553 of the Bankruptcy Code ("Avoidance Actions"), and all recoveries therefrom, in each case, relating solely to the Purchased Assets, the Business or the Assumed Liabilities; provided, that, for the avoidance of doubt, no Avoidance Actions relating solely to the Excluded Assets or Excluded Liabilities will be included as Purchased Assets;

(p)      all actions, Claims, lawsuits, causes of action and demands available to any Seller in the Business in connection with the action entitled *AGDP Holding Inc. v. TVT Capital Source LLC, Insta Funding LLC and Pinnacle Business Funding LLC,* Adv. Pro. No. 25-51803(MFW), and all recoveries therefrom and proceeds thereof;

(q)      all motor vehicles;

(r)      any amounts designated as a Purchased Asset pursuant to Section 2.2(i);

(s)      any Tax assets, including Tax refunds, credits or payments, of the Sellers relating to the Business or the Purchased Assets for any period; and

(t)      all other assets set forth on Schedule 2.1(t).

Section 2.2      Excluded Assets. Notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include the following or the proceeds thereof (collectively, the "Excluded Assets"), and nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey any Excluded Assets to the Purchaser, and the Sellers will retain all right, title and interest to, in and under the Excluded Assets:

(a)      any cash, cash equivalents on hand or marketable securities of the Sellers necessary to fund the Post-Closing Wind-Down Budget pursuant to Section 3.1(c) (the "Excluded Cash");

(b)       (i) any Excluded Contract; and (ii) any Assumed Contract for which applicable Law requires the consent of a Third Party to be assumed and assigned hereunder as to which, by the Closing Date or upon termination of the Contract Designation Period, as applicable, such consent has not been obtained;

(c)       all Insurance Policies maintained by any Seller (including (i) existing and any tail directors or officers liability insurance policies and (ii) any other Insurance Policy maintained by any Seller that provide or may provide coverage in respect of any Excluded Asset or Excluded Liability (in each case, including any tail policies or coverage thereon, together with all rights, claims, demands, proceedings, credits, cause of action or rights of set off thereunder)), other than those assigned to the Purchaser pursuant to Section 2.1(j);

(d)       any equity interest of a Seller;

(e)       the Purchase Price payable to the Sellers pursuant to Section 3.1;

(f)       the rights that accrue to the Sellers under this Agreement or in connection with the Transactions;

(g)       all actions, Claims, lawsuits, causes of action and demands available to any Seller and all recoveries therefrom, to the extent relating solely to any Excluded Liability;

(h)       the Sellers' documents, written files, papers, books, reports and records (i) prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Cases or corporate governance of any Seller, or (ii) that any Seller is required by Law to retain (collectively, the "Excluded Documents"); provided, that the Purchaser shall have the right to make copies of any portions of such Excluded Documents (A) relating to any Purchased Assets, the Business or Assumed Liabilities; or (B) that any Seller is required by Law to retain;

(i)       all retainers or similar prepaid amounts to the accountants, attorneys, consultants, advisors, investment bankers or other professional service providers of the Sellers; provided, that to the extent all or any portion of such retainers or similar prepaid amounts is returned to any Seller, the amount so returned shall be designated as a Purchased Asset;

(j)       subject to Section 8.3, the sponsorship of, and all assets, properties and rights (including all trusts, insurance policies and administrative services contracts related thereto) related to any Employee Benefit Plan and any other benefit or compensation plan, program, policy, agreement or arrangement at any time maintained, sponsored, participated in or contributed to (or required to be contributed to) by the Sellers or any of their Affiliates or under or with respect to which the Sellers or any of their Affiliates has (or has had) any liability or obligation, including on account of an ERISA Affiliate;

(k)       all Tax returns relating to the income taxes of the Sellers;

(l)       all assets listed on Schedule 2.2(l), notwithstanding anything to the contrary set forth herein.

16

Section 2.3    Assumption of Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, effective as of the close of business on the Closing Date, the Purchaser agrees to assume, pay, perform and discharge, promptly when payment or performance is due or required, only the following liabilities of the Sellers (together with such other liabilities as are expressly assumed by the Purchaser in accordance with the terms of this Agreement, including Section 3.1, collectively, the "Assumed Liabilities"):

(a)    Cure Amounts and those liabilities or obligations of the Sellers first arising and accruing under the Assumed Contracts from and after the Petition Date, and solely to the extent relating to the period from and after the Petition Date;

(b)    government charges or fees related to the Purchased Assets first arising and accruing on and after the Closing Date (other than Taxes attributable to a Pre-Closing Tax Period);

(c)    accounts payable incurred by the Sellers in the ordinary course of business from and after the commencement of the Bankruptcy Cases in accordance with the Approved Budget;

(d)    all liabilities and obligations relating to the Purchased Assets and the Business arising from and after the Closing Date;

(e)    accrued and unpaid liabilities pursuant to 28 U.S.C. §1930(a) as of the Closing Date;

(f)    all liabilities required to be paid to any holder of a Permitted Lien;

(g)    all accrued but unpaid liabilities and obligations of the Sellers in respect of any Transferred Employee (or the beneficiaries and dependents of any of them, to the extent applicable), including, without limitation, accrued vacation and/or other paid time off, compensation of any kind, including wages, payments, entitlements, holiday pay, vacation pay, sick pay, bonuses, commissions, severance pay (to the extent applicable), retiree or other post-employment medical or life obligations, pension contributions, indemnification obligations, insurance premiums and/or Taxes, arising prior to the Closing and set forth in the Approved Budget;

(h)    Event Cancellation Obligations;

(i)    Outstanding Event Obligations;

(j)    subject to Section 8.3, the 401(k) Sponsorship Obligations; and

(k)    to the extent not otherwise included in clauses (a) through (j), all accrued and unpaid liabilities constituting allowed administrative expense claims of the Sellers as of the Closing Date and set forth in the Approved Budget (for the avoidance of doubt, such Approved Budget may include liabilities (including payroll and vendor obligations) accrued as of the Closing Date but not due and payable until after the Closing Date).

Section 2.4    Excluded Liabilities. Notwithstanding any other provision of this Agreement to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not

assuming and will be deemed not to have assumed any other liability or obligation of (or Claim against) the Sellers or, subject to <u>Section 8.3</u> with respect to the 401(k) Sponsorship Obligations, any Employee Benefit Plan (including any liability or obligation in respect of the sponsorship of any Employee Benefit Plan and/or any other compensation or benefit plan, program, policy, agreement or arrangement of any kind at any time maintained, sponsored, participated in or contributed to (or required to be contributed to) by any of the Sellers or any of their Affiliates, or under or with respect to which any of the Sellers or any of its respective Affiliates has (or has had or could reasonably be expected to have) any liability or obligation, including on account of any ERISA Affiliates, as well as any claims and liabilities thereunder or in any way related thereto) of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise (all such Claims, liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>"). Without limiting the generality of the foregoing, Excluded Liabilities shall include: (a) any other liability or obligation of (or Claim against) any of the Sellers in respect of any Employee who is not a Transferred Employee, including any former employee, director, manager, officer, consultant, independent contractor, contingent worker or leased employee of any of the Sellers or any of their Affiliates (or the beneficiaries and/or dependents of any of them), arising or incurred by any of the Sellers or any of their Affiliates under, or in connection with, or non-compliance with, any applicable Law relating to labor (including the Worker Adjustment and Retraining Notification Act and any similar Law), employment, employment practices, terms and conditions of employment, wages and hours, or occupational safety and health; (b) all liabilities owed by any of the Sellers to NYC Festivals, LLC, NYC Club Event, LLC, SFXE IP LLC, LiveStyle Holdings, Inc., TVT Capital Source LLC, Pinnacle Business Funding LLC, Insta Funding LLC, or any of their respective Affiliates or assignees; (c) all liabilities attributable to: (i) Taxes of any Seller; (ii) Taxes with respect to the Purchased Assets, the Assumed Liabilities or the Business for any Pre-Closing Tax Period; and (iii) payments under any Tax allocation, sharing or similar agreement (whether oral or written) of any Seller or any of its predecessors in interest; and (d) all liabilities and obligations related to the Retained Obligations under the Prepetition Term Loan Facility.

Section 2.5    <u>Non-Assignment of Assets</u>.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, as applicable, any Third Party thereto (each such action, a "<u>Necessary Consent</u>" or collectively, the "<u>Necessary Consents</u>"), would constitute a breach, default or violation thereof or of any Law or Order or in any way adversely affect the rights of the Purchaser thereunder and (ii) the Bankruptcy Court has not entered an Order approving such assignment or transfer. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and the Parties will use their respective Commercially Reasonable Efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to the Purchaser as the Purchaser may reasonably request; <u>provided</u>, <u>however</u>, that the Sellers will not be obligated to pay any consideration therefor to any Third Party from whom consent or approval is requested or to initiate any litigation (or other action or proceeding) to obtain any such consent or approval and the Sellers' obligations to seek any

Necessary Consents shall not extend beyond the expiration of the Contract Designation Period. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of the Purchaser to such Purchased Asset following the Closing, the Parties will cooperate in a mutually agreeable arrangement, to the extent feasible, under which the Purchaser will obtain the benefits and assume the obligations thereunder in accordance with this Agreement and the Sale Order, and the Sellers will enforce, to the extent feasible and at the request of, for the account of and at the sole expense of the Purchaser and its Affiliates, any rights of the Sellers arising from any such Purchased Asset against any Third Party.

(b)     Subject to Sections 2.5 and 6.7, if, after the Closing, (i) the Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) the Sellers hold any Purchased Assets or Assumed Liabilities, the Purchaser or the Sellers, as applicable, will promptly transfer (or cause to be transferred) such Purchased Assets or Excluded Assets, or assume (or cause to be assumed) such Assumed Liabilities or Excluded Liabilities, to or from (as the case may be) the other Party. Prior to any such transfer, the Party receiving or possessing any such Assumed Asset or Excluded Asset will hold it in trust for such other Party.

(c)     At any time prior to the termination of the Contract Designation Period, the Purchaser will be entitled, in its sole discretion, to change the designation of any Assignable Contract on Schedule 6.7(a) from an Assumed Contract to an Excluded Contract by providing written notice thereof to the Sellers in accordance with Section 6.7, and any Assignable Contract so removed will be deemed to be an "Excluded Asset" for all purposes hereunder.

Section 2.6     Withholding Rights. Notwithstanding anything to the contrary in this Agreement, the Purchaser shall be entitled to deduct and withhold from the consideration otherwise deliverable under this Agreement, and from any other payments otherwise required pursuant to this Agreement, such amounts as the Purchaser is required to deduct and withhold with respect to any such deliveries and payments under applicable Law; provided that prior to withholding any amount (excluding any compensatory amount payable to a former or current employee), the Purchaser shall give notice of its intent to so withhold to the applicable Seller and provide such Seller the opportunity to provide the appropriate documentation and forms, and otherwise use commercially reasonable efforts to cooperate, to minimize or eliminate such withholding. To the extent that amounts are so withheld and timely remitted to the applicable Tax Authority, they shall be treated for all purposes of this Agreement as having been delivered and paid to such person in respect of which such deduction and withholding was made.

Section 2.7     Prorations and Utilities. To the extent not otherwise prorated or otherwise addressed pursuant to this Agreement (including, for the avoidance of doubt, as required in connection with any Cure Amounts), the Purchaser, on the one hand, and the Sellers, on the other hand, shall prorate (as of the Closing Date), if applicable, current real estate and personal property lease payments (both from and to the Sellers), charges against the real estate, power and utility charges and all other income and expenses which are normally prorated upon the sale of a going concern. As to power and utility charges, such amounts shall be prorated as of the Closing Date as between the Purchaser, on the one hand, and the Sellers, on the other hand, on the basis of an estimate of the amounts in accordance with GAAP and mutually agreed upon by the Purchaser and the Sellers.

19

## ARTICLE III
## PURCHASE PRICE; ALLOCATIONS

Section 3.1    Purchase Price. The aggregate consideration for the sale, transfer and delivery of the Purchased Assets (the "Purchase Price") shall consist of the following: (a) a credit bid of (i) all DIP Term Loan Obligations that are outstanding under the DIP Term Loan Facility as of the Closing Date and (ii) a portion of the Prepetition Term Loan Secured Obligations, in the amount of $110,000,000 (the "Credit Bid"), which Credit Bid shall exclude the Retained Obligations, which Retained Obligations shall remain outstanding following the Transaction; (b) the assumption of the Assumed Liabilities (including payment of applicable Cure Amounts with respect to the Assumed Contracts); and (c) the provision of an amount equal to (i) the Wind-Down Funding Amount for the Post-Closing Wind-Down Budget, less (ii) the amount of Excluded Cash (not to exceed the amount in clause (i)).

Section 3.2    Allocation of Purchase Price. The Purchaser and the Sellers agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (the "Allocation Principles") as provided on Schedule 3.2 hereof, such schedule to be delivered by Purchaser to the Sellers within 60 days of the determination of the Purchase Price. Each of the Purchaser and the Sellers agree to provide the other promptly with any other information required to complete Schedule 3.2. If the Sellers disagree with Schedule 3.2, the Sellers shall notify the Purchaser of such disagreement within 30 days after the Purchaser's delivery of Schedule 3.2. The Purchaser and the Sellers shall negotiate in good faith to resolve any such disagreement and shall amend Schedule 3.2 to reflect any resolution agreed to in writing. If the Purchaser and the Sellers are unable to agree on a final allocation within 15 days after the delivery of the Sellers' objection to Schedule 3.2, the Purchaser and the Sellers shall instruct a nationally recognized accounting firm experienced in such matters and satisfactory to both the Purchaser and the Sellers (the "Tax Matters Accounting Firm") to use its best efforts to determine a final allocation as promptly as possible and in no event later than 20 days after submission of the matter to the Tax Matters Accounting Firm. Only disputed items relating to Schedule 3.2 shall be submitted to the Tax Matters Accounting Firm for review. All determinations of the Tax Matters Accounting Firm relating to the disputed items, including, if necessary, based on a valuation of any of the Purchased Assets, absent Fraud, shall be final and binding on the Parties and shall produce a final allocation. The fees and expenses of the Tax Matters Accounting Firm shall be borne one-half by the Purchaser and one-half by the Sellers. Any final allocation agreed or otherwise determined pursuant to this Section 3.2 shall be the "Final Tax Allocation Statement" for purposes of this Agreement, and the final Schedule 3.2 (as modified by the Final Tax Allocation Statement pursuant to this Section 3.2) shall be the "Final Tax Allocation Schedule". The Final Tax Allocation Statement and the Final Tax Allocation Schedule shall be binding on the Purchaser and the Sellers.

Section 3.3    Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place via the electronic exchange of documents and fully released signature pages, at the earliest practicable date following the satisfaction (or waiver) of the conditions set forth in Article X (other than conditions that by their nature are to be first satisfied at Closing, but subject to the satisfaction or waiver of such

conditions), or at such other place and time as the Parties may designate in writing (email being sufficient); provided that the Parties shall use Commercially Reasonable Efforts to consummate the Transactions by no later than the Expiration Date (as defined below).

Section 3.4    Deliveries by the Sellers. At the Closing or at such time as is otherwise set forth herein, the Sellers will deliver or cause to be delivered to the Purchaser (unless delivered previously) the following:

(a)    a bill of sale, assignment and assumption agreement in a form mutually agreed between the Parties (the "Bill of Sale, Assignment and Assumption Agreement"), duly executed by the Sellers, pursuant to which the Sellers shall transfer and convey the Purchased Assets to the Purchaser and the Purchaser shall agree to assume the Assumed Liabilities;

(b)    the IP Assignment(s), in each case duly executed by the Sellers;

(c)    physical possession or control of all of the Purchased Assets;

(d)    a certificate executed by an officer of each Seller, in form and substance reasonably acceptable to the Purchaser, dated as of the Closing Date, stating that the conditions specified in Sections 10.1(d), 10.1(e) and 10.1(i) have been satisfied;

(e)    a Certificate of Non-Foreign Status in a form mutually agreed by the Parties executed by a duly authorized officer of each applicable Seller;

(f)    a duly executed IRS Form W-9 with respect to each Seller (or, in the case of any disregarded entity, the regarded parent entity of such Seller);

(g)    if required, copies of any certificates, resolutions, consents or other documents necessary to reflect the termination of the Sellers' 401(k) plans, and, to the extent agreed by the Parties, any other Employee Benefit Plans; and

(h)    all other documents, instruments and writings reasonably requested by the Purchaser to be delivered by the Sellers at or prior to the Closing and required or desirable in connection with the conveyance of the Purchased Assets to the Purchaser pursuant to this Agreement.

Section 3.5    Deliveries by the Purchaser. At the Closing or at such time as is otherwise set forth herein, the Purchaser will deliver or cause to be delivered to the Sellers (unless previously delivered) the following:

(a)    a customary payoff letter, release letter or other similar document acknowledging the satisfaction of the Credit Bid amount as consideration for the transfer of the Purchased Assets;

(b)    evidence of the payment, on behalf of the Sellers, of all Cure Amounts due and payable as of the Closing with respect to the Assumed Contracts;

(c)    an amount in cash required as part of the Purchase Price to fund the Post-Closing Wind-Down Budget pursuant to Section 3.1(c), by wire transfer of immediately available funds;

21

(d)    the Bill of Sale, Assignment and Assumption Agreement, duly executed by the Purchaser;

(e)    the IP Assignment(s), in each case duly executed by the Purchaser;

(f)    a certificate executed by an officer of the Purchaser, in form and substance reasonably acceptable to the Sellers, dated as of the Closing Date, stating that the conditions specified in Sections 10.2(a) and 10.2(b) have been satisfied; and

(g)    all other documents, instruments and writings reasonably requested by the Sellers to evidence the assumption by the Purchaser of the Assumed Liabilities and Assumed Contracts.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As of the Schedule Delivery Date, the Sellers hereby represent and warrant to the Purchaser as follows:

Section 4.1    Organization. The Sellers are either corporations or limited liability companies duly incorporated or organized and validly existing under the Laws of the jurisdiction of their respective organization and have all requisite power and authority to own, lease and operate their properties and to carry on their businesses as now being conducted.

Section 4.2    Authorization. Subject to the entry of the Sale Order in the Bankruptcy Cases, the Sellers have (or will have as of the Closing) full corporate or limited liability company power and authority to execute and deliver this Agreement and the Sellers' Ancillary Documents and to perform their obligations hereunder and thereunder and to consummate the Transactions. Subject to the entry of the Sale Order in the Bankruptcy Cases, the execution and delivery of this Agreement and the Sellers' Ancillary Documents by the Sellers and the performance by the Sellers of their obligations hereunder and thereunder and the consummation of the Transactions provided for herein and therein have been duly and validly authorized and approved by all necessary board (or similar governing body) action on the part of the Sellers. This Agreement has been, and the Sellers' Ancillary Documents will be as of the Closing Date, duly executed and delivered by the Sellers and (assuming the due authorization, execution and delivery of the same by the Purchaser, to the extent the Purchaser is party thereto) do or will, as the case may be, constitute (subject to the entry of the Sale Order in the Bankruptcy Cases) the valid and binding agreements of the Sellers, enforceable against the Sellers in accordance with their respective terms.

Section 4.3    Real Property.

(a)    There is no real property or interest in real property owned in fee by any Seller.

(b)    Schedule 4.3(b) sets forth an accurate and complete list of all Leases and all Leased Real Property Locations leased by the Sellers. The Sellers have made available true and complete copies of all Leases to the Purchaser. Except as set forth on Schedule 4.3(b), there exists no default under any Lease by the Sellers or, to the Knowledge of the Sellers, by any other party to any Lease. To the Knowledge of the Sellers, there are no conditions that currently exist or with the passage of time will result in a default or breach of any term by any Seller or any third party counterparty

to a Lease.  None of the Leased Real Property Locations are subject to any sublease or grant to any Person any right to the use, occupancy or enjoyment of the Leased Real Property Location or any portion thereof.  Except as set forth on Schedule 4.3(b), the buildings, plants, improvements, structures, building systems, fixtures, machinery, equipment and other property included in the Leased Real Property Locations are in good working order and repair and are in compliance with all Orders, Licenses and Laws. Except as set forth on Schedule 4.3(b), all construction at the Leased Real Property Locations has been performed in compliance with all Orders, Licenses and Laws. There has not been any casualty at any Leased Real Property Location that has not been fully restored.  The Sellers have not collaterally assigned, hypothecated or granted any other Lien in any Lease (or any interest therein) related to any Leased Real Property Location. The Sellers' possession and quiet enjoyment of the Leased Real Property Locations under any Lease is not being disturbed. The Sellers have not received any written notices of any violations with respect to any use restrictions, exceptions, reservations or limitations of record which in any material respect interfere with or impair the present and continued use thereof in the ordinary course of the Business. Except as set forth in Schedule 4.3(b), the Sellers have not received any written notices of any pending or threatened condemnation or other proceedings or claims (other than Permitted Liens) relating to any of the Leased Real Property Locations that have not been satisfied as of the date hereof. To the Knowledge of the Sellers, the Leases that are deemed Assumed Contracts pursuant to Section 6.7 will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the Transactions.

Section 4.4    Title to the Purchased Assets. Subject to Section 2.5, and subject to entry of the Sale Order, the Sellers own, or in the case of Purchased Assets that are leased, hold a valid leasehold interest in, the Purchased Assets free and clear of all Liens (other than Permitted Liens). Upon consummation of the Transactions, the Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens.  The Purchased Assets together with the services to be provided to the Purchaser pursuant to the Transition Services Agreement constitute all the properties, assets, interests in properties and rights to operate the Business immediately following the Closing (or after the termination of the Contract Designation Period, as applicable) in the ordinary course of business as conducted by the Sellers prior to Closing.

Section 4.5    Employees.

(a)    The Sellers have delivered to the Purchaser an employee census that sets forth a complete and accurate list of all the Employees as of the most recent practicable date, as specified on such list, showing for each Employee the position held, work location, date of hire or engagement, base salary or hourly wage rate, bonus and commission potential, the aggregate annual compensation for the Sellers' last fiscal year, such Employee's service recognized by the Sellers for purposes of the Employee Benefit Plans (including service with predecessor employers, if applicable, and any prior unbridged service with the Sellers), immigration status (and to the extent that the service provider requires a visa, work permit, employee pass, or other legal or regulatory approval for their engagement, the type of visa, permit, pass or approval), classification as exempt or non-exempt, full-time or part-time, leave of absence status (including the type of leave of absence and the expected date of return to active employment, if known), all accrued vacation and paid time off, and which collective bargaining unit, if any, represents such Employee. Except as set forth on Schedule 4.5(a), none of Employees is covered by any union, collective

bargaining or other similar labor agreement. Except as set forth on <u>Schedule 4.5(a)</u>, the Sellers do not have written Employment Agreements with Employees, and all such Employees are employed on an "at will" basis. The Sellers have delivered to the Purchaser a true, correct and complete copy of each Employment Agreement and each collective bargaining agreement and other similar labor agreement covering any Employee (including all amendments, side letters and similar documents relating thereto) (collectively, the "<u>Collective Bargaining Agreements</u>").

(b)     <u>Schedule 4.5(b)</u> contains a complete and accurate list of all Employee Benefit Plans. Except as set forth in <u>Schedule 4.5(b)</u>, no Seller currently maintains, contributes to or has any liability under any Employee Benefit Plan with respect to any Employee. No Employee Benefit Plan is, and the Sellers do not sponsor, maintain, contribute to, have any obligation to contribute to, or otherwise have any liability or obligation (including contingent liability), including on account of an ERISA Affiliate, under or with respect to: (i) a defined benefit pension plan or any plan, program or arrangement that is or was at any time subject to Title IV of ERISA or subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; (ii) a "multiemployer plan" (as defined in Section 3(37) of ERISA); (iii) a "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA); (iv) a "multiple employer plan" as described in Section 413(c) of the Code; or (v) a voluntary employee benefit association (as defined in Section 501(c)(9) of the Code). The Sellers do not have any liability or obligation (including contingent liability) as a consequence of at any time being considered a single employer with any other Person under Section 414 of the Code which is or would reasonably be expected to become a liability (contingent or otherwise) of the Purchaser.

(c)     <u>Schedule 4.5(c)</u> sets forth a true, correct and complete list of all independent contractors who are individuals (excluding individuals engaged or leased through staffing agencies or other third-party entities) providing the services of a single individual to the Business (the "<u>Independent Contractors</u>"), which list is current as of the date herein and includes any Independent Contractor who has performed services for the Business during the twelve (12) month period immediately preceding such date, and provides for each such Independent Contractor: (i) start date of services; (ii) type of services; (iii) duration of agreement; (iv) fee or compensation arrangements; and (v) approximate number of weekly hours of services provided by each such Independent Contractor.

(d)     There is not presently pending or existing, and to the Knowledge of the Sellers, there is not threatened, (i) any strike, slowdown, picketing or work stoppage, or (ii) any application for certification of a collective bargaining agent. With respect to the Business: (A) no labor organization or group of employees of any Seller or any Affiliate thereof has made a pending demand for recognition or certification, and there are and have been no representation or certification proceedings or petitions seeking a representation proceeding, with the National Labor Relations Board or any other similar labor relations tribunal or authority, nor have any such demands, proceedings or petitions been brought or filed or threatened to be brought or filed within the past five years; (B) there are not now, nor have there been at any time within the last five years, any actual or threatened organizing activities, strikes, work stoppages, slowdowns, lockouts, material arbitrations or material grievances, or other material labor disputes against or involving any Seller or any Affiliate thereof; (C) each Seller is in compliance in all material respects with all Collective Bargaining Agreements and with all applicable Laws respecting employment and employment practices, including terms and conditions of employment, wages and hours and

24

occupational safety and health; and (D) except as set forth on Schedule 4.5(d), within the past five (5) years, there have not been, and there are no, actions, claims, charges, complaints, or demands made, pending or, to the Knowledge of the Sellers, threatened to be made in writing, before any Governmental Entity or under any private dispute resolution procedure with respect to any alleged violation of any such applicable Laws.

(e)    Neither any Seller nor any of its respective Affiliates have, within the past three (3) years, received a "no match" letter from the Social Security Administration concerning any current or former employee. A USCIS Form I-9 has been properly prepared and retained for each Employee as required by Law. To the Knowledge of the Sellers, in the past three (3) years with respect to any Employee, no such Form I-9 was improperly prepared or that false documentation was provided in connection with satisfying the requirements of such Form I-9. To the Knowledge of the Sellers, all Employees who are working in the United States are legally authorized to work in the United States.

Section 4.6    Environmental Matters. Except as would not be material to the Business or the Purchased Assets, taken as a whole, or as otherwise set forth on Schedule 4.6: (i) the Purchased Assets and the Business are and for the past three (3) years have been in compliance with all applicable Environmental Laws; (ii) the Sellers have obtained and are in compliance with all Environmental Permits required for the operation of the Purchased Assets and the Business; (iii) there are no written claims under Environmental Law pending or, to the Knowledge of the Sellers, threatened in writing, against the Sellers with respect to the operation of the Purchased Assets or the Business; (iv) to the Knowledge of the Sellers, there has been no Release of Hazardous Material at, on, under or migrating from any Leased Real Property Location that could reasonably be expected to require any cleanup or remedial action or result in liability on the part of the Sellers under Environmental Laws; (v) neither the Purchased Assets nor the Business are subject to any Order relating to compliance with Environmental Law, Environmental Permits or the investigation, remediation, removal or cleanup of Hazardous Material; (vi) to the Knowledge of the Sellers, there are no underground storage tanks on any Leased Real Property Location for which a Lease is an Assumed Contract; and (vii) the Sellers have made available to the Purchaser true and complete copies of all material environmental reports, site assessments and audits in the possession of the Sellers with respect to the Business and any Leased Real Property Location for which a Lease is an Assumed Contract. The representations and warranties made in this Section 4.6 are the only representations and warranties of the Sellers with respect to environmental matters, Environmental Laws, Environmental Permits and Hazardous Materials.

Section 4.7    Insurance. Schedule 4.7 sets forth an accurate and complete list of all insurance policies maintained by the Sellers by or for the benefit of with the Business or the Purchased Assets, including any bonds and surety arrangements (collectively, the "Insurance Policies"), including the name of each policy, policy number, insurance carrier, term, type and amount of coverage, deductible or self-insured retention. The Sellers have made available to the Purchaser true and correct copies of the Insurance Policies. The Insurance Policies are in full force and effect, the limits of the Insurance Policies have not been materially eroded or exhausted and all premiums due with respect to the Insurance Policies have been paid in full.  The Sellers are not in material breach or default under the Insurance Policies. The Sellers have not received written notice of cancellation, termination or material premium increase with respect to any of the Insurance Policies. There are no material claims submitted in connection with the Insurance

Policies as to which coverage has been denied, rejected or disputed by the applicable insurers in respect of any Purchased Asset. As of the date of this Agreement, to the Knowledge of the Sellers, all claims and circumstances likely to give rise to a material claim in respect of the Purchased Assets covered by any of the Insurance Policies have been properly reported to the applicable insurers. All such Insurance Policies shall remain in effect through the Closing.

Section 4.8    Legal Proceedings. Other than the Bankruptcy Cases and except as set forth on Schedule 4.8, there is no suit, action, claim, arbitration, proceeding or investigation pending or, to the Knowledge of the Sellers, threatened against, relating to or involving the Sellers (whether as a plaintiff or a defendant), the Transaction, the Business or the Purchased Assets before any Governmental Entity.

Section 4.9    Intellectual Property and Privacy.

(a)    Schedule 4.9(a)(i) sets forth an accurate and complete list of all Registered Intellectual Property included in the Owned Intellectual Property, in each case including, to the extent applicable, the date of filing, issuance or registration, the filing, issuance or registration number, and the jurisdiction where the filing, issuance or registration was made (including, in the case of domain names, the domain registrar). To the Knowledge of the Sellers, the Registered Intellectual Property included in the Owned Intellectual Property is subsisting, valid and enforceable.  The Owned Intellectual Property and the Licensed Intellectual Property constitutes all Intellectual Property owned or used by the Sellers that is necessary for, used or held for use in the conduct of the Business. To the Knowledge of the Sellers, (i) the operation of the Business does not infringe, misappropriate, or otherwise violate the Intellectual Property of any other Person and (ii) no Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property. Except as set forth on Schedule 4.9(a)(iii), no claims alleging that the operation of the Business infringes, misappropriates, or otherwise violates the Intellectual Properties of any other Person or challenging the ownership, validity or right to use the Owned Intellectual Property are pending or, to the Knowledge of the Sellers, have been brought or are threatened. The Sellers have taken commercially reasonable measures to protect the trade secrets and other confidential information that are material to the operation of the Business.

(b)    All information technology systems, networks, software and other equipment used or held for use by the Sellers ("IT Systems") are sufficient for the conduct and operation of the Businesses as currently conducted by the Sellers. Except as set forth on Schedule 4.9(b), the IT Systems have not, within the past three years, experienced any material disruptions, interruptions, loss of functionality or other impairments. The Purchased Assets and the Sellers' operation of the Business are in compliance in all material respects with all Privacy Laws and Privacy Policies and contractual requirements or obligations in the operation of the Business and the Processing of Personal Information in connection with the Business, including the acquisition of consents and providing notice to individual and data subjects, as materially applicable.

(c)    To the Knowledge of the Sellers, no Person has gained unauthorized access to, used or engaged in unauthorized Processing of any Personal Information and AG Data related to the Business and held by or on behalf of the Sellers where such unauthorized access and/or processing has given rise to a legal duty under Privacy Laws or contractual requirements or obligations of the Sellers to notify any individual, data subject or Governmental Entity regarding any actual or

reasonably suspected incident, breach or security incident regarding such unauthorized access, use or Processing (each such incident, a "Security Breach").

(d)     The Sellers have not received written notice of any claim of any material violation of any Privacy Law, Privacy Policies or contractual requirements or obligations regarding the Processing of Personal Information or AG Data in connection with the Business.

Section 4.10    Consents. Except to the extent rendered unnecessary through the entry of the Sale Order or as otherwise set forth on Schedule 4.10, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Entity is required on the part of the Sellers in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which the Sellers are a party, the compliance by the Sellers with any of the provisions hereof or thereof, the consummation of the Transaction or the taking by the Sellers of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for the entry of the Sale Order.

Section 4.11    Validity of Assignable Contracts. Except as set forth on Schedule 4.11, as of the date of this Agreement, each Assignable Contract is in full force and effect and is a valid and binding obligation of the Sellers and, to the Knowledge of the Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (c) the obligation to pay Cure Amounts under Section 6.7(e). As of the date of this Agreement, (i) none of the Sellers has received written notice from any Third Party of its intention to terminate any Assignable Contract and (ii) to the Knowledge of the Sellers, no event has occurred which, with the passage of time or the giving of notice or both, would constitute a default under or a violation of any such Assignable Contract or would cause the acceleration of any obligation of the Sellers or the creation of a Lien upon any Purchased Asset that is not otherwise cured with the Sales Order.

Section 4.12    Financial Advisors. Except with respect to Portage Point Partners LLC, the Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or the Transaction for which the Purchaser is or will become liable.

Section 4.13    Compliance With Laws; Licenses; Financial Assurances.

(a)     To the Knowledge of the Sellers, except as set forth on Schedule 4.13(a)(i), the Sellers own (or lease, as applicable) and operate the Purchased Assets and currently conduct, and have in the past 3 months conducted, the Business in compliance in all material respects with all Orders, Licenses and Law applicable to the Sellers, the Purchased Assets or the Business, except for prior instances of non-compliance that have been fully and finally resolved to the satisfaction of all Governmental Entities with jurisdiction over such matter. Except as set forth on Schedule 4.13(a)(i), the Sellers have not, and to the Knowledge of the Sellers, none of their respective Representatives have received in the past 12 months any written notice from a Governmental Entity or Third Party alleging that any Seller or the Business is not in compliance in any material

respect with applicable Orders, Licenses or Law. The Licenses set forth on <u>Schedule 4.13(a)(ii)</u> are an accurate and complete list all of the Licenses held or required by Law to be held by the Sellers with respect to the current operation and conduct of the Business, the Purchased Assets or the Assumed Liabilities, and, except as set forth on <u>Schedule 4.13(a)(ii)</u>, each such License is freely transferrable to the Purchaser.

(b)     <u>Schedule 4.13(b)</u> sets forth a complete and accurate list of all performance bonds, surety bonds, and other financial assurance held by the Sellers with respect to the Purchased Assets, categorized by Transferred Licenses or the Purchased Assets, and including the name of the provider, the amount provided, and the amounts of collateral held by the provider.

Section 4.14    <u>Taxes</u>.

(a)     Except as set forth on <u>Schedule 4.14</u>, the Sellers have filed (or have had filed on their behalf) all material Tax Returns that the Sellers were required to file in respect of the Purchased Assets or the Business and all such Tax Returns are correct and complete in all material respects. Except as set forth on <u>Schedule 4.14</u>, the Sellers have timely paid (i) all material Taxes that are shown to be due on any such Tax Returns or pursuant to any assessment received by such Sellers, from any Tax Authority for any period preceding the Closing Date, and (ii) all Taxes that are due and are attributable to the Purchased Assets and the Business for periods ending on or prior to the Closing Date (whether or not shown as due and payable on any Tax Return). Except as set forth on <u>Schedule 4.14</u>, all Taxes that the Sellers are or were required by Law to withhold, collect or report with respect to the Purchased Assets or the Business have been timely withheld and paid over to the appropriate Tax Authority. The Sellers have complied in all material respects with any information reporting and withholding requirements in connection with any amounts paid or owing to any Person.

(b)     Except as set forth on <u>Schedule 4.14</u>, no deficiencies for Taxes or other assessments relating to Taxes have been claimed, threatened, proposed or assessed (in each case, in writing) with respect to the Purchased Assets or the Business. To the Knowledge of the Sellers, there are no ongoing, pending or threatened (in writing) audits relating to Taxes with respect to the Purchased Assets or the Business.

(c)     There are no outstanding agreements or waivers that would extend the statutory period in which a Tax Authority may assess or collect a Tax that could result in (i) a Lien upon the Purchased Assets or (ii) liability to the Purchaser as a transferee of or a successor to the Purchased Assets.

(d)     There are no Liens with respect to Taxes (other than Permitted Liens) upon the Purchased Assets.

(e)     The Sellers are not a party to any Tax indemnity, Tax allocation or Tax sharing agreement, other than any such agreement entered into in the ordinary course of business the principal purpose of which is not related to Tax, that could result in (i) a Lien upon the Purchased Assets or (ii) liability for the Purchaser as a result of its acquisition or ownership of the Purchased Assets.

(f)    There are no requests for rulings pending between any Seller and any Tax Authority in respect of any Tax that could result in (i) a Lien upon the Purchased Assets or (ii) liability to the Purchaser as a transferee of or successor to the Purchased Assets.

(g)    The Sellers have collected or self-assessed and remitted to the appropriate Tax Authority all sales and use or similar Taxes required to have been collected or self-assessed with respect to the Purchased Assets.

(h)    None of the Sellers have failed to properly and timely pay to the appropriate Tax Authorities all material payroll, unemployment and similar Taxes with respect to the Purchased Assets due on or before the Closing Date, to the extent that the failure to do so could result in any Lien on the Purchased Assets or any liability for the Purchaser as a result of its acquisition or ownership of the Purchased Assets.

Section 4.15    Accounts Receivable. All accounts receivable were acquired or arose from sales actually made or services actually performed in the ordinary course of business that represent *bona fide* transactions and valid and enforceable claims, are not subject to any setoff, counterclaim or legal action or proceeding and are collectible in accordance with their terms.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows as of the Effective Date and as of the Closing:

Section 5.1    Organization. The Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

Section 5.2    Authorization for Agreement; Consents and No Violations.

(a)    The Purchaser has all requisite power and authority to enter into this Agreement and the Purchaser Ancillary Documents to which it is a party and to consummate the Transactions (including all requisite power and authority to credit bid the Obligations). The execution, delivery and performance of this Agreement and the Purchaser Ancillary Documents by the Purchaser and the consummation of the Transactions (including with respect to the Credit Bid) have been duly authorized by all necessary actions of the Purchaser and this Agreement is, and the Purchaser Ancillary Documents to be executed and delivered by the Purchaser pursuant hereto will be, duly executed and delivered and, legal, valid and binding obligations of the Purchaser, enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium, or similar Laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the availability of equitable remedies.

(b)    Neither the execution and delivery of this Agreement or the Purchaser Ancillary Documents nor the consummation of the Transactions by the Purchaser (including with respect to the Credit Bid) requires the consent or approval of, the giving of notice to, registration, filing or recording with or the taking of any other action by the Purchaser in respect of, any Governmental Entity or any other Person, except in each case as would not materially impair the Purchaser's ability to consummate the Transactions or perform its obligations hereunder.

(c)    The execution and delivery of this Agreement and the Purchaser Ancillary Documents and the consummation of the Transactions by the Purchaser (including with respect to the Credit Bid) will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or the loss of a material benefit under: (i) any provision of the organizational documents of the Purchaser; (ii) the provisions of any material contract to which the Purchaser or any of its respective Affiliates is a party; or (iii) applicable Law, except in each case as would not materially impair the Purchaser's ability to consummate the Transactions or perform its obligations hereunder.

Section 5.3    <u>Financial Wherewithal; Solvency</u>. The Purchaser will have, as of the Closing Date, sufficient funds available to pay the Cure Amounts and otherwise consummate the Transactions, and to pay all fees and expenses required to be paid by the Purchaser hereunder and to assume the Assumed Liabilities. The Purchaser acknowledges that its obligations under this Agreement are not subject to any conditions regarding its ability to obtain financing for any portion or all of the Purchase Price. At and immediately after the Closing (and after giving effect to the Transactions), the Purchaser will be solvent, will have adequate capital and liquidity with which to engage in its business, and will be able to pay its bills and obligations as they come due (and will not have incurred debts beyond its ability to pay as they mature or become due).   The Purchaser is not entering into this Agreement and the transactions contemplated hereby with the actual intent to hinder, delay or defraud either present or future creditors.

Section 5.4    <u>Adequate Assurances Regarding Executory Contracts</u>. The Purchaser is and will be capable of satisfying the conditions contained in sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 5.5    <u>Litigation</u>. There is no action or proceeding pending or formally threatened in writing against the Purchaser or its Affiliates or involving any of its properties or assets that would be reasonably be expected to (a) materially impair the ability of the Purchaser to perform its obligations under this Agreement or the other Purchaser Ancillary Documents or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

Section 5.6    <u>Financial Advisors</u>. The Purchaser has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or the Transactions for which the Sellers or its Affiliates are or will become liable.

Section 5.7    <u>Non-reliance</u>. The Purchaser acknowledges and agrees that in entering into this Agreement and the Purchaser Ancillary Documents, and in consummating the Transactions contemplated hereby and thereby, it has fully and independently conducted its due diligence and, notwithstanding the delivery or disclosure to the Purchaser or its officers, directors, employees, agents or other Representatives of any documentation or other information (including any financial projections or other supplemental data), except as otherwise set forth in <u>Article IV</u> of this Agreement and the Schedules, the Sellers expressly disclaim any representations or warranties of any kind or nature, express or implied, and the Purchaser has not relied and is not relying on any representations, warranties, or other statements whatsoever, whether written or oral (from or by the Sellers, its Affiliates, or any Person acting on their behalf) other than those representations and

warranties of the Sellers expressly set out in Article IV of this Agreement, as modified by the Schedules, and that the Purchaser will not have any right or remedy arising out of any representation, warranty, or other statement not expressly set out in Article IV of this Agreement (as modified by the Schedules). Notwithstanding the foregoing, nothing herein shall limit, restrict, or otherwise affect any Person's right or ability to make, pursue, enforce or prosecute a claim for Fraud.

**ARTICLE VI**
**CERTAIN COVENANTS AND AGREEMENTS**

Section 6.1    Conduct of the Sellers. Except as expressly required by this Agreement or as set forth on Schedule 6.1, or as otherwise consented to in advance in writing by the Purchaser, for the period commencing on the date hereof and ending on the earlier of the Termination Date and the Closing Date, the Sellers shall:

(a)    use Commercially Reasonable Efforts to obtain approval of the Sale Order;

(b)    use Commercially Reasonable Efforts to maintain compliance with the DIP Order and related budgets;

(c)    subject to actions reasonably necessary to conduct the Chapter 11 process as determined in the reasonable discretion of the Sellers, use Commercially Reasonable Efforts to carry on the Business in the ordinary course of business and use Commercially Reasonable Efforts to maintain, preserve and protect the Purchased Assets in their current condition, ordinary wear and tear excepted, but including replacements, modifications and maintenance in the ordinary course of business;

(d)    maintain its books, accounts and records in the ordinary course of business;

(e)    not materially amend, modify, terminate, waive any rights under or create any Lien (other than a Permitted Lien or a Lien that will not be transferred to the Purchaser at the Closing) with respect to any of the Assumed Contracts, or enter into any Contract or Lease;

(f)    use Commercially Reasonable Efforts to defend and protect the Purchased Assets from infringement or deterioration;

(g)    comply in all material respects with applicable Laws with respect to the Business or any Purchased Assets;

(h)    use Commercially Reasonable Efforts to maintain in full force and effect all Transferred Licenses and comply with the terms of each such Transferred License;

(i)    not waive, compromise or settle any material claim or right involving the Purchased Assets;

(j)    not sell, lease, encumber, or otherwise dispose of all or any portion of any Purchased Assets, except sales of Inventory in the ordinary course of business;

(k)      not terminate, cancel or make any material changes to the structure, limits or terms and conditions of any of the Insurance Policies, including allowing the Insurance Policies to expire without renewing such Insurance Policies or obtaining comparable replacement coverage, or fail to pay premium or report known claims to an insurance carrier in a timely manner, in each case, except as would not be reasonably likely to be material to the Business or the Purchased Assets;

(l)      not, other than in the ordinary course of business and to the extent that such action would not adversely impact the Purchaser: (i) make, revoke, amend or change any material Tax election; (ii) change any annual Tax account period or adopt or change any method of Tax accounting; (iii) make, change or rescind a material Tax reporting practice or policy; (iv) file any amended Tax Return; (v) enter into any closing agreement; (vi) settle any material Tax claim or assessment; (vii) extend or waive the application of any statute of limitations regarding the assessment or collection of any Tax; (viii) apply for or pursue any Tax ruling; (ix) execute any powers of attorney in respect of any Tax matter; (x) surrender any right to claim a material refund of Taxes; or (xi) take any other similar action relating to the filing of any Tax Return or the payment of any Tax that may adversely impact the Purchaser (or any Affiliate of the Purchaser) or the Purchased Assets with respect to any taxable period (or portion thereof) ending after the Closing Date;

(m)      not (i) increase in any manner the compensation or benefits of, or enter into any new bonus or incentive agreement or arrangement with, any of its current or former Employees, officers, directors or consultants, (ii) establish, adopt, enter into, amend, modify or terminate any Employee Benefit Plan (or any plan, policy, program, agreement, arrangement or scheme that would be an Employee Benefit Plan if in existence on the date hereof), or accelerate the payment, vesting or funding of any compensation or benefits provided thereunder or otherwise or (iii) hire any individual who would be a Transferred Employee;

(n)      not transfer or convey, offer to transfer or convey, abandon, allow to lapse or dedicate to the public any material Owned Intellectual Property, or terminate or allow to expire any Assumed Contract governing any material Licensed Intellectual Property, or disclose or allow to be disclosed any material Confidential Information to any third party without appropriate confidentiality or non-disclosure requirements on such third party; and

(o)      not enter into any agreement or commitment to take any action prohibited by this Section 6.1.

Section 6.2      Inspection and Access to Information.

(a)      During the period commencing on the date hereof and ending on the earlier of the Termination Date and the Closing Date, except as may be prohibited by any Governmental Entity or by any applicable Law or as necessary to preserve any applicable legal privilege, the Sellers shall (and shall cause their officers, directors, employees, auditors and agents to) provide the Purchaser and its investment bankers, counsel, and other authorized representatives full access, during reasonable hours and under reasonable circumstances, to any and all of the Sellers' premises (including reasonable access for the Purchaser to perform Phase I Environmental Site Assessments at the Purchaser's sole cost and expense), properties, Employees (including executive officers and including for meeting and determining whether to offer employment to Employees), Documents,

Contracts, Leases, commitments, books, records and other information (including Tax Returns filed and those in preparation) pertaining to the Business and shall cause their officers to furnish to the Purchaser and its authorized representatives, upon request therefor, any and all financial, technical and operating data and other information pertaining to the Business and otherwise cooperate with the conduct of due diligence by the Purchaser and its representatives; provided, however, that in no event shall the Purchaser or its agents and representatives be entitled to conduct any drilling or intrusive sampling or testing of air, soil, subsurface strata, sediment, surface water, groundwater or any other materials at, on or under any Leased Real Property Location prior to the Closing without the prior written consent of the Sellers. The Sellers will promptly deliver to the Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding related to the Purchased Assets and the Transactions.

(b)      Except as may be prohibited by any Governmental Entity or by any applicable Law or as necessary to preserve any applicable legal privilege, for the longer of (i) a period of three years following the Closing Date, and (ii) the closing of the Bankruptcy Cases, the Purchaser and the Sellers shall grant to the other such access to and copies of their respective financial records and other books and records in their possession related to their conduct of the Business with respect to periods or portions of periods ending on or before the Closing Date and to the Purchaser's employees and such cooperation and assistance as shall be reasonably required to enable each of them to complete their legal, regulatory, stock exchange and financial reporting requirements, to complete their Tax Returns or for other reasonable business purposes, including the continued administration of the Bankruptcy Cases and remaining assets and liabilities and the investigation, prosecution and defense of all Claims, causes of action, lawsuits or demands to which the bankruptcy estates of the Sellers may have. In addition, the Purchaser shall make reasonably available to the Sellers and their agents and representatives (including any trustee), the Purchaser's employees, agents and officers to assist in the foregoing post-closing matters. For the avoidance of doubt, the Sellers' access to the Purchaser's books and records under or pursuant to this Section 6.2(b) shall be limited to those books and records that relate solely to the Business and the Excluded Assets, and nothing in this Section 6.2(b) shall prohibit, delay or otherwise impair the Sellers' ability to wind down their respective corporate existence and operations following the Closing.

Section 6.3      Notices of Certain Events. During the period commencing on the date hereof and ending on the earlier of the Closing Date and the Termination Date, the Sellers shall promptly notify the Purchaser in writing of the following should they arise after execution hereof:

(a)      any change or event that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect on the Business, the Purchased Assets or the Assumed Liabilities;

(b)      any notice or other communication from any Person, other than the Lenders, alleging that the consent of such Person is or may be required in connection with the Transactions, other than such notice or communication that is filed in the Bankruptcy Cases;

(c)     any notice or other communication from any Governmental Entity in connection with the Transactions, other than such notice or communication that is filed in the Bankruptcy Cases;

(d)     any action, suit, claim, investigation or proceeding commenced or, to their Knowledge, threatened in writing against, relating to or involving or otherwise affecting the Sellers, the Business, the Purchased Assets or the Assumed Liabilities that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect on the Business, the Purchased Assets or the Assumed Liabilities, other than such as are filed or are described in filings in the Bankruptcy Cases; and

(e)     (i) the damage or destruction by fire or other casualty of any Purchased Asset or part thereof; (ii) a material Release of Hazardous Material at, from or onto any property owned or operated by the Sellers or the Business; (iii) a disclaimer or denial of coverage issued by any insurance company with respect to any material claim submitted by the Sellers under any of the Insurance Policies; or (iv) any Purchased Asset or part thereof becoming the subject of any proceeding (or, to the Knowledge of the Sellers, proceeding that is threatened in writing) for the taking thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action.

Section 6.4    Reasonable Efforts; Further Assurances; Cooperation. Subject to the other provisions hereof, each Party shall each use its Commercially Reasonable Efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to obtain all consents required in connection with the consummation of the Transactions (provided, however, that none of the Sellers or the Purchaser will be obligated to pay any consideration therefor to any Third Party from whom consent or approval is requested or to initiate any litigation proceeding to obtain any such consent or approval) and to satisfy all conditions to their obligations hereunder and to cause the Transactions to be effected as soon as practicable, in accordance with the terms hereof and shall reasonably cooperate with each other Party in connection with any step required to be taken as a part of their obligations hereunder, including the following:

(a)     In the event any claim, action, suit, investigation or other proceeding by any Governmental Entity or other Person is commenced that questions the validity or legality of the Transactions or any other transaction contemplated hereby or seeks damages in connection therewith, the Parties shall: (i) cooperate and use all Commercially Reasonable Efforts to defend against such claim, action, suit, investigation or other proceeding; (ii) in the event an injunction or other Order is issued in any such action, suit or other proceeding, use commercially reasonable efforts to have such injunction or other Order lifted; and (iii) cooperate reasonably regarding any other impediment to the consummation of the Transactions.

(b)     Each Party shall give prompt notice to the other Parties of the occurrence, or failure to occur, of any event that the occurrence or failure of which would or would be likely to result in the failure to satisfy any condition specified in Article X. Each Party hereby acknowledges that no Party shall be deemed to have waived any right it may have hereunder as a result of such notifications.

34

(c)    The Purchaser shall use Commercially Reasonable Efforts to bind insurance coverage effective on the Closing Date that meets all legal and contractual requirements associated with the Business, including compliance with any additional insured or bonding requirements, and is otherwise, sufficient to cover the risks associated with the operation of the Business post-Closing as soon as reasonably practicable following the date of this Agreement.

Section 6.5    <u>Risk of Loss</u>. The risk of loss with respect to the Purchased Assets shall remain with the Sellers until the Closing. Until the Closing, the Sellers shall maintain in force the policies of property damage insurance under which any Purchased Asset is insured. In the event prior to the Closing any Purchased Asset is lost, damaged or destroyed and such loss, damage or destruction, individually or in the aggregate, has or would reasonably be expected to result in a Material Adverse Effect and the Closing nonetheless occurs, then, subject to the rights of the Lenders pursuant to the DIP Term Loan Facility, the Purchaser may require the Sellers to assign to the Purchaser the remaining proceeds of any insurance payable as a result of the occurrence of such loss, damage or destruction.

Section 6.6    <u>Bankruptcy Actions</u>.

(a)    The Sellers have filed the Bidding Procedures Motion and will diligently prosecute such motion and seek entry of the Sale Order.

(b)    This Agreement is subject to approval of the procedures set forth in the Bidding Procedures Order, including the consideration by the Sellers of competing bids in respect of all or any part of the Purchased Assets. From the date hereof (and any prior time) and until the earlier of (i) the completion of the Auction in accordance with the Bidding Procedures Order, or (ii) if no Qualified Bids (as defined in the Bidding Procedures Order) are received by the Bid Deadline (as defined in the Bidding Procedures Order) (such period being the "<u>Go-Shop Period</u>"), the Sellers are permitted to and to cause their Representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates and Representatives) in connection with a competing bid, including to respond (and to cause their Representatives to respond) to any inquiries or offers to purchase all or any part of the Purchased Assets (including supplying information relating to the Business (excluding with respect to Excluded Assets, and in such case, solely to such extent) and the assets of the Sellers to prospective purchasers) (the "<u>Go-Shop Actions</u>"); <u>provided</u>, that, from and after the date hereof, the Sellers' consideration of other bids for the Purchased Assets or the Business (including the taking by the Sellers or any of their respective Representatives of any of the Go-Shop Actions) shall be exercised in compliance with the Bidding Procedures (it being understood that, prior to the time at which the Bidding Procedures Order is entered by the Bankruptcy Court, the Sellers shall comply with the Bidding Procedures as if the Bankruptcy Court had entered the Bidding Procedures Order and such order was in effect).

Section 6.7    <u>Assumed Contracts</u>.

(a)    No later than the Schedules Delivery Date, the Sellers shall deliver a list of Contracts and Leases of the Sellers that are capable of assumption and assignment pursuant to section 365 of the Bankruptcy Code (the "<u>Assignable Contracts</u>"), as well as the Sellers' good faith estimate of all Cure Amounts for each such Assignable Contract. Promptly following delivery by

the Sellers of the list of Assignable Contracts to the Purchaser, the Purchaser shall designate each Assignable Contract as either an Assumed Contract, an Excluded Contract or a Designation Right Contract (as designated pursuant to <u>Section 6.7(f)</u>) and whether such Assignable Contract is material to the operation of the Business (collectively, the "<u>Material Contracts</u>"). Such list and designations shall be incorporated into this Agreement as <u>Schedule 6.7(a)</u>. At the Sale Hearing (notice of which shall be properly and timely served on all non-Sellers counterparties to Assignable Contracts by the Sellers), the Sellers shall seek authority to assume and assign to the Purchaser those Assignable Contracts that are, or that become (pursuant to the procedures set forth in <u>Section 6.7(f)</u> below), Assumed Contracts.

(b)     The Assumed Contracts shall be assumed by the Sellers and assigned to the Purchaser at the Closing pursuant to section 365 of the Bankruptcy Code; <u>provided</u> that, notwithstanding anything herein to the contrary, the Purchaser shall have the right in its sole and absolute discretion to amend <u>Schedule 6.7(a)</u> from time to time prior to the expiration of the Contract Designation Period to designate any Designation Right Contract (x) as an Assumed Contract in accordance with <u>Section 6.7(f)</u> below (whereupon such designation, such Designation Right Contract shall be an Assumed Contract), or (y) as an Excluded Contract (whereupon such designation, such Designation Right Contract shall be an Excluded Contract).

(c)     <u>Schedule 6.7(a)</u> sets forth those Contracts and Leases that the Purchaser has determined shall not be assumed and assigned to it, which shall be designated as "Excluded Contracts" (the "<u>Excluded Contracts</u>"); <u>provided</u> that, notwithstanding anything to the contrary, the Purchaser shall have the right in its sole and absolute discretion to amend <u>Schedule 6.7(a)</u> from time to time prior to the expiration of the Contract Designation Period to designate any Designation Right Contract as an Excluded Contract in accordance with <u>Section 6.7(f)</u> below (whereupon such designation, such Designation Right Contract shall be an Excluded Contract). Notwithstanding anything in this Agreement to the contrary, the Purchaser shall not be liable for any costs or liabilities in respect of any Contract or Lease from and after the time of its designation as an Excluded Contract and any liabilities arising under, relating to, or in connection with such Excluded Contract shall be deemed Excluded Liabilities for all purposes under this Agreement.

(d)     The Purchaser shall pay any Cure Amounts due in connection with the assumption and assignment of the Assumed Contracts as set forth on <u>Schedule 6.7(a)</u> for which all necessary Consents required by the Bankruptcy Court to transfer have been obtained, and the Purchaser will assume and agree to perform and discharge the Assumed Liabilities under the Assumed Contracts or, such other additional or fewer Assumed Contracts as otherwise agreed by the Parties at the time of Closing. The payment of the Purchase Price by the Purchaser at the Closing shall not be reduced by such Cure Amounts. For the avoidance of doubt, in the event that the Bankruptcy Court determines, after notice and hearing, that the Cure Amounts for any Assignable Contract exceeds the estimated amount set forth on <u>Schedule 6.7(a)</u> with respect to such Assignable Contract, the Purchaser may elect (in its sole discretion) by written notice to the Sellers within ten (10) Business Days after such ruling, to exclude such Assignable Contract from the list of Assumed Contracts at which point such Assignable Contract shall be deemed an Excluded Contract (and not an Assumed Contract) and the Purchaser shall have no obligation with respect thereto and <u>Schedule 6.7(a)</u> shall be deemed to be amended to update such Assignable Contract's designation.

(e)     From the date hereof until the expiration of the Contract Designation Period, the Sellers shall not seek Bankruptcy Court approval to reject any Assignable Contract unless and until such Assignable Contract is designated by the Purchaser as an Excluded Contract or unless otherwise agreed to in writing by the Purchaser.  Additionally, the Sellers shall file with the Bankruptcy Court such motions or pleadings as may be appropriate or otherwise as may be reasonably requested by the Purchaser to preserve the Sellers' right or ability to assume and assign any of the Assignable Contracts (including pursuant to section 365(d)(4) of the Bankruptcy Code until the expiration of the Contract Designation Period, and the Purchaser shall reasonably cooperate with the Sellers in such efforts.

(f)     Any Assignable Contract not designated by the Purchaser as either an Assumed Contract or an Excluded Contract as of Closing shall constitute a "Designation Right Contract". From and after the Closing Date until the earlier of (x) the date that is seventy-five (75) days following the Closing Date and (y) the date of confirmation of a Liquidating Plan (the "Contract Designation Period"), the Purchaser shall have the right, by providing the Sellers with written notice, to amend Schedule 6.7(a) to designate any Designation Right Contract as (i) an Assumed Contract, or (ii) an Excluded Contract. Upon receipt of notice of the Purchaser's designation of a Designation Right Contract as an Assumed Contract in accordance with this Section 6.7(f), the Sellers shall promptly provide notice to the applicable non-Seller counterparty of such designation. Notwithstanding anything herein to the contrary, the Purchaser shall pay and be solely responsible for all costs arising from, relating to, or in connection with, the continuation by the Sellers of Designation Right Contracts through the earlier to occur of (A) the expiration of the Contract Designation Period and (B) the date of the Sellers' receipt of written notice from the Purchaser designating such Designation Right Contract as an Excluded Contract in accordance with this Section 6.7(f). Notwithstanding anything in this Agreement to the contrary, on the date any Designation Right Contract is designated an Assumed Contract pursuant to this Section 6.7(f), such Contract or Lease shall be deemed an Assumed Contract for all purposes under this Agreement and no further consideration shall be required to be paid by the Purchaser for such Contract.

(g)     From and after the Closing Date, the Sellers shall notify the Purchaser within two (2) Business Days if (i) any Designation Rights Contract ceases to be in full force and effect and a valid and binding obligation of the Sellers or, to the Knowledge of the Sellers, the other parties thereto in accordance with its terms and conditions, (ii) the Sellers receive written notice from any Third Party of such Third Party's intention to terminate any Designation Rights Contract, or (iii) to the Knowledge of the Sellers, an event has occurred that, with the passage of time or the giving of notice or both, would (x) constitute a default under or a violation of any Designation Rights Contract or (y) cause the acceleration of any obligation of the Sellers or the creation of a Lien upon any Purchased Asset that is not otherwise cured with the Sales Order.

(h)     The Parties agree and acknowledge that the covenants set forth in this Section 6.7 shall survive the Closing. For the avoidance of doubt, nothing in this Section 6.7 shall prohibit, delay or otherwise impair the Sellers' ability to wind down their respective corporate existence and operations following the Closing.

Section 6.8 Transferred License Matters.

(a) To the extent permitted by Law, and in consultation with the Sellers and the applicable Governmental Entities, the Purchaser shall, at Purchaser's sole cost and expense, prepare all applications required to transfer the Transferred Licenses (which applications shall include the necessary applications, notices, forms and other documents to permit the Purchaser to operate under the Transferred Licenses with the appropriate Governmental Entities). The Sellers shall cooperate with and agree to provide reasonable assistance, at the Purchaser's sole cost and expense, to the Purchaser in connection with the application for and the procuring of the transfer of the Transferred Licenses. As promptly as practicable, the Sellers or the Purchaser, as applicable, shall properly file all applications required to transfer the Transferred Licenses from the Sellers to the Purchaser with the appropriate Governmental Entity (except any applications which may not be filed prior to the Purchaser being party to a fully executed surety agreement, which shall be properly filed promptly after the applicable surety agreement is executed in accordance with this Agreement). From and after the date hereof, the Purchaser and the Sellers shall use their respective Commercially Reasonable Efforts to pursue the prompt transfer of the Transferred Licenses to the Purchaser effective as of the Closing.

(b) To the extent allowed by and in accordance with Law, after the Closing and until the appropriate Governmental Entity approves the permanent transfer of the Transferred Licenses to the Purchaser (the "Interim Period"), the Sellers grant the Purchaser the right to conduct, at the sole cost and expense of the Purchaser, operations following the Closing under the Transferred Licenses. The Parties will make such filings, applications, notices or deliver any other documents as necessary to give effect to the foregoing arrangement during the Interim Period.

(c) The Sellers shall use Commercially Reasonable Efforts to cooperate with and support the Purchaser in connection with the preparation of the documents and forms required by any applicable Governmental Entity in obtaining, at the Purchaser's sole cost and expense, any approvals necessary in connection with any temporary or permanent license to sell liquor, beer, wine, and other alcoholic beverages at the premises where the Business is operated in connection with the operation of the Business after the Closing.

Section 6.9 Insurance Cooperation. Notwithstanding anything to the contrary in this Agreement, from and after the Closing, the Purchaser shall be entitled to the benefits under the Insurance Policies, but subject to the terms, conditions and limitations set forth therein, with respect to any occurrences that occurred or are alleged to have occurred prior to the Closing Date concerning the Business, the Purchased Assets or the Assumed Liabilities, but in each case excluding any such benefits relating to the Excluded Assets or Excluded Liabilities. The Sellers shall assign to the Purchaser, to the extent assignable, the Insurance Policies included in the Purchased Assets or, if not assignable, the right, power and authority to make directly to the insurer any request for payment under such Insurance Policies relating to any claims with respect to the Purchased Assets, the Business or the Assumed Liabilities. In the event that the Purchaser is unable make a direct claim for payment under the Insurance Policies with respect to the Purchased Assets, the Business or the Assumed Liabilities, the Sellers shall reasonably cooperate with the Purchaser, at the Purchaser's sole expense, in filing any insurance claims and in the collection of insurance proceeds including, where permitted by law, transferring to the Purchaser the right to pursue insurance proceeds related to such claims. Additionally, Purchaser shall pay the amount of any

deductibles, self-insured retentions or co-insurance that would otherwise be borne by the Sellers or any of their Affiliates as a result of such claims. The Sellers shall assign to the Purchaser, to the extent assignable, the right to receive any future proceeds (including any proceeds in respect of business interruption insurance for any period prior to or after the Closing Date) relating to any such claim following Closing. Any party receiving notice with respect to any such claim shall promptly notify all other Parties hereto. For the avoidance of doubt, nothing in this <u>Section 6.9</u> shall prohibit, delay or otherwise impair the Sellers' ability to wind down their respective corporate existence and operations following the Closing.

Section 6.10   <u>Publicity</u>. Prior to Closing, unless otherwise required by applicable Law, Bankruptcy Court requirement, or necessary or advisable (by the applicable Party's counsel) for successful prosecution of the Bankruptcy Cases, the Parties shall consult with each other before issuing any press release or public announcement concerning this Agreement or the Transactions, and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the Purchaser and the Sellers may make public statements with respect to this Agreement or the Transactions so long as such announcements do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or Bankruptcy Court requirement; <u>provided</u> that the issuing Party shall use its Commercially Reasonable Efforts to consult with the other Parties with respect to the text thereof to the extent practicable.

Section 6.11   <u>Transaction Documents</u>. The Parties shall negotiate in good faith, prior to the Closing, the terms of the Bill of Sale, Assignment and Assumption Agreement, the IP Assignments, the Transition Services Agreement and each other document, agreement or instrument required to be executed and delivered in connection herewith or therewith, and in each case such terms shall be in a form: (i) customary for transactions of the type contemplated by this Agreement; (ii) reasonably satisfactory to the Parties thereto; and (iii) with respect to the Transition Services Agreement, if requested by the Purchaser, that provides, during the Transition Services Period, for the provision to the Purchaser of services by Employees of the Sellers necessary to conduct the operation of the Business in the ordinary course, subject to any applicable third-party prohibitions on the provision of such services and further subject to the availability to the Sellers of sufficient assets and personnel to reasonably provide such services during the Transition Services Period.

Section 6.12   <u>Delivery of Schedules; Supplements to Schedules</u>. By no later than August __, 2025 (the "<u>Schedules Delivery Date</u>"), the Sellers shall deliver to the Purchaser an initial draft of the Schedules. From time to time up to the Closing, the Sellers shall promptly supplement or amend the Schedules that they have delivered with respect to any matter first existing or occurring following the date of delivery of the initial Schedules that (a) if existing or occurring at or prior to such date, would have been required to be set forth or described in the Schedules, or (b) is necessary to correct any information in the Schedules that has been rendered inaccurate thereby.

Section 6.13   <u>Survival of Representations and Warranties</u>. The Sellers and the Purchaser acknowledge and agree that all of the representations and warranties contained in <u>Articles IV</u> and <u>V</u> (or otherwise in this Agreement) shall expire as of the Closing and be of no further force or effect on and after the Closing. The Parties agree that the covenants contained in this Agreement

39

to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

Section 6.14    Sale Free and Clear. On the Closing Date, the Purchased Assets shall be transferred to the Purchaser free and clear of all Liens, claims and encumbrances, other than Assumed Liabilities and Permitted Liens expressly permitted by the Sale Order.

Section 6.15    Post-Closing Obligations.    Subject to any applicable provisions of a Liquidating Plan, to the extent any post-Closing obligation of the Sellers set forth herein survives the final resolution and closing of the Bankruptcy Cases, such obligation shall survive until such later date as such obligation has been fully and finally satisfied in accordance with its terms.

Section 6.16    Post-Closing Wind-Down Budget and Purchaser Commitments. In addition to funding the Post-Closing Wind-Down Budget, the Purchaser, on behalf of itself and any Affiliates, agrees to support and not object to (a) a chapter 11 plan of liquidation in form and substance reasonably acceptable to the Purchaser (a "Liquidating Plan"), which Liquidating Plan shall include, at a minimum, (i) allowance, classification and treatment of the Lenders' deficiency claim acceptable to the Lenders and (ii) customary mutual releases and exculpation of the Lenders and Debtors, or (b) such other liquidation process reasonably acceptable to the Sellers and the Purchaser.  In the event the wind-down of the Debtors' estates is pursuant to a Liquidating Plan, the Purchaser, on behalf of itself and any Affiliate, agrees to support and not object to a Liquidating Plan, and, when properly solicited to do so, to timely vote or cause to be voted all of its claims in support of the Liquidating Plan.

**ARTICLE VII**
**TAX MATTERS**

Section 7.1    Tax Cooperation. The Purchaser and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Tax Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax, in each case with respect to the Purchased Assets. The Sellers and the Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

Section 7.2    Computation of Tax Liabilities. For purposes of determining the liability for Taxes for a Pre-Closing Tax Period attributable to the Purchased Assets or the Business, the taxable period that includes the Closing Date shall close as of 12:01 AM as of the Closing Date. Whenever it is necessary to determine the liability for Taxes for a Straddle Period relating to:

(a)    Taxes imposed on a periodic basis, (e.g., property and other ad valorem Taxes), the determination of Taxes for the portion of the Straddle Period ending on and including the Closing Date shall be deemed to be the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Straddle Period ending on the day before the Closing Date and the denominator of which is the number of days in the entire Straddle

Period; provided, however, that appropriate adjustments shall be made to reflect specific events that can be identified and specifically allocated as occurring on or prior to the Closing Date; and

(b)      (i) Taxes based on the income or receipts for a Straddle Period; (ii) Taxes imposed in connection with any sale or other transfer or assignment of property (including all sales and use Taxes) for a Straddle Period; and (iii) withholding Taxes relating to a Straddle Period, the determination of the Taxes for the portion of the Straddle Period ending on and including, and the portion of the Straddle Period beginning and ending after, the Closing Date shall be calculated by assuming that the Straddle Period consisted of two taxable periods, one which ended at the close of the day immediately prior to the Closing Date and the other which began at the beginning of the Closing Date and items of income, gain, deduction, loss or credit attributable to the Purchased Assets or the Business for the Straddle Period shall be allocated between such two taxable years or periods on a "closing of the books basis" by assuming that the books of the Sellers were closed at the close of the day immediately prior to the Closing Date.

Section 7.3      Transfer Taxes. The Purchaser shall be responsible to pay any and all sales, use, stamp, documentary, filing, recording, transfer, real estate transfer, stock transfer, gross receipts, registration, duty, securities transactions or similar fees or taxes or governmental charges (together with any interest or penalty, addition to tax or additional amount imposed) as levied by any Tax Authority in connection with the Transactions (collectively, "Transfer Taxes"). To the extent the Purchaser or the Sellers are liable for such Transfer Taxes under applicable Law, such Party required by applicable Law to file shall timely file or cause to be filed (with the cooperation of the Sellers) all necessary documents (including all Tax Returns) with respect to such Transfer Taxes.

## ARTICLE VIII
## EMPLOYEE MATTERS

Section 8.1      Employees and Offers of Employment.

(a)      The Purchaser shall offer employment to all Employees who are actively employed as of the Closing Date (such Employees who accept offers of employment and actually commence employment with the Purchaser or one of its Affiliates are referred to as the "Transferred Employees") on terms and conditions of employment (specifically limited to salary, wages and benefits, and excluding defined benefit pension, nonqualified deferred compensation, long-term incentive, equity or equity-based incentive, severance and post-termination or retiree health and welfare benefits (collectively, the "Excluded Benefits")) that are substantially comparable in the aggregate to those in effect between such Transferred Employees and the applicable Sellers as of immediately prior to the Closing Date (exclusive of the Excluded Benefits).  Such offers of employment shall be effective as of the Closing Date (or, if applicable, the Delayed Transfer Date). Effective as of the Closing Date (or, if applicable, the Delayed Transfer Date), the Sellers agree to terminate the employment of all of the Transferred Employees with the Sellers. Any Employees who are on short-term or long-term disability leave as of immediately prior to the Closing Date (or, if applicable, the Delayed Transfer Date) shall not be Transferred Employees but shall be "Leave Employees." Leave Employees shall be retained by the Sellers or an Affiliate of the Sellers. If any such Leave Employee demonstrates the ability to return to work and present himself or herself for work within ninety (90) days of the Closing Date (or, if applicable, the Delayed Transfer Date), such Leave Employee shall be offered employment with the Purchaser or one of

41

its Affiliates and be treated as a Transferred Employee.  The Purchaser will be responsible for any and all direct and indirect liabilities and obligations owed to Transferred Employees (and any liabilities and obligations with respect thereto) for the period between the Closing Date and the Delayed Transfer Date. The Purchaser shall use commercially reasonable efforts to promptly establish benefit plans, payroll systems and related back-office services and any other necessary arrangements for employment of employees sufficient to conduct operations in the ordinary course of business and to comply with the terms of this Agreement.

(b)     Notwithstanding any other provision of this Agreement, Jurgen Bildstein will not be deemed to be a Transferred Employee.  The Purchaser contemplates extending an offer to engage Jurgen Bildstein as a consultant to the Purchaser on such terms that are acceptable to each of the Purchaser and Jurgen Bildstein in their respective sole discretion.

Section 8.2     Employee Benefit Plans. The Purchaser shall not assume the sponsorship of any Employee Benefit Plans or any other compensation or benefit plan, program, policy, agreement or arrangement of any kind at any time maintained, sponsored, contributed to, participated in or required to be contributed to by the Sellers or any of their Affiliates or under or with respect to which any Seller or any of its Affiliates has (or has had or could reasonably be expected to have) any liability or obligation, including on account of any ERISA Affiliate, or any obligation or liability thereunder; provided, however, that during the period between the Closing Date and the Delayed Transfer Date, the Purchaser will pay or reimburse the Sellers for any and all costs and expenses associated with maintaining any such Employee Benefit Plans, and shall pay all liabilities in respect of such Employee Benefit Plans, arising during such period, solely to the extent such costs, expenses and/or liabilities relate to the Transferred Employees. The Purchaser shall assume and honor all unused vacation and paid time off accrued as of the Closing Date (or, if applicable, the Delayed Transfer Date) by any Transferred Employee.

Section 8.3     Section 401(k) Plan Matters. Subject to satisfactory completion of the Purchaser's due diligence review of the 401(k) plans sponsored or maintained by the Sellers, at the Closing and to the extent permissible, the Purchaser shall assume the Sellers' 401(k) plans and thereafter serve as the sponsor of, and maintain, such 401(k) plans (the "401(k) Sponsorship Obligations").  No later than the date that is three (3) Business Days prior to the date of the Bankruptcy Court's scheduled hearing to consider the Bidding Procedures Motion and entry of the Bidding Procedures Order, the Purchaser will notify the Sellers if the Sellers' 401(k) plans will not be assumed by the Purchaser.  If the Purchaser will not assume the Sellers 401(k) plans as of the Closing Date, then the Sellers agree to terminate any 401(k) plans sponsored or maintained by the Sellers, effective immediately prior to the Closing Date.   If the Purchaser will not assumed the Sellers' 401(k) plans, then in connection with the termination of the 401(k) plans, the Sellers shall determine the amount of any pro-rata employer contributions for the year in which the Closing Date occurs (waiving any end-of-the-year requirements) and contribute such amounts to the plan prior to the Closing Date.  Prior to the Closing, the Sellers shall deliver to the Purchaser written evidence, in form and substance reasonably satisfactory to the Purchaser, that (a) the Sellers' boards of directors or the applicable committees thereof have validly adopted resolutions to terminate the 401(k) plans; and (b) the Sellers have made all necessary payments to fund the contributions (i) necessary or required to maintain the tax-qualified status of each of the 401(k) plans, (ii) for elective deferrals made pursuant to any such 401(k) plan for the period prior to termination, (iii) for employer matching and nonelective profit sharing contributions (if any) for

the period prior to termination and (iv) the 401(k) plan shall provide for the distribution or rollover of all accounts (including in-kind rollover of outstanding 401(k) plan loans) to be completed as soon as administratively feasible following the termination date in accordance with applicable Law and plan documents.

Section 8.4    Workers' Compensation. The Sellers shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by the Sellers' employees in the Business prior to the Closing Date (or if applicable, the Delayed Transfer Date). The Purchaser shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by any Transferred Employee on or after the date that such Transferred Employee commences employment with the Purchaser or for any workers' compensation claims arising out of injuries after the Closing Date for any employees of the Sellers that are injured while performing services for the Purchaser under the Transition Services Agreement. The Sellers shall be liable for all workers' compensation claims arising out of injuries or occupational diseases in the Business without an identifiable date of occurrence or exposure and sustained or contracted prior to the Closing Date.

Section 8.5    Third Parties. Nothing contained herein shall be construed as requiring, and the Sellers shall take no action that would have the effect of requiring, the Purchaser to continue any specific employee benefit plans or to employ, or to continue the employment of, any specific person. The provisions of this Article VIII are for the sole benefit of the Parties to this Agreement and nothing herein, expressed or implied, is intended or shall be construed to (a) constitute an amendment to any of the compensation and benefits plans maintained for or provided to employees prior to or following the Closing or (b) confer upon or give to any person (including for the avoidance of doubt any current or former employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of the Sellers or their Affiliates or the beneficiaries and dependents of any of them), other than the Parties hereto and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Article VIII) under or by reason of any provision of this Agreement.

## ARTICLE IX

## MUTUAL RELEASES

Section 9.1    Release of the Sellers. Effective as of the Closing Date, the Purchaser, on behalf of itself and its respective successors and assigns, and their present and former divisions, parents, subsidiaries, affiliates and each of their respective officers, directors, members, managers, partners, shareholders, employees, heirs, assigns, trustees, beneficiaries, successors, agents, attorneys, legal representatives and other representatives (collectively, the "Purchaser Releasors"), do hereby irrevocably and fully release, remise and forever discharge each of the Sellers and their respective successors and assigns, and their present and former divisions, parents, subsidiaries, affiliates, investment managers, and their respective officers, directors, members, managers, investment managers, partners, equityholders, employees, heirs, assigns, trustees, beneficiaries, successors, agents, attorneys, legal representatives and other representatives (collectively, the "Seller Releasees") of and from any and all losses, demands, causes of action, suits, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities

whatsoever, whether in law, statute or in equity, whether previously asserted or otherwise, and whether known or unknown, present or contingent, which the Purchaser Releasors may now or hereafter have, own or claim to have against any of the Seller Releasees by reason of any act, conduct, fact or circumstance whatsoever occurring prior to the Closing, for or on account of, relating to, or in any way in connection with any of the Seller Releasees, including, without limitation, any business relationship or other transactions between any of the Seller Releasees, on the one hand, and the Purchaser on the other hand (hereinafter for this section only, the claims released in this sentence shall be referred to as the "Seller Released Claims"). The Purchaser Releasors agree that this instrument may be treated as a complete defense to any action or proceeding that may be brought, instituted or taken by the Purchaser Releasors against the Seller Releasees with respect to the Seller Released Claims and shall forever be a complete bar to the commencement or prosecution of any action or proceeding by the Purchaser Releasors against the Seller Releasees for any damages, costs or attorneys' fees arising from or connected with the Seller Released Claims. Each Purchaser Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Seller Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Seller Releasee on the basis of any Seller Released Claim released, remised and discharged by any Purchaser Releasor pursuant to this Agreement. If any Purchaser Releasor violates the foregoing covenant, such Purchaser Releasor, for itself and its successors and assigns, and its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives, agrees that it shall pay, in addition to such other damages as any Seller Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Seller Releasee as a result of such violation. Notwithstanding any other provisions of this Agreement, nothing herein shall release, waive or discharge any Seller from (a) its obligations under this Agreement or any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered in connection with the Transactions, (b) its obligations with respect to the Retained Obligations, and (c) any rights, which as a matter of law or public policy cannot be released.

Section 9.2  Release of the Purchaser and Lenders. Effective as of the Closing Date, each of the Sellers, in each case on behalf of themselves and their respective successors and assigns, and their present and former divisions, parents, subsidiaries, affiliates and each of their respective officers, directors, members, managers, partners, shareholders, employees, heirs, assigns, trustees, beneficiaries, successors, agents, attorneys, legal representatives and other representatives (collectively, the "Seller Releasors"), do hereby irrevocably and fully release, remise and forever discharge the Purchaser and the Lenders and each of their respective successors and assigns, and their present and former divisions, parents, subsidiaries, affiliates, investment managers, and their respective officers, directors, members, managers, investment managers, partners, equityholders, employees, heirs, assigns, trustees, beneficiaries, successors, agents, attorneys, legal representatives and other representatives (collectively, the "Purchaser/Lender Releasees") of and from any and all losses, demands, causes of action, suits, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever, whether in law, statute or in equity, whether previously asserted or otherwise, and whether known or unknown, present or contingent, which the Seller Releasors may now or hereafter have, own or claim to have against any of the Purchaser/Lender Releasees by reason of any act, conduct, fact or circumstance whatsoever occurring prior to the Closing, for or on account of, relating to, or in any

way in connection with any of the Purchaser/Seller Releasees, including, without limitation, any business relationship or transactions between any of the Seller Releasors, on the one hand, and the Purchaser and/or any Lender, on the other hand (hereinafter for this section only, the claims released in this sentence shall be referred to as the "Purchaser/Lender Released Claims").  The Seller Releasors agree that this instrument may be treated as a complete defense to any action or proceeding that may be brought, instituted or taken by the Seller Releasors against the Purchaser/Lender Releasees with respect to Purchaser/Lender Released Claims and shall forever be a complete bar to the commencement or prosecution of any action or proceeding by the Seller Releasors against the Purchaser/Lender Releasees for any damages, costs or attorneys' fees arising from or connected with the Purchaser/Lender Released Claims.  Each Seller Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Purchaser/Lender Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Purchaser/Lender Releasee on the basis of any Purchaser/Lender Released Claim released, remised and discharged by any Seller Releasor pursuant to this Agreement.  If any Seller Releasor violates the foregoing covenant, such Seller Releasor, for itself and its successors and assigns, and its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives, agrees that it shall pay, in addition to such other damages as any Purchaser/Lender Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Purchaser/Lender Releasee as a result of such violation.  Notwithstanding any other provisions of this Agreement, nothing herein shall release, waive or discharge the Purchaser from (a) any of their respective obligations under this Agreement or any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered in connection with the Transactions, (b) their obligations under the DIP Order and the DIP Term Loan Documents (as defined therein), (c) any contractual indemnification or guaranty made by a Purchaser/Lender Releasee in favor of a Seller Releasor pursuant to the Contracts set forth on Schedule 9.2, (d) any claims, counterclaims, defenses, rights of set-off, demands and liabilities expressly preserved by the DIP Order, and (e) any rights, which as a matter of law or public policy cannot be released.

Section 9.3     California Civil Code.  To the extent applicable, each Party represents, warrants and agrees that it is fully aware of California Civil Code section 1542, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Each Party hereby knowingly and voluntarily waives and relinquishes the provisions, rights and benefits of California Civil Code section 1542 and any similar laws, rights, rules or legal principles of any other jurisdiction, whether foreign or domestic, federal, state or local, that may be applicable herein, and any rights they may have to invoke the provisions of any such law now or in the future

with respect to the claims being released pursuant to this Agreement, and each Party hereby agrees and acknowledges that this is an essential term of the releases set forth in this Agreement.  In connection with such releases, each Party acknowledges that it is aware that it or its attorneys or others may hereafter discover claims or facts presently known or unsuspected in addition to or different from those which they now know or believe to be true with respect to the subject matter of the claims being released under this Agreement.  Nevertheless, it is the intention of the Parties executing this Agreement to fully, finally and forever settle and release all matters and claims relating thereto which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action) constituting claims released pursuant to this Agreement.

## ARTICLE X
## CONDITIONS TO CLOSING

Section 10.1    Conditions to Obligations of the Purchaser. The obligations of the Purchaser to consummate the Transactions shall be subject to the fulfillment at or prior to the Closing of each of the following additional conditions (any or all of which may be waived by the Purchaser in its sole discretion in whole or in part to the extent permitted by applicable Law):

(a)    Closing Deliveries.  The Sellers shall have delivered to the Purchaser the closing deliveries required to be delivered by the Sellers pursuant to Section 3.4.

(b)    Sale Order. The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Cases in form and substance acceptable to the Sellers and the Purchaser. As of the Closing, the Sale Order shall not have been reversed, stayed, vacated, modified or amended without the prior written consent of the Purchaser.

(c)    Injunction. There shall be no effective injunction, writ or preliminary restraining order or any Order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the Transactions may not be consummated as provided herein, and no written notice shall have been received from any Governmental Entity indicating an intent to restrain, stay, prevent, materially delay or restructure the Transactions, in each case, where the Closing would (or would be reasonably likely to) result in a fine or penalty payable by the Purchaser or any of its Affiliates or to impose any restraint or restriction on the Purchaser's operation of the Business following the Closing.

(d)    Representations and Warranties. The representations and warranties of the Sellers set forth in Article IV shall have been true and correct in all material respects as of the Schedule Delivery Date and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (or to the extent such representations and warranties speak only as of an earlier date, they shall be true and correct in all material respects as of such earlier date), except that those representations and warranties that by their terms are qualified by materiality or Material Adverse Effect shall be true and correct in all respects.

(e)    Obligations Under this Agreement. The Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by the Sellers prior to or on the Closing Date.

(f)    <u>Transfer of Material Contracts and Leases</u>.  All Material Contracts and Leases have been assigned (or will be assigned on the Closing Date upon payment of any applicable Cure Amounts) to the Purchaser pursuant to Section 365 of the Bankruptcy Code.

(g)    <u>Liquor Sales</u>.  The Purchaser shall have been granted a temporary license to sell liquor in connection with the operation of the Business or, subject to any approvals required by the Bankruptcy Court, the applicable Seller and Purchaser shall have entered into a Liquor Management Agreement.

(h)    <u>Transfer of Licenses</u>.  With respect to all Transferred Licenses, the Purchaser shall have obtained, or arrangements reasonably satisfactory to the Purchaser in its good faith discretion shall be in place for obtaining during the Interim Period (i) all regulatory approvals and (ii) any other material permits, licenses, authorizations and approvals required or reasonably necessary to operate the Purchased Assets, including, to the extent necessary to obtain any approval from the applicable state or federal regulators, the Sellers and the Purchaser having entered into settlements reasonably satisfactory to the Purchaser with such regulators with respect to permit transfers, bonding requirements and regulatory compliance with respect to the Purchased Assets.

(i)    <u>No Material Adverse Effect</u>. No Material Adverse Effect shall have occurred since the date of this Agreement.

(j)    <u>Employee Benefits</u>. The Purchaser shall have in place arrangements (including through the Transition Services Agreement, if any) for employment of employees sufficient to conduct operations in the ordinary course of business, including establishment of benefit plans, payroll systems and related back-office services.

(k)    <u>Insurance</u>. The Purchaser shall have in place arrangements (including through the Transition Services Agreement, if any) for insurance coverage effective on the Closing Date that meets all legal and contractual requirements associated with the Business, including compliance with any additional insured or bonding requirements, and is otherwise sufficient to cover the risks associated with the operation of the Business post-Closing, as determined by a reasonably prudent operator of a business substantially similar to the Business.

(l)    <u>Schedules, Exhibits and Ancillary Documents</u>. The Schedules and Exhibits hereto and, to the extent deemed necessary by the Purchaser in its sole discretion prior to the Closing Date, the Transition Services Agreement, shall have been agreed between the Parties.

Section 10.2   <u>Conditions to Obligations of the Sellers</u>. The obligations of the Sellers to consummate the Transactions shall be subject to the fulfillment at or prior to the Closing of each of the following additional conditions (any or all of which may be waived by the Sellers in their sole discretion in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of the Purchaser contained in this Agreement shall have been true and correct in all material respects as of the Effective Date and shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date), except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects.

(b)     The Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by the Purchaser prior to or on the Closing Date.

(c)     The Purchaser shall have delivered to the Sellers the closing deliveries required to be delivered by the Purchaser pursuant to Section 3.5.

(d)     The Schedules and Exhibits hereto and, to the extent deemed necessary by the Purchaser in its sole discretion prior to the Closing Date, the Transition Services Agreement, shall have been agreed between the Parties.

Section 10.3   Sale Order. Notwithstanding anything to the contrary contained hereunder, the Sellers shall have no obligation to sell, and the Purchaser shall have no obligation to purchase, the Purchased Assets and consummate the Transactions, unless and until issuance of the Sale Order.

## ARTICLE XI
## TERMINATION

Section 11.1   Termination. This Agreement may be terminated at any time prior to Closing (provided that no Party may rely on the failure of any condition set forth in Article X if such failure was caused by such Party's breach of any provision of this Agreement):

(a)     in writing by mutual consent of the Parties;

(b)     by the Sellers or the Purchaser, if the Closing shall not have been consummated on or before 5:00 p.m. Eastern Time on November 7, 2025 (or such later date as has been agreed by the Sellers and the Purchaser) (the "Expiration Date"); provided, however, no Party that is in material breach of its obligations under this Agreement shall be entitled to terminate this Agreement pursuant to this Section 11.1(b);

(c)     by written notice from the Sellers to the Purchaser, in the event the Purchaser (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it at or prior to the Closing or (ii) materially breaches any of its representations and warranties contained herein, which failure or breach is not cured by the earlier of (A) twenty (20) days following the Sellers having notified the Purchaser of its intent to terminate this Agreement pursuant to this Section 11.1(c) and (B) the Expiration Date; provided that, in each instance, the Sellers are not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(d)     by written notice from the Purchaser to the Sellers, in the event the Sellers (i) fail to perform in any material respect any of their agreements contained herein required to be performed by them at or prior to the Closing, (ii) materially breach any of their representations and warranties contained herein, which failure or breach is not cured by the earlier of (A) twenty (20) days following the Purchaser having notified the Sellers of its intent to terminate this Agreement pursuant to this Section 11.1(d) and (B) the Expiration Date, or (iii) fail to deliver the initial draft of the Schedules to the Purchaser within the time period set forth in Section 6.12, or fail to amend or supplement the Schedules within ten (10) days following written notice by the Purchaser that

either the initial or an amended draft of the Schedules delivered to the Purchaser, as applicable, are not in form and substance reasonably acceptable to the Purchaser (any such written notice to be delivered by the Purchaser to the Sellers no later than ten (10) days following receipt by the Purchaser of such initial or amended draft of the Schedules), <u>provided</u> that the Purchaser's right to terminate shall be deemed waived if not exercised within ten (10) days following the Sellers' failure to properly amend or supplement the Schedules; provided that, in each instance, the Purchaser is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(e)     by the Purchaser or the Sellers if there is in effect a final non-appealable Order or any other action of a Governmental Entity of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of the Transaction, it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and use their respective Commercially Reasonable Efforts to pursue such appeal unless and until this Agreement is terminated pursuant to this <u>Section 11.1</u>;

(f)     by written notice by the Purchaser or the Sellers in the event that the Bankruptcy Court (i) denies the motion for the Sale Order, (ii) has not entered the Bidding Procedures Order, in form and substance satisfactory to each of the Purchaser and the Sellers in their reasonable discretion, on or before September 8, 2025, or (iii) has not entered the Sale Order, in form and substance satisfactory to each of the Purchaser and the Sellers in their reasonable discretion, on or before October 23, 2025; or

(g)     by the Purchaser or the Sellers, if (i) the Bankruptcy Court shall enter an order approving a definitive agreement with a party that is not the Purchaser or an Affiliate of the Purchaser for the acquisition of all or substantially all the Purchased Assets (such transaction, an "<u>Alternate Transaction</u>") and (ii) (A) the Purchaser does not submit the Back-Up Bid or (B) the Purchaser submits the Back-Up Bid and such Alternate Transaction is consummated.

The Party desiring to terminate this Agreement pursuant to this <u>Section 11.1</u> (other than pursuant to <u>Section 11.1(a)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 12.1</u>.

Section 11.2    <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to this <u>Article XI</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party (or its partners, officers, directors, stockholders or other Representatives) to the other Parties to this Agreement. The provisions of <u>Sections 6.5</u>, <u>10.3</u>, <u>11.2</u>, <u>11.3</u> and <u>Article XII</u> (with the exception of the provisions of <u>Section 12.13</u>) shall survive any termination hereof pursuant to <u>Section 11.1</u>.

Section 11.3    <u>Exclusive Remedies</u>. Except as specifically set forth in this Agreement, effective as of Closing, the Purchaser waives irrevocably any rights and Claims that the Purchaser may have against the Sellers, whether in law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein and occurring on or prior to the Closing, or (ii) the Purchased Assets, Assumed Liabilities or the Business or the Bankruptcy Cases. The Parties acknowledge and agree that if this Agreement is terminated pursuant to <u>Section 11.1</u>, the provisions of this <u>Article XI</u> shall be the sole and exclusive remedies for the Parties. None of

the Parties shall under any circumstances be liable to any other Party for any consequential, exemplary, special, incidental, compensatory, indirect, or punitive damages claimed under the terms of this Agreement, including lost profits, loss of revenue or income, cost of capital, loss of business reputation or opportunity or any damages based on diminution of value or any type of multiple damages.

### ARTICLE XII
### MISCELLANEOUS PROVISIONS

Section 12.1    Notices. All notices, communications and deliveries hereunder shall be made in writing signed by or on behalf of the Party making the same, shall specify the Section pursuant to which it is given or being made, and shall be delivered personally, via next day courier or registered or certified mail (with evidence of delivery and postage and other fees prepaid) or via email (with written confirmation of transmission) as follows:

| | |
|---|---|
| To the Sellers: | Avant Gardner, LLC<br>AGDP Holding Inc.<br>Reynard Productions, LLC<br>Made Event LLC<br>EZ Festivals LLC<br>140 Steward Avenue<br>Brooklyn, NY 11237<br>Attention: Gary Richards<br>Email: gary@avant-gardner.com |
| with a copy (which shall not constitute notice) to: | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square, 1000 North King Street<br>Wilmington, DE 19801<br>Attention: Sean M. Beach; Craig D. Grear<br>Email: sbeach@ycst.com; cgrear@ycst.com |
| To the Purchaser: | AG Acquisition 1 LLC<br>c/o Axar Capital Management LP<br>1330 Avenue of the Americas, 30th Floor<br>New York, NY 10019<br>Attention: Andrew Axelrod<br>Email: aaxelrod@axarcapital.com |
| with a copy (which shall not constitute notice) to: | McDermott Will & Schulte LLP<br>919 Third Avenue<br>New York, NY 10022<br>Attention: Adam Harris; Lauren Troeller |

Email: adam.harris@srz.com;
laurentroeller@mwe.com

or to such other representative or at such other address of a party as such party may furnish to the other party in writing. Any such notice, communication or delivery shall be deemed given or made: (a) on the date of delivery, if delivered in person; (b) on the first Business Day following delivery to an overnight courier service; (c) on the fifth Business Day following it being mailed by registered or certified mail; or (d) upon receipt of written confirmation of transmission, if sent via email (or, if no such written confirmation is received, on the first Business Day following the date such email was sent).

Section 12.2    Schedules and Exhibits. The Schedules and Exhibits, as may be amended in a manner acceptable to the Purchaser in its sole discretion, are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein as of the Schedule Delivery Date.

Section 12.3    Assignment; Successors in Interest. No assignment or transfer by any Party of such Party's rights and obligations hereunder shall be made except with the prior written consent of the other Party; provided that the Purchaser shall, without the obligation to obtain the prior written consent of the other Party, be entitled to assign this Agreement or all or any part of its rights or obligations hereunder to one or more Affiliates of the Purchaser; provided, further that the Purchaser shall remain obligated and liable pursuant to the Agreement. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns, and any reference to a Party shall also be a reference to the successors and permitted assigns thereof.

Section 12.4    Captions. The titles, captions and table of contents contained herein are inserted herein only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

Section 12.5    Controlling Law; Amendment; Venue. This Agreement shall be governed by and construed and enforced in accordance with the internal Laws of the State of New York and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflict of laws that would provide for the application of another law. This Agreement may not be amended, modified or supplemented except by written agreement of the Parties. Any suit, action, claim or proceeding arising out of or relating to this Agreement, the Purchaser Ancillary Documents, the Seller Ancillary Documents or the Transactions (the "Related Proceedings") shall be brought in the Bankruptcy Court, and each of the Parties irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court in any Related Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all Related Proceedings shall be heard and determined only in the Bankruptcy Court and agrees not to bring any Related Proceeding in any other court.

Section 12.6    Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE

51

PURCHASER ANCILLARY DOCUMENTS, THE SELLER ANCILLARY DOCUMENTS OR THE TRANSACTIONS.

Section 12.7    <u>Severability</u>. Any provision hereof that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Upon determination that any provision is prohibited or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as contemplated as of the date hereof to the greatest extent possible. To the extent permitted by Law, each Party hereby waives any provision of law that renders any such provision prohibited or unenforceable in any respect.

Section 12.8    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, will be deemed to constitute one and the same agreement. In the event that any signature to this Agreement is delivered by facsimile transmission or by e-mail delivery of a portable document format (.pdf or similar format) data file, such signature shall create a valid and binding obligation of the Party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

Section 12.9    <u>Enforcement of Certain Rights</u>. Except as provided in <u>Sections</u> <u>Section 9.1</u>, <u>9.2</u> and <u>12.16</u>, nothing expressed or implied herein is intended, or shall be construed, to confer upon or give any Person other than the Parties, and their successors or permitted assigns, any right, remedy, obligation or liability under or by reason of this Agreement, or result in such Person being deemed a third-party beneficiary hereof.

Section 12.10    <u>Waiver</u>. Any agreement on the part of a Party to any extension or waiver of any provision hereof shall be valid only if set forth in an instrument in writing signed on behalf of such Party. A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty. A waiver by any Party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

Section 12.11    <u>Integration</u>. This Agreement and the documents executed pursuant hereto represent the entire understanding and agreement between the Parties with respect to the subject matter hereto and thereto, and supersede all negotiations, agreements and understandings among the Parties with respect to the subject matter hereof.

Section 12.12    <u>Compliance with Bulk Sales Laws</u>. Each Party hereby waives compliance by the Parties with the "bulk sales," " bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

Section 12.13    <u>Cooperation Following the Closing</u>. The Parties hereto will from time to time do and perform such additional acts and deliver such additional documents and instruments

as may be required by applicable Law or as may be reasonably requested by any party to establish, maintain or protect such party's rights and remedies or to effect the intents and purposes of this Agreement or the other documents executed in connection with the Transactions.

Section 12.14  Expenses. Except as otherwise expressly provided herein, (a) the Purchaser shall pay its own fees, costs and expenses incurred in connection herewith and the Transactions, including the fees, costs and expenses of its financial advisors, accountants and counsel, and (b) the Sellers shall pay the fees, costs and expenses of the Sellers incurred in connection herewith and the Transactions, including the fees, costs and expenses of their financial advisors, accountants and counsel.

Section 12.15  "AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV HEREOF (BUT AS OTHERWISE LIMITED HEREBY), SELLERS MAKE NO (AND SELLERS EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO THE BUSINESS, THE OPERATION OR CONTINUED OPERATION OF THE BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR ANY OTHER MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE BUSINESS OR THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PART OF THE PURCHASED ASSETS, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY LEASED REAL PROPERTY LOCATION, THE ZONING OF ANY SUCH LEASED REAL PROPERTY LOCATION, THE VALUE OF THE BUSINESS OR THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE FUTURE RELATIONSHIP OR STABILITY OF THE CUSTOMERS OR VENDORS OF THE BUSINESS OR OF THE TRANSFERRED EMPLOYEES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS, THE BUSINESS, THE ASSUMED LIABILITIES OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV HEREOF (BUT AS OTHERWISE LIMITED HEREBY), SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV HEREOF (BUT AS OTHERWISE LIMITED HEREBY), SUBJECT TO PURCHASER'S RIGHTS UNDER THIS AGREEMENT, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND " WITH ALL FAULTS" AND WITHOUT RECOURSE AGAINST SELLERS.

Section 12.16  No Recourse. Notwithstanding anything in this Agreement or in any Purchaser Ancillary Document or Seller Ancillary Document, the Parties hereby acknowledge and agree that, except to the extent a Person is a named party to this Agreement, no Person, including

any current, former or future director, officer, employee, incorporator, member, manager, director, partner, investor, shareholder, agent, representative, or Affiliate of any such named party, shall have any liability to the other Party, and each Party shall have no recourse against, any Person other than the other Party in connection with any liability, claim or cause of action arising out of, or in relation to, this Agreement, any Purchaser Ancillary Document, any Seller Ancillary Document or the Transactions, whether granted by statute or based on theories of contract, tort, strict liability, equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise. Notwithstanding the foregoing, nothing herein shall limit, restrict, or otherwise affect any Person's right or ability to make, pursue, enforce or prosecute a claim for Fraud.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed, as of the Effective Date.

Purchaser:

**AG ACQUISITION 1 LLC**

By:_____
Name: Andrew Axelrod
Title: Authorized Signatory

[Signature page to Asset Purchase Agreement]

Sellers:

**AVANT GARDNER, LLC**

By: *Gary Richards*
Name: Gary Richards
Title: CEO


**AGDP HOLDING INC.**

By: *Gary Richards*
Name: Gary Richards
Title: Chief Executive Officer


**EZ FESTIVALS LLC**

By: *Gary Richards*
Name: Gary Richards
Title: CEO


**REYNARD PRODUCTIONS, LLC**

By: *Gary Richards*
Name: Gary Richards
Title: CEO


**MADE EVENT LLC**

By: *Gary Richards*
Name: Gary Richards
Title: CEO


[Signature page to Asset Purchase Agreement]

LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1(a) | Event Cancellation Obligations |
| Schedule 1(b) | Outstanding Event Obligations |
| Schedule 1(c) | Wind-Down Funding Amount |
| Schedule 2.1(j) | Purchased Insurance Policies |
| Schedule 2.1(r) | Other Purchased Assets |
| Schedule 2.2(m) | Other Excluded Assets |
| Schedule 2.3 | Priority Claims |
| Schedule 3.2 | Allocation of Purchase Price |
| Schedule 4.3(b) | Leased Real Property Locations |
| Schedule 4.5(b) | Employee Benefit Plans |
| Schedule 4.5(c) | Independent Contractor Information |
| Schedule 4.5(d) | Employment and Employment Practices Matters |
| Schedule 4.6 | Environmental Matters |
| Schedule 4.7 | Insurance |
| Schedule 4.8 | Legal Proceedings |
| Schedule 4.9(a) | Intellectual Property |
| Schedule 4.9(b) | Privacy |
| Schedule 4.10 | Consents |
| Schedule 4.11 | Contract Validity |
| Schedule 4.13(a) | Licenses |
| Schedule 4.13(b) | Financial Assurances |
| Schedule 4.14 | Taxes |
| Schedule 6.1 | Interim Period Activities |
| Schedule 6.7(a) | Assignable Contracts |
| Schedule 9.2 | Contractual Indemnification/Guaranty |