**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| AGDP Holding, Inc., *et al.*,[1] | ) Case No. 25-11446 (MFW) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket Nos. 12 & 62** |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' (I) DIP MOTION AND (II) SALE MOTION**

**-AND-**

**CROSS-MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (together, the "Debtors" or "Avant Gardner"), by and through its undersigned proposed counsel, hereby files:

(i)      this omnibus objection (this "Objection") to:

      (a)      the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code (i) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (ii) Granting (a) Liens and Superpriority Administrative Expense Claims and (b) Adequate Protection to Certain Prepetition Lenders; (iii) Authorizing Use of Cash Collateral; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [Docket No. 12] (the "DIP Motion"), and

      (b)      the *Debtors' Motion for Entry of (i) an Order (a) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (b) Authorizing the Debtors to Designate the Stalking Horse Bidder, (c) Scheduling an Auction and a Hearing on the Approval of the Sale of Some, All, or Substantially All of the Debtors' Assets, (d) Authorizing the Debtors to Enter Into the Purchase Agreement(s), (e) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (f) Granting Related Relief; and (ii) an Order or Orders (a) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of Encumbrances, (b) Approving the Assumption and Assignment of the Potential Assigned Contracts, and (c) Granting Related Relief* [Docket No. 62] (the "Sale Motion," and the procedures annexed thereto, the "Bidding Procedures"); and

(ii)      this cross-motion (this "Cross-Motion") seeking entry of an order appointing a chapter 11 trustee pursuant to section 1104(a) of title 11 of the United States Code (the "Bankruptcy Code").[2]

In support of this Objection and Cross-Motion, the Committee relies on the declaration of Joshua Nahas (the "Nahas Declaration") and the declaration of Brandon Batzel (the "Batzel Declaration") submitted contemporaneously herewith and respectfully represents as follows:[3]

---

[2] The Committee has filed contemporaneously herewith a *Motion of the Official Committee of Unsecured Creditors for an Order (a) Adjourning the Hearing on the Debtors' (i) DIP Motion and (ii) Sale Motion or, Alternatively, (b) Shortening the Notice and Objection Periods for, and Scheduling an Expedited Hearing on, the Cross-Motion of the Official Committee of Unsecured Creditors for Entry of an Order Appointing a Chapter 11 Trustee.*

[3] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the DIP Motion or the Sale Motion, as applicable.

## PRELIMINARY STATEMENT[4]

1.     The Committee stands ready to facilitate a value-maximizing chapter 11 sale or other transaction for the benefit of the Debtors' estates and all creditors. Unfortunately, it appears current management is only a shill for Axar Capital Management LP (together with its affiliates and each fund or account managed by them, "Axar"), a distressed debt fund run by founder and CEO Andrew Axelrod.[5] Axar, of course, is the Debtors' prepetition secured lender, the DIP lender, and the stalking horse bidder. Axar would have this Court believe that no one has been harmed more than Axar by the company's troubles. To be sure, the prudence of investing its limited partners' money in this company is highly questionable. This is especially true in light of the gross incompetence of the Debtors' pre- and post-petition fiduciaries to operate an endeavour of this scale, and those fiduciaries' cavalier and delusional fantasies dressed up as the art of the possible that would have led any prudent capital allocator to exit from the investment long ago. But instead of cutting its losses and ties, Axar doubled and tripled down executing on a "loan to own" strategy, methodically and intentionally taking incremental control over the Debtors until they were in a chokehold and had no ability operate independently. As such, Axar is squarely to blame for the failure of this enterprise.

---

[4] Certain portions of this Objection and Cross-Motion and the attached declarations are being filed under seal in accordance with the *Motion of the Official Committee of Unsecured Creditors for an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal (a) the Official Committee of Unsecured Creditors' Omnibus Objection to the Debtors' DIP Motion and Sale Motion and Cross-Motion for an Order Appointing a Chapter 11 Trustee, (b) Its Declarations in Support Thereof, and (c) Exhibits to Its Exhibit and Witness Lists for Any Hearing on the DIP Motion, Sale Motion, and Cross-Motion* filed contemporaneously herewith.

[5] BLOOMBERG L.P., *State of Distressed: Axar's Axelrod Keeping Loan-to-Own Alive* (Aug. 8, 2025) https://www.bloomberg.com/news/audio/2025-08-08/state-of-distressed-axar-s-axelrod-keeping-loan-to-own-alive (last visited Sept. 9, 2025).

2.      The evidence will show that, Axar, including Mr. Axelrod himself and through his close business associates Lilly Donohoe,[6] William Corbett,[7] Gary Richards (a/k/a DJ Destructo),[8] and Hooman Yazhari,[9] exercised and continues to exercise outsize control and undue influence over the Debtors' business. Indeed, even before these Axar insiders were installed, Axar controlled the Debtors' sole fiduciary, Jürgen "Billy" Bildstein, through ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[10]

3.      That control makes Axar a statutory (or, at least a non-statutory) insider of the Debtors and requires this Court to scrutinize the transactions and proposed process under a heightened standard that the Debtors and Axar will never be able to satisfy. Indeed, the evidence will show that the process and proposed transactions are *entirely unfair* and that this case is a foreclosure masquerading as a chapter 11 sale engineered by Axar and the Debtors' conflicted and irresponsible board of directors (the "Board") and management (with the aid of advisors installed by Axar), including Portage Point.[11] The purpose of this chapter 11 strategy is to deliver the

---

[6] Ms. Donohoe is an Axar insider and the CEO of Axar's funeral and crematorium business Everstory Partners. *See* EVERSTORY PARTNERS, Board of Directors, https://www.everstorypartners.com/about/board-of-directors (last visited Sept. 7, 2005).

[7] Mr. Corbett is an Axar insider and the Chief Investment officer of Everstory Partners. *See* EVERSTORY PARTNERS, Management, https://www.everstorypartners.com/about/management (last visited Sept. 7, 2005).

[8] Mr. Richards is an Axar insider, Avant Gardner's current CEO, former conflicted director of Avant Gardner, and the former CEO of Axar's electronic music business LiveStyle Inc. (f/k/a SFX Entertainment, Inc.) ("LiveStyle"). *See Declaration of Gary Richards in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 13] (the "First Day Declaration") ¶ 9.

[9] Mr. Yazhari is an Axar insider, a current conflicted director of Avant Gardner, and ██████████████████████████ ██████████. *See* Gasbarra Dep. 65:5-12 ████████████████████████████████ ████████████, Batzel Decl., Ex. 1. References to "Gasbarra Dep." are to the transcript of the Deposition of Jeff Gasbarra, held on September 5, 2025 and exhibits introduced at the deposition are attached as Exhibit 2 to the Batzel Declaration. Mr. Gasbarra testified as a corporate representative of the Debtors pursuant to Federal Rule of Civil Procedure 30(b)(6).

[10] *See* ██████████████████████████████████████████████████████, Batzel Decl., Ex. 3; Gasbarra Dep. 28:3-29:14 ████████████████████████████████████████████.

[11] As used herein, "Portage Point" means, collectively, Triple P TRS, LLC and Triple P Securities, LLC, the Debtors' current financial advisor and investment banker, respectively.

Debtors' business, all its valuable unencumbered assets, *and releases* to Axar for no consideration, to the exclusion of unsecured creditors and in contravention of the purposes of chapter 11.

4.      In tandem with the DIP facility, the Debtors and their advisors present the expedited sale by credit bid of substantially all their assets to Axar as the only option in these cases. The Committee opposes the interdependent DIP financing and asset sale framework, as it benefits only Axar and will provide no value to unsecured creditors. Indeed, the forced inclusion of unencumbered assets (including the proceeds of virtually all chapter 5 causes of action, as well as commercial tort claims and causes of action (which would include causes of action against Axar himself)) in the assets to be sold by credit bid will surrender the estates' most valuable assets to Axar for nothing. Further, the sale and the Bidding Procedures fail to facilitate a truly competitive bidding and auction process.

5.      The process the Debtors designed ensures no one but Axar shows up to bid by presenting an undervalued picture of Avant Gardner's business to potential third-party purchasers. The Committee's proposed financial advisor, Dundon Advisers LLC and Island Capital (together, "Dundon"), has performed a preliminary analysis based on ███████████████████████

███████████████████████████████████████████████████████

███████████████[12]█████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████[14]████████████████████████████

███████████████████████████████████████████████████████

---

[12] Batzel Decl., Ex. 4.

[13] Batzel Decl., Ex. 5.

[14] Batzel Decl., Ex. 6.

███████████████████████████████████████████████[15] ██████████████████████,

and (iv) a list of comparable publicly traded companies.[16] Dundon's analysis suggests that the true

value of Avant Gardner is between ████████████████████████████████████████

███████████████████████████████████████████████████████████.[17]

As demonstrated in the Nahas Declaration, properly renovated, the Mirage and the other venues

should generate cash flow that justifies a value ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████.[18] But the fatally defective process set up

by the Debtors will likely ensure that no other bids will materialize approximating anything near

to the potential value of the Mirage, and given that the Debtors have been marketing the assets

with a story designed to undervalue them, it unlikely that reforms now could redeem the process.[19]

6.      To be sure, as a result of the mismanagement under Axar's control, the Debtors'

business prospects in the immediate near term are dismal. At the early stage of these cases,

responsibility for the damages to the Debtors resulting from this mismanagement has not been

investigated.[20] Why? Because neither the Debtors nor their conflicted directors (all of whom,

except for Billy Bildstein, were appointed by Axar pursuant to rights given to him in 2024 under

a ████████████████████████████████████)[21], *see* First Day Decl. ¶ 8, have

---

[15] Batzel Decl., Ex. 7.

[16] Nahas Decl., Ex. A.

[17] *See* Nahas Decl. ¶¶ 11-18.

[18] *See* ████████████████████████, Batzel Decl., Ex. 8 at 12.

[19] The Committee is investigating claims and causes of action against Axar for lender liability to remedy the damages resulting from this tainted process.

[20] *See* Gasbarra Dep. 142:21-143:6 ████████████████████; *id.* 169:5-170:3 ████████████████.

[21] Batzel Decl., Ex. 9.

investigated those claims ███████████.[22] According to the Debtors' professional witness, they are █████████████████████████████████████████.[23] For reasons that evade logic, if you accept the premise that a debtor in possession has fiduciary duties, management has nevertheless already decided to sell those uninvestigated claims to Axar under its stalking horse asset purchase agreement for $0 cash consideration.

7.       The Committee submits this is a bad faith misappropriation of the chapter 11 process. Indeed, since the Committee's appointment two weeks ago, its investigation to date has revealed a troubling history that shows not only that the proposed transaction with Axar is an insider transaction on non-arms' length terms that should not be approved but also that existing management is subject to Axar's control, and cannot be entrusted with the duties of a bankruptcy trustee and remain in possession of these estates.

8.       After ██████████████████████████████████████ ███████████████████████████████████,[24] Axar ████████████ ████████████████████████████████████████████████████████ ██████[25] and taking warrants in the company ███████████████.[26] It then exploited its influence with both LiveStyle, which Axar owns, and Avant Gardner, whose fiduciary it controlled ████ ███████████████, to orchestrate the extension of "loans" from LiveStyle to Avant Gardner in connection with Avant Gardner's acquisition of the Electric Zoo festival.[27] Axar stood on both



---

[22] Gasbarra Dep. 142:21-143:6.

[23] Gasbarra Dep. 142:21-143:6.

[24] *See* Gasbarra Dep. 24:10-25:13; 28:3-29:14 ████████████████████████ ███████████.

[25] *See* Batzel Decl, Ex. 10 ████████████████████████████████.

[26] *See* ██████████████████████████████████, Batzel Decl, Ex. 11 ██████████████████████████████.

[27] The Committee's investigation of the LiveStyle transactions is ongoing. ████████████████ ██████████████████████████████████████████████████████

sides of these transactions, which ultimately resulted in the Debtors suffering massive liability and reputational harm following the 2023 Electric Zoo festival cancellations. *See infra* Relevant Background, Section A.2. In the aftermath, Axar █████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████[28]████████████████████████████

███████████████████████████████████████████████████████████████████████

███████. *See infra* Relevant Background, Section A.4. Next, in July 2024, Axar took control of two of Avant Gardner's three Board seats through rights granted to it ████████████████ █████.

9.      That Axar-controlled Board hired Josh Wyatt,[29] who, as the Debtors admitted during the section 341 meeting of creditors held on September 5, 2025, served as the CEO presiding over the disastrous execution of the Mirage renovation which, on information and belief, was the result of either duplicitous or delusional submissions to the New York City Department of Buildings (the "<u>NY DOB</u>") made by ████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████.[30]

---

████████████████████. *See, e.g.,* █████████████████████████████, Batzel Decl., Ex. 12. The Debtors and Axar purportedly attempted to clean up the structure of the LiveStyle "loans" more than two years later by executing a promissory note, dated July 16, 2024, *see* First Day Decl. ¶ 31, but the Committee has not received a copy of that note.

████████████████████████████████████████████████████████████████████.

[28] *See* Batzel Decl., Ex. 10 ████████████████████████████████████.

[29] *See* Gasbarra Dep. 62:25-63:2 ██████████████████████████.

[30] Gasbarra Dep. 67:22-25 █████████████████████████████████.

10.     On information and belief, the Mirage renovation project, overseen by the Axar-controlled Board and management, sought to classify the venue as a "temporary structure" █████ ████████████████████████████████████████[31] to evade construction and safety standards. The Debtors and Axar were determined to open for the 2025 season at all costs. They even went as far as, among other things, submitting design plans of the structure *without a roof* to circumvent maximum height requirements even though those designs made the structure unusable for its intended purpose (because the structure could not be used and would fall down without a roof), in addition to misrepresenting floor space to skirt requirements concerning square footage limits for mezzanines and balconies. In addition, instead of getting preapprovals for the design as is customary in large scale entertainment venue construction to avoid the imprudent investment of capital and time in a structure that may be condemned by the NY DOB, management or their designees sought these approvals *while simultaneously building a structure that did not comply with building and safety codes in New York.*

11.     Importantly, those codes exist for a very specific reason: the health and safety of the public. Management and the Axar-controlled Board flouted those codes in pursuit of a quixotic vision, disregarding the safety of the public, including by failing to use fire-rated materials that would satisfy combustibility standards. Thankfully for the safety of the public, but unfortunately for the Debtors' vendors who are left holding the bag, the NY DOB challenged the Debtors' temporary classification and ████████████████████████████████████████████ ████████████████████████████████████,[32] and ultimately revoked the

---

[31] *See* █████████████████.

[32] ██████████████████; *see also* Gasbarra Dep. 102:21-103:4 ██████████████████████████████████████████████.

venue's operating permit, preventing the Mirage from operating for the entire 2025 season. First Day Decl. ¶ 59.

12.     Not only does this conduct represent gross mismanagement that could have, if the NY DOB had not intervened, imperiled the safety of the public, it also was done without regard for the vendors who extended trade credit to the Debtors in reliance on the Debtors' promises to pay them as they pursued their fanciful renovation. The Committee investigation to date reveals that this is a pattern that began prepetition. On information and belief, in 2024, the Debtors strong-armed vendors to take significant discounts on outstanding invoices as the behest and for the benefit of Axar, thereby clearing significant general unsecured liabilities that Axar now stands to benefit from exclusively.[33]

13.     The Debtors' financial improvidence and malfeasance goes further. Earlier this year, management and the Board made the inexplicable decision, ████████████████ ██████████[34] (and, as the evidence will show, with Axar's full knowledge), to enter █████ ███████████ merchant cash advance transactions with TVT, Pinnacle, and Insta Funding (collectively, the "MCA Lenders"), agreeing to █████ usurious rates with █████████ ██████ that Avant Gardner now seeks to challenge through an adversary proceeding. See Adv. Compl. ¶¶ 2, 19, 113;[35] see also First Day Decl. ¶¶ 45, 48. They then turn around and use that improvident decision as a basis for filing these cases when the MCA Lenders began sweeping and garnishing accounts. See First Day Decl. ¶ 57.

---

[33] The Committee has found preliminary evidence to support this. See ████████████████████ ████████, Batzel Decl., Ex. 13 at 4, 8 ██████████████████████████████████████████ ███████████████████████████████████████████████████.

[34] See Batzel Decl., Ex. 14 █████████████████████████████████████████████████████████.

[35] Complaint, AGDP Holding Inc., et al. v. TVT Capital Source LLC, et al., Adv. Proc. No. 25-51803(MFW) (Bankr. D. Del. Aug. 4, 2025) [Docket No. 1] (the "Adversary Complaint").

14.     

15.     On information and belief, in the wake of the NY DOB's revocation of the Mirage's permits, Axar completed its chokehold maneuver on the company, instructing the head of its *funeral and cremation services* business, Ms. Lilly Donohue, who lacks any disclosed expertise or experience in the Debtors' business or industry, to take over management decisions and oversee the Mirage renovation. The Axar-controlled Board also promoted Mr. Richards to figurehead CEO and named Mr. Yazhari, who also does not appear to have any relevant experience in the arts or entertainment, as the sole member of the Board's purported restructuring committee. Axar relied on Mr. Yazhari to rubber stamp the insider DIP loans, the proposed related party sale transaction, and Axar's hand-picked engagement of Portage Point[38] to run a rigged and deeply flawed sale process designed to declare Axar the winning bidder.[39]

---

[36] Gasbarra Dep. 121:20-122:10.

[37] Gasbarra Dep. 121:20-122:7

[38] The Debtors' professional witness and corporate representative testified in the Debtors' 30(b)(6) deposition that ███ . *See* Gasbarra Dep. 125:20-127:16 . *id.* 190:5-191:1.

[39] Portage Point has positioned itself to continue to capitalize on its relationship with Axar if it is the winning bidder. [*See* Docket No. 129] ¶ 17.

16.    These revelations demonstrate that Axar is, at a minimum,[40] a controlling creditor and a statutory (or at least non-statutory) insider of these Debtors. As such, the integrated DIP Motion and Sale Motion transaction is not entitled to the business judgment rule. Rather, the DIP Motion and the Sale Motion must be subjected to heightened scrutiny under the "entire fairness" standard, requiring Axar to affirmatively demonstrate both fair dealing and fair price. Viewed through this lens of heightened scrutiny, the Debtors' and Axar's integrated scheme is replete with objectionable features designed to chill bidding, strip the estates of value, and circumvent the fundamental creditor protections of the Bankruptcy Code. In summary, these features include:

- the encumbrance and sale of the estates' most valuable unencumbered assets—including chapter 5 avoidance actions, commercial tort claims, and potential claims against insiders—to the likely targets of those very actions for no consideration, effectively granting Axar a *de facto* release (and giving Axar sole authority to release other insiders);

- an aggressive and compressed sale timeline with deficient marketing materials design to discourage interest in the assets and deter third-party bidders who lack Axar's insider knowledge of the Debtors' complex operations, particularly concerning liquor licenses, permitting, and other regulatory matters, as well as an insufficient and underfunded Committee investigation process;

- a proposed credit bid under section 363(k) of the Bankruptcy Code of Axar's prepetition debt that the Committee submits is subject to legitimate dispute (as detailed below) and sufficient "cause" exists here for the Court to deny Axar's right to credit bid;

- the establishment of a process through the DIP facility and the Bidding Procedures that together amounts to a *sub rosa* plan, dictating the outcome of these cases by disposing of all estate assets—including unencumbered assets—and granting broad, non-consensual releases, all without affording creditors the fundamental protections of adequate disclosure and the right to vote inherent in a true chapter 11 plan process; and

---

[40] The Committee believes there may be actionable claims against Axar for lender liability, recharacterization, and equitable subordination, among other claims, and seeks to disqualify Axar's credit bid for cause under section 363(k) as described below.

- after the proposed sale is consummated, the Debtors may be left with no alternative but to convert these cases to chapter 7 liquidations, as there is no guaranteed budget for an orderly wind-down, let alone a plan.

17.      For these reasons, the Court respectfully requests that the Court deny the Motions and bring these cases to a swift, efficient, and orderly conclusion through the appointment of a chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code.

## JURISDICTION

18.      This Court has jurisdiction to consider the Cross-Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2021. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The legal predicates for the relief sought herein are sections 1104(a) and 1112(b) of the Bankruptcy Code, and rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Committee confirms its consent to the entry of a final order or judgment by the Court if it is determined that this Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## RELEVANT BACKGROUND

### A.      EVENTS PRECEDING THE DEBTORS' CHAPTER 11 FILINGS

19.      The Debtors operate a multi-space entertainment venue complex, specializing in large-scale live entertainment, best known for its flagship venue, the Mirage, which also includes two indoor venues known as The Great Hall and The Kings Hall. *See* Sale Motion ¶ 6. The Debtors host world-class musical artists and their venues have become a premier destination for electronic dance music events. First Day Decl. ¶¶ 6–7.

20.     The Debtors attribute their decision to file these chapter 11 cases to their failure to open the Mirage for the 2025 season following an ambitious renovation project and aggressive collection activities by certain contractors and merchant cash advance lenders. *See* First Day Decl. ¶¶ 46–59. This simplistic narrative, however, ignores a history marked by years of mismanagement and the central and deeply troubling role of Axar and Andrew Axelrod.

## 1.     Avant Gardner's Early History of Dangerous Operations

21.     Since opening its doors in 2017, Avant Gardner and Billy Bildstein have been plagued by allegations of unlawfully overcrowding their venues beyond capacity,[41] failing to pay their employees or contractors, running afoul of license and permit requirements, and ignoring the safety of their customers. Avchukov Compl. ¶¶ 107-15;[42] Brockmole Compl. ¶¶ 30-44.

22.     For example, from 2021 to 2022, Avant Gardner purportedly was investigated by and received multiple charges from the New York State Liquor Authority ("SLA") for violations that included "employing unlicensed security guards" and "refusing inspections", which ultimately resulted in a settlement that required Avant Gardner to pay a $100,000 fine and hire an independent security monitor. Avchukov Compl. ¶ 109.[43] In addition, the NY DOB, the New York City Department of Health & Mental Hygiene, and the New York Fire Department have each allegedly "shuttered the venue for unsafe conditions" on multiple occasions. Avchukov Compl. ¶ 110. On information and belief, in 2022, Avant Gardner also purportedly held an event at a lumberyard across the street from the Mirage on or around Halloween of that year without any permit.

---

[41] At several shows held at The Great Hall between January 9, 2022 and February 18, 2022, Avant Gardner purportedly sold 23% to 33% more tickets than the venue's maximum capacity. *See* Proposed Supplemental and Amended Class Action Complaint, *Brockmole, et. al. v. EZ Festivals LLC, et al.*, Civ. Action No. 1:23-cv-08106 (S.D.N.Y. Dec. 21, 2023) [Docket No. 23] (the "Brockmole Complaint") ¶ 33.

[42] Amended Consolidated Class-Action Complaint, *Avchukov, et. al. v. Avant Gardner, LLC, et al.*, No. 1:23-cv-08106 (S.D.N.Y. Apr. 4, 2024) [Docket No. 62] (the "Avchukov Complaint").

[43] Avant Gardner allegedly denied access to the independent security monitor and refused to pay for its services. Avchukov Compl. ¶ 112.

23.     During this same period, while disregarding the safety and welfare of their patrons, Avant Gardner pursued an irresponsible growth strategy. On information and belief, Axar exploited its influence with both LiveStyle and Avant Gardner to orchestrate Avant Gardner's acquisition of the Electric Zoo festival's operations from another Axar-controlled company, LiveStyle, in May 2022. *See* First Day Decl. ¶ 23. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.[44]

### 2.    The 2023 Electric Zoo Festival Disaster

24.     The 2023 Electric Zoo festival was a disaster, leading to a class action lawsuit by multiple groups of plaintiffs and "hurt[ing] the Company's financial and reputational standing." First Day Decl. ¶ 24. The festival was billed as a three-day event over Labor Day weekend between Friday, September 1, 2023 and Sunday, September 3, 2023, and was scheduled to host an estimated 40,000 patrons. *See* Brockmole Compl. ¶ 47.

25.     On the morning of Friday, September 1, 2023, Avant Gardner announced, without any prior notice, that the first day of the Electric Zoo festival was cancelled, *see* Avchukov Compl. ¶ 58, and dishonestly blamed "global supply chain issues" through their social media accounts. *Id.* ¶ 60; Brockmole Compl. ¶¶ 52-53. In reality, however, the alleged actual reason for Friday's cancellation included Avant Gardner's "fail[ure] to build the stages . . . and other safety structures" and "fail[ure] to obtain proper inspections, approvals, and/or permits", Avchukov Compl. ¶ 62, despite being well-aware in advance that "[t]he New York City Department of Parks and Recreation would not issue the permits needed for [the 2023 Electric Zoo festival]." Brockmole Compl. ¶ 48.

---

[44] *See supra*, n.27. ██████████████████████████████████████████. *See id.*

26.     Avant Gardner's missteps continued over the remaining two days of the festival. The second day started approximately two hours later than scheduled. Avchukov Compl. ¶ 69. On Sunday, the final day of the 2023 Electric Zoo festival, Avant Gardner oversold the event by at least 7,000 tickets beyond the venue's capacity, Brockmole Compl. ¶ 55, which "led to chaos and people storming the gates to get into the festival."[45] The fiasco got the attention of New York City Mayor Eric Adams, who made statements over the following days that the city would take action against the festival's organizers.[46] The size of the general unsecured claims pool attributable to the 2023 Electric Zoo festival remains subject to the Committee's diligence, but proofs of claim asserted on behalf of the class in the class action lawsuit list the aggregate claim amount at $11 million.[47]

### 3.     Billy Bildstein Leverages the Assets of Avant Gardner to Take Ownership While Axar and Andrew Axelrod Lay the Groundwork for Control

27.     In 2021, Billy Bildstein



---

[45] *See* Charline Charles, *Electric Zoo Festival overbooked by 7,000 people, resulting in chaos,* PIX11 (Sept. 7, 2023) https://pix11.com/news/local-news/electric-zoo-festival-overbooked-by-7000-people-resulting-in-chaos/.

[46] *See, e.g.,* Alecia Reid, *Mayor Eric Adams says city will take action against Electric Zoo Festival organizers*, CBS News (Sept. 5, 2023), https://www.cbsnews.com/newyork/news/mayor-eric-adams-says-city-will-take-action-against-electric-zoo-festival-organizers/ (last visited Sept. 7, 2025).

[47] *See* AGDP Holding Inc., No. 25-11446, Claim No. 17.

[48] *See supra*, n.24.

[49] *See supra*, n.24. The Committee is currently investigating whether this transaction is an avoidable fraudulent transfer under applicable non-bankruptcy law pursuant to section 544(b).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████.[50]

### 4.    Axar Executes on its Control Strategy and Andrew Axelrod Quietly Begin to "Co-Manage" Avant Gardner

28.    Following the failed 2023 Electric Zoo festival, Axar and Andrew Axelrod stepped up their role in Avant Gardner considerably, both in terms of their investment and influence over the company's operations, with new publications suggesting that Axar has been quietly "co-managing" the Debtors since late 2023.[51] ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████.[52] In connection with its amended and restated financing agreement, Axar extracted from Mr. Bildstein ███████████████ through which Axar was given ███████████ Mr. Bildstein to appoint two directors.[53] *See* First Day Decl. ¶ 8. ████████████████

███████████████████████████████████████████████████████

---

[50] *See supra*, n.10.

[51] *See* Dave Brooks, *Brooklyn mirage has been quietly co-managed by hedge fund manager Axar Capital amid reopening drama*, BILLBOARD PRO (June 18, 2025) https://www.billboard.com/pro/brooklyn-mirage-reopening-club-co-managed-axar-capital/.

[52] *See supra*, ns.24, 25; Batzel Decl., Ex. 3.

[53] *See* ████████████████.

██████████████████████████████████████████████████████

████████████████████████████.

29.     In fact, the designees identified by Axar were Axar insiders. Mr. Richards was the CEO of LiveStyle, which is an entity that formerly owned the Electronic Zoo festival and which Axar owned as a result of transactions consummated in the and after the chapter 11 case of *SFX Entertainment* before this Court in which Axar was a prepetition secured and DIP lender.[54] Indeed, Mr. Richards testified in the section 341 meeting on September 5, 2025 that Axar owned LiveStyle. Similarly, Mr. Hooman Yazhari is a UK-trained solicitor with extensive restructuring experience, and which sits on at least one board alongside Axar's deputy chief investment officer, Grant Mitchell.[55] Avant Gardner's professional witness also testified ████████████████████████ ████████████████████████████████████[56] Further, Mr. Richards and, on information and belief, Mr. Yazhari, has been indemnified by Axar as additional protection designed to induce them to take their officer and/or director roles and evidencing that Axar has influence over the decision-making of these conflicted fiduciaries. *See* First Day Decl. n.2 (stating that the Debtors' current CEO, Gary Richards, entered into an agreement with Axar pursuant to which ***"[Axar] has agreed to backstop*** the Debtors' indemnification and reimbursement obligations" (emphasis added)).

---

[54] *See* Ben Sisario, *SFX Entertainment Emerges From Bankruptcy With New Name: LiveStyle*, N.Y. TIMES (Dec. 6, 2016), https://www.nytimes.com/2016/12/07/business/media/sfx-entertainment-livestyle.html; *In re SFX Entertainment, Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. Feb. 16, 2016) [Docket No. 108] (verified statement listing Axar as part of ad hoc secured lender group).

[55] *See* Grant Mitchell's LinkedIn profile showing that he serves as Axar's deputy chief investment officer and also sits on the board of Tortoise Capital, Mitchell, Grant, Deputy Chief Investment Officer, LINKEDIN, https://www.linkedin.com/in/grant-m-mitchell/ (last visited Sept. 7, 2025), and Hooman Yazhari's LinkedIn profile showing that he also sits on the board of Tortoise Capital, Hooman Yazhari, Attorney, LINKEDIN, https://www.linkedin.com/in/hoomanyazhari/ (last visited Sept. 7, 2025).

[56] *Supra*, n.9.

30.     Before the appointment of these Axar insiders to the Board, ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[57] In

connection with that process, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████. *See infra*, Relevant Background, Section E.

**5.      Axar Entrusts the Future of the Mirage to the Head of Axar's Funeral Business and DJ Destructo**

31.     In ████████, the Axar-controlled Board and management embarked on an ill-

considered renovation project for the Mirage.[58] *See* First Day Decl. ¶ 47. █████████

████████████████████████████████████████████ the Mirage was set to reopen on May 1,

2025 ███████████████████████████[59] █████████████████████████████████████████

███████████████████████████████.[60] Ultimately, the project failed when the

NY DOB revoked the venue's temporary operating permit just days before its scheduled

reopening, preventing the Mirage from operating for the entire 2025 season. First Day Decl. ¶ 59.

The loss of revenue from Avant Gardner's primary venue triggered an acute liquidity crisis that

precipitated this filing. *Id.*

32.     The Axar-controlled Board hired Josh Wyatt, who served as the CEO presiding

over the disastrous execution of the Mirage renovation which, as the evidence will show, was the

---

[57] Gasbarra Dep. 131:23-132:4.

[58] ███████████████████████.

[59] █████████████████████████.

[60] █████████████████████████.

result of either duplicitous or delusional submissions to the NY DOB made by or under the supervision and advice of ████████████████████████████████████████ ████████████████████████████████████████████.[61] On information and belief, the Board and former CEO Josh Wyatt, with the consent and knowledge of Axar, outsourced all permitting matters to ████████, who oversold his firm's ability to manage the permitting and planning process. Management and the Board, which at the time included two of the current Board members and CEO Gary Richards, abrogated their responsibilities to oversee this process. In fact, the Mirage's targeted May 1 reopening date was not even within the realm of the possible because management and their delegates lacked the knowledge, expertise, and managerial competence to execute on the renovation.

33.    The evidence will show that the Mirage's renovation project, overseen by the Axar-controlled Board and management, sought to classify the venue as a "temporary structure" that would allow the Debtors ████████████████████ to evade construction and safety standards, while strong-arming vendors and causing Avant Gardner to take out predatory pay day loans ██████████████████, as explained above.

34.    On information and belief, in the aftermath of the DOB's revocation of the Mirage's permits, Ms. Donohue took over day to day management of the Debtors, Mr. Yazhari was appointed to the "restructuring committee" of the Board, and Mr. Richards was reassigned from the Board to CEO.[62] At this point, Axar's control of the Debtors was complete. As put by Josh Wyatt in an email to one of the Debtors' contractors on May 6, 2025, Axar was "***very deep into our business now***" and "***running finance from above***", which included, "***personally now***

---

[61] *See* email from Josh Wyatt to one of the Debtors' contractors, dated May 6, 2025 (the "May 6 Wyatt Email"), Batzel Decl., Ex. 15 ████████████████████████████; Gasbarra Dep. 68:4-15.

[62] ██████████████████████████████████████████████ ██████████████████████████████. *See* Gasbarra Dep. 21:14-16, 75:20-76:10.

*approving all wires*."[63] ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████.[64]

35.    On May 18, 2025, Gary Richards was named as Avant Gardner's new CEO. First Day Decl. ¶ 2. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.[65]

36.    ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████.[66] █████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████[67]

37.    Axar soon began funding approximately $20 million in "protective advances", deepening the Debtors' financial distress and cementing Axar's control, *see* First Day Decl. ¶ 29, and caused Avant Gardner to retain Portage Point to run a section 363 sale process that would present an undervalued picture of the business to third-party investors and all but guarantee that Axar would be the successful bidder. Axar then relied on Mr. Yazhari to rubber stamp the insider

---

[63] May 6 Wyatt Email (emphasis added).

[64] *See* ████████████████████████, Batzel Decl., Ex. 16; ████████████████████████, Batzel Decl., Ex. 17.

[65] *See* ████████████████████████████████████████████████, Batzel Decl., Ex. 18 ████.

[66] *See* ████████████████████████████████████████, Batzel Decl., Ex. 19.

[67] ████████████████████████.

DIP loans (including rolling up the protective advances) and the proposed interested party sale of Avant Gardner to Axar.

38.     The evidence will show that Avant Gardner, under Axar's control through its self-selected Board, ███████████████████████████████████, as well as, on information and belief, ████████████████, potentially exposing the Debtors' officers and directors to personal liability. Moreover, the Committee believes that evidence will show that Axar and Andew Axelrod were aware of these violations and, despite having *de facto* control of Avant Gardner's Board, management, and financial decisions, █████████████████████████████ ██████████████████████████.

## B.     THE DEBTORS' CHAPTER 11 PROCEEDINGS

39.     On August 4, 2025 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases in the United States Bankruptcy Court for the District of Delaware. The Debtors continue to operate their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

40.     On the Petition Date, the Debtors filed the DIP Motion.

41.     On August 5, 2025, this Court held a hearing, following which, among other things, it approved the DIP Motion on an interim basis.

42.     On August 14, 2025, the Debtors filed the Sale Motion.

43.     On August 18, 2025, the United States Trustee (the "U.S. Trustee") appointed the Committee. [Docket No. 73]. On August 19, 2025, the Committee retained Orrick, Herrington & Sutcliffe LLP as lead bankruptcy counsel, and Morris James as Delaware Counsel. On August 20, 2025, the Committee selected Dundon as financial advisor.

44.     The hearing on the Sale Motion and the final hearing on the DIP Motion were initially scheduled for September 4, 2025 at 2:00 p.m. ET. The Debtors subsequently adjourned the hearing to September 11, 2025 at 2:00 p.m. ET and extended the Committee's deadline to object to the Motions to September 4, 2025 at 4:00 p.m. ET. [*See* Docket No. 134]. By agreement, the deadline for the Committee to object to the DIP Motion and Sale Motion was ultimately extended through and including September 7, 2025 at 12:00 p.m. ET.[68]

## C.     THE DIP MOTION

45.     The DIP Motion requests authorization to enter into a $45 million DIP facility consisting of $25 million of new money and commitments and a roll-up of approximately $20 million in prepetition "protective advances," a structure that effectively elevates a significant portion of Axar's prepetition, at-risk debt into postpetition, superpriority status.

46.     According to the Debtors, as of the Petition Date, the Debtors had approximately $141.9 million outstanding under Axar's prepetition term loans, including the protective advances, and approximately $11.8 million outstanding under the LiveStyle subordinated "loans" incurred when Axar caused the Debtors to acquire Electric Zoo. *See* DIP Motion ¶¶ 13, 18-20. The Debtors contend that the prepetition term loans and the LiveStyle note are secured by liens on and security in substantially all the Debtors' assets, with the LiveStyle note subordinated to Axar's term loans. *See* Interim DIP Order ¶ (E)(i)-(iii).[69]

47.     As a condition of the DIP financing, Axar is granted priming liens on all tangible and intangible assets of the Debtors' estates, whether existing before or after the Petition Date.

---

[68] Further information regarding the Debtors' history, business operations, capital structure, secured indebtedness, and the events leading up to the commencement of these chapter 11 cases can be found in the First Day Declaration.

[69] *Interim Order Pursuant to Sections 105, 361, 362, 364, 503 and 507 of the Bankruptcy Code (i) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (ii) Granting (a) Liens and Superpriority Administrative Expense Claims and (b) Adequate Protection to Certain Prepetition Lenders; (iii) Authorizing Use of Cash Collateral; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [Docket No. 46] (the "Interim DIP Order").

Crucially, this collateral package includes what are most likely the estates' most valuable, previously unencumbered assets: the proceeds of avoidance actions and commercial tort claims, which may be a primary source of potential recovery for general unsecured creditors.

48.    The DIP financing imposes a series of restrictive terms that limit creditor rights and ensure a rapid sale to Axar. These terms include an aggressively short and underfunded period for the Committee to investigate and challenge the Axar's prepetition liens, and tight case milestones tied directly to the stalking horse sale process.

### D.    THE SALE MOTION

49.    The Sale Motion seeks approval of Bidding Procedures, the designation of Axar as the stalking horse bidder, and the approval of the Stalking Horse APA.

50.    The stalking horse bid consists of a $110 million credit bid (comprising DIP and prepetition term loan obligations), assumption of certain liabilities, and a wind-down funding amount that has yet to be disclosed or agreed upon.

51.    The "Purchased Assets" include previously unencumbered assets, including: (i) avoidance actions under chapter 5 of the Bankruptcy Code, *see* Stalking Horse APA § 2.1(o), (ii) commercial tort claims, including those related to construction work, *id.* § 2.1(n), (iii) litigation claims against TVT, Pinnacle, and Insta Funding, *id.* § 2.1(p), and (iv) all tax refunds credits, and payments related to the business or the purchased assets, *id.* § 2.1(s).

52.    Axar cherry picks liabilities to assume, leaving ██████ in tax and other obligations behind. The Stalking Horse APA provides that Axar will assume only a narrow subset of the Debtors' liabilities, carefully limited to those necessary to operate the business post-closing. Specifically, Axar agrees to assume cure costs for assigned contracts, certain postpetition payables, and administrative expenses (but only to the extent included in the approved budget), accrued but unpaid employee-related obligations for "Transferred Employees" only, certain event-related

23

obligations, and a yet-to be-disclosed wind-down budget and, if applicable, 401(k) plan sponsorship. All these assumed liabilities are tightly circumscribed and subject to Axar approval or budgetary limits. By contrast, the Stalking Horse APA expressly excludes all other liabilities— including all tax obligations for pre-closing periods and employee-related liabilities for non-transferred employees. Further, while Axar has agreed to fund a wind-down budget, it expressly excluded from its own direct responsibility all significant prepetition liabilities, including unremitted trust fund taxes, ███████████████████████████████████████ ██████.[70] Notably, while the Stalking Horse APA provides for the payment of budgeted administrative expenses accrued as of the sale closing date, it offers no assurances that administrative expenses or priority claims will be satisfied if the estimates used in preparing the approved budget prove to be wrong.

53.     The Stalking Horse APA also requires the Debtors, on behalf of their estates, to grant a broad and unconditional release to Axar and its representatives, extinguishing any and all causes of action the estates may hold against them for any prepetition conduct, lender liability, or avoidance actions. *See* Stalking Horse APA § 9.2.

54.     The Stalking Horse APA also grants Axar a "free look" on contracts post-closing, giving Axar a unilateral right to use any of the Debtors' contracts for up to 75 days post-closing before deciding whether to assume or reject them. This provision leaves contract counterparties (which include artists scheduled for perform at Avant Gardner venues) in limbo, while simultaneously making it impossible to value the claims pool and potentially exposing the now assetless estates to new administrative expenses. *See* Stalking Horse APA § 6.7(f).

55.     The Debtors' proposed sale timeline is highly compressed:

---

[70] *See* Gasbarra Dep. 121:20-122:10; 164:13-165:23.

- Bid Deadline: October 8, 2025

- Auction (if necessary): October 15, 2025

- Sale Hearing: October 23, 2025

- Target Closing: November 7, 2025

**E.**    **THE DEBTORS' RIGGED AND DEEPLY FLAWED SALE PROCESS**

56.    The sale process designed and executed by the Debtors and their professionals is deeply flawed and appears engineered to chill bidding, portrays an unrealistically gloomy image of the Debtors' true value, and ensures that the assets are delivered to the insider stalking horse bidder for a fraction of their worth. ████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████. *See* Nahas Decl. ¶ 11.

57.    ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████. *See* Nahas Decl. ¶¶ 11–13, 18. ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████.

58.    ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████



███████████████████████████████████████. Nahas Decl. ¶ 14. ██████████

████████████████████████████████████████████████████████████████████

██████████████. *Id.*

59.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. *See*

Nahas Decl. ¶¶ 19, 21. The Court should not sanction a process so evidently structured to deliver

the estates' crown jewels to their insider lender at a bargain price.

**RELIEF REQUESTED**

60.    The Committee respectfully requests entry of an order denying the Motions and

appointing a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

**ARGUMENT**

**A.    OMNIBUS OBJECTION TO THE DIP MOTION AND SALE MOTION**

61.    "By definition, the business judgment rule is not applicable to transactions among

a debtor and an insider of the debtor." *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr.

S.D.N.Y. 2020). Instead, transactions between debtors and their insiders are subject to "heightened

scrutiny". *See Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) (insider's "dealings with the

corporation are subject to rigorous scrutiny"); *Schubert v. Lucent Techs Inc. (In re Winstar

Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a

debtor and an insider is to be rigorously scrutinized by the courts." (quoting *Fabricators Inc. v.

Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991))); *In re

Nugelt*, 142 B.R. 661, 667 (Bankr. D. Del. 1992) ("insider transactions are subject to greater

scrutiny than arms' length transactions"); *In re Papercraft Corp.*, 211 B.R. 813, 823 (W.D. Pa.

1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged[.]"), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *LATAM*, 620 B.R. at 769.

62.     Under the heightened scrutiny standard, a debtor has the burden to demonstrate the "entire fairness" of the proposed transaction by showing that both (a) the process leading to the transaction and (b) the price and terms of the transaction "not only appear fair but are fair." *LATAM*, 620 B.R. at 769 (quoting *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)); *see In re Los Angeles Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) (insider DIP financing "requires proof of fair dealing and fair price and terms").

63.     The Bankruptcy Code defines the term "insider" to include six statutory categories, including a "person in control of the debtor". 11 U.S.C. § 101(31). However, because of Congress's use of the term "includes" in section 101(31), "courts have identified a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside of any of the enumerated categories." *Schubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)*, 554 F.3d 382, 395 (3d Cir. 2009). In determining whether a person is a non-statutory insider, courts consider "whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length." *Id.* at 396-97 (cleaned up).

64.     Here, Axar is unquestionably an insider, either under section 101(31)'s "person in control" language or as a non-statutory insider. As set forth above, Axar controls two of the Debtors' three Board seats, and controls the third through ████████████████████████ ██████. Axar recently promoted one of its original director appointees, Gary Richards, to the Debtors' CEO, and selected the Debtors' prior CEO, Josh Wyatt,[71] who presided over the Mirage

---

[71] *See* Gasbarra Dep. 62:25-65:4 ███████████████████████████████████████.

27

renovation. *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 659 (S.D. Tex. 2008) (finding that directors' relationship with investors could establish insider status) (citing *In re Fortune Natural Res. Corp.*, 350 B.R. 693, 696 (Bankr. E.D. La. 2006) ("Indeed, when [the son of the corporate debtor's director] is without question an insider of the debtor, it would be both folly and a triumph of form over substance to hold that the LLC over which [the son] exerts complete control is not an insider.")); *accord, e.g.*, *Papercraft*, 187 B.R. at 494 (finding that a creditor whose vice president sat on the debtors' board was an insider for purposes of equitable subordination claim), *rev'd and remanded on other grounds*, 211 B.R. 813 (W.D. Pa. 1997). In addition, the evidence will show that in the months leading up to the Petition Date, Axar instructed the head of its funeral and cremation services business, Ms. Lilly Donohue, to take over control of the Debtors despite having no official capacity to do so, including the renovation project. During that same period, Axar was "running finance from above", which included, "personally . . . approving all wires."[72] As such, Axar is an insider and the Debtors have the burden to show that the proposed DIP financing and sale are entirely fair. The Debtors have not (and cannot) meet this heavy burden.

65.     The Debtors' strategy (at Axar's direction) is clear: execute a transaction (consisting of the DIP financing and stalking horse sale) that hands the Debtors' business and releases to Axar, with no meaningful process or investigation. This approach bypasses the statutory safeguards of plan confirmation—namely, adequate disclosure and creditor voting—and risks leaving the estate administratively insolvent and with insufficient funding to wind down the Debtors' estates. Those costs would instead be imposed on unsecured creditors, who will receive no recovery, while Axar takes all of the Debtors' value for itself.

---

[72] May 6 Wyatt Email.

66.    A secured lender, let alone an insider, cannot use the tools available in bankruptcy exclusively to benefit itself, whether through DIP financing, a sale under section 363 of the Bankruptcy Code, or otherwise. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("[C]onvert[ing] the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender" is not permitted); *see also In re Encore Health Assocs.*, 312 B.R. 52, 57-58 (Bankr. E.D. Pa. 2004) (denying section 363 sale because it would "only generate[] funds solely for the secured creditor which could realize the value of its collateral by foreclosing and selling the assets itself"); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 428 (Bankr. S.D. Tex. 2009) (denying section 363 sale where "[t]he only effect of the bankruptcy process would be to transfer the debtors' assets to its secured creditor with benefits that the creditor could not achieve through foreclosure."). As Judge Goldblatt noted in *In re Nova Wildcat Shurt-Line Holdings, Inc.*:

> [I]f you're a secured creditor and want to invoke the bankruptcy process for the purpose of what will likely be maximizing the value of your collateral, you don't get to impose the costs of that on other people … *you've got to pay the freight* associated with [that] process … includ[ing] paying the expected administrative expenses [of the case] including[ing] reasonable committee fees".

No. 23-10114 (CTG) (Bankr. D. Del. 2023), Mar. 2, 2023 Hr'g Tr. at 87:14-21 [Docket No. 212] (emphasis added).

67.    The Debtors' proposed insider-driven transaction will set in motion a series of steps that will ensure no one except Axar benefits in these cases, while preventing the Committee from fulfilling its statutory obligation as a counterbalance in these chapter 11 cases. Under the proposed DIP facility and Stalking Horse APA, Axar would receive, among many other benefits: (i) a roll-up of $20 million in prepetition debt; (ii) the full value of the estates' unencumbered assets—including avoidance actions, commercial tort claims, and claims against Axar itself and other

insiders—first as part of Axar's DIP collateral package and then as part of the purchased assets at the sale closing; (iii) significant adequate protection; and (iv) broad releases for virtually all manner of wrongdoing before the Committee has a chance to properly investigate Axar's actions. This is a *de facto* distribution of substantially all estate value to a single, controlling insider, while dictating no recoveries for unsecured creditors. That is not the purpose of chapter 11.

1.      **The Integrated DIP Financing and Insider Sale Constitute an Impermissible *Sub Rosa* Plan Designed to Benefit Axar at the Expense of the Estates**

68.     The DIP Motion and the Sale Motion are not separate requests for relief but rather two parts of a single, integrated scheme designed to effectuate a quick sale of substantially all the Debtors' assets to Axar under quintessential "plan-like" terms, without having to satisfy the disclosure requirements of section 1125 or adhering to any of the procedural safeguards of section 1129. Courts reject attempts like this to "circumvent the [Bankruptcy] Code's procedural safeguards." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017). So-called "*sub rosa* plans are prohibited" to prevent "transactions that will, in effect, short circuit the requirements of chapter 11 for confirmation of a reorganization plan." *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (cleaned up); *see also In re Laffite's Harbor Dev. I, LP*, No. 17-36191-H5-11, 2018 Bankr. LEXIS 2, at *6 (Bankr. S.D. Tex. Jan. 2, 2018) ("The bankruptcy court cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.") (denying DIP motion as a *sub rosa* plan where terms would grant lenders excessive control over debtor, leverage the bankruptcy process, and unduly prejudice the rights of other parties in interest); *LATAM*, 620 B.R. at 816 (touchstone consideration in assessing if DIP financing is a *sub rosa* plan is "whether the proposed terms would prejudice the powers and rights that the [Bankruptcy] Code confers for the benefit of all creditors and leverage the [c]hapter 11 process by granting the lender excessive control over the debtor or its assets as to

unduly prejudice the rights of other parties in interest"); *In re Cont'l Airlines, Inc.*, 780 F.2d 1223, 1227-28 (5th Cir. 1986) ("Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan.").

69.     The DIP facility and the Stalking Horse APA are designed to (i) transfer the estates' most valuable unencumbered assets—including avoidance actions and commercial tort claims[73]— to Axar, a potential target of those actions, for no consideration (and giving Axar sole authority to release other insiders), *see* Stalking Horse APA, § 2.1(o); (ii) grant broad, non-consensual, plan-style releases to Axar, *see* Stalking Horse APA, § 9.2; (iii) give Axar veto rights over any liquidating plan even after it has absconded with all of the estates' assets, *see* Stalking APA § 6.16; and (iv) dictate the final distribution of estate assets, likely in a manner that ensures administrative insolvency.

70.     For example, the Stalking Horse APA grants an express, non-consensual release of all estate claims against Axar. *See* Stalking Horse APA, § 9.2. The Stalking Horse APA also dictates the disposition to Axar of other estate claims and causes of action, including avoidance actions and claims against other insiders, which functionally permits Axar to grant releases to the Debtors' officers and directors. *See* Stalking Horse APA, § 2.1(o). Those are hallmarks of a plan, not a section 363 sale. Both provisions achieve the same end—a release of Axar (and presumably Gary Richards, Hooman Yazhari, █████████████████, and potentially other officers and directors)—and both impermissibly bypass the creditors who are the economic beneficiaries of

---

[73] While the Committee's investigation into Axar's prepetition liens remains ongoing, the Committee has not been provided any evidence that commercial tort claims were specifically identified prior to the Petition Date and therefore no prepetition lien attaches to them. *See In re Main Street Bus. Funding, LLC*, 642 B.R. 141, 153 (Bankr. D. Del. 2022) (Under the UCC, "security interests in commercial tort claims must be specifically identified or described in the security agreement." Moreover, "[i]n order for a security interest in a commercial tort claim to attach, the claim must be in existence when the security agreement is authenticated.").

those claims and whose consent is required (before the Committee has had an opportunity to investigate such claims). *See In re Braniff*, 700 F.2d 935, 939 (5th Cir. 1983) (finding that releases and other terms went beyond a mere "use, sale or lease of [] property" and impermissibly dictated the terms of a reorganization plan).

71.     Granting the relief sought in the DIP Motion, especially when considered together with the proposed sale, likewise constitutes a *sub rosa* plan. For example, a failure to meet any of the DIP milestones related to the sale would trigger an event of default under the DIP facility, allowing Axar to exercise remedies while cutting off the flow of cash to the estates. *See* DIP Term Loan Note §§ 14(h), 16(b); Interim DIP Order ¶ 4.2. As a result, if the Committee seeks additional time to generate interest in the assets (which may now be impossible because the existing process has already tainted the market causing severe damages to the estates), or to delay the sale while pursuing a timely challenge, Axar can terminate the DIP facility and foreclose on the collateral, effectively creating a procedural trap that discourages any changes to the process or meaningful investigation. As such, the proposed DIP financing would give Axar control over the sale process and, by extension, these cases. *See In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 814, 820 (Bankr. S.D.N.Y. 2020) (denying a DIP facility as a *sub rosa* plan in part because it "dictate[d] key terms of an eventual plan of reorganization").

72.     Lastly, the Stalking Horse APA and the DIP facility together dictate the result of these chapter 11 cases *sub rosa*: the cases will likely be converted to chapter 7 or dismissed. The Stalking Horse APA provides that Axar will assume allowed administrative expense claims as of the sale closing date and as set forth in an approved budget and provide some cash to the estates to fund wind-down expenses in an undisclosed amount. However, the proposed sale would allow Axar to leave behind ████████████████████████, and the provisions requiring

Axar to fund some to be determined wind-down costs does not specify that the amount will be sufficient to cover a plan process. The Debtors' claim that they intend to pursue a plan of liquidation is illusory. At this time, a plan is neither contemplated nor funded. Not once in the Debtors' First Day Declaration do they mention a chapter 11 plan or what a plan would look like. In sum, the proposed DIP financing/insider sale transaction *is* the Debtors' plan (driven by Axar) and it must be rejected.

**2.    The Proposed DIP Financing Does Not Meet the Entire Fairness Standard, Inappropriately Restricts the Committee, Prejudices the Outcome of the Sale Process, and is Not in the Best Interests of the Estates**

73.    The entire fairness standard demands that debtors robustly market the terms of a proposed insider transaction to third parties before they may enter into it. *See In re Innkeepers USA Tr.,* 442 B.R. at 231 (insider plan support agreement not approved where term sheet was not "shopped" prior to signing); *In re Bidermann Indus. U.S.A., Inc.,* 203 B.R. 547, 553 (S.D.N.Y. 1997) (insider sale cannot be approved under entire fairness standard where there is no "concerted effort to shop the debtors before the debtors selected a purchaser").

74.    Here, while Portage Point submitted a declaration that they solicited third-party interest for providing DIP financing, that process was far from extensive or robust. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████.[74] That does not amount to the active and vigorous marketing process required by the entire fairness doctrine and section 364 of the Bankruptcy Code. Moreover, Portage Point has since testified ████████████████████████████████████████

---

[74] *See* Gasbarra Dep. 146:24-148:18.

█████████████████████[75] ████████████████████████████████████████

███████████████████████████████████████████. Finally, in addition to the lack of

marketing efforts, the Debtors had no leverage or incentive to negotiate the terms of the DIP

Facility given Axar's complete control over a majority of the Board and management.

75.      Even if there had been a fair process (there was not), the Debtors cannot show that

the terms of the proposed DIP financing are entirely fair. The DIP facility's harsh terms include

the proposed roll-up of Axar's prepetition debt, liens on previously unencumbered assets

(including proceeds of avoidance actions and commercial tort claims) as collateral, a short sale

timeline, hair-trigger and illusory events of default, and extensive restrictions on challenge rights.

The proposed DIP facility ignores the interests of the estates and other creditors and seeks to

impose a process designed solely for Axar's benefit and which gives Axar *de facto* control over

these cases. These terms violate the Debtors' fiduciary obligations to the estates and should not be

permitted. *See In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D.N.H. 1989) (debtor's

"pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its

principal beneficiaries").[76] As such, the terms of the DIP facility are not entirely fair and the

proposed financing is not in the best interests of these estates and should be denied.

### a.      The Roll-Up Must be Subject to the Committee's Challenge Rights

76.      Approval of a roll-up requires a substantial showing of necessity by a debtor and

they are "not favored" in bankruptcy. *See In re Verasun*, No. 08-12606 (BLS) (Bankr. D. Del.

---

[75] *See* Gasbarra Dep. 125:20-127:16 ██████████████████████████████████████████; *id.* 190:5-191:1.

[76] In *Tenney Village*, the court denied a financing agreement where the confirmation of a plan over the lender's objection would constitute a termination event and permit foreclosure without a court order. *Id.* at 562. The court found that the financing terms effectively enabled the lender to control the debtor and its business, thereby "pervert[ing] the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [lender] and the Debtor's principals who guaranteed its debt." *Id.* at 568. Similarly here, the terms would enable the lenders to control the reorganization process, a task that is reserved for the Debtors as a fiduciary for the estates.

2008) Dec. 3, 2008, Hr'g Tr. at 32:20-25 [Docket No. 316] (J. Shannon noting that bankruptcy courts in the District of Delaware, the Southern District of New York, and elsewhere have found that "rollups are not favored. They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing [of need for the financing] has to be made"); *In re Bruin E&P Partners, LLC*, No. 20-33605 (Bankr. S.D. Tex. 2020), July 17, 2020 Hr'g Tr. at 67:9-10 [Docket No. 79] (finding that roll-ups are "heavily disfavored under the Bankruptcy Code").

77.     The Debtors' proposal to roll-up over $20 million in purported "protective advances" is an improper attempt to elevate a prepetition claim to superpriority status and secure it with valuable, unencumbered estate assets. Chief among these assets are avoidance actions— including potential avoidance actions against Axar itself and claims against the MCA Lenders— and previously unidentified commercial tort claims. As discussed above, these claims are not part of Axar's original collateral. The proposed roll-up is designed to ensure this value is diverted exclusively to Axar to satisfy prepetition debt.

78.     In some circumstances, a roll-up of allowable prepetition *secured* claims may be justified, but there are no grounds for doing so here. To obtain approval for a roll-up, the debtor and prepetition lender should be able to show that the lender is *oversecured*. But Axar's position is that it is undersecured with a deficiency claim in excess of its credit bid. Put differently, if Axar is really undersecured then it is effectively seeking to roll up unsecured prepetition debt. This is not permitted. *See, e.g.*, *In re Wildcat Met Mining, Inc.*, No. 22-10080. 2024 WL 1025002, *11 (Bankr. S.D.W. Va. Mar. 8, 2024) (proposed "roll-up" that would have elevated claim from general unsecured claim to superpriority administrative expense claim was "patently unapprovable"); *In re Lodgenet Interactive Corp.*, No. 13-10238 (SCC), 2012 WL 13339748, *15 (Bankr. S.D.N.Y. Oct. 1, 2012) (roll-up could be unwound upon determination that prepetition debt was

undersecured); *In re School Specialty, Inc.*, No. 13-10125(KJC), 2010 WL 11827360, *8 (Bankr. D. Del. Dec. 3, 2010) (same); *In re Revel AC, Inc.*, No. 14-22654-GMB, 2009 WL 10805298, *15 (Bankr. D.N.J. Feb. 26, 2009) (same).

79.      For these reasons, the roll-up should be denied. However, if a roll-up is approved (it should not be), then any final DIP order must specify that it will be unwound if the Committee successfully challenges Axar's prepetition liens.

### b.      The DIP Collateral Package Improperly Encumbers Unencumbered Assets

80.      The proposed DIP financing seeks to expand Axar's collateral package with liens on the proceeds of avoidance actions and other unencumbered assets. Granting liens on avoidance actions proceeds (including against Axar itself) is particularly offensive. Avoidance actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, general unsecured creditors. *See In re Cybergenics Corp.*, 226 F.3d 237, 243–44 (3d Cir. 2000), *rev'd en banc,* 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away. When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.") (internal citation omitted); *In re Tribune Co.,* 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"); *Bethlehem Steel Corp. v. Moran Towing Corp.* (*In re Bethlehem Steel Corp.),* 390 B.R. 784, 786–87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor

claims that could only be brought by a trustee or debtor in possession . . . ."); *In re Sweetwater,* 55 B.R. 724, 731 (D. Utah 1985) ("The avoiding powers are not 'property' but a statutorily created power to recover property."), *rev'd on other grounds,* 884 F.2d 1323 (10th Cir. 1989); *In re Sapolin Paints, Inc.,* 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (reciting "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell, *or otherwise transfer* the right to maintain a suit to avoid a preference" (emphasis added)).

81.    For that reason, DIP financing orders in this district and elsewhere regularly exclude avoidance actions and their proceeds from DIP financing and adequate protection collateral packages. *See, e.g.*, *In re YogaWorks, Inc.,* No. 20-12599 (KBO) (Bankr. D. Del. Nov. 9, 2020), ¶ 3(a) [Docket No. 133] (excluding avoidance action proceeds from DIP collateral); *In re Emerge Energy Services LP,* No. 19-11563 (KBO) (Bankr. D. Del. Aug. 14, 2019), ¶ 13(a)(i) [Docket No. 209] (same); *See also In re Akorn, Inc.,* No. 20-11177 (KBO) (Bankr. D. Del. June 15, 2020) ¶ 7 [Docket No. 179] (excluding avoidance action proceeds, except for postpetition transfers under section 549 of the Bankruptcy Code); *In re Proneerve Holdings, LLC,* No. 15-10373 (KJC) (Bankr. D. Del. Mar. 20, 2015), ¶ 7 [Docket No. 115] (excluding avoidance action proceeds from DIP collateral); *In re Hipcricket, Inc.,* No. 15-10104 (LSS) (Bankr. D. Del. Feb. 11, 2015), ¶ 14 [Docket No. 117] (same); *In re LSP Energy Limited Partnership,* No. 12-10460 (MFW) (Bankr. D. Del. Feb. 27, 2012), ¶ 13(a) [Docket No. 79] (same); *In re Goold Electronics Corp.*, No. 93 C 4196, 1993 WL 408366, at *3-4 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions).

82.    The Debtors have not provided any justification for the extraordinary grant of liens on, and payment of superpriority claims from, avoidance action proceeds or other unencumbered assets to Axar. Accordingly, unencumbered assets, including avoidance actions and their proceeds,

should be excluded from the DIP collateral (and similarly excluded from property used to pay any superpriority claims arising under section 507(b) of the Bankruptcy Code) and reserved for the benefit of the Debtors' unsecured creditors. Absent that, at a minimum, any final DIP order should at least exclude estate claims against ***Axar itself*** (which Axar and the Debtors have already agreed will be released under the Stalking Horse APA) and the proceeds thereof. *See In re SFX Entertainment, Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. 2016) Mar. 7, 2016 Hr'g. Tr. at 17:15–21; 20:4-9; 21:17–20 [Docket No. 198] (Walrath, J.) (rejecting liens on claims against lender itself where parties already agreed to release those claims under a restructuring support agreement).

### c.   *The Challenge Procedures, Budget, and Milestones are Designed to Thwart Meaningful Committee Oversight*

83.     The Debtors seek to prohibit the Committee from performing its statutory duties through an inadequate budget and challenge procedures. The Debtors' proposed $525,000 budget for Committee professionals is unfairly low, and the October 19, 2025 challenge deadline (i.e., 75 calendar days from entry of the Interim DIP Order) is similarly inadequate to allow the Committee to conduct a fulsome investigation.

84.     Courts in this Circuit have typically approved committee professional fee budgets of approximately 30–40% of the debtor's budget for professionals to enable the committee to perform its statutory function. *See, e.g.*, *In re Cal Div Int'l., Inc.*, No. 15-10548 (CSS), 2015 WL 9487852 (Bankr. D. Del. Dec. 28, 2015) (approving interim fee application for committee counsel of approximately 30% of all counsel fees incurred); *In re Eastern Outfitters, LLC*, No. 17-10243 (LSS) (Bankr. D. Del. Mar. 31, 2017) [Docket No. 260] (approving final DIP financing order where the budget reflected committee professional fees of approximately 35% of the Debtors' professional fee budget); *In re Pacific Sunwear of California, Inc.*, No. 16-10882 (LSS) (Bankr. D. Del. Apr. 7, 2016) (committee counsel and financial advisor fee budget approved at

approximately 35% of debtors' budget for counsel and financial advisor); *In re Evergreen Solar, Inc.*, No. 11-12590 (MFW) (Bankr. D. Del. 2011) Sept. 6, 2011 Hr'g Tr. at 42-51 [Docket No. 189] (declining to apply the debtor's proposed caps and instead, substituted a general pool for all professionals from which debtor and committee professionals could recover fees on a pro rata basis); *In re Blink Holdings, Inc.*, No. 24-11686 (JKS) (Bank. D. Del. 2024) Sept. 10, 2024 Hr'g Tr. at 65:22–66:4 [Docket No. 376] (refusing to restrict committee budget to budgeted amount and requiring all estate professionals to share pro rata from a fund).

85.     Despite this well-accepted standard, the Debtors and Axar propose a Committee professionals budget of only $525,000 —a mere ***7.6%*** of the $6,870,000 budgeted for the Debtors' professionals and far less than Axar's professionals. This obvious ploy to handicap the Committee's ability to perform its statutory function would grant an unfair advantage over the Committee and prevent the Committee from meaningfully participating in these cases. Under the circumstances here, the Committee submits that a budget of at least $2.25 million—33% of the Debtors' professional fee budget—is appropriate for the Committee's professionals.

86.     Regarding the proposed challenge period, the Committee must investigate and file a motion seeking standing, with a draft complaint attached, by October 10, 2025 (i.e., 5 business days before the expiration of the challenge deadline). This timeline would give the Committee *just 53 days* from appointment to conduct its investigation, prepare a complaint, and seek standing. Instead, the Committee submits that any final DIP order should grant the Committee automatic standing to pursue challenges, as is routinely granted in cases where, like here, the debtor has waived its right to pursue challenges itself. *See, e.g.*, *In re Old Razor Company, LLC*, No. 10-12351 (Bankr. D. Del. Aug. 27, 2010) [Docket No. 174]; *In re PCAA Parent, LLC*, No. 10-10250 (Bankr. D. Del. Mar. 2, 2010) [Docket No. 179]; *In re Pliant Corp.*, No. 09-10443 (Bankr. D. Del.

Mar. 20, 2009) [Docket No. 337]; *In re Quebecor World (USA) Inc.*, No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) [Docket No. 470]; *In re Dana Corp.*, No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006) [Docket No. 721].

87.     Further, the DIP Term Note includes the follow events of default:

- any party in interest files papers seeking to "limit or prevent the DIP Lender, the Agent, *or the Prepetition Secured Parties* from exercising their credit bid rights in connection with the sale of any" of the Debtors' assets, DIP Term Note § 16(h)(iii) (emphasis added);

- any order is entered "avoiding or requiring repayment of any payments made on account of the Obligations owing under" the DIP Term Note— thus, if the Committee successfully challenges Axar's prepetition term loans leading to an unwinding of the roll-up, it would constitute an event of default, DIP Term Note § 16(l); and

- any suit is commenced, including by the Committee, to subordinate any claim or lien of Axar, DIP Term Note § 16(p).

88.     These provisions are an inappropriate attempt to discourage the Committee from even considering bringing a potentially meritorious challenge by acting as a tripwire that will terminate the DIP facility and allow Axar walk away with its collateral before the merits of the challenge can even be weighed by the Court. As such, these provisions render the Committee's challenge rights illusory and prevent the Committee from performing its statutory function.[77] The events of default under any final DIP order cannot be rigged to allow Axar to foreclose on all of the Debtors' assets as a result of the Committee commencing a challenge. At a minimum, the "Remedies Notice Period" before Axar can exercise remedies against the DIP collateral must be tolled for so long as the Committee's challenge remains pending.

---

[77] Indeed, this very Objection—which is offered in a good faith attempt to curtail the Debtors' control person, Axar, from commandeering this Court for its benefit and to the detriment of the unsecured creditors—will default the DIP Term Note.

#### d.    Other Terms of the Proposed DIP Financing Should be Rejected

89.    In addition, the Committee submits that other terms of the proposed DIP facility are unreasonable and should be removed (or at least modified):

- the estates should not be on the hook to indemnify Axar for losses incurred in connection with a successful challenge, which would defeat or impair the purpose of such a challenge;

- Portage Point's success fee should not be included in the definition of "Allowed Professional Fees" for purposes of the carve-out. If the trigger for the carve-out occurs, that is not a successful case;

- Axar's fees and expenses cannot be covered on an uncapped basis, but need to be subject to a budget like every other party paid from the DIP loan proceeds;

- the budget for Committee professionals should be expressly available to pay for the Committee's activities in discharging its duties, including contested motion practice such as this Objection and Cross-Motion and any other objection or motion the Committee has to file in these cases;

- the DIP lender release should carve out claims arising from actual fraud, gross negligence or willful conduct. To the extent of any such activity, a bad actor should not benefit from the release; and

- the provision providing that challenges shall be released on a closing of the sale needs to be qualified to provide "except to the extent the Challenge period has been extended by Order of the court beyond the contemplated closing date" because Axar should be required to delay closing rather than have a mechanism to curtail challenge rights extended by order of the Court.

### 3.    The Court Should Deny Axar's Right to Credit Bid

90.    A court may eliminate or disallow a purported secured lender's right to credit bid for "cause" pursuant to section 363(k) of the Bankruptcy Code. 11 U.S.C. § 363(k). "[T]he right to credit bid is not absolute," and the Bankruptcy Code "plainly contemplates situations in which estate assets encumbered by liens are sold without affording secured lenders the right to credit bid." *In re Phila. Newspapers, LLC*, 599 F.3d 298, 315 (3d Cir. 2010).

91.     The term "cause" is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-case basis." *In re Old Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011); *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006) (limiting credit bid rights "for cause" is a flexible concept to be considered on a case-by-case basis). "Cause" is traditionally found, like here, in "situations in which a secured creditor has engaged in ***inequitable conduct***" harming the debtor or its estate. *In re Phila. Newspapers*, 599 F.3d at 316 n.14 (emphasis added); *In re Aloha Airlines, Inc.*, No. 08-00337, 2009 WL 1371950 (Bankr. D. Hawaii 2009) (denying right to credit bid where creditor struck a prior business deal relating to the debtor's assets with a competitor of the debtor and engaged in inequitable conduct harming the debtor); *In re The Free-Lance Star Publ'g Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (denying secured lender the right to credit bid because it leveraged its position as a secured lender to acquire additional collateral prior to the bankruptcy filing for the purpose of purchasing assets with credit in a bankruptcy case); *see also In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60-62 (Bankr. D. Del. 2014) (finding that cause existed to deny secured creditors' right to credit bid under § 363(k) of the Bankruptcy Code where the secured lender had chilled the bidding process by inequitably pushing the debtor into bankruptcy so that it could short-circuit the bankruptcy process).

92.     Courts have also found "cause" to deny a right to credit bid when "a sufficient dispute exists regarding the validity of the lien forming the basis for the credit bid." *In re L.L. Murphrey Co.*, No. 12-03837-8-JRL, 2013 WL 2451368, at *5 (Bankr, E.D.N.C. June 6, 2013) (citations omitted); *see also In re Olde Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011) ("Courts have found cause under § 363(k) to bar a secured creditor from credit bidding when the creditor's lien is questioned or otherwise in dispute."); *accord In re Figueroa Mountain*

*Brewing, LLC*, No. 9:20-BK-11208-MB, 2021 WL 2787880, at *9 (Bankr. C.D. Cal. July 2, 2021) (denied secured lender the right to credit bid based on allegations that the loan agreement and all payments were fraudulent transfers and the lender had dominated and controlled the debtor in an effort to take control of its assets); *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 61 (Bankr. D.S.C. 2010) (holding that a secured creditor, whose lien and $34 million claim were disputed and the subject of adversary proceedings seeking avoidance and equitable subordination, was not entitled to credit bid its claim at the sale of the debtor's assets); *In re McMullan*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that "[a]t any such sale, [the secured creditor] shall not be entitled to offset bid any of its claimed liens or security interests under 11 U.S.C. § 363(k) because the validity of its liens and security interests are unresolved"), *aff'd*, 162 F.3d 1164 (8th Cir.1998).

93.      Cause exists here under section 363(k) to deny Axar's $110 million credit bid based upon, among other things, Axar's inequitable conduct, as well as the fact that the validity of Axar's prepetition loan is subject to a legitimate dispute. Indeed, the Committee intends to file a motion seeking standing to commence, on behalf of the estates, an adversary proceeding against Avar to pursue claims for (i) recharacterization and (ii) equitable subordination.[78] For the reasons explained herein and as may be detailed further in an adversary complaint, there is a legitimate dispute regarding the bona fides of Axar's prepetition claim.

>    ### a.      *Denial of Axar's Credit Bid is Supported by Showings that Axar's Claims are Subject to Recharacterization and Equitable Subordination*

>    ### (1)      Recharacterization Claim

94.      Recharacterization is part of the Court's equitable authority to allow and disallow claims under section 502 of the Bankruptcy Code. *See In re SubMicron Systems Corp.*, 432 F.3d

---

[78] Axar's claim are also likely subject to challenge on other grounds, including disallowance as unmatured interest or fraudulent transfers, and may be subject to recoupment rights on account of actionable commercial tort claims sounding in lender liability.

448 (3rd Cir. 2006). Recharacterization and equitable subordination (discussed below) are equitable tools for the bankruptcy court to "ensure 'that substance will not give way to form [and] that technical considerations will not prevent substantial justice from being done.'" *Id.* at 454 (quoting *Pepper*, 308 U.S. at 306 (1939)).

95.     To distinguish debt from equity, courts consider the following eleven factors set forth in *In re Autostyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001):

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Id.* at 749–50; *see also In re HH Liquidation, LLC*, 590 B.R. 211 (Bankr. D. Del. 2018).

96.     As explained by the Third Circuit, the "overarching inquiry" is "whether the parties called an instrument one thing when in fact they intended it as something else." *SubMicron*, 432 F.3d at 456. The parties' "intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *Id.* There is "no mechanicistic scorecard" for analyzing the factors and "[a]nswers lie in facts that confer context case-by-case." *Id.*

97.     As the Committee will explain in any adversary complaint that it files against Axar, numerous facts establish that Axar's prepetition "loan" was always intended to be an investment rather than a loan:

- ████████████████████████████████████████████████████


.[79]

- In connection with the prepetition term loans, Axar received warrants to purchase up to 40% of the Debtors' outstanding equity. *See* First Day Decl. ¶ 30.

- 
.

- Axar controls two of the Debtors' three Board seats and handpicked the Debtors' current CEO (Gary Richards) as well as his predecessor, Josh Wyatt.

- Upon information and belief, the Debtors attempted but were unable to obtain alternative financing at the time Axar advanced funds to the Debtors under the prepetition term loans (with the exception of the ▮▮▮▮▮, ▮▮▮▮▮ usurious advances made by the MCA Lenders).

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .[80]

- As discussed at length herein, Axar actively participated in the Debtors' management, using Axelrod's confidant Lilly Donohue to manage operations in an unofficial capacity and "running finance from above".

98.    These facts support a finding that Axar never intended to be repaid on the loan and the Debtors never intended to repay Axar as a lender. Rather, Axar always expected to convert its investment into equity in the Debtors at the expense of trade and other unsecured creditors to obtain a windfall. Accordingly, Axar's alleged prepetition secured claims should be appropriately recharacterized as an equity investment.

---

[79] *See supra*, ns.24, 25, 52.

[80] *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Batzel Decl, Ex. 20 ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

### (2)    Equitable Subordination Claim

99.    Pursuant to section 510(c) of the Bankruptcy Code, a court may subordinate all or part of an allowed claim to all or part of another allowed claim. 11 U.S.C. § 510(c)(1). Equitable subordination is an appropriate remedy "when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants." *SubMicron*, 432 F.3d at 454. The elements of an equitable subordination claim are as follows: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Id.* at 462 (citations omitted).

100.    "Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002). However, "[t]here is no standardized test for what constitutes 'unfair conduct.' And courts look to the particularized facts before them to determine whether the conduct and injury demand equitable subordination." *In re Ashinc Corp.*, 629 B.R. 154, 217–18 (Bankr. D. Del. 2021), *order adopted in part, rejected in part*, No. 12-11564-CSS, 2022 WL 2666888 (D. Del. July 11, 2022).

101.    Courts differentiate between insiders and non-insiders when analyzing whether a parties' conduct was inequitable. For insiders, the applicable standard is much lower than for non-insiders: "An insider's conduct is 'rigorously scrutinized,' and the plaintiff 'bears the burden of presenting material evidence of unfair conduct that the insider claimant then must rebut by proving the fairness of his transactions with the debtor.'" *In re Broadstripe, LLC*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (quoting *Schubert*, 554 F.3d at 412).

102.    As an initial matter, Axar exercises complete control over the Board and management, including current CEO Gary Richards, and is clearly a statutory or non-statutory insider for the reasons explained at length above.

103.    The same inequitable conduct that weighs in favor of the appointment of a chapter 11 trustee (discussed further below) also supports equitable subordination of Axar's claim. Among other things, the Axar-controlled Board and management made decisions with severe consequences, such as submitting intentionally misleading design plans to skirt building height and square floor space requirements, failing to use fire-rated materials, seeking to evade other construction and safety standards, and entering into ███████████ merchant cash advance transactions.

104.    The harm to the creditors of the estates caused by Axar is obvious. If the sale is approved as Axar and the Debtors intend, general unsecured creditors will receive no cash from the sale and will have no chance at a recovery because the cases will (very likely) be dismissed or converted without confirmation of a chapter 11 plan. Axar will be the only creditor that receives any benefit from these chapter 11 cases.

105.    Finally, subordinating Axar's claims would be "consistent with the Bankruptcy Code" since Axar's claims, to the extent they are not recharacterized as equity, would be subordinated to other general unsecured creditors harmed by Axar's conduct, but not to equity.

106.    Because the Committee has established that there is a legitimate dispute as to the validity of Axar's claims, Axar must be denied the right to credit bid.

**b.    Limiting Axar's Credit Bid Rights Would Foster a Competitive Bidding Process**

107.    Courts have also held that the furtherance of general bankruptcy goals, such as the desire to foster a competitive bidding environment, might constitute "cause" sufficient to limit

credit bidding rights under section 363(k). *See Fisker*, 510 B.R. 55 (capping a secured creditor's right to credit bid where "[t]o do otherwise would freeze bidding"); *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (capping a secured creditor's right to credit bid where the creditor lacked a lien on certain of the debtors' assets, the creditor had engaged in inequitable conduct, and "limiting the amount of the credit bid . . . [would] restore enthusiasm for the sale and foster a robust bidding process"). Further, "a court may deny a lender the right to credit bid in the interest of any policy advanced by the [Bankruptcy] Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *See In re Phila. Newspapers, LLC*, 599 F.3d 298, at n.14 (3d Cir. 2010). Additionally, credit bidding should not be allowed when it would chill bidding and threaten notions of fairness in the bankruptcy process. *See id.*

108.   These cases present a compelling basis for finding "cause" to deny Axar's its right to credit bid. Indeed, the very party that appears to have exerted substantial control over the Debtors' operations, burdened the Debtors with unsustainable levels of debt from multiple sides (including Axar's prepetition term loans and LiveStyle debt), and led the Debtors down the path to their own demise, now attempts to "buy" the Debtors' assets while ensuring there will be no serious competition.

109.   The Debtors, operating under the direction of an Axar-selected CEO, are underselling the assets. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ .

110.     To be clear, the Debtors' advisors are not the targets of the Committee's objection. But the evidence suggests that the Debtors, operating under the direction of an Axar-appointed CEO and an Axar-controlled Board, have created marketing materials that materially understate the future potential of the Debtors' assets. This conduct serves only one purpose: to discourage third-party interest and pave the way for an uncontested, insider sale.

111.     This is precisely the scenario that the Third Circuit and the *Fisker* court warned of. The Committee has raised serious questions about the conduct that led to this point, which stem largely from Axar's complete control over the Debtors and a sale process that appears designed to undersell the assets. To then allow that same controlling insider to submit a massive, full-value credit bid[81] into this tainted process would, as the court found in *Fisker*, "freeze bidding." No rational third party will expend the time and resources to independently diligence a deal in the face of an undervalued presentation of the business when the insider who designed the flawed process can simply bid the face amount of its disputed debt, guaranteeing it will win.

112.     The true value of the Debtors' business is significantly greater than the Debtors represent. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ . *See* Nahas Decl. ¶ 17. ████████████████

███████████████████████████████████████████████████

███████████████████████████ . *See id.* ██████████████████████

---

[81] Although Axar proposes to credit bid only $110 million of combined DIP and prepetition obligations, under the current Bidding Procedures it could bid the full value of its debt.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████.

113.     As such, in addition to the grounds for cause in an adversary complaint against Axar (which support denying Axar's credit bid completely), "cause" also exists under section 363(k) to limit Axar's credit bid to the value of the new money DIP loans to ensure a fair and open auction.

> **c.     Alternatively, Axar's Credit Bid Rights Should be Conditioned Upon Final Adjudication of any Adversary Complaint Filed Against Axar**

114.     If the Court does not deny Axar's credit bid outright, at a minimum the Court should condition the right of Axar to credit bid on the final adjudication of the claims in any adversary complaint that the Committee files against Axar. For the reasons described above, the Committee has presented legitimate challenges to Axar's claims. Those claims will most likely not be fully adjudicated before the sale hearing. Accordingly, if Axar is the successful bidder and the Committee later succeeds on its equitable subordination, recharacterization, or other claims, then Axar should be required to pay cash for the assets in an amount equal to its successful bid amount. Otherwise, these estate claims would be rendered moot. *See In re KII Liquidating, Inc.*, 607 B.R. 398 (D. Del. 2019). To ensure that the estates' remedy is preserved, Axar should be required to post a bond or fund an escrow account in the total amount of its successful bid until the claims have been fully adjudicated. To that end, all marketing materials must explicitly and conspicuously state that Axar's credit bid remains subject to the Committee's challenge rights and may be disallowed, subordinated, or reduced.

115.     Furthermore, any right of Axar to credit bid the full amount of its alleged prepetition secured obligations should only be permitted in combination with a cash bid that is sufficient to:

(a) pay all administrative expenses and priority claims associated with the sale; (b) provide adequate funding to administer and wind down the Debtors' estates, as determined in consultation and with the consent of the Committee; and (c) provide a distribution to general unsecured creditors. The credit bid should also not be applied to any of the Debtors' unencumbered assets, including commercial tort claims, the claims asserted in the adversary proceeding against the MCA Lenders, avoidance actions, or avoidance proceeds. The sale of any such unencumbered assets to Axar must require a cash payment at fair market value.

### 4.    The Proposed Sale is Fundamentally Flawed to Axar's Benefit, Does Not Meet the Entire Fairness Standard, and Should be Denied

116.    The primary objective of a section 363 sale is to realize optimal value for a debtor's estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc.* (*In re Barn Stores, Inc.*), 107 F.3d 558, 564–65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Patriot Coal Corp.*, 493 B.R. 65, 78-79 (Bankr. E.D. Mo. 2013) ("The overarching goal . . . is . . . to maximize the value of Debtors' estates for the organized benefit of all stakeholders."); *In re Wintz Companies*, 219 F.3d 807, 812 (8th Cir. 2000) ("The sale procedure approved by the bankruptcy court provided for [a process] calculated to maximize the value the estate might obtain."); *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005) ("The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances."); *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring better benefit to the estate); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa.

1998) (noting judges should encourage "fervent bidding" that "redounds to the benefit" of the bankruptcy estate).

117.    Bidding procedures should "provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests." *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004). Thus, courts will refuse to approve procedures that "undermine principles of fair play" because "unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value." *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

118.    A stalking horse is intended to "serve as a catalyst for other bidders[.]" *In re Energy Future Holdings*, 990 F.3d 728, 744 (3d Cir. 2021) (citing *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992)); *see also In re AE Liquidation, Inc.*, 866 F.3d 515, 519 n.3 (3d Cir. 2017) (stalking horse "enters into an asset purchase agreement with the debtor … prior to an auction" and "establish[es] a competitive floor or minimum bid").

119.    As noted above, heightened scrutiny applies to the proposed insider sale to Axar. The Court cannot simply defer to the Debtors' business judgment. Instead, the Court must analyze the proposed Bidding Procedures and the Stalking Horse APA to determine whether they "make economic sense and are in the best interest of the bankruptcy estate and its creditors." *See In re Wintz Companies*, 230 B.R. 840, 846-47 (B.A.P. 8th Cir. 1999).

> **a.    The Stalking Horse Bid and Sale Process are Tainted by Axar's Manipulation and Self-Dealing**

120.    As explained above, Portage Point is running a rigged process designed to declare Axar and Andrew Axelrod, ████████████████████████████████████████, the winning bidder. ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████.[82] ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████.[83] ████████████████████████

██████████████████.[84] █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████.[85] Notably, the

Debtors' professional witness was not even the Portage Point professional running the sales process, calling into question whether the Debtors have satisfied their duty to produce a corporate representative with requisite knowledge to cover the topics of the 30(b)(6) deposition.

121.    The sale of claims to Axar (which have not been investigated) is particularly egregious given that the decision was made by fiduciaries installed by and beholden to the Axar. This raises serious questions concerning the directors' fulfillment of their fiduciary duties, as the Board is causing the estates to effectively forfeit one of their most valuable litigation assets for the direct benefit of its directors' patron (who has also backstopped their indemnification obligations,

---

[82] *See* Gasbarra Dep. 178:17-190:2.

[83] *See* Gasbarra Dep. 188:15-24.

[84] *See* Gasbarra Dep. 188:25-190:2.

[85] *See* Gasbarra Dep. 186:24-188:7.

*see* First Day Decl. n.2). The Committee also has serious concerns about the fact that Axar's stalking horse bid involves the acquisition of claims against the *same* directors and officers making the decision to approve the sale (which the Committee must assume will be released by Axar if it is the winning bidder), casting further doubt on the Board's independence.

122.    For the foregoing reasons, the Debtors cannot satisfy their burden to show that the transactions under the Sale Motion are the result of a fair process.

> **b.    The Stalking Horse APA Improperly Transfers Unencumbered Value Away from the Estates for No Consideration**

123.    The Stalking Horse APA, if approved, would sell the estate's avoidance actions to Axar, the likely defendant in those actions—a perversion of bankruptcy law. Stalking Horse APA § 2.1(o). Avoidance actions are not assets of the debtor that can be sold like inventory; they are statutory powers held by the estate for the benefit of unsecured creditors. *See In re Cybergenics Corp.*, 226 F.3d at 243–45 (fraudulent transfer claims are not assets of the debtors and cannot be transferred to a buyer of the debtors' assets); *In re Tribune Co.*, 464 B.R. 126, 200 (Bankr. D. Del. 2011), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011) (same).

124.    Here, Axar's prepetition liens would not extend to avoidance actions or commercial tort or other claims that may exist against Axar absent the proposed DIP facility. *See In re Oakwood Homes Corp.*, No. 02-13396PJW, 2005 WL 670310, at *4 (Bankr. D. Del. Mar. 18, 2005) (avoidance actions "are creatures of statute, available in bankruptcy solely for the benefit of creditors of the debtor, whose rights the trustee enforces") (citing *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989)).

125.    Allowing Axar to acquire those assets now, on account of DIP liens, which are also being used in a credit bid to acquire all the Debtors' assets, would deprive unsecured creditors of what may be one of the few potentially valuable sources of recovery in these cases. More

importantly, the Committee has not had sufficient time, nor been provided with, sufficient documentation to determine the value of these the avoidance actions and the extent to which it would be appropriate to include these actions in the stalking horse sale. As such, the Debtors cannot satisfy their burden to show that the transactions under the Sale Motion are fair terms for the estates.

126.    In any approved Stalking Horse APA, all previously unencumbered claims and causes actions, together with any other estate causes of action, should be "Excluded Assets." Similarly, the definition of "Excluded Assets" under the Stalking Horse APA includes the "Sellers' directors and officers liability insurance policies," yet the definition of "Purchased Assets" includes "proceeds of any insurance policies related to any such rights, claims, and causes of action." *Compare* Stalking Horse APA ¶ 2.2(f), *with* Stalking Horse APA ¶ 2.1(c). Any order approving bidding procedures should make clear that all insurance proceeds and policies, other than insurance specifically tied to the transferred assets, are Excluded Assets.

127.    Finally, the Stalking Horse APA would give Axar a unilateral right to use any of the Debtors' contracts for up to 75 days post-closing before deciding whether to assume or reject them. *See* Stalking Horse APA § 6.7(f). In other words, for nearly three months after the sale closes, Axar would have the ability to take a free ride on the backs of unsecured creditors by continuing to cancel upcoming schedules shows (which would result in rejection damages that inflate the general unsecured claims pool), while keeping all revenue from shows that Axar decides will go forward for itself. The Court must not approve these terms.

## B.    CROSS-MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

128.    Section 1104(a) provides that, upon request, the Court "shall" order the appointment of a Chapter 11 trustee upon a showing (i) of "cause", including fraud, dishonesty,

incompetence, or gross mismanagement, "either *before or after* the commencement of the case", or (ii) that such appointment "is in the interests of creditors". 11 U.S.C. § 1104(a) (emphasis added).

129.    Where the court finds either that cause exists or that the appointment of a trustee is in the interest of the parties, "an order for the appointment … is mandatory." *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

130.    While section 1104(a)(1) lists "fraud, dishonesty, incompetence, or gross mismanagement" as examples of what constitutes "cause" for the appointment of a chapter 11 trustee, this list is non-exhaustive. *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998). Thus, courts have found cause in cases involving "*conflicts of interest*; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; *lack of adequate disclosure*; lack of appropriate cost controls; *transgressions related to taxes*; failure to make required payments; *lack of credibility and creditor confidence*; and breaches of fiduciary duties." *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020) (emphasis added).

131.    Section 1104(a)(2) provides the Court with "particularly wide discretion" to appoint a chapter 11 trustee even absent wrongdoing or mismanagement. *See In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (N.D. Ill. 1994). In determining whether to appoint a Chapter 11 trustee under the "in the interests of creditors" test, courts consider: (a) the debtor's trustworthiness; (b) the debtor's past and present performance and potential for reorganization; (c) whether creditors have confidence in present management; and (d) the benefits of appointing a trustee balanced against the costs of appointment. *See, e.g.*, *Vascular Access*, 611 B.R. at 765; *Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016) (analyzing same factors). Given the flexibility afforded to courts under

section 1104(a), findings of "cause" and findings of "best interests" are often "intertwined and dependent on the same facts." *Vascular Access*, 611 B.R. at 765.

132. . The Committee agrees. The need for a chapter 11 trustee is easily established by the facts of these cases:

- **Fraud or Dishonesty**. The evidence will reveal that the Debtors perpetrated a fraud on, and acted dishonestly in discussions with, their suppliers and, potentially, the City of New York. The Debtors' representatives assured their suppliers for the Mirage's renovation project that the venue would obtain the necessary permits to open for the 2025 season (in addition to having strong-armed their vendors to take significant discounts at the behest and for the benefit of Axar). Those same representatives sought to classify the venue as a "temporary structure" that would allow the Debtors to ████████ evade construction and safety standards, which would have put customers at risk of injury or death. On information and belief, the Debtors and Axar were determined to open for the 2025 season at all costs, making decisions with serious consequences, at a minimum, (i) submitting design plans for the structure *without a roof* to circumvent maximum height restrictions (despite a roof being essential to the structural integrity and intended use of the structure—as designed, the walls of the structure would collapse without a roof in place) and that misrepresented floor space to skirt applicable square footage limits for mezzanines and balconies, and (ii) failing to use fire-rated materials that would satisfy the combustibility standards under New York City building codes. This alone is cause to appoint a chapter 11 trustee. *See In re PRS Ins. Grp., Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001) (fraud or dishonesty is sufficient to warrant appointment of a trustee under § 1104(a)(1)); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) ("Dishonesty provides a reason to appoint a trustee under § 1104(a)(l)."); *In re Davis*, Nos. 09-10198-8-JRL, 10-02711-8-JRL, 2010 WL 2640587, *2 (Bankr. E.D.N.C. Jun. 29, 2010) (fraud or dishonesty by a debtor or its managers is one of "[t]he clearest examples [where appointment of a trustee is warranted]").

- **Incompetence or Gross Mismanagement**. Since January of this year, the Debtors made the inexplicable decision to enter ████████  merchant cash advance transactions during the Mirage renovation project, agreeing to ████████ usurious rates with ████████ ████████. *See* Adv. Compl. ¶¶ 2, 19, 113. The Debtors' inexplicable

57

decision to agree to predatory payday loans, ████████
████████, clearly evidences incompetence and
gross mismanagement. *See In re Sharon Steel Corp.*, 86 B.R. 455, 458
(Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1990) (incompetence
and gross mismanagement are the most common grounds for appointment
of a trustee under § 1104(a)(1)).

- **More Incompetence or Gross Mismanagement**. There is a serious
question as to whether the Debtors have any real corporate governance or
management structure at this time. On information and belief, Axar
instructed the head of its funeral and cremation services business, Ms.
Donohue to take over control of the Debtors in an unofficial capacity,
including the renovation project. Axar also promoted Mr. Gary Richards
(aka DJ "Destructo") (who Axar previously appointed to the Debtors' Board
along with Mr. Yazhari) as the Debtors' figurehead CEO and named Mr.
Yazhari as the sole member of the Board's purported restructuring
committee. This, again, clearly evidences incompetence and gross
mismanagement.

- **Conflicts of Interest**. The Debtors' Board and current CEO are hopelessly
conflicted, as they were all appointed at the direction of Axar and Andrew
Axelrod. Mr. Bildstein is also conflicted because ████████
████████. Axar also relied on its self-appointed Board
member, Mr. Yazhari, to serve as the sole member of the restructuring
committee and rubber stamp the insider DIP loans, the proposed interested
party sale transaction, and Axar's hand-picked engagement of Portage Point
to run a rigged and deeply flawed sale process designed to declare Axar the
winning bidder. In addition, Axar engaged in self-interested transactions by
orchestrating the extension of "loans" from another one of its companies,
LiveStyle, to the Debtors to finance their purchase of the Electric Zoo
festival's operations from LiveStyle. Axar stood on both sides of these
transactions, which ultimately resulted in the Debtors suffering massive
liability and reputational harm. As such, there is ample cause for the
appointment of a chapter 11 trustee. *See Vascular Access*, 611 B.R. at 767
(conflicts of interest of debtor's principal alone would support finding that
cause existed to appoint a chapter 11 trustee); *In re Morningstar Marketplace,
Ltd*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016) (conflicts of interest arise when
a debtor's management has multiple roles and are a factor in whether cause
exists to appoint a trustee); *In re Westbank Holdings, LLC*, No. 22-10082,
2022 WL 3052135, *13 (Bankr. E.D. La. Aug. 1, 2022) ("[A] finding that
the principals or managers of a debtor possess irremediable conflicts of
interest can … serve as 'cause' to appoint a trustee under § 1104(a)(1).");
*In re Patman Drilling Inter., Inc.*, No. 07-34622-SGL, 2008 WL 724086,
*6 (Bankr. N.D. Tex. Mar. 14, 2008) (finding cause existed to appoint a
chapter 11 trustee "because of the overwhelming conflicts of interest of the
Debtor's management"); *In re BLX Grp., Inc.*, 419 B.R. 457, 472 (Bankr. D.
Mont. 2009) (concluding that appointment of chapter 11 trustee to manage a

sale process was in the best interests of creditors because it would "eliminate the insider circumstances and conflicts of interest" and would allow for a "professionally managed sale process"); *Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee."); *Euro-American Lodging*, 365 B.R. at 427-28 ("Where [a chapter 11 debtor and its managers] suffer from material conflicts of interest, an independent trustee should be appointed under § 1104(a)(2)."); *In re McCorhill Publ., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (where there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, appointment of a trustee is warranted in the best interests of all creditors and all parties in interest to investigate the financial affairs of the debtor).

- **Transgressions Related to Taxes**. The Debtors have admitted ██████ ██████████████████████████████████, potentially exposing the Debtors' officers and directors to personal liability. Moreover, the Committee believes that evidence will show that Axar and Andew Axelrod were aware of these violations and, despite having *de facto* control of the Debtors' Board, management, and financial decisions, ███████████ ██████████████████████. *See Euro-American Lodging*, 365 B.R. at 426 ("'Gross mismanagement' includes the chronic failure to pay taxes, particularly where the failure leads to liability for interest and penalties."); *In re Great Northeastern Lumber & Mill Work Corp.*, 20 B.R. 610, 611 (Bankr. E.D. Pa. 1982) (failure of the debtor to pay sales taxes for six years constituted such gross mismanagement as to constitute "cause" for the appointment of a trustee under §1104(a)(1)); *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985) (debtor's continuous failure to file tax returns was sufficient cause for appointment of a trustee).[86]

- **Breaches of Fiduciary Duty**. The Debtors' assets may include claims and causes of action against current and former officers and directors, including Mr. Richards and Mr. Yazhari for their actions since joining the Board in July 2024, as well as founder and current director Mr. Bildstein. The current Board and management cannot be expected to exercise their fiduciary duty to investigate and prosecute claims against themselves. *See In re Grasso*, 490 B.R. 500, 518 (Bankr. E.D. Pa. 2013) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985)) ("Allowing a debtor to remain in control of its business during a bankruptcy filing is 'premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"); *Vascular Access*, 611 B.R. at 764 ("A debtor-in-possession's inability or unwillingness to discharge its fiduciary responsibilities necessitates the

---

[86] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████.

appointment of an independent trustee"); *In re Circulatory Centers of America,* LLC, 579 B.R. 752, 760 (Bankr. W.D. Pa. 2017) ("In instances where principals actively elevate their own interests above those of the debtor to the point that it causes or is substantially likely to cause significant damage to the bankruptcy estate, a trustee has been deemed appropriate."); *see also PRS Ins. Grp.*, 274 B.R. at 389 (appointment of trustee appropriate under section 1104(a)(2) where causes of action against insiders were a significant asset of the estate).

- **Lack of Adequate Disclosure**. While the Debtors have produced pre-documents and communications, the professional witness that the Debtors put up for deposition aimed at their sale process is not even on Portage Point's investment banking side. In addition, Axar's counsel has largely stonewalled the Committee regarding its requests for production for the past few weeks, before suddenly dumping thousands of documents on the Committee right before its objection deadline.[87]

- **Acrimony and Lack** . The Debtors and the Committee have reached a standstill. *See Marvel Ent. Grp.*, 140 F.3d at 466-67, 472-74, 478 (affirming appointment of a trustee based on debtor acrimony towards creditors); *Grasso*, 490 B.R. at 525 (debtor's animosity towards creditors for their legitimate attempts to evaluate the debtor's financial affairs warranted appointment of a trustee). This befits a *Marvel Entertainment* solution.

133.    In light of the Debtors' prepetition incompetence and dishonesty, obvious conflicts of interest, and the proposed insider DIP financing and sale, the Committee is shocked that the Debtors did not engage a financial advisor to provide a chief restructuring officer (a "CRO") which, if done properly, could have helped alleviate concerns of mismanagement. However, no CRO was appointed. Instead, Axar remains in control of the Board, and, ultimately, Mr. Richards and any other CEO that may be employed through the rights granted to Axar ███████████ ██████. Both Mr. Richards and Mr. Yazhari are also key figures in the Debtors' demise and, by extension, will be key subjects of any investigation regarding the Debtors' prepetition entanglements. In contrast, a duly appointed chapter 11 trustee would displace the Axar-appointed Board's control over the Debtors' estates and start from a position of independence.

---

[87] The Committee reserves the right to seek to file supplemental briefing based on its review of Axar's production.

134.     For the foregoing reasons, the Court should grant the Committee's Cross-Motion, ordering the immediate appointment of a chapter 11 trustee under section 1104(a) of the Bankruptcy Code.

## **RESERVATION OF RIGHTS**

135.     The Committee and its members reserve all their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection and Cross-Motion, to seek discovery, to raise additional objections and introduce evidence during the hearing on the DIP Motion, Sale Motion, and Cross-Motion, and to negotiate and document alternative terms and proposals.

## **NOTICE**

136.     Notice of this Cross-Motion has been provided to: (i) the U.S. Trustee; (ii) counsel to the Debtors; (iii) counsel to Alter Domus (US) LLC, in its capacity as administrative agent under the Prepetition Financing Agreement and the DIP Facility (as defined in the DIP Motion); (iv) counsel to the DIP Lenders and the Prepetition Term Lenders (as defined in the DIP Motion) and the Stalking Horse Bidder (as defined in the Sale Motion); (v) counsel to LiveStyle; and (vi) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Committee respectfully submits that no further notice is required.

## **CONCLUSION**

WHEREFORE, the Trustee respectfully requests that the Court (i) sustain this Objection, (ii) deny the relief requested in the DIP Motion, (iii) deny the relief requested in the Sale Motion, (iv) grant the Committee's Cross-Motion by ordering the immediate appointment of a chapter 11 trustee, and (v) grant the Committee such other or further relief as it deems appropriate.

*[Remainder of Page Intentionally Left Blank]*

Dated: September 7, 2025          Respectfully submitted,


By: */s/ Eric J. Monzo*
     **MORRIS JAMES LLP**
     Eric J. Monzo (DE Bar No. 5214)
     Siena B. Cerra (DE Bar No. 7290)
     Delaware Avenue, Suite 1500
     Wilmington, DE 19801
     Telephone: (302) 888-6800
     Facsimile:  (302) 571-1750
     E-mail: emonzo@morrisjames.com
         scerra@morrisjames.com
     -and-


     **ORRICK, HERRINGTON & SUTCLIFFE LLP**
     Mark Franke (admitted *pro hac vice*)
     Nicholas Poli (admitted *pro hac vice*)
     Brandon Batzel (admitted *pro hac vice*)
     Ari Roytenberg (admitted *pro hac vice*)
     51 West 52nd Street
     New York, NY 10019
     Telephone: (212) 506-5000
     Facsimile:  (212) 506-5151
     Email: mfranke@orrick.com
        npoli@orrick.com
        bbatzel@orrick.com
        aroytenberg@orrick.com


     -and-

     Nick Sabatino (admitted *pro hac vice*)
     400 Capitol Mall, Suite 3000
     Sacramento, CA 95814
     Telephone: (916) 447-9200
     Facsimile:  (916) 329-4900
     Email: nsabatino@orrick.com


     *Proposed Counsel to the Official Committee of*
     *Unsecured Creditors*