**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING, INC., *et al.*,[1] | Case No. 25-11446 (MFW) |
| Debtors. | Jointly Administered |
| | **Hearing Date: October 22, 2025 at 10:30 a.m.**<br>**Obj. Deadline: October 15, 2025 at 4:00 p.m.** |

**OBJECTION OF TVT CAPITAL SOURCE LLC, INSTA FUNDING LLC, AND
PINNACLE BUSINESS FUNDING LLC TO DEBTORS' MOTION PURSUANT TO
SECTIONS 105 AND 363(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULE 9019 FOR AN ORDER APPROVING SETTLEMENT BY AND AMONG THE
DEBTORS, AXAR CAPITAL MANAGEMENT LP, AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

TVT Capital Source, LLC, Insta Funding, LLC, and Pinnacle Business Funding LLC (collectively, the "MCA Funders") by and through their undersigned counsel, hereby file this objection (the "Objection") to the *Debtors' Motion Pursuant to Sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving Settlement by and among the Debtors, Axar Capital Management, LP, and the Official Committee of Unsecured Creditors* [Docket No. 262] (the "9019 Motion"), respectfully rely on the *Declaration of Andrew Fellus* (the "Fellus Decl."), submitted herewith, and state as follows:

**PRELIMINARY STATEMENT**

As admitted by the Debtors in the 9019 Motion, the Official Committee of Unsecured Creditors ("Committee") commenced substantial due diligence regarding the Debtors' finances and operational affairs following its appointment on August 18, 2025. *See* 9019 Motion, at ¶11.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are AGDP Holding, Inc. (6504); Avant Gardner, LLC (6054); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave., Brooklyn, NY 11237, Attn: General Counsel.

10023340

As a result of such due diligence, the Committee filed, just one month ago, an eye opening (yet heavily redacted)[2] objection to the proposed sale process and DIP financing arrangement, including a request for the appointment of a chapter 11 trustee.  *See Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtors' (I) DIP Motion and (II) Sale Motion and Cross-Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* [Docket No. 150] (the "Committee Objection").  As put best by the Committee itself, and as related to the misconduct of the Debtors' prepetition lender, Axar Capital Management LP and its CEO Andrew Axelrod:

i.   "[C]urrent management is only a shill for Axar Capital Management LP[3] . . . a distressed fund run by founder and CEO Andrew Axelrod."  *See* Committee Objection, at ¶1.

ii.  "Axar is squarely to blame for the failure of this enterprise." *See id.*

iii. "Axar, including Mr. Axelrod himself and through his close business associates Lilly Donohoe, William Corbett, Gary Richards (a/k/a DJ Destructo), and Hooman Yazhari, exercised and continues to exercise outsize [sic] control and undue influence over the Debtors' business.  Indeed, even before these Axar insiders were installed, Axar controlled the Debtors' sole fiduciary, Jürgen "Billy" Bildstein . . . ."  *See id.*, at ¶2.

iv.  "That control makes Axar a statutory (or, at least a non-statutory) insider of the Debtors and requires this Court to scrutinize the transactions and proposed process under a heightened standard that the Debtors and Axar will never be able to satisfy." *See id.*, at ¶3.

v.   "[T]he evidence will show that the process and proposed transactions are entirely unfair and that this case is a foreclosure masquerading as a chapter 11 sale engineered by Axar and the Debtors' conflicted and irresponsible board of directors (the "Board") and management (with the aid of advisors installed by Axar), including Portage Point.  *See id.*, at ¶3.

vi.  "The purpose of this chapter 11 strategy is to deliver the Debtors' business, all its valuable unencumbered assets, *and releases* to Axar for no consideration."  *See id.*, at ¶3 (emphasis in original).

---

[2] The MCA Funders question the basis for many of the redactions.

[3] Axar Capital Management, LP is referred to herein as "Axar". Axar's CEO is Andrew Axelrod, referred to herein as "Axelrod."

10023340

vii.   "[A]s a result of the mismanagement under Axar's control, the Debtors' business prospects in the immediate near term are dismal. At the early stage of these cases, responsibility for the damages to the Debtors resulting from this mismanagement has not been investigated. Why? Because neither the Debtors nor their conflicted directors (all of whom, except for Billy Bildstein, were appointed by Axar pursuant to rights given to him in 2024 . . . ) have investigated those claims." *See id.*, at ¶6.

viii.  "[T]his is a bad faith misappropriation of the chapter 11 process." *See id.*, at ¶7.

ix.    The Axar-controlled Board also promoted Mr. Richards to figurehead CEO and named Mr. Yazhari, who also does not appear to have any relevant experience in the arts or entertainment, as the sole member of the Board's purported restructuring committee. Axar relied on Mr. Yazhari to rubber stamp the insider DIP loans, the proposed related party sale transaction, and Axar's hand-picked engagement of Portage Point to run a rigged and deeply flawed sale process designed to declare Axar the winning bidder." *See id.*, at ¶15.

x.     "The Committee believes there may be actionable claims against Axar for lender liability, recharacterization, and equitable subordination, among other claims, and seeks to disqualify Axar's credit bid for cause under section 363(k) as described below." *See id.*, at ¶15, n. 40.

Even based only on the limited information outlined by the Committee in the Committee Objection, releasing Axar/Axelrod for the above-outlined misconduct for the limited value provided in the proposed 9019 Motion is not acceptable under any relevant standard. The MCA Funders themselves have suffered at the hands of the Debtors' management and Axar, having been induced to provide the Debtors with $11,000,000,[4] and with Axar never intending to repay the remaining principal balance of $7,300,000. *See e.g., Answer, Affirmative Defenses, and Counterclaims of TVT Capital Source LLC, Insta Funding LLC, and Pinnacle Business Funding LLC* [Docket No. 24 in Adv. Pro. No. 25-51803] (the "MCA Funders' Answer"), Counterclaims, at ¶¶10, 11, 15, 16, 24, 25, 32, 33, 40, 44, 45, 46, 47, 80, 81. Such funds are instead being used solely for Axar's benefit. *See id.*, at ¶¶45-47.

---

[4] The $11,000,000 was collectively funded by the MCA Funders and White Star Funding Inc. d/b/a TVT Cap ("White Star").

10023340

Similarly, the 9019 Motion purports to allow for the release of various conflicted officers and directors, including Pam Corrie, Alec Ifshin, Hooman Yazhari, and Gary Richards (aka "DJ Destructo")—all of whom are beholden to Axar and Axelrod, and did their bidding during the prepetition period.  *See* Committee Objection, at ¶2; *see also* 9019 Motion, at p. 11.  The 9019 Motion fails to explain the rationale behind such releases, and what consideration is being provided by these parties for such releases.

While the MCA Funders intend to pursue their direct claims against Axar, Axelrod, and any other parties involved in misconduct against the MCA Funders, these estates should not be able to walk away from valuable derivative claims based on the evidence set forth by the Committee to date.

## THE PREPETITION SECURED LENDER AS A BAD ACTOR

1.      The MCA Funders hereby adopt the factual background as outlined in the Committee's Objection.  Consistent with the many allegations espoused by the Committee, the MCA Funders have similarly suffered as a direct result of Axar's and Axelrod's misconduct.

2.      On January 9, 2025, Mr. Wyatt, as CEO of Avant Gardner, at the direction of Axar/Axelrod, executed a term sheet with TVT Capital Source, LLC ("TVT") whereby TVT and Avant Gardner agreed to overarching terms that would govern an $11 million transaction with TVT (and/or other additional parties) through four (4) separate tranches.  A true and correct copy of the term sheet is attached to the Fellus Decl. as **Exhibit "A"**; *see also* Committee Objection, at ¶13.

3.      From January 16, 2025 through April 1, 2025, the MCA Funders and White Star collectively funded $11 million to Avant Gardner consistent with the term sheet and subject to additional terms pursuant to specific agreements between the relevant funder and Avant Gardner.

4

*See* Fellus Decl., at ¶3; *see also* Exhibits A-H of the First Amended Complaint [Docket Nos. 7, 18 in Adv. Pro. No. 25-51803].

4.      On April 3, 2025, the Debtors entered into a certain



5.      The Term Sheet ▊▊▊▊▊▊▊▊▊ executed at a time when Axar was in complete control of the Debtors.  *See* Committee Objection, at ¶13.  The Debtors informed the MCA Funders that the senior secured lender, Axar, consented to the financing arrangements with the MCA Funders, such that the receivables at issue were unencumbered.  *See* Fellus Decl., at ¶4.

6.      Similarly, the agreements with the MCA Funders stated that that Debtors had "good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interest, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of [the Debtors]."  *See* Fellus Decl., at ¶5, and Exhibit B thereto.  Axar was aware of, and consented to, such representations.  *See id.*

7.      The MCA Funder agreements, among other things, required the Debtors to instruct their credit card processor (Billfold) to send the net sales receipts of food and beverage sales at the Debtors' venues directly to a specified MCA Funder lockbox account.  *See* Fellus Decl., at ¶6; *see also Declaration of Gary Richards in Support of Chapter 11 Petitions and First Day Pleadings*

10023340

[ECF No. 13] (the "First Day Declaration"), at ¶56.  The MCA Funders would then debit amounts owed to them, and would remit the ultimate balance (net of amounts owed to Billfold and the MCA Funders) to the Debtors if the amounts owed to the MCA Funders for the given time period were satisfied.  *See id.*  Pursuant to the agreements with the MCA Funders, the Debtors' authorization to route the flow of the Debtors' accounts receivable to the MCA Funder lockbox was irrevocable, at least without the consent of the MCA Funders.  *See id.*  The Debtors never had possession of these funds as the MCA Lockbox was in the possession and control of the MCA Funders at all relevant times.  *See id.*

8.      Upon information and belief, the Debtors, at the direction and/or with the consent of Axar/Axelrod, improperly rescinded the authorization that directed the Debtors' processor to route all net sales of the Debtors' receivables to the TVT lockbox account.  *See* First Day Declaration*, at* ¶56, *see also* MCA Funders' Answer, Counterclaims, at ¶¶26-47.  This action occurred post-petition and without any Court authorization.  *See id.*

9.      Similarly, and notwithstanding Axar's direction and consent to enter into the MCA Funder arrangements, and the Debtors'/Axar's representations that the receivables purchased by the MCA Funders were unencumbered, Axar interfered with the MCA Funders' agreements with the Debtors when it instructed the Debtors' bank to release the hold that was placed pursuant to Insta Funding's valid prejudgment lien attachment.  *See* First Day Declaration*, at* ¶58.

10.     To date, the MCA Funders and White Star have only collected approximately $3,700,000 on account of $11,000,000 funded (which, notwithstanding the bad acts of the Debtors and Axar/Axelrod, they are now trying to wrongfully recover).[5]  Axar/Axelrod induced the MCA Funders to provide capital to the Debtors, including through fraudulent misrepresentations, among

---

[5] Brazenly, Axar seeks to purchase the claims filed against the MCA Funders through the 9019 settlement and sale.

10023340

other things, and are now attempting, through the 9019 Motion and proposed sale, to obtain the benefit of such funds while leaving the MCA Funders without the use of its rightful property and/or cash collateral. *See* Fellus Decl., at ¶¶4,5; *see also* MCA Funders' Answer, Counterclaims, at ¶¶26-47. The MCA Funders are just one group of interested parties who have been harmed by Axar's/Axelrod's misconduct. *See* Committee Objection, at ¶12 ("[T]he Debtors strong-armed vendors to take significant discounts on outstanding invoices at the behest and for the benefit of Axar, thereby clearing significant general unsecured liabilities that Axar now stands to benefit from exclusively.").

11.     The injuries suffered by the MCA Funders line up with the actions and misconduct alleged by the Committee and form the basis of an equitable subordination claim (among other lender liability causes of action) against, *inter alia*, Axar—claims which, if successful, would allow for a competitive sale process, a greater and more equitable benefit to the Debtors' estates, and prevent Axar/Axelrod from benefitting from its malfeasance.

## **APPLICABLE LAW**

12.     Bankruptcy courts must scrutinize proposed settlements under Bankruptcy Rule 9019 "to determine what course of action will be in the best interest of the estate." *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996). The Debtors cite to the well-known *Martin* factors, namely: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.

13.     Notably absent, however, is the acknowledgement that this settlement is with an insider (or at the very least, a party that should be deemed in the nature of an insider). As a result, scrutiny of the proposed settlement must be "rigorous." *See In re Whittaker Clark & Daniels Inc*,

2025 WL 2611753, at *12 (3d Cir. 2025) (citing *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) (quotation omitted)). This standard is the same under section 363(b) of the Bankruptcy Code. *See In re Summit Global Logistics, Inc.*, 2008 WL 819934, at *9 (Bankr. D.N.J. 2008) (insider transactions are subject to heightened scrutiny) (citations omitted).[6]

## ARGUMENT

A. **Credible Lender Liability Claims Against Axar Cannot be Settled Under the Proposed 9019 As Currently Constructed**

14.     Under section 510(c) of the Bankruptcy Code, the bankruptcy court has the power to either subordinate a claim below other claims of the same type or order that a lien securing a claim be transferred to the estate if the claimant has engaged in inequitable conduct. *See* 11 U.S.C. § 510(c); *see also* Benjamin Weintraub & Alan N. Resnick, BANKRUPTCY LAW MANUAL, ¶ 5.14 at 5-51 (4th ed. 1996).

15.     "Equitable subordination is a remedial doctrine that gives courts the power to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Global Outreach, S.A.*, 2014 WL 4948184, at *12 (Bankr. D.N.J. 2014) (citing *Citicorp Venture Capital, Ltd. v. Comm. Of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003)) (internal quotation marks omitted).

16.     To establish a foundation for equitable subordination in this circuit, the proponent must (i) show the claimant engaged in some type of inequitable conduct; (ii) that the misconduct resulted in injury to the debtor's creditors or provided an unfair advantage to the claimant; and (iii) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. *Id.* (citing *In re Winstar Comm., Inc.*, 554 F.3d 382, 411 (3d Cir. 2009)).

---

[6] *See* Proposed Order ("The Settlement . . . is approved in its entirety pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.").

10023340

17.      Where a party sufficiently controls or dominates the will of the debtor, its operations, or decision-making processes and exercises that control to the detriment of others, that creditor will be treated as an insider.  *See In re Badger Freightways, Inc.*, 106 B.R. 971, 977, (Bankr. N.D. Ill. 1989). "[I]nsider claims have been equitably subordinated in cases involving '(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimant.'" *In re KDI Holdings, Inc.*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) (citing *In re 80 Nassau Assocs.*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)).

18.      There is no doubt about Axar's control and domination of the Debtors, including for its own benefit.  Axar/Axelrod exercised dominion and control over the Debtors' board of directors, CEO, and management team such that it was effectively in control of the day-to-day operations; Axar/Axelrod was "running finance from above including personally now approving all wires"; Axar/Axelrod formed a single-member "restructuring committee" comprised of its hand-selected choice of Mr. Yazhari, an Axar insider; Axar/Axelrod directed the Debtors to take out loans with LiveStyle, an Axar affiliate, rather than investing its own funds in the business when it was clear the business was undercapitalized; Axar/Axelrod directly participated in the Debtors' misguided attempts to receive certain permits from the city of New York; Axar/Axelrod provided $20 million of so-called "protective advances" to the Debtors prepetition that served solely to "protect" Axar (while previously refusing to fund and instead steering the Debtors to funding from affiliates and into receiving money from the MCA Funders that Axar never intended to repay); and Axar/Axelrod forced the Debtors to "strong arm[] vendors to take significant discounts on outstanding invoices at the behest and for benefit of Axar thereby clearing significant general unsecured liabilities that Axar now stands to benefit from exclusively." *See Committee Objection*,

at ¶¶2-3, 10, 12-14.  The evidence reflects that the Debtors' Axar-controlled board breached its fiduciary duties, Axar failed to adequately capitalize the Debtors, and Axar ultimately coerced and manipulated the Debtors solely for its own benefit, resulting in a farce of a chapter 11 process ensuring that everyone loses except for Axar.  *Id.* at ¶¶2-5, and 15.

19.     The relief requested in the 9019 Motion itself buttresses the lender liability claims against Axar.  Indeed, it appears that Axar is seeking a release for *current directors and officers of the Debtors*, who are not a party to the proposed settlement.  Those directors and officers—two of which were installed by Axar itself—are not providing any consideration for such proposed releases.  The relationship between Axar and the Debtors' insiders could not be any clearer.  *See In re KDI Holdings, Inc.*, 277 B.R. at 516 ("This is not a case in which [the lenders] simply monitored the Debtors' situation or suggested a course of action the Debtors ought to follow to improve their financial situation, . . . nor where the lender even threatened to exercise its legal rights should the debtor fail to acquiesce to the lender's suggestions . . . Instead, if proven, the facts alleged by the Committee establish that [the lenders] took over the day-to-day management of Debtors, and directed the payment of certain debts to corporations in which [the lenders] had an interest.").

20.     Accordingly, the settlement with the Committee involving insider Axar must be rigorously scrutinized by this Court, complete with sufficient evidence to refute the overwhelming facts supporting lender liability claims against Axar.  Given that the 9019 Motion has not provided any such information, the settlement cannot be approved by this Court.

**B.    The Other Martin Factors Weigh In Favor of Denying the Requested Relief**

21.     Notably, the Debtors do not address why they would be unlikely to "collect" from Axar.  Importantly, the factual underpinnings to the Committee investigation identify that the most

10023340

relevant remedy would be a subordination of Axar's claim (or even recharacterization).  In that regard, there appears to be no issue with collection.  As to whether any protracted litigation may trigger a DIP default, that appears to be purposeful on Axar's part, ensuring that no party can adequately investigate or challenge its behavior without plunging this case into complete chaos and disarray.  *See* Committee Objection, at ¶71 ("As such, the proposed DIP financing would give Axar control over the sale process and, by extension, these cases.").  This Court should not tolerate a proposed settlement that provides for the same result—tripwires and traps that dictate the final resolution of this case before a plan has even been proposed.  *See In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 814, 820 (Bankr. S.D.N.Y. 2020) (denying a DIP facility as a sub rosa plan in part because it "dictate[d] key terms of an eventual plan of reorganization").

22.     Next, the anticipated litigation as set forth in the Committee Objection is not complex—in fact, it appears that much of the work has already been completed, and the question would be for the Court to determine whether the conduct at issue necessitates a remedy such as equitable subordination and/or recharacterization.  Such a determination could drastically change the trajectory of this case, insofar as without Axar's credit bid, it appears that competitive bidding would be likely, if not guaranteed.  To the extent the Committee's sealed declarations include such relevant analysis, they should be made public for purposes of an adequate evaluation of the 9019 Motion.

23.     Finally, the paramount interests of creditors dictates that this settlement must be denied.  While we commend the Committee's efforts to engage with the major constituents here to facilitate a resolution, as parties that: (i) were bilked out of millions of dollars; (ii) were induced to enter into contractual arrangements; (iii) relied on fraudulent misrepresentations; and (iv) had the very same party that directed the Debtors to enter into arrangements with the MCA Funders

11

tortiously interfere with their contractual arrangements, the MCA Funders do not support the proposed settlement.

24.     Moreover, the 9019 Motion proposes a release for Axar, its managed funds and accounts, and respective representatives,[7] with such release to "become effective upon the earlier of (a) the effective date of a plan of liquidation, and (b) the entry of an order approving the Settlement pursuant to which Purchaser agrees to deliver to the Debtors the consideration contemplated by the APA, the Settlement and liquidating plan."  So, Axar/Axelrod will receive a release before providing any of the consideration contemplated by the settlement—they are only obligated to "agree" to deliver the consideration.  The Court cannot possibly allow for such inequitable result.

## RESERVATION OF RIGHTS

25.     The MCA Funders reserve all their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, to raise additional objections and introduce evidence during the hearing on the 9019 Motion.

## NOTICE

26.     Notice of this Objection has been provided to: (i) the U.S. Trustee; (ii) counsel to the Debtors; (iii) counsel to Alter Domus (US) LLC, in its capacity as administrative agent under the Prepetition Financing Agreement and the DIP Facility (as defined in the DIP Motion); (iv) counsel to the DIP Lenders and the Prepetition Term Lenders (as defined in the DIP Motion) and the Stalking Horse Bidder (as defined in the Sale Motion); (v) counsel to LiveStyle; and (vi) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).  In

---

[7] The 9019 Motion should identify who these parties include.  It is impossible to know how broad this proposed Debtor release truly is.

light of the nature of the relief requested herein, the MCA Funders respectfully submit that no further notice is required.

## CONCLUSION

27.     WHEREFORE, the MCA Funders respectfully request that the Court (i) sustain this Objection, (ii) deny the relief requested in the 9019 Motion, and (iii) grant the MCA Funders such other or further relief as it deems appropriate.

Dated: October 15, 2025

*/s/ Cheryl A. Santaniello*
Cheryl A. Santaniello, Esq. (DE Bar No. 5062)
Porzio, Bromberg & Newman, P.C.
300 Delaware Avenue, Suite 1220
Wilmington, Delaware 19801
Telephone: (302) 526-1235
Facsimile: (302) 416-6064
Email: casantaniello@pbnlaw.com

-and-

Rachel A. Parisi, Esq. (*Pro Hac Vice*)
Christopher P. Mazza, Esq. (*Pro Hac Vice*)
Michael F. Medved, Esq. (*Pro Hac Vice*)
Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
Telephone: (973) 538-4006
Facsimile: (973) 538-5146
Email: raparisi@pbnlaw.com
Email: cpmazza@pbnlaw.com
Email: mfmedved@pbnlaw.com

*Counsel to TVT Capital Source, LLC, Insta Funding, LLC, and Pinnacle Business Funding LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 (MFW) |
| Debtors. | Jointly Administered |

**DECLARATION OF ANDREW FELLUS IN SUPPORT OF OBJECTION OF TVT
CAPITAL SOURCE LLC, INSTA FUNDING LLC, AND PINNACLE BUSINESS
FUNDING LLC TO DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 363(b)
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER
APPROVING SETTLEMENT BY AND AMONG THE DEBTORS, AXAR CAPITAL
MANAGEMENT LP, AND THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS**

I, Andrew Fellus, pursuant to 28 U.S.C. §1746, hereby declare that the following is true and correct to the best of my knowledge, information and belief under penalty of perjury:

1. I am the current Chief Executive Officer of TVT Capital Source LLC ("TVT"). I have personal knowledge of the facts set forth herein, or have otherwise consulted with Insta Funding LLC and Pinnacle Business Funding LLC as necessary on such facts. If called as a witness, I could and would competently testify to the matters set forth herein. I make this declaration in support of TVT, Insta Funding LLC ("Insta Funding"), and Pinnacle Business Funding LLC's ("Pinnacle") (collectively, the "MCA Funders") objection (the "Objection") to the *Debtors' Motion Pursuant to Sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving Settlement by and among the Debtors, Axar Capital*

---

[1]The Debtors in these Chapter 11 Cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

*Management, LP, and the Official Committee of Unsecured Creditors* [Docket No. 262] (the "9019 Motion").

2.      On January 9, 2025, I caused TVT to execute a term sheet (the "Term Sheet") with Debtor Avant Gardner, LLC ("Avant Gardner") through negotiations with its CEO at the time, Josh Wyatt.  The term sheet papered an agreement between TVT and the Debtors that would govern TVT's (and/or additional parties) funding of the Debtors throughout 2025 to the tune of approximately $11 million through separate tranches.  A true and correct copy of the Term Sheet is attached hereto as **Exhibit "A"**.

3.      In accordance with the Term Sheet, the MCA Funders, along with White Star Funding Inc. d/b/a TVT Cap, collectively funded over $11 million to the Debtors from January 16, 2025, through April 1, 2025.  These funding arrangements were consistent with the Term Sheet as well as additional terms that were negotiated in each specific agreement.

4.      In negotiating the Term Sheet and the subsequent agreements, the Debtors informed the MCA Funders that the receivables at issue in each of the relevant agreements were unencumbered, and that Axar consented to the sale of such receivables free and clear of any interests it may have had.  Indeed, Axar was involved in negotiations regarding the funding from the MCA Funders.  ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

5.      For example, section 2.10 of the Insta Funding agreement attached hereto as Exhibit B states: "Merchant has good, complete, unencumbered and marketable title to all Receipts, free

and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Company." *See* Exhibit B.

6.       The agreements entered into between the Debtors and MCA Funders included, *inter alia*, a redirection letter that instructed the Debtors' credit card processor (Billfold) to send the net sales receipts of food and beverage sales at the Debtors' venues directly to a specified lockbox account held by TVT, which redirection letter was irrevocable without the MCA Funders' consent. Once the funds were transferred by Billfold to the lockbox, TVT would remit the ultimate balance (net of amounts owed to Billfold and the MCA Funders) to the Debtors if the amounts owed to the MCA Funders for the given time period were satisfied. These receipts were never transferred to the Debtors at any point prior to the Debtors' interference with the redirection letter.

7.       To date, the MCA Funders and White Star have collected approximately $3,700,000 on account of $11,000,000 funded to the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

<u>Dated</u>: October 15, 2025

*Andrew Fellus*
_____
Andrew Fellus

# EXHIBIT A



Date: January 7, 2025

**VIA ELECTRONIC DELIVERY**
Avant Gardner

Attn: Josh Wyatt

**Re: Proposed Financing of $11,000,000**

Dear Josh Wyatt ,

TVT Capital ("Lender") is pleased to present this Term Sheet ("Term Sheet") outlining the proposed financing structure for Avant Gardner ("Borrower"). The total facility amount is Eleven Million Dollars ($11,000,000), disbursed in **four (4)** separate tranches, subject to the terms, conditions, and approvals described below.

This Term Sheet is for discussion purposes only and does not constitute a commitment or obligation on the part of TVT Capital or any of its affiliates to provide financing. The final structure remains subject to satisfactory due diligence, approval by Lender's investment committee, and execution of definitive agreements acceptable to both parties.

Kindly review and, if acceptable, please countersign this Term Sheet by January 15, 2025 so that we may proceed to closing and facilitate the first tranche of funding by Friday of this week.

We thank you for the opportunity to work with you and look forward to a successful partnership.

Sincerely,
TVT Capital



## **TERM SHEET**

**1. Parties**

- **Lender**: TVT Capital (and/or its designated affiliates)
- **Borrower**: Avant Gardner

**2. Total Facility Amount**

- **$11,000,000**, disbursed in four (4) separate tranches

### **Tranche Details**

### **Term Sheet #1 / Tranche #1**

1. **Funding Amount**: $4,000,000
2. **Factor Rate**: 1.38
3. **Total Repayment Amount**: $4,000,000 × 1.38 = $5,520,000
4. **Term**: 44 weeks
5. **Weekly Payment Structure**:
   - **Weeks 1 – 12**: 25% reduced debit, weekly payment = $31,363.64
   - **Weeks 13 – 24**: 50% reduced debit, weekly payment = $62,727.28
   - **Weeks 25 – 44 (remaining 20 weeks)**: standard weekly payment = $219,545.63
6. *(The above weekly amounts approximate the required total repayment of $5,520,000 over 44 weeks.)*
7. **Origination Fee**: $120,000
8. **Net Funding Amount**: $4,000,000 – $120,000 = $3,880,000 (disbursed to Borrower)

**Term Sheet #2 / Tranche #2 & #3**

1. **Funding Amount (per Tranche)**: $2,000,000
2. **Factor Rate**: 1.38
3. **Total Repayment Amount**: $2,000,000 × 1.38 = $2,760,000
4. **Term**: 36 weeks
5. **Weekly Payment Structure**:
    ○ **Weeks 1 – 18**: 50% reduced debit, weekly payment = $38,333.34
    ○ **Weeks 19 – 36 (remaining 18 weeks)**: standard weekly payment = $115,000.00
6. *(The above amounts approximate the required total repayment of $2,760,000 over 36 weeks.)*
7. **Origination Fee**: $60,000
8. **Net Funding Amount**: $2,000,000 – $60,000 = $1,940,000 (disbursed to Borrower)

    **Note**: This structure (Tranche #2 and Tranche #3) may be repeated or combined as necessary for two disbursements of $2MM each, subject to the Funding Conditions below.

**Term Sheet #3 / Tranche #4**

1. **Funding Amount**: $3,000,000
2. **Factor Rate**: 1.38
3. **Total Repayment Amount**: $3,000,000 × 1.38 = $4,140,000
4. **Term**: 36 weeks
5. **Weekly Payment Structure**:
    ○ **Weeks 1 – 18**: 50% reduced debit, weekly payment = $57,500
    ○ **Weeks 19 – 36 (remaining 18 weeks)**: standard weekly payment = $172,500.00
6. *(The above amounts approximate the required total repayment of $4,140,000 over 36 weeks.)*
7. **Origination Fee**: $90,000
8. **Net Funding Amount**: $3,000,000 – $90,000 = $2,910,000 (disbursed to Borrower)

## 3. Prepayment Discount Schedule

If Borrower prepays the total outstanding balance on any tranche in full, the following Factor Rates shall apply, based on the number of days from funding:

- **0    –    30 Days**:    1.20
- **31   –    60 Days**:    1.20
- **61   –    90 Days**:    1.20
- **91   –    120 Days**:   1.20
- **121 –    150 Days**:    1.30
- **151 –    180 Days**:    1.30

*(Any prepayment after 180 days will be subject to the full 1.38 Factor Rate)*



## 4. Funding Conditions

1. **Tranche Timing**:
   - **Tranche #1** is intended to fund by Friday January 16, 2025, subject to the execution of final documentation and satisfaction of all closing conditions.
   - **Tranches #2, #3, and #4** will be allocated for the winter months and will **only be disbursed upon the following**:

      1. Financial review confirming ongoing financial stability and performance of Borrower.
      2. Satisfactory status updates on the construction project demonstrating progress.
      3. Positive payment history on previous tranches (i.e., timely and consistent debit payments).
      4. Approval by Lender's investment committee upon receipt of updated financial statements, project milestones, and compliance with all terms.

2. **Use of Funds**: Construction costs, working capital, and general corporate purposes, unless otherwise agreed in writing.
3. **Security / Collateral**: To be detailed in the definitive agreements. Lender may require a first-priority (or senior) security interest in Borrower's assets, including but not limited to receivables, equipment, and other assets.
4. **Governing Law**: State of [___], unless otherwise specified in final documentation.
5. **Documentation**: Borrower shall provide all necessary corporate resolutions, organizational documents, project details, financial statements, and any other items reasonably requested by Lender's counsel to complete underwriting and documentation.
6. **Legal and Other Expenses**: Each party shall bear its own expenses, provided that the Borrower shall be responsible for Lender's reasonable legal fees associated with documentation of this facility.

## 5. Expiration

This Term Sheet shall expire if not countersigned by [date/time], unless otherwise extended by TVT Capital in writing.

## 6. Non-Binding

Except with respect to the provisions relating to confidentiality, expenses, and governing law, this Term Sheet is non-binding. A binding commitment will be provided only upon the execution and delivery of mutually satisfactory definitive loan documents.



**ACCEPTANCE**

By signing below, Avant Gardner acknowledges and agrees to the general terms and conditions outlined above and authorizes TVT Capital to proceed with final underwriting and documentation accordingly.

**Avant Gardner**

By: _____

Name: _____
          JOSH WYATT

Title: _____
          Ceo

Date: _____
          1/9/2025

---

**TVT Capital**

By: _____

Name: _____

Title: _____

Date: _____

---

*Thank you for the opportunity to serve your funding needs.*

*End of Term Sheet*

**Docusign**

## Certificate Of Completion

Envelope Id: 200315E9-E985-46CE-ABD6-FDC7D840C3D8                    Status: Completed
Subject: Complete with Docusign: Avant Term sheet (1).pdf
Source Envelope:
Document Pages: 5                    Signatures: 1                    Envelope Originator:
Certificate Pages: 1                    Initials: 0                    Contracts Team
AutoNav: Enabled                                                       881 Baxter Drive STE 100
EnvelopeId Stamping: Enabled                                          SOUTH JORDAN , UT  84095
Time Zone: (UTC-08:00) Pacific Time (US & Canada)
                                                                      IP Address: 38.122.240.34

## Record Tracking

Status: Original                    Holder: Contracts Team                    Location: DocuSign
          1/9/2025 7:07:39 AM

| Signer Events | Signature | Timestamp |
|---|---|---|
| JOSH WYATT <br><br> Ceo <br> Security Level: Email, Account Authentication (None) | *Josh Wyatt* <br> E19EE668ED32481... <br><br> Signature Adoption: Pre-selected Style <br> Using IP Address: 174.229.32.201 <br> Signed using mobile | Sent: 1/9/2025 8:08:38 AM <br> Viewed: 1/9/2025 8:10:24 AM <br> Signed: 1/9/2025 8:10:38 AM |

Electronic Record and Signature Disclosure:
    Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/9/2025 8:08:38 AM |
| Certified Delivered | Security Checked | 1/9/2025 8:10:24 AM |
| Signing Complete | Security Checked | 1/9/2025 8:10:38 AM |
| Completed | Security Checked | 1/9/2025 8:10:38 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

# EXHIBIT B























# INSTA FUNDING LLC

6 Landmark Square 4th floor, Stamford, CT 06901  |  (305)317-2001  |  ████████████

## SALE AND PURCHASE OF FUTURE RECEIVABLES AGREEMENT

This Sale and Purchase of Future Receivables Agreement (hereinafter referred to, including as the same may from time to time be amended, supplemented and/or restated, and together with the Terms and Conditions, agreements and Appendices attached hereto as this "Agreement") is made as of  04/01/2025        between INSTA

FUNDING LLC (the "Company"), the merchant listed below (the "Merchant"), and the undersigned Guarantor (the "Guarantor") (collectively referred to herein as the "Parties").

## MERCHANT INFORMATION

Business Legal Name: Avant Gardner                    ████████████████

ET AL SEE ADDENDUM ET AL  d/b/a:
The Brooklyn Mirage

                                                        State of Incorporation/Organization:

Type of Entity (check one): ☐ Corporation ☐ Limited Liability Company ☐ Sole Proprietor ☐ Partnership ☐ Other

Physical Address: 107 Union St                City: Brooklyn  State: NY Zip Code: 11231
Mailing Address: 107 Union St                 City: Brooklyn         State:    NY        Zip Code: 11231

Email Address:                                   Phone Number:

## SALE AND PURCHASE OF FUTURE RECEIPTS

In consideration of the Purchase Price specified below (the "Purchase Price"), Merchant hereby sells, assigns and transfers to Company (making Company the absolute owner thereof), a percentage specified below (the "Specified Percentage") of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors, including all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business for the payments due to Merchant as a result of Merchant's sale of goods and/or services (collectively, the "Receipts"), until the cumulative amount of Receipts specified below (the "Purchased Receipts Amount") has been remitted by or on behalf of Merchant to Company. Company will debit an amount equal to the remittance amount via ACH specified below (the "Remittance(s)") from the depositing bank account (the "Designated Bank Account") as designated in Appendix B (Authorization for Direct Deposit and Direct Payment), of which such account must be acceptable to, and, pre-approved by Company into which Merchant and Merchant's customers shall remit Receipts from each transaction, until such time as Company receives payment in full of the Purchased Receipts Amount. Unless otherwise agreed to in writing, Merchant agrees to deposit, or cause to be deposited, all Receipts into the Designated Bank Account and to direct any processor or issuer of any credit, debit, stored value or other payment source (each, a "Payment Card Processor") effecting remittance of any Receipts ("Payment Card Receipts") to Merchant to deposit all Payment Card Receipts into the Designated Bank Account. Merchant agrees not to make or cause debits to the Designated Bank Account (other than in favor of Company) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the Remittance amount (provided that it shall not be a default if: (1)there is an insufficient balance in the Account as a result of a business slowdown that causes a diminution in Receipts, and (2) Merchant gives Company twenty-four (24) hours' advance notice that there will be insufficient funds in the Account such that the ACH of the Remittance amount will not be honored by Designated Bank Account.

Merchant is selling a portion of a future revenue stream to Company and is, therefore, not borrowing money from Company, and, therefore, there is no interest rate or payment schedule and no time period during which the Purchased Receipts Amount must be collected by Company. The Remittance is a good faith estimate of the Specified Percentage multiplied by the revenues of the Merchant. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, in and of itself, does not constitute a breach of this Agreement. Company is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and Company assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give Company a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and each Guarantor are only guaranteeing their performance of the terms of this Agreement and are not guaranteeing the payment of the Purchased Receipts Amount. The initial Remittance shall be as described below, and the Remittances thereafter may be subject to adjustment as set forth in Section 1.3 of the Terms and Conditions.

Merchant hereby authorizes Company to ACH debit the Remittances from the Designated Bank Account on a daily basis (other than on a day that is a legal holiday under the laws of the State of Connecticut or is a day on which banking institutions in such states are authorized or required by law to close) or on a weekly basis as described below. Company's payment of the Purchase Price shall be deemed the acceptance and performance by Company of this Agreement, and Merchant understands that it is responsible for ensuring that each Remittance to be debited by Company remains in the Designated Bank Account and will be held responsible for any fees incurred by Company resulting from a rejected ACH attempt or an Event of Default (as defined in the Terms and Conditions). Notwithstanding anything to the contrary in this Agreement or any other agreement between Company and Merchant, upon the occurrence of an Event of Default, Company shall be entitled to receive one hundred percent (100%) of the Purchased Receipts Amount, plus attorney fees and costs, and applicable fees as described in Appendix A of this Agreement. If Merchant commits an Event of Default by switching its Designated Bank Account or using multiple depository accounts without Company's consent, Merchant expressly authorizes any Payment Card Processor to deliver all payments directly to Company until Company has received the entire Purchased Receipts Amount in full. The obligation of Company to fund the Purchase Price hereunder is subject to Company receiving executed counterparts of each of the MCA Documents (as defined in the Terms and Conditions).

Purchase Price: 3,000,000.00                    Specified Percentage: 29.57        Purchased Receipts Amount: $ 4,140,000.00

Remittance: 147,857.14

)

_____

(*Choose One*)     ☐ **Daily Remittance**          ☐ **Weekly Remittance (Every** Thu

THE AGREEMENT'S TERMS AND CONDITIONS & EACH OF THE APPENDICES ATTACHED HERETO ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

**MERCHANT #1**                                                   (Printed Name and Title)                    (Signature)

BY: Joshua Wyatt                                               **MERCHANT #2**

                                                                         BY:

(Printed Name and Title)                    (Signature)

                                                                         (Printed Name and Title)                    (Signature)

## TERMS AND CONDITIONS

| Term | Amount | Description |
|---|---|---|
| *Purchase Price* | $ 3,000,000.00 | The total amount of funding that Company agrees to tender to Merchant for the Purchased Receipts. |
| *Purchased Receipts Amount* | $ 4,140,000.00 | The dollar value of the Purchased Receipts that Merchant hereby sells to Company. |
| *Direct Payments to Third Parties/Renewals* | $ 0.00 | Amount paid to prior purchasers of the Receipts, including Company. |
| *Fees* | $ 90,000.00 - Origination Fee<br>$ 50.00 - Wire Fee<br>$ 495.00 - Underwriting Fee<br>$ 0.00 - UCC1 Fee<br>$ 90,545.00 - Total | The amount Company will withhold from the Purchase Price, which represents Company's due diligence and other costs in performing its analysis for this financing transaction including bank fees, wire fees, UCC-1 filing fees, and underwriting fees as detailed in Appendix A to this Agreement. |
| *Disbursement to Merchant* | $ 2,909,455.00 | The amount disbursed to Merchant, net of Direct Payments to Third Parties and Fees. |
| *Specified Percentage* | 29.57% | An agreed upon percentage of the Receipts that Merchant shall deliver to Company until the entire Purchased Receipts Amount is delivered to Company in accordance with this Agreement. |
| *Discount Factor* | 1.38 | The risk adjustment to the Purchased Receipts Amount that determines the Purchase Price. |
| *Remittance (select one):*<br><br>☐ *Daily*<br><br>☐ x *Weekly (every* Thu )<br><br>☐ *Bi-weekly (every* _____ ) | $86,250.00 Weeks 1-8<br><br>$.172,500.00 Weeks 9-28 | A dollar amount that Merchant and Company agree to be a good faith approximation of the Specified Percentage of Daily/Weekly Receipts as of the date of this Agreement, based upon the information provided by Merchant to Company regarding Merchant's most recent Receipts. The dollar amount to be withdrawn via ACH from the Merchant's bank account designated in Appendix B, or in the Event of Default under Article III, from any and all accounts Company locates through its Power of Attorney pursuant to Section 1.10 of this Agreement. |

Each party is obligated upon his, her or its execution of the Agreement to all terms of this Agreement and any Guaranty or other related agreement, including these Terms and Conditions. Each person signing above for Merchant represents that Merchant has duly authorized the execution, delivery and performance of this Agreement and that he or she is authorized to sign this Agreement for Merchant, and each person signing above, including each Guarantor, represents and warrants to Company that the information provided herein and in all of Company documents, forms and recorded interviews is true, accurate and complete in all respects, and acknowledges that Company has materially relied on the truth and correctness of all such information in deciding to enter into this Agreement and the transaction herein provided for. If any such information is false or misleading, Merchant shall be deemed to be in material breach of this Agreement and any other agreements between Merchant and Company and Company shall be entitled to all remedies available under law in addition to all remedies expressly provided for herein. An investigative or consumer report may be made in connection with the Agreement with respect to Merchant and each Guarantor. Merchant and each of the above-signed Guarantors authorizes Company, its agents and representatives and any credit reporting agency engaged by Company, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Guarantors for the purpose of this Agreement, and (ii) to obtain consumer and business credit reports on Merchant or any of its Guarantors at any time during the term of this Agreement or for Company's consideration of Merchant's eligibility to enter into any future agreement with Company.

## I.  TERMS OF ENROLLMENT IN PROGRAM

**1.1  Merchant Deposit Agreement and Payment Card Processing**. Merchant shall (a) execute an agreement acceptable to Company with a bank acceptable to Company ("Bank") to obtain electronic fund transfer services for the Account, and (b) if applicable, execute an agreement acceptable to Company with a Payment Card Processor instructing the Payment Card Processor to deposit all Receipts into the Designated Bank Account until Company has received one hundred percent (100%) of the Purchased Receipts Amount. For this purpose, Company shall have the right to notify any Payment Card Processor and to direct any such Payment Card Processor to remit to Company and/or its agents all Payment Card Receipts received by such Payment Card Processor. Merchant shall provide Company and/or its authorized agent(s)

with all the information, authorizations, and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes Company and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to Company for the Receipts as specified herein and to remit such amounts to Company. These authorizations apply not only to the approved Designated Bank Account, but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by Company or not. This additional authorization is not a waiver of Company's entitlement to declare this Agreement breached by Merchant as a result of Merchant's usage of an account that Company did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of Company. The Parties agree that this Agreement shall be considered to be performed in all material respects in the State of Connecticut, regardless of Merchant and/or Guarantor's address, location, place of business or otherwise.

1.2 **Term of Agreement**. This Agreement shall remain in full force and effect until the entire Purchased Receipts Amount and any other amounts due are received by Company as per the terms of this Agreement.

1.3 **Reconciliation; Adjustments to the Remittance**. If an Event of Default has not occurred, once every two (2) calendar weeks, after Company provides the total funding amount to Merchant, Merchant may give notice to Company to request a change in the Remittance(s) to more accurately reflect the Specified Percentage of Receipts being collected by Merchant at that time. All requests hereunder must be in writing to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and said requests must include a) a summary of the reason/cause behind the reconciliation request explaining why the Merchant's business revenue is experiencing a slowdown; b) copies of the Merchant's bank account statements; c) credit card processing statements; and d) accounts receivable report, if applicable, from the date of funding through the date of the requested reconciliation. Company retains the right to request additional documentation such as bank login or access to view Merchant's accounts. Merchant shall provide Company with viewing access to its bank accounts, including the Designated Bank Account, as well as all information reasonably requested by Company to properly calculate the Merchant's adjusted Remittance. Refusal to provide the foregoing information or access to bank accounts shall constitute a breach of this Agreement and Company shall have no obligation to reconcile.

Upon receipt of the reconciliation request, Company shall have five (5) business days to approve (or deny) such request and adjust the initial Remittance amount for the following two (2) calendar weeks. The amount shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Specified Percentage divided by the number of Business Days in the previous two (2) calendar weeks. The adjusted Remittance shall become the new daily or weekly Remittance amount until any subsequent adjustment period has expired. At the end of the adjusted subsequent two (2) calendar weeks, or at the end of any other agreed upon adjustment period, Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's adjusted Remittance amount shall return to the initial Remittance amount as agreed upon in Page 1 of this Agreement. The Merchant agrees and understands that the frequency of Remittances shall not be changed (i.e., daily to weekly), unless agreed to in writing and signed by the Parties to this Agreement. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with Company's right and ability to debit Merchant's Designated Bank Account while the request is pending or to unilaterally modify the initial Remittance amount, in any method other than the ones listed in this Agreement.

1.4 **Financial Condition**. Merchant and Guarantor(s) authorize Company and its agents to investigate their financial responsibility and history, and will provide to Company any authorizations, bank or financial statements, tax returns, etc., as Company deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Company is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.5 **Transactional History**. Merchant authorizes all of its banks, brokers, and Payment Card Processors to provide Company with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide Company with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from Company.

1.6 **Indemnification**. Merchant and Guarantor(s) jointly and severally indemnify and hold harmless any Payment Card Processor, its officers, directors and shareholders against all fosses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Payment Card Processor resulting from (a) claims asserted by Company for monies owed to Company from Merchant and (b) actions taken by any Payment Card Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by Company.

1.7 **No Liability**. In no event will Company be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by each Merchant and each Guarantor. In the event these claims are nonetheless raised, Merchant and Guarantor(s) will be jointly liable for all of Company's attorney's fees and expenses resulting therefrom.

1.8 **Reliance on Terms**. Sections 1.1, 1.5, 1.6, 1.7 and 2.5 of this Agreement are agreed to for the benefit of Merchant, Company, Payment Card Processor, and Bank and notwithstanding the fact that neither Payment Card Processor nor Bank is a party to this Agreement, Processor and Bank may rely upon their terms and raise them as a defense in any action.

1.9 **Nature of Transaction**. THIS IS NOT A LOAN. Merchant and Company agree that the Purchase Price (less the applicable fees agreed to herein) under this Agreement is in exchange for the Purchased Receipts Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Company to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts purchased pursuant to this Agreement, and that it equals the fair market value of such Receipts. Company has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Receipts Amount as the Receipts are created. Payments made to Company in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the Parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that Company has charged or received interest hereunder in excess of the higher applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Company shall pro mptly refund to Merchant any interest received by Company in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that Company not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of usury in any action or proceeding. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to Company a security interest in all rights, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Receipts Amount and all other obligations of Merchant under this Agreement. Merchant hereby authorizes Company to file any Uniform Commercial Code ("UCC") financing statements deemed necessary or advisable by Company to perfect or maintain Company's interest in the Receipts.

1.10 **Power of Attorney**. Merchant irrevocably appoints Company as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Company from Payment Card Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 1.11 and Article III herein, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (as defined in the Security Agreement); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Company; and (v) to contact Merchant's banks and financial institutions using Merchant's and Guarantor(s)'s personal information to verify the existence of an account and obtain account balances; (vi) to file any claims or take any action or institute any proceeding which Company may deem necessary for the collection of any of the unpaid Purchased Receipts Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Receipts Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and Company is authorized to use Merchant's funds to pay for same; and (vii) Company shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Guarantor, to notify any Payment Card Processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of Company's choosing in order to settle all obligations due to Company under this Agreement.

1.11 **Protections against Default**. The following Protections 1 through 6 may be invoked by Company immediately and without notice to Merchant in the event that Merchant:

(a) takes any action to discourage the use of electronic check processing that are settled through Payment Card Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning such checks into the Company electronic check processor;

(b) changes its arrangements with Payment Card Processor or the Designated Bank Account in any way that is adverse or unacceptable to Company;

(c) changes the electronic check processor through which the Receipts are settled from Payment Card Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor;

(d) intentionally interrupts the operation of its business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without the express prior written consent of Company;

(e) takes any action, fails to take any action, or offers any incentive, economic or otherwise, theresult of which will be to induce any customer(s) to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Payment Card Processor; or

(f) fails to provide Company with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five (5) days after a request from Company.

The following protections are in addition to any other remedies available to Company at law, in equity or otherwise pursuant to this Agreement:

*Protection 1*. The full uncollected Purchased Receipts Amount plus all fees (including reasonable attorney's fees and expenses) due under this Agreement and the other MCA Documents become due and payable in full immediately.

*Protection 2*. Company may enforce the provisions of the limited Guaranty against any Guarantor.

*Protection 3*. Company may enforce its security interest in the Collateral in accordance with the Security Agreement and may exercise any and all rights and remedies of a secured party under UCC Article 9.

*Protection 4*. Company may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, if Company recovers a judgment against Merchant, Merchant shall be liable for all of Company's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

*Protection 5*. Company may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on the Account or otherwise for all sums due to Company.

*Protection 6*. In the event Merchant changes or permits the change of the Designated Bank Account approved by Company, or adds an additional bank account, Company shall have the right, without waiving any of its rights and remedies and without notice to Merchant, to notify Merchant's Payment Card Processor or any new or additional Payment Card Processor, of the sale of the future Receipts hereunder and to direct such entity to deliver all amounts due to Merchant directly to Company.

1.12 **Protection of Information**. Merchant and each Guarantor, in respect of himself or herself personally, authorizes Company to disclose information concerning Merchant's and such Guarantor's credit standing (including credit bureau reports that Company obtains) and business conduct only to agents, affiliates and credit reporting bureaus. Merchant and such Guarantor each hereby waives to the maximum extent permitted by law any claim for damages against Company or any of its agents or affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.13 **Confidentiality**. Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documents (collectively, "Confidential Information") are proprietary and confidential information of Company. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of Company to any person other than an attorney, accountant, financial advisor or employee of Merchant who requires such Confidential Information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles Company to not only damages and reasonable attorney's fees, but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

1.15 **D/B/As**. Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## II. REPRESENTATIONS, WARRANTIES, AND COVENANTS

2.1 **Financing Condition and Financial Information**. Merchant's and each Guarantor(s)'s bank and financial statements, copies of which have been furnished to Company, and future statements which will be furnished hereafter at the discretion of Company, fairly represent the financial condition of Merchant or such Guarantor, as applicable, as of such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of

Merchant. Merchant and Guarantor(s) have a continuing, affirmative obligation to advise Company of any material adverse change in their financial condition, operation or ownership. Company may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s) shall provide them to Company within five (5) Business Days after request from Company. Merchant's or Guarantor(s)'s failure to do so is a material breach of this Agreement.

2.2 **Governmental Approvals**. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3 **Authorization**. Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 **Use of Funds**. Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes. Merchant will not, directly or through any of its subsidiaries, engage in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Purchase Price will be used to purchase or carry margin stock.

2.5 **Electronic Check Processing Agreement**. Merchant shall not change its Payment Card Processor, add terminals, change its financial institution or bank account(s) (including the Designated Bank Account) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without Company's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6 **Change of Name or Location**. Merchant shall not conduct Merchant's businesses under any name other than as disclosed to the Payment Card Processor and Company, nor shall Merchant change any of its places of business without prior written consent by Company.

2.7 **Daily Batch Out**. Merchant shall batch out receipts with the Payment Card Processor on a daily basis, if applicable.

2.8. **Estoppel Certificate**. Merchant shall from time to time, in Company's sole discretion, upon at least one (1) day's prior notice from Company to Merchant, execute, acknowledge and deliver to Company and/or to any other person, firm or corporation specified by Company, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Receipts Amount or any portion thereof has been repaid.

2.9 **No Bankruptcy**. As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six (6) months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further represents and warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10 **Unencumbered Receipts**. Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Company.

2.11 **Business Purpose**. Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates.

2.12 **Defaults under Other Contracts**. Merchant's execution of, and/or performance under, this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13 **Good Faith**. Each Merchant and each Guarantor hereby affirms that Merchant is receiving the Purchase Price and selling Company the Purchased Receipts Amount in good faith and will use the Purchase Price funds in accordance with Section 2.4.

2.14 **Working Capital Funding**. Merchant shall not enter into any arrangement, agreement, or commitment that relates to or involves the Merchant's Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than Company.

2.15 **Stacking Prohibited**. Merchant shall not enter into any merchant cash advance, factoring transaction, or loan that relates to or involves its Receipts, with any party other than Company, from the date of funding the Purchase Price through the duration of this Agreement ("Stacking"). Company may share information regarding this Agreement with any third party in order to determine whether Merchant is in compliance with this provision. Funding amounts received from any party other than Company, subsequent to the date on which Company provides the total funding amount to Merchant, shall be subject to collections to satisfy the outstanding account balance under this Agreement. Each instance of Stacking shall place Merchant in material breach of this Agreement, and Merchant shall be liable for the full Purchased Receipts Amount, the Default Fee, and the Stacking Fee as described in Appendix A of this Agreement and shall be due and payable immediately to Company.

2.16 **Bank Log-in Requirements**. Due to the high-risk nature of this transaction, Merchant and Guarantor(s) agree that they are required under this Agreement to give Company "view only" access to their business bank account(s) twenty-four (24) hours a day, seven (7) days per week. This account access shall be in effect for the duration of this Agreement and begins on the day the Merchant is approved for funding and ends upon Company's Receipt of the full Purchased Receipts Amount. Merchant and Guarantors(s) shall grant Company "view only" access to their business bank account(s)within twenty-four (24) hours of receiving notice of its approval for funding and failure to comply with this specified timeframe shall deemed a Default of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

    (a)    Merchant or any Guarantor shall violate any term or covenant in this Agreement or any other MCA Document;

    (b)    Merchant fails to pay (or cause to be paid) any fees described on Appendix A attached hereto when and as required to be paid as described therein;

    (c)    any representation or warranty by Merchant in this Agreement or any other MCA Document shall prove to have been incorrect, false or misleading in any material respect when made;

(d)  the sending of notice of termination by Merchant or notifying Company verbally or in writing of its intent to breach this Agreement;

(e)  Merchant fails to give Company twenty- four (24) hours' advance notice that there will be insufficient funds in the Account such that the ACH of the Remittance amount will not be honored by Designated Bank Account;

(f)  Merchant fails to supply all requested documentation/access and allow for daily and/or real time monitoring of its bank accounts (including the Designated Bank Account);

(g)  Any Remittance is returned or rejected due to insufficient funds ("NSF") on more than two (2) occasions if Merchant is on a daily Remittance schedule, and more than one (1) occasion if Merchant is on a weekly Remittance schedule, throughout the duration of this Agreement;

(h)  Any Remittance is returned or rejected on the basis of an action by the Merchant or Guarantor, including but not limited to, banking codes R02, R07, R08, and/or R10.

(i)  Merchant enters into any financing agreements, subsequent to entering into this Agreement, with any other party including but not limited to: Loans, merchant cash advances, receivables financing, factoring, or any other agreement that will increase the total debt or merchant cash advances owed by Merchant to any party other than Company.

(j)  Merchant transfers or sells all or substantially all of its assets;

(k)  Merchant makes or sends notice of any intended bulk sale or transfer by Merchant;

(l)  Merchant uses multiple depository accounts without the prior written consent of Company;

(m)  Merchant changes or closes the Designated Bank Account without the prior written consent of Company;

(n)  Merchant fails to provide timely notice to Company such that its Merchant ID Number ("MID") with any Payment Card Processor has been changed or added;

(o)  Merchant shall default under any of the terms, covenants and conditions of any other agreement with Company.

3.2 **Remedies**. In case any Event of Default occurs and is not waived pursuant to Section 4.5. hereof, Company may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the limited Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of Company in connection with this Agreement may be exercised at any time by Company after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity. If an Event of Default occurs, the full uncollected amount of the Purchased Receipts Amount, plus all applicable fees and charges as listed in Appendix A of this Agreement, shall become due and payable in full immediately. Company may, without limitation to the Protections described in Section 1.11 of this Agreement, protect and enforce its rights through any of the following remedies:

(a)  Company may assess a default fee of 25% of the Purchased Receipts Amount, plus a Legal Fee of 25% of the aggregate sum of the Purchased Receipts Amount, Default Fee, and any other applicable fees as outlined in Appendix A of this Agreement.

(b)  Company may enforce the provision of the limited Guaranty of Performance against the Guarantor(s) of this Agreement.

(c)  Company may exercise any and all rights and remedies of a secured party under Article 9 of the UCC.

(d)  Company may debit Merchant's depository accounts wherever situated in such amounts as determined by Company for the purpose of collecting funds for application towards the unrealized Purchased Receipts Amount, and other amounts owed by Merchant to Company, by means of ACH debit or facsimile signature on a computer-generated check drawn on by Merchant's bank account or otherwise.

(e)  If Merchant changes/permits the change of the Account approved by Company, or adds an additional bank account, Company shall have the right, without waiving any of its rights and remedies and without notice to Merchant, to notify Merchant's Payment Card Processor, or any additional Payment Card Processor, of the sale of the future Receipts hereunder and to direct such entity to deliver all amounts due and owing to Merchant directly to Company.

3.3 **Costs**. Merchant shall pay to Company all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the covenants in this Agreement and the enforcement thereof, and (c) the enforcement of Company's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications**. Merchant is required to give Company written notice within twenty-four (24) hours of any filing under Title 11 of the United States Code. Merchant is required to give Company seven (7) days written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV. MISCELLANEOUS

4.1 **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Company.

4.2 **Assignment**. Company may assign, transfer or sell its rights to receive the Purchased Receipts Amount or delegate its duties hereunder, either in whole or in part, including by assigning, transferring or selling a participation in the Purchased Receipts Amount. Merchant acknowledges that, if any such assignment is made, persons other than Company may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the other MCA Documents or any interest herein or therein without the prior written consent of Company, which consent may be withheld in Company's sole discretion.

4.3 **Negative Pledge**. Each Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.

4.4 **Notices**. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to Company shall become effective only upon receipt by Company. Notices to Merchant shall become effective three (3) days after mailing.

4.5 **Waiver Remedies**. No failure on the part of Company to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.6 **Binding Effect; Governing Law, Venue, and Jurisdiction**. This Agreement shall be binding upon and inure to the benefit of Merchant, Company and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Company, which consent may be withheld in Company's sole discretion. Company reserves the rights to assign this Agreement pursuant to Section 4.2 with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut, without regards to any applicable principals of conflicts of law. Except required to enforce a security interest or otherwise required by applicable law, any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if the Company so elects, be instituted in any court sitting in Fairfield County, State of Connecticut, to the exclusion of all other forums (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by Company to transfer such proceeding to an Acceptable Forum.

4.7 **Survival of Representations, Warranties, and Covenants**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.8 **Interpretation**. All parties hereto have reviewed this Agreement with attorneys of their own choosing and have relied only on their own attorn eys' guidance and advice. No construction determinations shall be made against either party hereto as drafter.

4.9 **Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

4.10 **Entire Agreement**. This Agreement and the other MCA Documents embody the entire agreement among Merchant, each Guarantor and Company and supersede all prior agreements and understandings relating to the subject matter hereof.

4.11 **JURY TRIAL WAIVER**. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY, AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR RESPECTIVE ATTORNEYS.

4.12 **CLASS ACTION WAIVER**. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (A) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (B) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.13 **Counterparts and Digital Acceptance**. This Agreement and the other MCA Documents may be executed in multiple counterparts, each of which shall be deemed an original provided all parties have executed a counterpart of this Agreement, and all such counterparts shall together constitute one and the same instrument. Any signature delivered by a party hereto by facsimile transmission, e-mail or other electronic means will be deemed to be an original signature. The Parties hereto consent and agree that use of a keypad, mouse or other devise to select an item, button, icon or similar act or action while using any electronic service in executing this Agreement or the other MCA Documents constitutes a valid and enforceable signature, acceptance and agreement as if actually signed in writing. Further, the Parties hereto agree that no certification authority or other third-party verification is necessary to the validity of an electronic signature and that the lack of such certification or third-party verification will not in any way affect the enforceability of the signature or any resulting contract among the parties hereto.

4.14 **Headings**. The headings used in this Agreement will be used only for the purpose of reference and shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or be given any legal effect whatsoever.

4.15 **Service of Process**.

**IMPORTANT NOTICE** - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

In addition to service of process under the laws of the Acceptable Forums, each Merchant and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Company obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

(a)    Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Merchant and Guarantor, as contained in this Agreement, or in Company's records, or any other mailing address provided to Company in writing; and

(b)    Electronic mail (e-mail) when sent to the respective e-mail addresses of each Merchant and Guarantor, as contained in this Agreement, or in Company's records, or any other e-mail address provided to Company in writing.

Merchant and Guarantors must promptly notify Company, in writing, of each and every change of address to which service of process can be made. Service upon the last known address shall be sufficient. Merchant and Guarantors shall have thirty (30) calendar days after service hereunder is complete in which to respond. Furthermore, Merchant and Guarantors expressly consent that any and all notices, demands, requests or other communications under and pursuant to this Agreement shall be delivered in accordance with the provisions of this Agreement.

Further, each Merchant and Guarantor consent and agree to the following representations and waivers:

(a) Each Merchant and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions.

(b) Each Merchant and Guarantor agrees and consents that service of process is deemed effective according to the following:

   i. If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

   ii. If sent by e-mail, on the same day and time that the e-mail is sent.

(c) Each Merchant and Guarantor represents that their respective mailing and e-mail addresses as contained in this Agreement, and/or as provided to Company in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them.

(d) Each Merchant and Guarantor agrees and consents that Company may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Merchant and Guarantor waives any objection if Company serves process directly on them; and

(e) EACH MERCHANT AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

**4.16 PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

(a) **EACH AND EVERY MERCHANT AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:**

   i. **THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND**

   ii. **WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH COMPANY OBTAINING ANY PREJUDGMENT REMEDY AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND**

   iii. **WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE COMPANY TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.**

(b) **EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) COMPANY'S EXTENSION OF SALES-BASED FINANCING TO MERCHANT(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) COMPANY MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION AGAINST ANY ONE OF THE UNDERSIGNED.**

(c) **EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, COMPANY MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION") IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.**

(d) **EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 4.15, INCLUDING FOR COMPANY OBTAINING ANY PREJUDGMENT REMEDY.**

**4.17 PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS AGREEMENT WITH YOUR LAWYER.

(a) **EACH AND EVERY MERCHANT AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:**

   i. **THIS AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND**

   ii. **WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE,**

FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH COMPANY OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

iii. WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE COMPANY TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

(b) EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, COMPANY MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

(c) EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) COMPANY'S EXTENSION OF SALES-BASED FINANCING TO MERCHANT(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) COMPANY MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

(d) EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 4.15, INCLUDING FOR COMPANY OBTAINING ANY PREJUDGMENT REMEDY.

## V. DEFINED TERMS

As used herein the following terms have the following meanings:

*"Business Day"* means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of Connecticut or is a day on which banking institutions in such state are required by law to be closed.

*"Collateral"* has the meaning ascribed to such term in the Security Agreement.

*"Guaranty"* means that certain Limited Guaranty of Performance, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time.

*"Security Agreement"* means that certain Security Agreement, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time.

*"MCA Documents"* means this Merchant Agreement, the Security Agreement, the Limited Guaranty, and Appendices attached hereto.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the date first above written.

**MERCHANT #1**                                              **MERCHANT #2**

BY: Joshua Wyatt                                            BY:

_____    _____        _____    
(Printed Name and Title)          (Signature)              (Printed Name and Title)
                                                                                        _____
                                                                                              (Signature)
_____    _____        _____    _____

## SECURITY AGREEMENT

This Security Agreement, dated <u>04/01/2025</u> (as may be amended, restated, or otherwise modified from time to time, this "Agreement"), is made by and between INSTA FUNDING LLC, a Connecticut limited liability company (the "Company") and the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor") (collectively referred to herein as the "Parties"):

Business Legal Name: Avant Gardner LLC        ██████████████

Mailing City: _____    **Address:** 107 Union St                      Brooklyn

                                        **State:** NY _____ **Zip Code:** 11231

1.    Company, Merchant and each Guarantor are parties to a certain Sale and Purchase of Future Receivables Agreement, dated as of the date hereof (together with the Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which Company agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein).

2.     The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this Agreement by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant and will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this Agreement in order to induce the Company to purchase such Receipts.

3.     This Agreement will constitute a security agreement under the Uniform Commercial Code ("UCC"). Each Merchant and each Guarantor grants to Company a security interest in and lien upon: (a) all personal property of every kind and nature, wherever located, and now owned or hereafter acquired, including without limitation, all accounts, contract rights, rights to the payment of money, insurance claims and proceeds, chattel paper, electronic chattel paper, documents, instruments, securities and other investment property, deposit accounts, supporting obligations of every nature, and general intangibles, including without limitation, customer lists, and all books and records related thereto, and all recorded data of any kind and any nature, regardless of the medium of recording; together with, to the extent not listed above as the original collateral, all substitutions and replacements for and products of any of the foregoing property, and together with proceeds of any and all of the foregoing property.as those terms are each defined in Article 9 of the UCC in effect in any applicable jurisdiction and as may be amended from time to time, now or hereafter owned or acquired by Merchant or such Guarantor; (b) all funds at any time in the Designated Bank Account, regardless of the source of such funds; (c) present and future electronic check transactions; and (d) all proceeds of the foregoing, as that term is defined in Article 9 of the UCC (collectively, and together with any Cross-Collateral (as defined below), the "Collateral"). Merchant agrees to provide other security to Company upon request to secure Merchant's obligations under this Agreement. These security interests and liens will secure all of Merchant's payment and performance obligations under the Merchant Agreement and MCA Documents and each Guarantor's Remittance and performance obligations under the MCA Documents. Company is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

4.     This security interest may be exercised by Company without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. Company shall have the right to notify account debtors at any time. Pursuant to Article 9 of the UCC, Company has control over and may direct the disposition of the Collateral, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral.

5.     With respect to such security interests and liens, Company will have all rights afforded under the UCC, any other applicable law and in equity. Merchant will obtain from Company written consent prior to granting a security interest of any kind in the Collateral to a third party. Each Merchant and each Guarantor agrees to execute and deliver to Company such instruments and documents Company may reasonably request to perfect and confirm the lien, security interest, and right of setoff set forth in this Agreement. Company is authorized to execute all such instruments and documents in Merchant's and Guarantor's name.

6.     Each Merchant and each Guarantor acknowledges and agrees that any security interest granted to Company under any other agreement between Merchant or such Guarantor and Company (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Each Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as Company deems necessary to perfect or maintain Company's first priority security interest in the Collateral, including the execution of any account control agreements. Each Merchant and each Guarantor hereby authorizes Company to file any UCC-1 financing statements deemed necessary by Company to perfect or maintain Company's security interest. Merchant and Guarantor(s) shall be liable for, and Company may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Company in protecting, preserving and enforcing Company's security interest and rights.

7.     Upon the full performance by Merchant of its obligations under the Merchant Agreement, the security interest in the Collateral shall automatically terminate without further act of either party being required, and all right to the Collateral shall revert to the Merchant. Upon any such termination, Company shall execute, acknowledge, and deliver such satisfactions, releases, and termination statements, if applicable, as Merchant shall reasonably request.

8.     Each Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.

9.     The Terms and Conditions set forth in the Merchant Agreement are hereby incorporated by reference as if fully stated herein and shall apply to and govern this Security Agreement.

**MERCHANT #1**                                          **MERCHANT #2**

_____                                 _____

BY: Joshua Wyatt                    (Signature)          BY:                         (Signature)

_____                                 _____
   (Printed Name and Title)                                 (Printed Name and Title)

IN WITNESS WHEREOF, the Parties hereto have caused this Security Agreement to be duly executed as of the date first above written.

## LIMITED GUARANTY OF PERFORMANCE

This Limited Guaranty of Performance , dated  04/01/2025   (as may be amended, restated, or otherwise modified from time to time, this "Guaranty"), is made by and between INSTA FUNDING LLC, a Connecticut limited liability company (the "Company"), and the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor") (collectively referred to herein as the "Parties"):

Business Legal Name: Avant Gardner LLC

**Mailing City:** _____    **Address:** 107 Union St                                    Brooklyn

**State:** NY                    **Zip Code:** 11231

1. Company, Merchant and each Guarantor are parties to a certain Sale and Purchase of Future Receivables Agreement, dated as of the date hereof (together with the Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which Company agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein).

2. The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this limited Guaranty by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant and will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this limited Guaranty in order to induce Company to purchase such Receipts.

3. Each Guarantor jointly and severally guarantees Merchant's good faith, truthfulness, and performance of all of the representations, warranties and covenants made by Merchant in each MCA Document as each may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligation s"). Each of Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Merchant Agreement or in any other MCA Document or upon the occurrence of an Event of Default and the liability for obligations hereunder of the persons constituting Guarantor(s) under this Guaranty are joint and several.

4. Company does not have to notify any Guarantor of any of the following events and no Guarantor will be released from its obligations under this limited Guaranty if it is not notified of:

   (i)        Merchant's failure to timely remit any amount required under the Merchant Agreement or any other MCA Document;

   (ii)       any adverse change in Merchant's financial condition or business;

   (iii)      any sale or other disposition of any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv)

        Company's acceptance of the MCA Documents; and

   (v) any renewal, extension or other modification of the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company.

In addition, Company may take any of the following actions without releasing Guarantor from any of its obligations under this limited Guaranty:

   (i)    renew, extend or otherwise modify the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company;

   (ii)   release Merchant from its obligations to Company;

   (iii)  sell, release, impair, waive or otherwise fail to realize upon any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and

   (iv)   foreclose on any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under any of the MCA Documents.

Until the Purchased Amount and Merchant's other obligations to Company under the Merchant Agreement and the other MCA Documents are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Limited Guaranty or any other MCA Document. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any Collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Limited Guaranty or any other MCA Document: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Company must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Limited Guaranty and the other MCA Documents shall include that amount.

5. Each Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Limited Guaranty and the other MCA Documents; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

6. Governing Law and Jurisdiction. This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of Connecticut, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in the State of Connecticut, County of Fairfield (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to the Acceptable Forums. Merchant and Guarantor(s) hereby agree that the mailing of any summons and complaint, or demand, in any proceeding commenced by Company by certified or registered mail, return receipt requested to the mailing address(es) listed on the Merchant Agreement, or via email address(es) listed on the Merchant Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

7. **JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY, AND VOLUNTARILY**

AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR RESPECTIVE ATTORNEYS.

8.   **CLASS ACTION WAIVER**. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (A) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (B) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

9.   **Service of Process**.

**IMPORTANT NOTICE** - THIS SERVICE OF PROCESS PROVISION CONTAINS IMPORTANT CONSENTS AND WAIVERS. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

In addition to service of process under the laws of the Acceptable Forums, each Merchant and Guarantor agree and consent to receive any court required service of process (including, without limitation, service of process (a) to commence litigation, (b) after litigation has been commenced for any court filings, and (c) for Company obtaining a Prejudgment Remedy), through the following methods and manners (collectively "Acceptable Methods"):

(a)   Mail when sent by certified or registered mail, return receipt requested, Federal Express, or other overnight courier, addressed to the respective mailing addresses of each Merchant and Guarantor, as contained in the Merchant Agreement, or in Company's records, or any other mailing address provided to Company in writing; and

(b)   Electronic mail (e-mail) when sent to the respective e-mail addresses of each Merchant and Guarantor, as contained in the Merchant Agreement, or in Company's records, or any other e-mail address provided to Company in writing.

Merchant and Guarantors must promptly notify Company, in writing, of each and every change of address to which service of process can be made. Service upon the last known address shall be sufficient. Merchant and Guarantors shall have thirty (30) calendar days after service hereunder is complete in which to respond. Furthermore, Merchant and Guarantors expressly consent that any and all notices, demands, requests or other communications under and pursuant to this Guaranty shall be delivered in accordance with the provisions of this Guaranty.

Further, each Merchant and Guarantor consent and agree to the following representations and waivers:

(a)   Each Merchant and Guarantor agrees that service of process made through either or both of the Acceptable Methods will constitute valid and lawful service of process on them without the necessity for service of process by other means (e.g., as provided for by statute or rules of court), but without invalidating service of process performed in accordance with such other provisions.

(b)   Each Merchant and Guarantor agrees and consents that service of process is deemed effective according to the following:

    i.   If sent by certified or registered, mail return receipt requested, Federal Express, or other overnight courier, at the earlier of: (a) four calendar days after mailing, (b) when delivered, or (c) when actually received; and

    ii.  If sent by e-mail, on the same day and time that the e-mail is sent.

(c)   Each Merchant and Guarantor represents that their respective mailing and e-mail addresses as contained in the Merchant Agreement, and/or as provided to Company in writing, are correct and valid, they regularly receive and send correspondence from these addresses, and service sent to these addresses is expected to be received by them.

(d)   Each Merchant and Guarantor agrees and consents that Company may serve process on them directly, including for the Acceptable Methods, without the necessity of having service completed by a marshal or indifferent person, but without invalidating service of process completed by a marshal or indifferent person, and each Merchant and Guarantor waives any objection if Company serves process directly on them; and

(e)   EACH MERCHANT AND GUARANTOR WAIVES ANY OBJECTION TO INSUFFICIENCY OF PROCESS, INSUFFICIENCY OF SERVICE OF PROCESS, OR PERSONAL JURISDICTION, WHETHER RAISED IN A MOTION TO DISMISS, OR OTHER SIMILAR MOTION, IF SERVICE IS CONDUCTED BY ANY METHOD OR MANNER CONTAINED IN THIS SERVICE OF PROCESS PROVISION OR ANY OTHER METHOD ALLOWED UNDER THE LAWS OF THE ACCEPTABLE FORUMS.

10.   **PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT IS $250,000 OR LESS.**

**IMPORTANT NOTICE** - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

(a)   **EACH AND EVERY MERCHANT AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:**

    i.    **THE MERCHANT AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND**

    ii.   **WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH COMPANY OBTAINING ANY PREJUDGMENT REMEDY <u>AFTER, BUT NOT UPON</u>, COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND**

    iii.  **WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE COMPANY TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.**

(b)   **EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) COMPANY'S EXTENSION OF SALES-BASED FINANCING TO MERCHANT(S) IS $250,000 OR LESS, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND**

PUBLIC ACT 23-201 APPLY TO THE MERCHANT AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) COMPANY MAY ONLY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER, <u>AFTER, BUT NOT UPON, COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

(c)     EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, COMPANY MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION")) IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

(d)     EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 9 INCLUDING FOR COMPANY OBTAINING ANY PREJUDGMENT REMEDY.

11.     <u>PREJUDGMENT REMEDY WAIVER WHERE SALES-BASED FINANCING AMOUNT EXCEEDS $250,000.</u>

<u>IMPORTANT NOTICE</u> - THIS PREJUDMGENT REMEDY WAIVER MAY RESULT IN THE ATTACHMENT OF YOUR BANK ACCOUNTS WITHOUT PRIOR NOTICE OR COURT HEARING. YOU HAVE THE RIGHT TO REQUEST A COURT HEARING TO CONTEST ANY ATTACHMENT MADE THROUGH USE OF THIS PREJUDGMENT REMEDY WAIVER. YOU SHOULD CAREFULLY REVIEW THIS AND ALL OTHER PROVISIONS OF THIS GUARANTY WITH YOUR LAWYER.

(a)     EACH AND EVERY MERCHANT AND GUARANTOR (COLLECTIVELY THE "UNDERSIGNED") ACKNOWLEDGES AND AGREES:

i.      THE MERCHANT AGREEMENT IS A "COMMERCIAL TRANSACTION" AS DEFINED IN CONNECTICUT GENERAL STATUTES SECTION 52-278a AS AMENDED, AND

ii.     WAIVES ALL RIGHTS TO PRIOR NOTICE AND PRIOR OPPORTUNITY FOR A HEARING UNDER SECTIONS 52-278a TO 52-278g INCLUSIVE OF THE CONNECTICUT GENERAL STATUTES AS AMENDED, OR UNDER ANY SIMILAR LAW WHETHER STATE, FEDERAL OR CONSTITUTIONAL, IN CONNECTION WITH COMPANY OBTAINING ANY PREJUDGMENT REMEDY <u>UPON OR AFTER</u> COMMENCING ANY LITIGATION IN CONNECTICUT AGAINST ANY ONE OF THE UNDERSIGNED, AND

iii.    WAIVES ANY REQUIREMENT FOR THE POSTING OF A BOND, AND ANY RIGHT TO REQUEST THAT A COURT REQUIRE COMPANY TO POST A BOND IN CONNECTION WITH ANY PREJUDGMENT REMEDY.

(b)     EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT AS PART OF THIS PREJUDGMENT REMEDY WAIVER, BUT NOT AS AN EXCLUSIVE REMEDY, COMPANY MAY ATTACH OR GARNISH THE UNDERSIGNED'S MONEY, AND OTHER PROPERTY, HELD IN ANY ACCOUNT AT ANY FINANCIAL INSTITUTION (INCLUDING WITHOUT LIMITATION AT ANY BANK, CREDIT UNION, OR OTHER FINANCIAL INSTITUTION (INDIVIDUALLY AND COLLECTIVELY "FINANCIAL INSTITUTION") IF THE FINANCIAL INSTITUTION: (1) HAS A BRANCH, OFFICE OR ATM LOCATED IN CONNECTICUT, OR (2) IS REGISTERED WITH THE CONNECTICUT SECRETARY OF STATE, OR (3) IS AUTHORIZED TO CONDUCT BUSINESS IN CONNECTICUT, OR (4) IS ENGAGED IN THE TRANSACTION OF BUSINESS IN CONNECTICUT.

(c)     EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT: (1) COMPANY'S EXTENSION OF SALES-BASED FINANCING TO MERCHANT(S) EXCEEDS $250,000, AND (2) THE PROVISIONS OF CONNECTICUT GENERAL STATUTES SECTION 36a-868 AND PUBLIC ACT 23-201 DO NOT APPLY TO THIS AGREEMENT AND PREJUDGMENT REMEDY WAIVER, AND (3) COMPANY MAY OBTAIN A PREJUDMGENT REMEDY, THROUGH USE OF THIS WAIVER <u>UPON OR AFTER COMMENCING ANY LITIGATION</u> AGAINST ANY ONE OF THE UNDERSIGNED.

(d)     EACH OF THE UNDERSIGNED ACKNOWLEDGES AND AGREES TO THE SERVICE OF PROCESS METHODS PROVIDED FOR IN THE SERVICE OF PROCESS PARAGRAPH 9, INCLUDING FOR COMPANY OBTAINING ANY PREJUDGMENT REMEDY.

12.  The Terms and Conditions set forth in the Merchant Agreement and Security Agreement are hereby incorporated by reference as if fully stated herein and shall apply to and govern this Guaranty.

**IN WITNESS WHEREOF, the Parties hereto have caused this Limited Guaranty of Performance to be duly executed as of the date first above written.**

**MERCHANT #1**                                                                                      **MERCHANT #2**

BY: Joshua Wyatt                                                                              BY:

_____        _____        _____        _____

(Printed Name and Title)                      (Signature)                      (Printed Name and Title)                      (Signature)

_____        _____        _____

**FEE STRUCTURE**
**(Appendix A)**

13

A. **Origination Fee**: 3.02        % of the Purchase Price amount to cover all related due diligence search and filing fees, processing, and other _____ third-party services utilized.

B. **Underwriting Fee**: $495.00 to cover underwriting and related expenses.

C. **UCC Filing Fees**: $295.00 to cover the administrative costs associated with filing the UCC-1 financing statement; $395.00 to cover the administrative costs of filing the UCC-3 financing statement to terminate/release any UCC-1 filed upon receipt of the full Purchased Receipts Amount.

D. **No Sufficient Funds (NSF) Fee**: $35.00 each instance the Merchant's account bears insufficient funds to cover the scheduled ACH debit(s) and the bank returns a code of "NSF."

*NOTE: NSF return code on more than two (2) occasions if Merchant is on a daily Remittance schedule, or more than one (1) occasion if Merchant is on a weekly Remittance schedule constitutes an Event of Default under the Merchant Agreement.*

E. **Stop Payment Fee**: $50.00 each time a Merchant directs the bank to *reject* or *stop* a scheduled ACH debit.

F. **Blocked Account Fee**: $3,000.00 each time the Merchant *blocks* the account from processing the scheduled ACH debits.

G. **Bank Change Fee**: $100.00 will be charged when (1) Merchant requires a change of account to be debited requiring Company to adjust its system, or when (2) Merchant changes bank account login credentials without informing the Company.

H. **Stacking Fee**: 10% of the Purchase Price amount for any and all stacking that occurs post-funding.

*NOTE: The Stacking Fee shall be applied per occurrence of each instance of Stacking that occurs by the Merchant.*

I. **Default Fee**: 25% of the full Purchased Receipts Amount in the event Merchant defaults under the Merchant Agreement.

J. **Legal Fee**: 25% of the full Purchased Receipts Amount, inclusive of the Default Fee and other applicable fees herein, to cover the cost of retaining an attorney to enforce the Merchant Agreement.

K. **Wire Fee**: Merchant shall receive the Purchase Price electronically in its Designated Bank Account and shall be charged either $50.00 for a wire transfer, or $20.00 for an ACH, as applicable.

**IN WITNESS WHEREOF, the Parties hereto acknowledge and agree to this Fee Structure (Appendix A) to the Merchant Agreement.**

**MERCHANT #1**                                               **MERCHANT #2**

BY: Joshua Wyatt

                                                             BY:

_____        _____        _____
(Printed Name and Title)                (Signature)                (Printed Name and Title)

                                                             _____        _____
(Signature)                (Printed Name and Title)                (Signature)                (Signature)

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)**
**(Appendix B)**

_____

**Merchant Name:** Avant Gardner LLC

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of the Sale and Purchase of Future Receivables Agreement ("Merchant Agreement"), dated as of  04/01/2025  by and between Insta Funding LLC (the "Company"), Merchant and the Guarantor(s) party thereto, to which this Appendix B is attached (together with the Merchant Agreement Terms and Conditions attached thereto and the other appendices attached thereto, and as may be amended, restated or otherwise modified from time to time).

**Designated Bank Account #1:**

Bank

Name:

**Designated Bank Account #2:**

Bank Tax ID:

Name:

Account #:

Routing #:

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant and Guarantor authorize Company to disburse the advance proceeds less the amount of any applicable fees upon advance approval by initiating ACH credits to the Designated Bank Account(s), in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant and Guarantor also authorize Company to collect amounts due from Merchant under the Merchant Agreement by initiating ACH Debits from the Designated Bank Account(s). Merchant and Guarantor further authorize Company to collect amounts due from Merchant, or in the alternative Guarantor, under the Merchant Agreement by initiating ACH Debits from any other, now existing or hereinafter created business, or personal, accounts Company locates through its investigation of Merchant and Guarantor, and that Merchant and Guarantor knowingly withheld from Company. The initial authorized amount is as follows, which may be adjusted by Company from time to time in accordance with the Merchant Agreement:**

Remittance Amount: $86,250.00 Weeks 1-8 $172,500.00 Weeks 9-28

Remittance Schedule: Weekly,  every Thursday

*\*The Remittance Amount and Schedule are subject to Reconciliation in accordance with the Merchant Agreement.*

If any Remittance date falls on a weekend or holiday, Merchant and Guarantor understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's, or in the alternative, Guarantor's, financial institution for any reason, including without limitation insufficient funds, Merchant and Guarantor understand that Company may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant and Guarantor also authorize Company to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** Company is not responsible for any fees charged by Merchant's, or in the alternative, Guarantor's, bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH Debits and Credits to the Designated Bank Account(s) must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until Company has received written notification from Merchant or Guarantor at the address set forth above at least five (5) banking days prior of its termination to afford Company a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Account(s). Merchant and Guarantor will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant and Guarantor request that the financial institution that holds the Designated Account(s) to honor all ACH entries initiated in accordance with this Authorization Agreement.

By signing below, Merchant and Guarantor attest that the Designated Bank Account(s) was established for business purposes and not primarily for personal, family or household purposes. Merchant and Guarantor further attest that the Designated Account(s) contains sufficient funds in order for any and all obligations to be met in accordance with the Merchant Agreement. Moreover, Merchant and Guarantor certify that they shall comply with all state and federal laws and shall be bound by the ACH Rules as set by NACHA.

15

**IN WITNESS WHEREOF, the Parties hereto acknowledge and agree to this Authorization Form (Appendix B) to the Merchant Agreement.  MERCHANT #1**

BY: Joshua Wyatt _____        _____

    (Printed Name and Title)                (Signature)


## <u>MERCHANT DEFINITION ADDENDUM</u>
### (Appendix C)

**Merchant hereby agrees that "Merchant" is defined to include the following related/affiliated entities:**


~~73 MARKET LESSEE LLC~~

~~BRADBURY LESSEE LLC~~

~~EQUINOX HOLDINGS, INC.~~

~~FOTOGRAFISKA MIAMI, LLC NEUEHOUSE~~

~~HOLLYWOOD LLC NEUEHOUSE INC.~~

~~NEUEHOUSE MANAGEMENT LLC~~
REYNARD PRODUCTIONS LLC

EZ FESTIVALS

LLC / MADE EVENT LLC

AGDP HOLDING INC LLC

AG MANAGEMENT POOL LLC

~~NH HOLDINGS TRUST~~

~~CULTUREWORKS, INC.~~


**IN WITNESS WHEREOF, the Parties hereto acknowledge and agree to this Merchant Definition Addendum (Appendix C) to the Merchant Agreement.**


**MERCHANT #1**                                    **MERCHANT #2**

BY: Joshua Wyatt                                   BY:

    (Printed Name and Title)        (Signature)            (Printed Name and Title)

                                                             (Signature)

_____    _____        _____    _____

# Instafunding

### ADDENDUM #1 TO THE PURCHASE AND SALE OF FUTURE RECEIVABLES AGREEMENT

This is an addendum to the Purchase and Sale of Future Receivables Agreement dated on the day of  04/01/2025
_ by and between Instafunding hereinafter referred to as "Purchaser" and  Avant Gardner LLC ~~73 MARKET LESSEE,~~
~~BRADBURY LESSEE LLC EQUINOX HOLDINGS,~~
~~INC.~~
~~FOTOGRAFISKA MIAMI, LLC~~
~~NEUEHOUSE HOLLYWOOD LLC NEUEHOUSE~~
~~INC.~~
~~NEUEHOUSE MANAGEMENT LLC~~
~~REYNARD PRODUCTIONS LLC~~
~~EZ FESTIVALS~~
~~LLC / MADE EVENT LLC~~
~~AGDP HOLDING INC LLC~~
~~AG MANAGEMENT POOL LLC~~
~~NH HOLDINGS TRUST~~
~~CULTUREWORKS, INC.~~                              (The "Business") and  Joshua Wyatt
(CEO), collectively hereinafter referred to as "Seller" (Purchase Agreement).

Now, therefore, in consideration of the premises and the mutual representations, covenants, undertakings, and agreements hereinafter contained Seller and Buy represent, Covenant, undertake and agree as follows:

Seller and Purchaser agree to discount the amount of the purchased amount according to the following schedule:

| Early Repurchase Date | Discount RTR Amount |
|---|---|
| Calendar Days 1 - 30 | $3,630,000.00 |
| Calendar Days 31 - 60 | $3,750,000.00 |
| Calendar Days 61 - 90 | $3,900,000.00 |

RTR Must be received either in the manner described in the agreement or via wire transfer to the Purchasers Bank
Account and funds cleared prior to 12 AM on the above-mentioned date. The funds must be received from Merchant's business bank account, this addendum is not valid if funds received from any other third party.

Execution of this Addendum is made as of this ___ 04/01/2025 ___.


Purchaser:                                    Seller:

By: Instafunding                              By:  Joshua Wyatt


X. _____                   X. _____

Seller:

By: _____

X. _____

9903570.2

Docusign Envelope ID: C9677057-0ABA-424A-B01F-759709BFBA83