# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AGDP HOLDING INC., *et al.*,[1] | Case No. 25-11446 (MFW) |
| Debtors. | (Jointly Administered) |

### AFFIDAVIT OF PUBLICATION OF THE NOTICE OF AUCTION AND SALE HEARING IN THE NEW YORK TIMES

This Affidavit of Publication includes the sworn statement verifying that the Notice of Auction and Sale Hearing was published and incorporated by reference herein as follows:

1. In *The New York Times* on September 29, 2025, attached hereto as **Exhibit A**.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

# Exhibit A



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

**PROOF OF PUBLICATION**

September 30, 2025

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

9/29/2025, NY/NATL, pg B5



*Larnyce Tabron*




ANDRI TAMBUNAN FOR THE NEW YORK TIMES


MARK ABRAMSON FOR THE NEW YORK TIMES

Myra Donohue said using a chatbot to help set a household budget has given her more confidence with her finances. "It's kind of exciting to see what ChatGPT is capable of," said Alexander Stuart, who is using it to learn about investing.

# They Had Money Issues So They Turned to ChatGPT for Solutions

**FROM FIRST BUSINESS PAGE**

by how quickly — within seconds — it generated a tailored budget for her.

A.I. chatbots have taken on many roles, including therapist, career coach, even romantic partner or friend. As more than half of Americans manage their finances on their own, many are turning to chatbots like OpenAI's ChatGPT and Google's Gemini for help tackling debt, finding better ways to save or figuring out how to invest in the stock market.

(The New York Times has sued OpenAI for use of copyrighted work. OpenAI has denied the claims.)

Two-thirds of adults who have used generative A.I. said they had used it for financial advice, and around 80 percent of those who acted on that advice said it had improved their financial situation, according to a recent survey of more than 1,000 people by Intuit Credit Karma. Younger generations are especially receptive: Around 82 percent of Generation Z and millennial A.I. users reported using it for financial guidance.

And while there are risks associated with chatbots — like data leaks, inaccurate information or bizarre advice, and the potential to cause users to spiral emotionally — the appeal makes sense. A.I. chatbots are accessible, fast and often free, or at least cheaper than a financial adviser. And for users too embarrassed to discuss money problems with a real person, chatbots offer an easier way to open up.

But financial advice served up by chatbots should be handled with caution. The Credit Karma survey found that more than half of the Americans who acted on the financial advice offered by generative A.I. said they had made a poor financial decision or a mistake in trying to follow the guidance.

Advisers recommend that people double-check A.I.'s suggestions and any links it provides with a professional before acting on them. Chatbots tend to take questions at face value and fail to challenge underlying assumptions or gather important context, which could be risky when seeking money advice, said Tyler Gilley, an associate wealth adviser at the investment firm Halbert Hargrove.

Still, Ms. Donohue said, she has gained more confidence about managing her bills and finances.

"It was really about me getting back on the horse," said Ms. Donohue, a human resources administrator in Grass Valley, Calif. "I wanted a professional kind of service, but I also wanted to get it done without spending."

### Prompts for Paying Down Debt

Jennifer Allan, 35, didn't realize how much credit card debt she was racking up. As a real estate agent in Clayton, Del., with a newborn daughter and no paid maternity leave, she relied on credit cards for everyday expenses, like diapers and groceries.

"I woke up one day, and I was like, 'If I use ChatGPT for everything else, why wouldn't I just use it to help me pay down this debt?'" Ms. Allan said.

Her first prompt: "I'm in credit card debt. I have no idea how much credit card debt I'm in. I don't know what to do."

She owed $23,000, and decided to undertake a 30-day challenge to help her stay focused and drive down her debt. Each day, within the same chat, she asked ChatGPT for a new task to help her raise money, and she did each one. She sold a fresh watermelon with her debt total tattooed on it for $51, recovered $700 from her state's unclaimed property registry and donated her plasma for $80, despite her fear of needles. She also saved nearly $600 by turning leftover pantry items into meals, she said.

Ms. Allan, who documented the daily challenge on TikTok, said she succeeded in paying off nearly half her credit card debt.

ChatGPT also suggested that she contact her credit card companies in an attempt to lower her balance. The companies offered to close the cards, but she declined.

### Budgeting for Milestones

People looking for financial advice feel most comfortable asking chatbots about budgeting and tracking expenses, according to a survey by the financial services company Empower. For Kathryn Aguilo, a 30-year-old kindergarten teacher, that is exactly how she has used it.

She first used ChatGPT last year to help her and her fiancé save for their 180-person wedding on Long Island. The chatbot suggested they cut back on eating out, set a $40 limit when they did and stop opening bar tabs. It also suggested that they bring cash instead of using cards. Ms. Aguilo also saved by making her own wedding decorations and wearing $10 heels she bought with a coupon.

Then, she resold most of the wedding prep items on Facebook Marketplace for around $250.

After the wedding, Ms. Aguilo turned to ChatGPT to build an expense tracker and budget so she and her husband could start saving for a down payment on a home. They closed on a two-bedroom house in January, and Ms. Aguilo again went to ChatGPT for advice on how to pay down her 30-year mortgage faster.

"I'm not, like, asking it to create my future children and what they're going to look like," Ms. Aguilo said. "I do really just use it intentionally for saving, budgeting and to help us."

### Stock Market Moves

While many use A.I. just to break even, some use it to get ahead. Fresh off a breakup and in the same accounting job for six years, Alexander Stuart, 32, wanted a change.

In late June, Mr. Stuart asked ChatGPT to act as a "free college" to teach him about stock investing and how to "become one of the greatest traders." He had $400 to put into the market, and the chatbot helped him plan trading strategies, like how to manage risk and choose when to buy and sell.

Then he put the guidance to the test. His first trade was on the chipmaker AMD, after the chatbot said it was the best investment out of 500 companies based on mergers, analysts' notes, trading activity and more. He took the advice, he said, and, using an options strategy, his investment doubled the same day.

"It's kind of exciting to see what ChatGPT is capable of," Mr. Stuart said. "It's been eye-opening to just learn that it could go so much further."

With the chatbot's help, he started trading almost daily and earned multiple returns on his trades. Now, Mr. Stuart's account on Robinhood, a popular trading app, stands at around $1,600 — a big return on investment, though he realizes the gains could disappear just as quickly, and he said he's investing for entertainment and educational purposes, not to pay his bills.

### When Your Chatbot Fails You

Despite the success some people have had after asking A.I. to fix their finances, others say they have been led astray.

Take Mr. Stuart. About a month into investing, he lost nearly $60 on an Nvidia trade after realizing that one of the numbers ChatGPT cited as new was days old, something financial experts warn about when relying on A.I. chatbots. Since then, Mr. Stuart has started manually uploading and verifying the data on his own before letting the chatbots make his investing decisions. He is also comparing ChatGPT's advice with suggestions offered by Grok, another chatbot.

Uploading information poses some risks, too, though. Ms. Allan, who completed the 30-day challenge, uploaded her bank statements to get personalized A.I. advice, but some advisers recommend that users keep personal details and sensitive information, like a Social Security number, away from the chatbot. They said uploaded information should be broad and generalized.

"Would you send it over email? If not, don't put it into a chatbot," said Molly Rimes, a financial adviser at Modera Wealth Management.

Blindly following a chatbot's advice can be just as bad — even if the consequence isn't financial ruin. Ms. Allan decided to embark on another month of prompts to settle her remaining debt. This time, the chatbot suggested more outlandish tasks, like selling pictures of her feet. She initially posted some for sale, but deleted them the next day.

"It is worrisome in the sense that I know that there are people out there that rely on it in the same way that someone would a professional," said Mr. Gilley, the wealth adviser, about A.I. advice. "People will sometimes sacrifice that trust-building process in favor of the ease and quickness."



**Infosys Limited**
Corporate Identification Number (CIN): L85110KA1981PLC013115
Regd. Office: Electronics City, Hosur Road, Bengaluru - 560 100.
Phone: 91 80 2852 0261, Fax: 91 80 2852 0362 Email: investors@infosys.com Website: www.infosys.com

**POSTAL BALLOT NOTICE**

Members are hereby informed that pursuant to the provisions of Section 108 and 110, and other applicable provisions of the Companies Act, 2013, as amended (the "Act"), read together with the Companies (Management and Administration) Rules, 2014, as amended (the "Management Rules"), General Circular No. 09/2024 dated September 19, 2024 and General Circular No. 03/2025 dated September 22, 2025, issued by the Ministry of Corporate Affairs, Government of India, and Circular No. SEBI/HO/CFD/CFD-PoD-2/P/CIR/2024/133 dated October 3, 2024, issued by the Securities and Exchange Board of India (hereinafter collectively referred to as the "Circulars"), Secretarial Standard on General Meetings issued by the Institute of Company Secretaries of India, Regulation 44 of the Securities and Exchange Board of India (Listing Obligations and Disclosure Requirements) Regulations, 2015, as amended (the "LODR Regulations") and any other applicable law, rules, circulars, notifications and regulations (including any statutory modification(s) or re-enactment(s) thereof, for the time being in force), the approval of members of Infosys Limited (the "Company") is sought for the following special resolution only by way of remote e-voting ("e-voting") process:

| Description of Special Resolution |
|---|
| Approval for the Buyback of Equity Shares of the Company |

Pursuant to the Circulars, the Company has sent the electronic copies of the Postal Ballot Notice along with the explanatory statement on Saturday, September 27, 2025, through electronic mode to those Members whose email addresses are registered with the Company/depository participant(s) as on September 22, 2025 ("Cut-off Date").

The Postal Ballot Notice was also provided to Deutsche Bank Trust Company Americas, as ADR depository, who will be using the same to prepare a voting instruction card to be sent, together with the Postal Ballot Notice, to (i) registered holders of American Depositary Receipts evidencing American Depositary Shares ("ADSs") with underlying equity shares of the Company; and (ii) the mailing agent for The Depository Trust Company ("DTC"), who will then mail their voting instruction form, together with the Postal Ballot Notice, to beneficial holders of ADSs who hold their ADSs through a bank, broker or other nominee in DTC.

The said Notice is also available on the relevant section of the website of the Company at: www.infosys.com, BSE Limited ("BSE"): www.bseindia.com and National Stock Exchange of India Limited ("NSE"): www.nseindia.com on which the Equity Shares of the Company are listed and on the website of National Securities Depository Limited ("NSDL"): www.evoting.nsdl.com.

In accordance with the provisions of the Circulars, Members can vote only through remote e-voting process. The voting rights of the Members shall be reckoned on the basis of the equity shares of the Company held by them as on the Cut-off Date. Any person who is not a shareholder of the Company as on the Cut-off Date shall treat the Postal Ballot Notice for information purposes only.

The Company has engaged the services of NSDL for the purpose of providing e-voting facility to all its Members. The e-voting facility will be available during the following period:

| Commencement of e-voting period | 09.00 AM IST on Monday, October 6, 2025 |
|---|---|
| Conclusion of e-voting period | 05.00 PM IST on Tuesday, November 4, 2025 |
| Cut-off date for eligibility to vote | September 22, 2025 |

The e-voting facility will be disabled by NSDL immediately after 5.00 p.m. IST on Tuesday, November 4, 2025, and will be disallowed thereafter.

Members who have not updated their e-mail address are requested to register the same in respect of the shares held by them in electronic form with the Depository through their Depository Participant and in respect of shares held in physical form by writing to Company's Registrar and Share Transfer Agent, KFin Technologies Limited either by email to einward.ris@kfintech.com & or by post to Unit: Infosys Limited, Selenium Tower B, Plot 31 & 32, Financial District, Nanakramguda, Serilingampally Mandal, Hyderabad - 500032.

The Board has appointed Hemanth, Holla & Co., (membership No. FCS 6374) (CP No. 6519) Practicing Company Secretaries, as the scrutinizer ("Scrutinizer") for conducting the e-voting process in a fair and transparent manner.

In case of any queries, you may refer the Frequently Asked Questions ("FAQs") for Shareholders and e-voting user manual for Shareholders available at the download section of www.evoting.nsdl.com or call on toll free no.: +91 1800 1020 990/+91 1800 224 430 or send a request at evoting@nsdl.co.in.

The Scrutinizer will submit his report to the Chairman or any other person authorized by the Chairman after the completion of scrutiny of the e-voting, and the result will be announced not later than two working days from the conclusion of e-voting and will also be displayed on the Company website (https://www.infosys.com/investors/shareholder-services/postal-ballot.html) and on the website of NSDL (https://www.nsdl.co.in), and communicated to the stock exchanges, depository, registrar and share transfer agent on the said date.

For any queries or grievances pertaining to e-voting, shareholders are requested to contact Shobha Anand, Vice President, KFin Technologies Limited, Unit: Infosys Limited, Selenium Tower B, Plot 31-32, Financial District, Nanakramguda, Serilingampally Mandal, Hyderabad-500 032, Contact details: Email id- shobha.anand@kfintech.com; einward.ris@kfintech.com; Contact number—1800-309-4001. Shareholders can also contact: Amit Vishal, Deputy Vice President or Pallavi Mhatre, Senior Manager, National Securities Depository Limited, T301, 3rd Floor, Naman Chambers, G Block, Plot No- C-32, Bandra Kurla Complex, Bandra East, Mumbai- 400051, India, Contact details: evoting@nsdl.co.in Contact number- 1800 1020 990/1800 224 430/ 022 - 4886 7000.

**Additional Information for ADS Holders**

In order for holders of ADSs to participate in the Buyback, they must cancel all or the desired portion of their ADSs and withdraw the underlying equity shares prior to the record date to be established for the Buyback such that they become equity shareholders of the Company as on such record date. Holders of ADSs should review the Postal Ballot Notice, which includes important additional details about the foregoing. Such Notice has been furnished with the U.S. Securities and Exchange Commission ("SEC") in Form 6-K and can be viewed on SEC's website at www.sec.gov.

**Additional Information Pursuant to U.S. Law**

The Buyback for the outstanding equity shares of the Company described herein has not yet been approved by the Company's shareholders and, accordingly, has not yet commenced. This communication is provided for informational purposes only and is neither an offer to purchase nor a solicitation of an offer to sell any securities of the Company pursuant to the Company's Buyback or otherwise. If the Buyback is approved by the Company's shareholders, any offers to purchase or solicitations of offers to sell will be made pursuant to a Tender Offer Statement on Schedule TO (including the Letter of Offer and other documents relating to the tender offer) which will be filed with the SEC by the Company. The Company's security holders are advised to carefully read these documents, any amendments to these documents and any other documents relating to the Buyback that are filed with the SEC in their entirety prior to making any decision with respect to the Company's Buyback because these documents contain important information, including the terms and conditions of the offer. The Company's security holders may obtain copies of these documents (when they become available) and other documents filed with the SEC for free at the SEC's website at www.sec.gov or from the Company's Investor Relations department at sharebuyback@infosys.com.

September 27, 2025
Bengaluru, India

For **Infosys Limited**
Sd/-
**A G S Manikantha**
Company Secretary

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re:
AGDP HOLDING INC., et al.,[1]
Debtors.

Chapter 11
Case No. 25-11446 (MFW)
(Jointly Administered)
Docket Ref. Nos. 62 and 173

**NOTICE OF AUCTION AND SALE HEARING**

PLEASE TAKE NOTICE that on August 4, 2025 (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

PLEASE TAKE FURTHER NOTICE that on August 14, 2025, the Debtors filed the Debtors' Motion for Entry of an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Debtors to Designate the Stalking Horse Bidder, (C) Scheduling an Auction and a Hearing on the Approval of the Sale of Some, All, or Substantially All of the Debtors' Assets, (D) Authorizing the Debtors to Enter Into the Purchase Agreement(s), (E) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (F) Granting Related Relief; and (II) An Order or Orders (A) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of Encumbrances, (B) Approving the Assumption and Assignment of the Potentially Assigned Contracts, and (C) Granting Related Relief [Docket No. 62] (the "Bidding Procedures Motion"), pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, inter alia, entry of an order (the "Bidding Procedures Order") (a) scheduling an auction (the "Auction") for the sale(s) of all, substantially all, or any portion of the Debtors' assets (the "Assets"); (b) approving procedures (the "Bidding Procedures") for submitting competing bids for the Assets; (c) authorizing, but not directing, the Debtors to designate the Stalking Horse Bidder in accordance with the Stalking Horse Purchase Agreement; (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under the Purchase Agreement(s), subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures; (e) approving the form and manner of the notice of the Auction and the Sale Hearing; and (f) establishing procedures for the assumption and assignment of the Potentially Assigned Agreements to any purchaser(s) of the Assets and approving the manner of notice thereof (the "Cure Notice").

PLEASE TAKE FURTHER NOTICE that on September 11, 2025, the Court entered the Bidding Procedures Order [Docket No. 173]. Pursuant to the Bidding Procedures Order, if at least two (2) Qualified Bids with regard to any Assets (as defined in the Bidding Procedures Order) are received by the Bid Deadline (as defined below), the Debtors will conduct the Auction. The Auction shall be held on **Wednesday, October 15, 2025, starting at 10:00 a.m. (prevailing Eastern Time)** or such other time as the Debtors shall designate and thereafter notify all Qualified Bidders. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than **October 8, 2025, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") may bid at the Auction. Any party that wishes to submit a Bid (as defined in the Bidding Procedures) for all, substantially all, or any portion of the Assets must submit a Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that the Auction, if required, will be conducted at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, or if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. For the avoidance of doubt, the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases as soon as reasonably practicable.

PLEASE TAKE FURTHER NOTICE that, as soon as practicable after completion of the Auction, the Debtors shall file a notice identifying the Successful Bidder(s) with the Court. The Debtors will file a proposed form of Sale Order or Sale Orders on the docket in these Chapter 11 Cases by **Friday, October 17, 2025.**

PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of the Sale(s) of the Assets to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances will be held before the Honorable Mary F. Walrath, United States Bankruptcy Judge, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801 on **Thursday, October 23, 2025, at 10:30 a.m. (prevailing Eastern Time)**, or at such other time thereafter as counsel and interested parties may be heard.

PLEASE TAKE FURTHER NOTICE that the Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by including such adjournment on any agenda filed with the Court or by the filing of a notice with the Court.

PLEASE TAKE FURTHER NOTICE that all objections to approval of the Sale(s), including objections related to the conduct at the Auction, the identity of the Successful Bidder (unless the Successful Bidder is the Stalking Horse Bidder), and the ability of the Successful Bidder (unless the Successful Bidder is the Stalking Horse Bidder) to provide adequate assurance of future performance) or to the Stalking Horse Bidder's ability to provide adequate assurance of future performance must be in writing, state the basis for such objection with specificity, and be filed with the Court and served before **Monday, October 20, 2025, at 4:00 p.m. (prevailing Eastern Time)**, on the following parties (collectively, the "Objection Notice Parties"): (a) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, DE, Attn: Sean M. Beach (sbeach@ycst.com), S. Alexander Faris (afaris@ycst.com) and Evan S. Sanuk (esaruk@ycst.com); (b) counsel to the DIP Lenders and the Stalking Horse Bidder, McDermott Will & Schulte LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam Harris (adam.harris@srz.com) and Reuben Dizengoff (reuben.dizengoff@srz.com); (c) the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Jonathan W. Lipshie (Jon.Lipshie@usdoj.gov); (d) proposed counsel to the Official Committee of Unsecured Creditors, Orrick, Herrington & Sutcliffe LLP, 51 West 52nd Street, New York, NY 10019, Attn: Mark Franke (mfranke@orrick.com) and Brandon Batzel (bbatzel@orrick.com); (e) counsel to any other statutory committee that has been appointed in these Chapter 11 Cases; and (f) any Successful Bidder identified prior to such objection deadline, if applicable.

UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

PLEASE TAKE FURTHER NOTICE that this Sale Notice is subject to the fuller terms and conditions of the Bidding Procedures Motion, the Bidding Procedures Order, and the Bidding Procedures, with such Bidding Procedures Order controlling in the event of any conflict. The Debtors encourage all parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale(s) of the Asset and for copies of any related document(s), including the Bidding Procedures Motion, the Bidding Procedures Order, or the Bidding Procedures, may make a written request at https://veritaglobal.net/agdp/inquiry. In addition, copies of the Bidding Procedures and Sale Motion, the Bidding Procedures Order, and the Bidding Procedures are on file with the Clerk of the Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtors' claims and noticing agent's website free of charge at https://veritaglobal.net/agdp.

Dated: September 15, 2025, Wilmington, Delaware, YOUNG CONAWAY STARGATT & TAYLOR, LLP, /s/ S. Alexander Faris, Edmon L. Morton (No. 3856), Sean M. Beach (No. 4070), Kenneth J. Enos (No. 4544), S. Alexander Faris (No. 6278), Sarah Gawrysiak (No. 7403), Evan S. Sanuk (No. 7452), 1000 North King Street, Rodney Square, Wilmington, Delaware 19801, Telephone: (302) 571-6600, Facsimile: (302) 571-1253, Email: emorton@ycst.com, sbeach@ycst.com, kenos@ycst.com, afaris@ycst.com, sgawrysiak@ycst.com, esaruk@ycst.com, Counsel to the Debtors and Debtors in Possession

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are: AGDP Holding Inc. (6504); Avant Gardner, LLC (6504); AG Management Pool LLC (9962); EZ Festivals LLC (8854); Made Event LLC (6272); and Reynard Productions, LLC (5431). The Debtors' service address is 140 Stewart Ave, Brooklyn, NY 11237, Attn: General Counsel.

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures, the Bidding Procedures Order, or the Bidding Procedures and Sale Motion, as applicable.